Margaret Morgan Hall (Bar No. 293699)
Email: mhall@environmentaldefensecenter.org
Linda Krop (Bar No. 118773)
Email: lkrop@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, California 93101
Telephone: (805) 963-1622
Facsimile: (805) 962-3152

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; SANTA BARBARA CHANNELKEEPER, a California non-profit corporation;

            Plaintiffs,

    vs.

BUREAU OF OCEAN ENERGY MANAGEMENT; RICHARD YARDE, Regional Supervisor, Office of Environment, Bureau of Ocean Energy Management; DAVID FISH, Bureau of Safety and Environmental Enforcement; ABIGAIL ROSS HOPPER, Director, Bureau of Ocean Energy Management; BRIAN SALERNO, Director, Bureau of Safety and Environmental Enforcement; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; JOAN BARMINSKI, Pacific Region Director, Bureau of Ocean Energy Management; MARK FESMIRE, Acting Pacific Region Director, Bureau of Safety and Environmental Enforcement; UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, Secretary of

Civil Case No. 2:16-CV-8418

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**(National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*.; Endangered Species Act, 16 U.S.C. § 1531 *et seq*., Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.)**

Complaint for Declaratory and Injunctive Relief        Page 1

1   the Interior,

2   Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (federal officer action), the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g) (citizen suit provision), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 (declaratory order). The claims comprising this action arise under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the ESA, and the APA.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant Bureau of Safety and Environmental Enforcement's ("BSEE") Pacific Region Office and Bureau of Ocean Energy Management's ("BOEM") Pacific Region Office are both located in Camarillo, California.

## INTRODUCTION

3. Plaintiffs Environmental Defense Center ("EDC") and Santa Barbara Channelkeeper ("Channelkeeper") bring this civil action for declaratory and injunctive relief against the United States Department of the Interior ("DOI" or "Interior"), its component agencies BSEE and BOEM, and individual agency officials sued in their official capacity (collectively, "Federal Defendants" or "Defendants"), for violations of NEPA in relation to Defendants BSEE's and BOEM's May 27, 2016, Finding of No Significant Impact ("FONSI") decision approving the agencies' *Programmatic Environmental Assessment of the Use of Well Stimulation Treatments on the Southern California Outer Continental Shelf* ("PEA"). Under that decision, the agencies ended a moratorium on permit approvals involving the use of well stimulation treatments ("WSTs"), including acid well stimulation ("acidizing") and hydraulic fracturing ("fracking"), and

approved a proposed action allowing the use of WSTs throughout the Southern California Outer Continental Shelf ("OCS") waters without conditions, mitigations, or other specific limitations, in order to facilitate oil and gas development and production on the forty-three current leases and twenty-three operating offshore platforms located within federal waters off California's coastline.

4.     The PEA was one of Federal Defendants' primary settlement obligations arising out of prior litigation brought by Plaintiff EDC in the case *Environmental Defense Center v. Bureau of Safety and Environmental Enforcement, et al.* (C.D. Cal. Case No. 2:14-cv-09281-PSG-FFM).  The PEA is the first environmental analysis Federal Defendants have conducted regarding the impacts of offshore well stimulation, even though Defendants have periodically permitted the use of offshore fracking, acid well stimulation, and related "routine" acid treatments or "acid washes," since the 1980s.  In the prior case, Plaintiff EDC alleged BSEE's decisions to approve fifty-one Applications for Permits to Drill ("APDs") and Applications for Permits to Modify ("APMs") authorizing WSTs, without allowing for any public participation or conducting adequate environmental review, violated NEPA.

5.     Offshore well stimulation methods including acid well stimulation and hydraulic fracturing, as well as similar practices including "routine" acidizing or "acid washes," pose numerous known environmental risks to coastal and marine natural resources.  In addition, many risks are unknown or poorly understood due to significant data gaps.  These risks include impacts to water quality associated with discharges of toxic chemicals found in well stimulation fluids, air quality impacts including greenhouse gas emissions, impacts to many threatened and endangered species, including the blue whale, fin whale, humpback whale, and the southern sea otter, and risks to other fish, birds, and aquatic organisms including invertebrate species that comprise the base of the food chain.  The use of offshore

well stimulation also presents the potential for spills related to accidental release of chemicals during transport to and from oil and gas platforms, from chemicals stored on platforms, and from the disposal of such chemicals through underground injection or direct discharge to the marine environment.  Moreover, there are geologic hazards associated with purposely fracturing the geologic formation and injecting additional fluids in seismically active areas.  Finally, there are significant risks regarding whether well casings have been designed to safely accommodate the increased pressures associated with offshore well stimulation activities, and whether offshore platforms and wells have been designed for the extended life associated with well stimulation activities.

6.      Despite these impacts, BSEE and BOEM concluded in the PEA that the use of fracking and acidizing off California's shores will have *no* environmental impact in nearly every respect, including air quality, water quality, induced seismicity, benthic resources, commercial and recreational fisheries, areas of special concern (such as Channel Islands National Marine Sanctuary), recreation, and tourism.  In reaching these unsupported conclusions, Defendants have failed to take the "hard look" at the potential environmental impacts of offshore well stimulation, and the cumulative impact of similar "routine" acid treatments, or "acid washes," that NEPA requires.

7.      In addition to Federal Defendants' overarching failure to provide the hard look required by NEPA, the PEA is legally deficient in numerous additional fundamental respects.  These deficiencies include a failure to properly define the action's purpose and need, failure to consider a reasonable range of alternatives, failure to adequately acknowledge and address incomplete or unavailable information, and numerous deficiencies in the document's analysis of direct, indirect, and cumulative environmental impacts.  All of these failings render the agencies' FONSI inadequate and unlawful.  Federal Defendants were instead legally required to prepare an Environmental Impact Statement ("EIS") to analyze

the numerous environmental impacts and risks caused by the use of WSTs offshore California. *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006) ("[An EIS] must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor.").

8.    In addition, BSEE's and BOEM's approval of the PEA and FONSI is unlawful because the agencies failed to initiate consultation under section 7 of the ESA with respect to the twenty-five species listed as threatened or endangered that may be affected by the action.  In the alternative, to the extent BSEE and BOEM assert that they have conducted consultation and concluded that the action will have no effect on the listed species, that no effect determination is unlawful under the ESA.

9.    Plaintiffs bring this case seeking declaratory relief that BSEE's and BOEM's decision to authorize the use of WSTs offshore California in reliance upon the PEA and FONSI is unlawful under NEPA, and that Defendants' failure to conduct consultation and/or their finding of no effect on threatened and endangered species is unlawful under the ESA.  Plaintiffs seek to enjoin the use of WSTs until Defendants prepare an EIS in compliance with NEPA and its regulations, and conduct a lawful consultation process under the ESA and its regulations.

## PARTIES

10.    Plaintiff EDC is a California public benefit, non-profit corporation, headquartered in Santa Barbara.  Founded in response to the 1969 Santa Barbara oil spill, EDC has approximately 3,000 members and protects and enhances the local environment through education, advocacy, and legal action on behalf of itself and other non-profit, environmental organizations.  Since its founding nearly forty years ago, EDC has worked to protect the Santa Barbara Channel, other local coastal waters, the Channel Islands, and the terrestrial coastal environment of Santa Barbara and Ventura Counties, from the risks and impacts of offshore oil drilling.

The large majority of offshore oil and gas platforms off California's coast continue to be located in the Santa Barbara Channel.  The issue of offshore oil drilling directly impacts all four of EDC's primary organizational priorities: the Santa Barbara Channel, clean water, open spaces and wildlife, and climate and energy.

11.     Plaintiff Channelkeeper is a non-profit public benefit corporation with its principal place of business located in Santa Barbara.  Channelkeeper's mission is to protect and enhance the water quality of the Santa Barbara Channel and its tributaries for the benefit of its ecosystems and the surrounding human communities.  Channelkeeper accomplishes its mission through science-based advocacy, education, field work, and enforcement of environmental laws. Specifically, Channelkeeper and its members monitor and participate in the activities of the Regional and State Water Boards, and other local, state, and federal agencies.  Channelkeeper and its members also create and collaborate on the development of policies and programs affecting pollution issues in the Santa Barbara Channel and its tributaries, including pollution from oil and gas exploration and development, and pipeline oil spills such as the May 2015 spill near Refugio State Beach.  Channelkeeper and its members play an important role in contributing to the health of the Santa Barbara Channel through a variety of programs, including river and coastal monitoring and scientific data collection. Channelkeeper has approximately 800 members who live, recreate, and work in and around waters of the State of California, including communities in Santa Barbara, Ventura, Los Angeles, and Orange Counties that are at risk or are otherwise impacted by oil exploration, production, development, and transportation, including the offshore oil platforms and related oil infrastructure at issue in this case.

12.     The majority of Plaintiffs' members live, work and recreate within coastal communities in Santa Barbara and Ventura Counties that are impacted by offshore oil drilling on a daily basis, and that are at risk from the impacts of an

offshore oil drilling disaster, as illustrated by the 1969 oil spill and other smaller spills that have occurred since that time.  Plaintiffs' members not only utilize the area that is impacted by offshore drilling and threatened by potential offshore oil drilling disasters—including the waters of the Santa Barbara Channel, the beaches of Santa Barbara and Ventura Counties, and the Channel Islands National Park and Channel Islands National Marine Sanctuary—it is their home.

13.    Plaintiffs' members also live, work or recreate within coastal communities in Los Angeles and Orange Counties that are impacted by offshore oil drilling on a daily basis, and that are at risk from the impacts of an offshore oil drilling disaster, as illustrated by the 1969 oil spill and other smaller spills that have occurred since that time.  Plaintiffs' members utilize areas in San Pedro Bay that are impacted by offshore drilling.

14.    Plaintiffs' members suffer particularized injuries within specific areas of the Santa Barbara Channel and San Pedro Bay affected by Defendants' programmatic decision to authorize the use of well stimulation offshore California without conditions, mitigations, or other specific limitations.

15.    Many of the offshore oil and gas platforms from which offshore well stimulation has been conducted in the past, and from which offshore well stimulation is expected to be conducted in the future, are located in the Santa Barbara Channel, and include Platforms Gail, Gilda, Harmony, Heritage, Hondo, and Irene.  Offshore well stimulation, including "frac pacs," are routinely utilized from offshore well platforms located in San Pedro Bay, including Platforms Ellen and Eureka.

16.    Plaintiffs' members regularly utilize the Santa Barbara Channel, including the waters surrounding Platforms Gail, Gilda, Harmony, Heritage, Hondo, and Irene for a variety of pursuits.  For example, Plaintiffs' members have a broad range of recreational interests in the Santa Barbara Channel and its

beaches, including swimming, surfing, kayaking, sailing, fishing, SCUBA diving, and other activities.

17.    Plaintiffs' members utilize the Santa Barbara Channel, its islands, and its beaches for wildlife viewing opportunities including whale watching, bird observation, and simple enjoyment of the predominantly unspoiled and clean environment, and for scientific, educational, and professional purposes.

18.    Plaintiffs' members have been involved in, and personally invested in, environmental education, study, and conservation efforts in and around the Santa Barbara Channel; and Plaintiffs' members have economic interests that depend upon a clean, natural environment and in particular, a Santa Barbara Channel free from oil spills and other offshore drilling mishaps.  Plaintiffs' staff represent the community on the Channel Islands National Marine Sanctuary Advisory Council.

19.    Plaintiffs' members regularly utilize San Pedro Bay, including the waters surrounding Platforms Ellen and Eureka, for a variety of pursuits.  For example, Plaintiffs' members have a broad range of recreational interests in the San Pedro Bay and its beaches, including swimming, surfing, kayaking, sailing, fishing, SCUBA diving, and other activities.

20.    All of these interests are harmed by Defendants' failure to comply with NEPA with respect to the approval of the PEA and FONSI authorizing the continued use of offshore well stimulation methods.

21.    All of these interests are harmed by Defendants' failure to comply with the ESA with respect to the approval of the PEA and FONSI authorizing the continued use of offshore well stimulation methods.

22.    The legal violations alleged in this complaint cause direct injury to the aesthetic, economic, conservation, recreational, scientific, educational, and wildlife preservation and conservation interests of Plaintiffs and their members.

23.    The above-described aesthetic, economic, conservation, recreational, scientific, educational, wildlife preservation and conservation, and other interests

of Plaintiffs and their members have been, are being, and will continue to be irreparably harmed by Defendants' violations of law.  The harm to these interests would be remedied by an Order of this Court declaring Defendants' actions as unlawful under NEPA and the ESA and enjoining future approval of offshore well stimulation pending full compliance with NEPA and the ESA.  Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate under the APA.

24.     Defendants BSEE's and BOEM's failure to comply with NEPA's and the ESA's mandates has also resulted in informational, procedural, and organizational harm to Plaintiffs and their members.  Defendants are the cause of these injuries, and the requested relief would redress these injuries, at least in part.

25.     Defendant BOEM is one of two agencies charged with managing offshore resources in federal waters, including regulation of oil and gas exploration, development, and production on the OCS.  30 C.F.R. § 550.101 (2011).  BOEM is an agency of DOI, and is responsible for environmental analysis under NEPA and the ESA.

26.     Defendant RICHARD YARDE is the Regional Supervisor for the Office of the Environment of BOEM and is sued in his official capacity as one of the agency staff who approved the PEA FONSI on May 27, 2016.

27.     CHARLES B. BARBEE was the Regional Environmental Officer for BSEE who approved the PEA FONSI on May 27, 2016 but based on available information appears to no longer work at BSEE.

28.     Defendant DAVID FISH is the Acting Chief for the Environmental Compliance Division at BSEE is sued in his official capacity as a responsible officer in the federal agency responsible for the violations of NEPA and the ESA alleged herein.

29.     Defendant ABIGAIL ROSS HOPPER is the Director of BOEM and is sued in her official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

30.     Defendant BSEE is one of two agencies charged with managing offshore resources in federal waters, including regulation of oil and gas exploration, development, and production on the OCS.  30 C.F.R. § 250.101 (2012).  BSEE is an agency of DOI.  BSEE is responsible for permitting offshore drilling operations and ensuring they comply with safety regulations.

31.     Defendant BRIAN SALERNO is the Director of BSEE and is sued in his official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

32.     Defendant JOAN BARMINSKI is the Pacific Region Director of BOEM and is sued in her official capacity as a responsible officer in the federal agency responsible for the violations of NEPA and the ESA alleged herein.

33.     Defendant MARK FESMIRE is the Acting Pacific Region Director of BSEE and is sued in his official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

34.     Defendant DOI is a United States agency in the executive branch, and is responsible for managing the resources under its jurisdiction in accordance with all applicable laws and regulations, including NEPA and the ESA.

35.     Defendant SALLY JEWELL is the DOI Secretary and is sued in her official capacity as the head of the federal agency responsible for the violations of NEPA and the ESA alleged herein.

36.     BSEE and BOEM were created in October 2011, as part of a DOI reorganization of the former Minerals Management Service ("MMS").  The reorganization was prompted by the 2010 *Deepwater Horizon* explosion and resulting oil spill in the Gulf of Mexico, and was part of a larger reform effort

described by the Obama Administration as the most aggressive and comprehensive reform to offshore oil and gas regulation in United States history.

## LEGAL BACKGROUND

### A.   Administrative Procedure Act

37.   Under the APA, reviewing courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

38.   The APA provides for judicial review of "final agency action."  5 U.S.C. § 704.

39.   Agency actions subject to judicial review include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

40.   A license subject to judicial review includes "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  5 U.S.C. § 551(8).

41.   Congress intended the definition of agency action under the APA to be expansive.  S. Doc. No. 248, 79th Cong.,  2d Sess., at 255 (1946) ("The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction."); *see also Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 478 (2001) (interpreting the APA definition of agency action as "meant to cover comprehensively every manner in which an agency may exercise its power").

### B.   The Outer Continental Shelf Lands Act

42.   Originally enacted in 1953, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356b, reaffirmed federal control over resources on the OCS, located beyond three nautical miles from a state's coast.  OCSLA

requires that oil exploration and production be "balanced with 'protection of the human, marine, and coastal environments.'"  *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 292 (D.C. Cir. 1988) (quoting 43 U.S.C. § 1802(1)–(2)).

43.     Under OCSLA, oil and gas exploration and production in the OCS involves four stages: 1) Interior's development of a five-year leasing program, 43 U.S.C. § 1344; 2) lease sales, *id.* § 1337; 3) exploration, *id.* § 1340; and 4) development and production, *id.* §1351.

44.     The fourth and final OCSLA stage, development and production, consists of two separate and distinct discretionary agency actions that must occur prior to the commencement of drilling operations: 1) approval of a development and production plan (or, as previously called, a plan of development) (collectively referred to hereafter as "DPP"); and 2) issuance of drilling permits or modification to drilling permits (APDs or APMs) that are consistent with the DPP.  *See* 43 U.S.C. §1351; 30 C.F.R. §§ 250.410–250.418 (2012).

45.     OCSLA establishes detailed statutory requirements for the contents of DPPs.  *See* 43 U.S.C. § 1351.  Among other mandates, the DPP must set forth the specific work to be performed, the location and size of facilities and operation, and the land, labor, material, and energy requirements associated with such facilities and operations, the environmental safeguards to be implemented, and all safety standards.  *Id*. § 1351(c)(1)–(6).

46.     These statutory requirements are supplemented by additional detailed regulatory requirements, which have been recently revised and updated in the wake of the 2010 *Deepwater Horizon* disaster in the Gulf of Mexico.  *See* 30 C.F.R. §§ 550.241–550.262 (2011).

47.     OCSLA affirmatively requires that DOI "shall, from time to time," review approved DPPs in order to determine if plan revisions are necessary, and shall include "changes in available information and other onshore or offshore

conditions affecting or impacted by the development and production pursuant to such plan." 43 U.S.C. § 1351(h)(3).

48.     OCSLA further directs that if such periodic review "indicates that the plan should be revised to meet" statutory requirements, "the Secretary shall require such revision." 43 U.S.C. § 1351(h)(3).  OCSLA regulations provide additional specific detail regarding post-approval requirements for DPPs, including specific triggers establishing when DPPs must be revised or supplemented.  *See* 30 C.F.R. §§ 550.280–550.285 (2011).

49.     Before drilling any well, or before sidetracking, bypassing or deepening a well, a lessee must obtain approval of an APD.   30 C.F.R. §§ 250.410–250.418 (2012).

50.     An operator must apply for an APM if it intends to revise its drilling plan, change major drilling equipment, or plugback.  30 C.F.R. § 250.465(a) (2012).  APMs must include a "detailed statement of the proposed work that would materially change from the approved APD."  30 C.F.R. § 250.465(b)(1) (2012).

51.     APDs and APMs authorizing development and production may only be issued when consistent with an approved DPP.  *See* 30 C.F.R. § 250.410(b) (2012).

**C.     National Environmental Policy Act**

52.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (1978).  NEPA establishes two overarching purposes: 1) to create an open, informed and public decision making process by insuring that environmental information is available to public officials and citizens before decisions are made and before actions are taken; and 2) to require that the federal government integrate environmental considerations into all of its actions by helping public officials make decisions that are based on an understanding of environmental consequences, and that protect, restore, and enhance the environment.  40 C.F.R. §§ 1500.1(b), (c) (1978).

53.    The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies.  *See* 42 U.S.C. §§ 4342, 4344; *see also* 40 C.F.R. §§ 1500–1518 (1978).

54.    The CEQ regulations affirm that public scrutiny is an "essential" part of the NEPA process, and that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b) (1978).

55.    NEPA requires each federal agency to prepare, and circulate for public review and comment, a detailed EIS prior to undertaking any major federal action significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).  When a federal agency is not certain whether an EIS is required, it must prepare an EA.  40 C.F.R. § 1508.9 (1978).  If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4 (1978).  If an EA concludes that there are no significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a FONSI.  40 C.F.R § 1508.13 (1978).

56.    NEPA requires federal agencies proposing actions to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R. §§ 1502.13, 1508(9)(b) (1978); 43 Fed. Reg. 45,983 (1979).   The purpose and need statement "is an obvious place for the court to start when analyzing the adequacy of an environmental impact statement [or environmental assessment]," as "[i]t is from this statement that the agency, public, and ultimately, the court may begin to judge whether the agency has fully analyzed the possible impacts of the action and reviewed a reasonable range of alternatives to that action."  *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1261 (E.D. Cal. 2006).

57.     Using the purpose and need statement as a foundation, federal agencies are directed under NEPA to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. . . ." 42 U.S.C. § 4332(2)(E).  The discussion of alternatives is "the heart" of the NEPA process, and is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (1978); *Idaho Sporting Congress v. Alexander*, 222 F. 3d 562, 567 (9th Cir. 2000) (compliance with NEPA's procedures "is not an end in itself . . . [but] it is through NEPA's action forcing procedures that the sweeping policy goals announced in § 101 of NEPA are realized.").

58.     As purpose and need statements are one of the main engines driving the alternatives analysis within a NEPA document, failure to properly define a project's purpose and need will, in turn, preclude proper consideration of a reasonable range of alternatives.  *National Parks Conservation Ass'n v. Bureau of Land Management*, 606 F. 3d 1058, 1072 (9th Cir. 2010) ("As a result of this unreasonably narrow purpose and need statement, the BLM necessarily considered an unreasonably narrow range of alternatives.").

59.     The scope of NEPA is quite broad, mandating disclosure and consideration of direct, indirect, and cumulative environmental effects.  40 C.F.R. §§1502.14(a), 1508(b) (1978).

60.     Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 C.F.R. § 1508.8(a) (1978).  Indirect effects are caused by the action and are later in time or farther removed in distances, but are still reasonably foreseeable.  *Id*. § 1508.8(b).  Both direct and indirect impacts include "effects on natural resources, structures, and functioning of affected ecosystems."  *Id*. § 1508.7.

---

Complaint for Declaratory and Injunctive Relief                    Page 16

61.     In addition to direct environmental impacts, NEPA also mandates disclosure and consideration of "connected," "cumulative," and "similar" environmental effects.  40 C.F.R. §§1502.14(a), 1508(b) (1978).

62.     A cumulative impact is defined as: "the impact on the environment which results from the incremental impact of the action when added to the other past, present, and reasonably foreseeable future actions regardless of which agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7 (1978).

63.     The CEQ regulations define "similar" actions as those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography."  40 C.F.R. § 1508.25(a)(3) (1978).

64.     In determining whether a proposed action may significantly affect the environment, NEPA requires that both the context and intensity of that action be considered.  40 C.F.R. § 1508.27 (1978).  In considering context, "[s]ignificance varies with the setting of the proposed action."  *Id.* § 1508.27 (a).   Consideration of intensity, on the other hand, "refers to the severity of the impact," including impacts on "[u]nique characteristics of the geographic area such as proximity to park lands . . . wetlands . . . or ecologically critical areas,"  "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  *Id.* § 1508.27 (b).

65.     CEQ regulations provide for a limited exception to the requirement to prepare an EIS or EA under "categorical exclusions," where an agency has made a prior determination, through rulemaking, that certain categories of activities do not

have a significant impact on the human environment, either individually or cumulatively. *See* 40 C.F.R. §§ 1501.4(a)(2), 1508.4 (1978).

66.     NEPA obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments, and public comments, before decisions are made. 40 C.F.R. § 1500.1(b) (1978) (NEPA analysis "must be of a high quality" and "[a]ccurate scientific analysis . . . [is] . . . essential to implementing NEPA.").

67.     NEPA's implementing regulations place specific obligations on agencies considering a proposed action with incomplete or unavailable information. Under those regulations, when there is incomplete or unavailable information regarding potential environmental impacts, the agency shall always make clear that such information is lacking. 40 C.F.R. § 1502.22 (1978). In addition, an "agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain . . . [and] where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects." *National Parks & Conservation Ass'n v. Babbitt*, 241 F. 3d 722, 731 (9th Cir. 2001).

68.     Underlying all of NEPA's procedural requirements is the mandate that agencies take a 'hard look' at all of the environmental impacts and risks of a proposed action. As stated by the Ninth Circuit, "general statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal citations omitted).

69.     NEPA and its implementing regulations embody a precautionary approach under which an agency must prepare an EIS when there is a substantial question whether there may be any significant impacts. *Klamath Siskiyou*, 468 F.3d at 562 (EIS "must be prepared if substantial questions are raised as to whether

a project may cause significant degradation of some human environmental factor."); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) ("[A] plaintiff need not show that significant effects will in fact occur, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared.").  In considering the threshold for preparing an EIS, the Ninth Circuit has repeatedly emphasized that "[t]his is a low standard." *Klamath Siskiyou*, 468 F.3d at 562.

### D.  Endangered Species Act

70.    The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 180 (1978).  Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b).

71.    To achieve these objectives, the ESA directs the U.S. Fish and Wildlife Service ("FWS") or National Marine Fisheries Service ("NMFS") to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species.  16 U.S.C. § 1533.  An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively.  *Id.* § 1532(6), (20).

72.    Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery.  One central protection, Section 7(a)(2), mandates that all federal agencies avoid actions that: (1) jeopardize listed species; or (2) destroy or adversely modify designated critical habitat.  *Id.* § 1536(a)(2).  Federal agency actions include those projects "authorized, funded, or carried out by such agency."

50 C.F.R. § 402.02 (1986).  To comply with these Section 7(a)(2) safeguards, the federal agency taking action and FWS or NMFS take part in a cooperative analysis of potential impacts to listed species and their designated critical habitat known as the consultation process.

73.     First, the agency must obtain "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area" from NMFS or FWS. 50 C.F.R. § 402.12(c) (1986) (emphasis added); *see also* 16 U.S.C. § 1536(c)(1).

74.     If a species or critical habitat may be present, the agency must prepare a biological assessment "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. §§ 402.12(f), 402.14(a), (b)(1) (1986).  If the agency determines, with the concurrence of the wildlife agency, that the action is not likely to adversely affect a listed species, formal consultation is not required. *Id.* § 402.14(b)(1) (1986).  Such a determination must be set aside, however, if it is "arbitrary and capricious," meaning it failed to consider relevant factors or "articulate a rational connection between the facts found and the choice made." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498 (9th Cir. 2011).

75.     Federal agencies must initiate formal consultation with FWS or NMFS when their actions "may affect" a listed species or designated critical habitat.  50 C.F.R. § 402.14(a) (1986).  The standard for consultation is low: "'[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement.'" *W. Watersheds Project*, 632 F.3d at 496 (quoting 51 Fed. Reg. 19,949).

76.     Effects that must be considered as part of this inquiry include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02 (1986).

Indirect effects are "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* Through the formal consultation process, FWS or NMFS prepares a "biological opinion" as to whether the action jeopardizes the species or destroys or adversely modifies critical habitat and, if so, suggests "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A). During the consultation process, both agencies must "use the best scientific and commercial data available." *Id*. § 1536(a)(2); 50 CFR § 402.14(d) (1986).

77.    Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C. §1538(a). The ESA defines the term "take" broadly to include "harass, *harm*, pursue, hunt, shoot, wound, *kill*, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19) (emphasis added). "Take" includes indirect as well as direct harm and need not be purposeful. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). The ESA provides a limited exception to the prohibition on take under Section 9 for taking that is in compliance with an incidental take statement ("ITS"). *See* 16 U.S.C. § 1536 (o)(2). After consultation pursuant to Section 7, if NMFS and FWS conclude jeopardy is not likely or offer reasonable and prudent alternatives to avoid jeopardy, NMFS and FWS may issue an ITS, which authorizes limited take of a species. *Id*. § 1536 (b)(4)(iv). Such a statement specifies the impacts of "incidental taking" on listed species and measures to minimize impacts. *Id*. § 1536 (o)(2). Any take of a listed species that is not in compliance with an ITS violates Section 9. *See Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt*., 273 F.3d 1229, 1239 (9th Cir. 2001).

## FACTUAL BACKGROUND

### A.    Offshore Oil Drilling and the Santa Barbara Channel

78.    The Santa Barbara Channel has long been the epicenter of California's offshore oil drilling, yet the controversy surrounding that drilling has always been

---

intensive and shows no signs of abating.  As stated by the Ninth Circuit Court of Appeals, "[t]hat there has been continuous and significant public controversy over the environmental effects of offshore activities in California for the past thirty years, and there is significant public controversy over these lease extensions in particular is beyond debate." *California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002).

79.     The Santa Barbara Channel is an arm of the Pacific Ocean separating Santa Barbara, Ventura, and other coastal communities from the northern Channel Islands (including Santa Barbara, Anacapa, Santa Cruz, Santa Rosa, and San Miguel Islands).  In 1980, these islands were designated as Channel Islands National Park.

80.     Reflecting the environmental importance of the Channel's marine environment, the Channel Islands National Marine Sanctuary was created, encompassing the waters that surround Channel Islands National Park from the mean high tide line to six nautical miles offshore, around each of the five islands. In addition, a network of state and federally-designated Marine Protected Areas ("MPAs") has been established in the Santa Barbara Channel.

81.     Numerous threatened and endangered species reside in the Santa Barbara Channel on a seasonal or residence basis, including blue, fin, and humpback whales, and the southern sea otter.  Minke and killer whales, porpoises, dolphins, seals and sea lions, and hundreds of species of birds, fishes, and invertebrates also frequent and depend on the habitat of the Santa Barbara Channel and Channel Islands.

82.     The Channel's scenic beauty and rich natural resources in large part define the quality of life along California's south-central coast and are the foundation for its largest economic drivers, including fishing, recreation and tourism.

83.     Over the objections of local residents and officials, as well as the state of California, the federal government began awarding the first federal leases for oil in California in 1963 and in the Santa Barbara Channel in 1967.

84.     Offshore oil drilling in the Santa Barbara Channel has been accompanied by spills and other accidents since its first days.  During 1968, the first year of intensive drilling in the Santa Barbara Channel, several oil spills occurred, including a spill of more than 2,000 gallons of crude oil from newly-installed Platform Hogan off Carpinteria.  Robert Sollen, *An Ocean of Oil: A Century of Political Struggle Over Petroleum off the California Coast,* DENALI PRESS, at 41–42 (1998).

85.     On January 29, 1969, the nation's first major offshore oil spill occurred at Platform "A" in the Santa Barbara Channel.  *See Norton*, 311 F.3d at 1165–67 (describing factual background prior to spill).  The blow out is attributed to federal regulators' waiver of safety requirements.  *Id.* at 1166 (noting that the spill "might have been avoided but for a failure of federal oversight").

86.     "As President Nixon aptly observed, the Santa Barbara spill changed the nation's attitudes towards the environment.  Some would trace the current framework of environmental protections in substantial measure directly to the Santa Barbara oil spill."  *Norton*, 311 F.3d at 1167 (internal citations omitted).

87.     Despite continued intensive opposition from local residents and officials, DOI continued its leasing program in the Santa Barbara Channel, as well as San Pedro Bay, after the 1969 oil spill, conducting lease sales in 1975, 1979, and 1981 through 1984.  In total, between 1961 and 1984, the federal government held eleven lease sales for the Pacific OCS, resulting in nearly 2,000,000 acres of OCS oil and gas lease areas off the California coast.  BOEM, *Status of Leases and Qualified Company Report*, at 25 (June 2016) *available at* http://www.boem.gov/pacific-status-of-leases/.

88.     Since 1969, twenty-four city and county governments in California have passed measures opposing OCS oil and gas activities, and the State has enacted a permanent ban on new offshore leasing in state waters.  The longtime opposition of area residents, and the public generally, to offshore oil drilling in California and other areas was also eventually reflected by both federal legislation and Presidential action.

89.     From 1982 through the end of Fiscal Year 2008, Congress enacted annual moratoria restricting spending of appropriated funds for OCS oil and gas leasing and drilling activities, although the restrictions varied in the amount of acreage, specific location, and activities impacted.  Curry L. Hagerty, *Outer Continental Shelf Moratoria on Oil and Gas Development*, Cong. Research Serv., R41132 (Mar. 23, 2011).

90.     The President also has executive powers to authorize OCS leasing moratoria under OCSLA and the Antiquities Act of 1906.  In 1990, President George H.W. Bush issued a Presidential Directive establishing a moratorium on leasing throughout much of the OCS, which in 1998 was extended by President Clinton until 2012.  In 2008, President George W. Bush lifted the Executive Withdrawal.

91.     Accordingly, all areas in the Pacific OCS, including the Santa Barbara Channel, could be considered for leasing for the first time in more than thirty years, though none have yet been issued.

92.     Today, offshore oil drilling in the Southern California OCS is conducted from twenty-three operating platforms on forty-three active leases stemming from sales in 1966 (one lease); 1968 (twenty-five leases); 1975 (four leases); 1979 (five leases); 1981 (seven leases); and 1982 (one lease).

93.     The forty active leases encompass eight units: Beta (San Pedro Bay) (four leases) (current operator Beta Offshore); Pitas Point (Santa Barbara Channel) (two leases) (current operator DCOR); Point Arguello (two leases) (current

---

operator FMOGLLC); Point Hueneme (two leases) (current operator DCOR); Point Pedernales (four leases) (current operator FMOGLLC); Santa Clara (seven leases) (current operator Venoco); Santa Ynez (seventeen leases) (current operator ExxonMobil); Tranquillon Ridge (two leases) (FMOGLLC current operator). BOEM, Status of Leases and Qualified Company Report.

94.     During the time period in which federal leases were being issued and DPPs being developed in the Southern California OCS, the federal government prepared EISs under the newly enacted NEPA.  *See, e.g., Get Oil Out, Inc. v. Andrus*, 477 F. Supp. 40, 44–45 (C.D. Cal. 1979) (listing early EISs including the 1974 EIS for Proposed Plan of Development of the Santa Ynez Unit and the 1976 EIS "Oil and Gas Development in the Santa Barbara Channel").

95.     However, it has now been decades—in some cases more than forty years—since the federal government prepared these EISs.  The technologies utilized in oil gas drilling and production, and the potential impacts therefrom, are significantly different today.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140, 1157 (N.D. Cal. 2013) ("The evidence before BLM showed that the scale of fracking in shale-area drilling today involves risks and concerns that were not addressed by the [prior programmatic environmental analyses] of oil and drilling development in the area.  Because the [prior analysis] does not address these concerns that are specific to these 'new and significant environmental impacts,' further environmental analysis was necessary.").

96.     The aging oil platforms located off the Southern California coastline within the Santa Barbara Channel and San Pedro Bay are in many cases already operating beyond their original estimated life spans.

97.     For example, in 1980 DOI estimated that Platforms Gilda and Gina, located off the City of Oxnard's coastline, would together produce fifty-two million barrels of crude oil and forty-two billion cubic feet of natural gas over a period of approximately twenty years.  *See* Platform Gilda and Platform Gina

Project Environmental Impact Report/Environmental Assessment, Volume I (May 1980) (prepared by City of Oxnard and U.S.G.S.), at 3.1-2; *id*. at Figure 3.5-1 (anticipated production schedule for Platform Gina); *id*. at Figure 3.5-2 (anticipated Production Schedule for Platform Gina—Repetto Formation). Platform Gina's estimated lifespan was even briefer, at only eighteen years.  *Id*. at 4.3-9.  The analysis contained no consideration of the use of offshore fracking and acidizing, but did estimate that development of the Monterey Foundation could extend the life of Platform Gilda by an additional five years.

98.     Platform Gina was installed in 1980, thirty-six years ago, while Platform Gail was installed in 1987, twenty-nine years ago. Final PEA, at Table 3-1.  Thus, both are already operating well beyond the estimated life span and the twenty year environmental analysis associated with that assumption.

99.     The use of WSTs, similar "routine" acid treatments and "acid washes," and other enhanced oil recovery techniques is allowing the recovery of oil that would otherwise not be recoverable from existing and new wells, thereby further extending the operating life of aging platforms well beyond their intended lifespan.

**B.     Well Stimulation, Including Hydraulic Fracturing and Acid Well Stimulation, Offshore California**

100.     Fracking is a well stimulation method that involves pumping a mixture of water, sand (known as "proppant"), and chemicals down a well at extremely high pressures to break apart a hydrocarbon-bearing geologic formation and improve rates of oil or natural gas production.

101.     DOI recently defined hydraulic fracturing (*aka* 'fracking') as:

> involv[ing] the injection of fluid under high pressure to create or enlarge fractures in the reservoir rocks. The fluid that is used in hydraulic fracturing is usually accompanied by proppants, such as particles of sand, which are carried into the newly fractured rock and help keep the fractures open once the fracturing operation is completed. The proppant-filled fractures become conduits for fluid migration from the reservoir rock to the wellbore and the fluid is subsequently brought to the surface. In

> addition to the water and sand (which together typically make up 98 to 99 percent of the materials pumped into a well during a fracturing operation), chemical additives are also frequently used. These chemicals can serve many functions in hydraulic fracturing, including limiting the growth of bacteria and preventing corrosion of the well casing. The exact formulation of the chemicals used varies depending on the rock formations, the well, and the requirements of the operator.

Department of the Interior, Bureau of Land Management Final Rule: Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16,128 (Mar. 26, 2015).

102.   Advancements in the technologies utilized in fracking, together with other developments in horizontal drilling technologies, have served to vastly increase oil and gas production from the dense sedimentary rock known as shale. In 2000, shale gas comprised one percent of domestic supplies; today, that figure exceeds thirty-five percent and is expected to grow further.

103.   California's Monterey Shale, encompassing large portions of the central and southern portion of the state, both on and offshore, has been identified as a potential source of significant oil that could be accessed by fracking.

104.   Acidizing is a WST that uses the application of one or more acids, typically hydrofluoric acid and hydrochloric acid, to the well or underground geologic formation.  Acidizing may be done at high pressures, and may be used in combination with fracking and other WSTs.

105.   In California, two primary forms of acidizing are utilized: acid fracturing and acid matrix stimulation treatment.

106.    Acid fracturing involves the pressured injection of acid into an underground geologic formation in order to fracture the formation, thereby enhancing the production of oil or gas.  Acid fracturing is similar to fracking in that pressures are done at the fracture gradient of the hydrocarbon bearing formation to create the fractures, but differs in that proppants are not used.

107.   Acid matrix stimulation, or "matrix acidizing," is similar to acid fracturing except it is performed below fracture pressure and is used to dissolve chemicals to create wormholes near the wellbore.  Acid matrix stimulation dissolves sediment and mud solids, thereby increasing the permeability of the rock and enlarging the natural pores, facilitating the flow of oil and gas.

108.   Today's acidizing relies on drilling fluids containing extensive amounts of chemicals.  Like fracking, the exact formula used in these acid fluids varies by company, and is often treated as proprietary information undisclosed under "trade secret" and other business confidentiality laws.

109.   Hydrofluoric acid can corrode glass, steel, and rock.  Due to its corrosive nature, operators mix it with other substances, many of which are also utilized in fracking operations.  Hydrofluoric acid is often created on site by mixing hydrochloric acid and ammonium fluoride, and then injecting the mixture into the well.

110.   After the acid treatment, the used acid, chemicals, oil, and sediments are pumped out in a process called backflush.  This backflush, like frac flowback, is either re-injected or discharged directly to the marine environment.

111.   Hydrofluoric acid is one of the most dangerous fluids utilized in any industrial process.  Hydrofluoric acid can damage lungs and cause severe burns.  It is listed by the National Fire Protection Association in the most dangerous category of hazardous materials, and is recognized on the Superfund list as an "extremely hazardous substance."  Above sixty-seven degrees, hydrofluoric acid can form a poisonous vapor cloud that stays near the ground.

112.   In addition to treatments relying on acid that are characterized as acid well stimulation, offshore oil operators commonly use a similar technology that they characterize as "routine acidizing" or "acid washes."  These treatments rely upon similar types and concentration of acids that pose similar environmental and

1   public health impacts, but that rely upon less volume of acid solution than
2   acidizing technically considered to be well stimulation.

3        113.    Historically, well stimulation operations typically utilized
4   concentrations of hydrofluoric acid of less than nine percent.  Oil companies have
5   publicly stated that they are now experimenting with higher concentrations of
6   hydrofluoric acid in California, as well as experimenting with higher pressures.

7        114.    Although rudimentary forms of well stimulation techniques have
8   existed for decades, today's technologies bear little resemblance to past practice,
9   and exacerbate the environmental and public health risks of conventional oil and
10  gas production.  Oil and gas development, whether conventional or utilizing well
11  stimulation, poses inherent environmental and public health risks, but the extent of
12  those risks associated modern with well stimulation methods are largely unknown
13  and unstudied.

14       115.    For example, a 2014 independent scientific study addressing the
15  environmental and public health impacts of fracking and acidizing prepared by the
16  nonpartisan California Council on Science and Technology ("CCST")  concluded
17  that  "only incomplete information and data exist," and that "[f]ew scientific
18  studies of the health and environmental impacts of well stimulation have been
19  conducted to date, and the ones that have been done focus on other parts of the
20  country."  CCST, *An Independent Scientific Assessment of Well Stimulation in*
21  *California: Volume II.  Potential Environmental Impacts of Hydraulic Fracturing*
22  *and Acid Stimulations*, at 6 (July 2015) ("CCST Volume II Study").  The numerous
23  gaps in information include the "concentration of well stimulation chemicals, their
24  degradation products, and natural constituents mobilized" by fracking and
25  acidizing.  *Id*. at 336.

26       116.    The CCST Volume II Study, which addresses potential environmental
27  impacts, uses the word "unknown" eighty-seven times.  The study further notes
28  that as many as 100 chemicals used in WST have "completely unknown

materials." CCST Volume II Study, at 81.  Other fundamental information gaps noted in the study include the amount of frack fluid that returns to the surface and how much remains underground.  In addition, as the CCST Study notes, "discharges are not monitored for constituents specific to or indicative of hydraulic fracturing, and the timing of sampling is unlikely to coincide with or measure any potential impacts from well stimulation treatments."  *Id*. at 103.

117.   The deficiency of information concerning offshore fracking and acidizing is even more pronounced than for onshore use.  Unlike onshore fracking, DOI has not initiated a rulemaking or other public process to address the use of offshore fracking and other well stimulation techniques, including requiring oil companies to disclose the chemicals used in well stimulation, nor provided the public with any estimates of the prevalence of well stimulation, or the extent of its expected use in the future.

118.   Prior to the *EDC v. BSEE* settlement and the PEA at issue in this lawsuit, Defendants BSEE and BOEM had not prepared any prior environmental analysis of the potential environmental and public health risks and impacts associated with the use of modern well stimulation techniques off the California coastline.

119.   In fact, despite periodic use since the 1980s, the use of fracking and acidizing off southern California's shores was largely unknown to the general public, local elected officials, and cooperating state agencies including the California Coastal Commission and the California State Lands Commission, until 2013, when investigative reporters with Associated Press and Truthout, discovered its use through records obtained under the Freedom Of Information Act ("FOIA"), 5 U.S.C. § 552.  *See* Jason Dearen and Alicia Chang, *Oil companies frack in coastal waters off California*, ASSOCIATED PRESS, (Aug. 3, 2013) ("California coastal regulators said they were unaware until recently that offshore fracking was even occurring.").

120.   In 2012 and 2013, Plaintiff EDC had also submitted FOIA requests to BSEE in order to investigate whether there had been any instances of fracking from offshore platforms located in federal waters off the California coast, and through review of those FOIA responses, EDC determined that at least fifteen instances of fracking off California's shores had occurred over the last twenty years as of that date.  In September 2013, EDC published its analysis, along with several policy recommendations directed at Defendants, in a report entitled DIRTY WATER: FRACKING OFFSHORE CALIFORNIA.[1]  One of the key findings of the report was that Federal Defendants had never conducted any environmental analysis of offshore fracking and acidizing under NEPA, despite the fact that oil companies had periodically utilized those techniques for more than two decades.

121.   Subsequent to the publication of the report, Plaintiff EDC wrote to Federal Defendants, outlining alleged violations of NEPA and other environmental laws in relation to the use of fracking and acidizing offshore California, in hopes that the agencies would voluntarily take action to remedy these violations without the need for court intervention.  The agencies never responded to Plaintiff EDC's correspondence, although EDC staff did meet with BSEE and BOEM personnel on one occasion.

### C.   Prior Litigation and Settlement in *Environmental Defense Center v. Bureau of Safety and Environmental Enforcement*

122.   Due to the agencies' lack of prior consideration or analysis of offshore fracking and acidizing, combined with a complete lack of transparency, EDC filed litigation in U.S. District Court for the Central District of California on December 3, 2014, alleging that BSEE had violated NEPA in relation to its approval of fifty-one APDs or APMs authorizing offshore well stimulation issued between February 2013 and the filing date of that case.

---

[1] *Available at* http://www.environmentaldefensecenter.org/wp-content/uploads/2015/03/DirtyWater.pdf.

123.   Specifically, Plaintiff EDC challenged BSEE's routine approval of APDs authorizing the use of well stimulation pursuant to NEPA categorical exclusions.  Unlike an EIS or EA, categorical exclusions are cursory, checklist type documents that do not contain detailed analysis of potential environmental impacts. EDC's action challenged BSEE's 1) failure to provide for public participation as required by NEPA; 2) unlawful reliance on categorical exclusions despite evidence of significant and cumulative environmental effects; 3) unlawful reliance on categorical exclusions despite extraordinary circumstances; 4) unlawful reliance on categorical exclusions to approve APDs despite lack of applicability; 5) failure to conduct any NEPA analysis for APMs; and 6) unlawful reliance on categorical exclusions for APMs.

124.   Plaintiff EDC also challenged BSEE's routine approval of APMs authorizing the use of well stimulation with no additional NEPA analysis.  Instead, BSEE "tiers" its NEPA analysis for these APMs to the NEPA analysis conducted for the underlying APD.  As noted above, however, BSEE has without exception approved APDs in the Pacific Region with categorical exclusions, the bare minimum of NEPA analysis.

125.   BSEE never provided the public with any notice or opportunity to comment on or otherwise participate in its decisions to approve the APDs and APMs at issue in *EDC v. BSEE*.  Indeed, BSEE has refused to even provide NEPA documentation for its decisions to authorize APDs and APMs upon direct request, instead requiring Plaintiff EDC and other members of the public to submit formal requests for such documents under FOIA.

126.   With one exception, Plaintiff EDC limited its challenges in *EDC v. BSEE* to APDs or APMs authorizing offshore well stimulation that had been issued in the eighteen months preceding the initiation of that lawsuit, as well as APDs which had been issued more than a eighteen months prior, but which had been

modified by an APM in the eighteen months preceding the initiation of that lawsuit.

127.   The individual permits challenged in *EDC v. BSEE* authorized well stimulation operations from seven offshore oil platforms, located in different regions of the Santa Barbara Channel: Platforms Gail and Gilda off the Ventura County coastline near the City of Oxnard and the Channel Islands National Marine Sanctuary, and Platforms Harmony, Heritage, Hondo, and Irene off the Santa Barbara County coastline.

128.   Platform Gail was installed in 1987, is part of the Sockeye Field/Santa Clara Unit, and is located at 739 feet depth.  Venoco, Inc., pursuant to Lease OCS-P-0205, currently operates platform Gail.  The DPP for Platform Gail was approved on November 14, 1986.

129.   Platform Gilda was installed in 1981, is part of the Santa Clara Field/Santa Clara Unit, and is located at 205 feet depth.  Dos Cuadras Offshores Resources, Inc., pursuant to Lease OCS-P-216, currently operates platform Gilda. The Plan of Development for Platform Gilda was approved in 1980.

130.   Platform Harmony is the largest and deepest platform offshore southern California.  Platform Harmony was installed in 1989, is part of the Hondo Field/Santa Ynez Unit, and is located at 1,198 feet depth.  ExxonMobil Corp. pursuant to Lease OCS-P-0190 currently operates platform Harmony.  The DPP for Platform Harmony was approved on September 20, 2985, and a revision to the DPP was approved on April 4, 1988.

131.   Platform Heritage was installed in 1989, is part of the Pescado and Sacate Fields/Santa Ynez Unit, and is located at 1,075 feet depth.  ExxonMobil Corp. pursuant to Lease OCS-P-0182 currently operates platform Harmony.  The DPP for Platform Heritage was approved on September 20, 1985, and a revised DPP was approved on April 4, 1988.

---

Complaint for Declaratory and Injunctive Relief                                        Page 33

132.   Platform Irene was installed in 1985, is part of the Point Pedernales & Tranquillon Ridge Fields/Point Pedernales Unit, and is located at 242 feet depth. Freeport McMoran Oil & Gas LLC pursuant to Lease OCS-P-0441 currently operates platform Irene.  The DPP for Platform Irene was approved in 1985.

133.   In addition to the general environmental significance of the Santa Barbara Channel in which all of the above offshore oil platforms are located, the individual platforms from which well stimulation is known to have been conducted are located in specific areas of the Channel with high ecological value and environmental importance.  Platforms Gail and Gilda, for example, are the closest of all Channel platforms to the Channel Islands National Marine Sanctuary, as well as in close proximity to Anacapa Island within Channel Islands National Park, and the Marine Reserve Area extending off that Island's northern shores.  Platforms Harmony, Heritage and Hondo are located off the Gaviota coast in Santa Barbara County, one of the most environmentally valuable and unique areas along the entire west coast.

134.   The offshore oil platforms from which known well stimulation has been conducted, like all of the platforms in the Santa Barbara Channel and San Pedro Bay, do not operate in isolation, but rely upon an extensive network of service barges, oil, gas, and water pipelines, processing facilities, and other infrastructure to service and assist operations at the platforms, and to move the recovered crude oil and natural gas to refineries and the consumer market.  This supporting infrastructure, like operations at the platforms themselves, are subject to accidents caused by human error, weather events, mechanical failure and other equipment failures, and other incidents that can result in spills of oil and other hazardous substances to the surrounding marine and terrestrial environment.

135.   For example, the May 19, 2015, failure of the Plains All American Pipeline, L.P.'s Line 901 pipeline ("Line 901"), which released approximately 2,934 barrels of heavy crude oil onto Refugio State Beach, with much of the oil

making its way into the Pacific Ocean, illustrates the connected risks associated with well stimulation and general oil production from the offshore oil platforms in the Southern California OCS.  Line 901 is an onshore twenty-four-inch diameter buried, insulated pipeline approximately ten-and-seven-tenths miles in length, that transports heated crude oil originating from offshore oil platforms located in federal outer continental shelf waters and state waters off the coast of Santa Barbara to other pipelines, which eventually convey the oil and gas to refineries. These platforms include Platforms Harmony, Heritage and Hondo, currently operated by ExxonMobil, and from which some of the largest well stimulation operations conducted to date off California's shores have occurred.  Other major onshore pipelines convey the oil produced from the platforms located off Ventura County.

136.   Before reaching Line 901 and other onshore oil pipelines, oil, gas, and water must be conveyed to those onshore processing facilities and pipelines. BSEE currently regulates 213 miles of offshore pipeline in the Pacific OCS Region.  Onshore facilities located in Lompoc, Gaviota, Goleta, Carpinteria, La Conchita, Ventura, Oxnard, San Pedro, Long Beach, and Huntington Beach then process the conveyed liquids, before oil and gas is then conveyed by onshore pipelines to refineries.  Many of these onshore facilities are located in close proximity to densely populated areas, environmentally significant habitat, or specially designated areas such as Refugio, El Capitan, and McGrath State Beaches.

137.   On February 2, 2015, Defendants filed their answer to Plaintiff EDC's complaint in *EDC v. BSEE*.  Defendants' answer "admit[ed] that BSEE had granted nineteen APDs authorizing offshore well stimulation, as BSEE understands that term, pursuant to categorical exclusions."  Docket No. 13, at ¶ 141.

138.   On February 2, 2015, American Petroleum Institute ("API") moved to intervene as a defendant.  On February 18, 2015, ExxonMobil moved to intervene as a defendant.  Judge Gutierrez approved both of these motions on April 2, 2015, on which dates the answers from both parties were entered.  In alleging their right to intervene, both groups characterized their "protectable interest" in the ability to continue to conduct offshore well stimulation.  *See, e.g.*, API Intervention Brief, Docket No. 15, at 9 ("API members broadly rely on occasion on well stimulation technologies, including hydraulic fracturing and acidizing, to facilitate oil and gas exploration, development, and production throughout the federal OCS.").  ExxonMobil, which operates in the Santa Ynez Unit from Platforms Heritage, Harmony, and Hondo, noted that it holds twenty-nine of the fifty-one permits challenged in the action, stating that the company "has future exploration and development plans for its substantial investments in offshore leases in the Pacific region that potentially involve well stimulation."  ExxonMobil Brief, Docket No. 19, at 1.

139.   On June 11, 2015, Federal Defendants manually filed the administrative record for the case.  However, the case would never proceed to summary judgment briefing on the merits.  On August 17, 2015, Plaintiff EDC and Federal Defendants filed a stipulation asking to modify the briefing schedule in light of the fact that the parties had made significant progress in settlement negotiations.  After three additional continuances (October 8 and November 17, 2015, and January 12, 2016), Plaintiff and Federal Defendants submitted their joint motion to dismiss the case based on the lodged settlement agreement on January 29, 2016.

140.   Under the settlement agreement, Federal Defendants agreed to prepare a PEA addressing environmental impacts of offshore well stimulation in federal waters off California, and issue the final environmental review document by May 28, 2016, after a public comment period of at least thirty days.  *EDC v. BSEE*

Settlement Agreement, Docket No. 79-1, lodged Jan. 29, 2016.   The PEA was to "result in a determination that either an [EIS] and Record of Decision ("ROD") is required or a Finding of No Significant Impact ("FONSI") is appropriate." *Id.* at 2. Accordingly, if the agencies determined during the PEA process that well stimulation may have significant environmental impacts, they were required to prepare an EIS.  In accordance with NEPA, the settlement agreement specified that Federal Defendants "will not pre-determine the outcome of this assessment to require one product or the other (*i.e.* an EIS/ROD or EA/FONSI) before the analysis in the programmatic EA is complete."  *Id.* at 3.

141.   The settlement agreement further required the agencies to withhold approval of drilling permits authorizing well stimulation pending completion of the PEA.

142.   The settlement agreement also required BSEE to "pursu[e] avenues for increasing transparency of the permit review and approval process." Specifically, BSEE committed to "receive future permit applications through the eWell system . . . and . . . build a web-based search engine similar to that used in the Gulf of Mexico Region . . . or expand that search engine to include permit applications received in the Pacific Region."  *Id*.  Until that system is operational, BSEE obligated itself to "provide notice of newly submitted complete applications for [WST] to EDC," including "posting of publicly releasable information associated with newly submitted complete applications within five working days of receipt." *Id*.

**D.   The Draft Programmatic Environmental Assessment**

143.   On February 22, 2016, BSEE and BOEM issued a *Notice of Availability of Draft Programmatic Environmental Assessment to Evaluate Potential Environmental Effects of Well Stimulation Treatments on the Pacific Outer Continental Shelf*, 81 Fed. Reg. 8743.  The Notice announced the availability of the Draft PEA, and defined well stimulation treatments to include

fracturing (diagnostic fracture test, frac pac, and acid fracturing) and non-fracturing (matrix acidizing and polymer/surfactant injection).  *Id*.  The Notice provided for a public comment period of thirty days, until March 23, 2016. *Id*.

144.   Although BSEE and BOEM have never previously conducted any NEPA analysis of offshore fracking and acidizing, the Draft PEA predetermines that the practices will be allowed, stating in the very first sentence that the agencies "propose to allow the use of selected well stimulation treatments on the 43 current active leases and 23 operating platforms on the Southern California Outer Continental Shelf."   Draft PEA, at ES-1.

145.   Similarly, the Draft PEA defines the purpose and need for the proposed action as "to allow the use of certain WSTs (e.g. hydraulic fracturing) in support of oil production at platforms on the Pacific OCS [and] to carry out BSEE and BOEM's responsibilities under the Outer Continental Shelf Lands Act (OCSLA) for effectively managing resources on the Federal OCS." *Id*.

146.   The Draft PEA considers four alternatives: Alternative 1: proposed action—allow use of WSTs; Alternative 2: allow use of WSTs with subsurface seafloor depth stipulations; Alternative 3: allow use of WSTs but no open water discharge of WST waste fluids; and Alternative 4: no action—allow no use of WSTs. Draft PEA, at ES-4.

147.   The Draft PEA defines the affected environment as the forty-three lease areas in southern California. Draft PEA, at ES-4–ES-5.  As previously described, these lease areas are concentrated in two primary regions:  the Santa Barbara Channel, in Santa Barbara and Ventura Counties, and the San Pedro Bay area off the northern Orange County/southern Los Angeles County coastline.

148.   The Draft PEA evaluates the potential effects from offshore well stimulation treatments on the following categories of impacts: air quality; water quality; geologic resources/seismicity; benthic resources; marine and coastal fish and essential fish habitat; marine and coast birds; marine mammals; sea turtles;

commercial and recreational fisheries; areas of special concern; recreation and tourism; environmental justice; and archeological resources.  Draft PEA, at ES-6–ES-7.

149.   Nearly without exception, BSEE and BOEM conclude in the Draft PEA that offshore fracking and acidizing will have *no* environmental impacts. In its consideration of air quality, water quality, benthic resources, commercial and recreational fisheries, areas of special concern, and recreation and tourism, the Draft PEA states that "no WST [well-stimulation techniques]-related impacts [are] expected."  Draft PEA, at ES-11–ES-12.  The Draft PEA only recognizes one category of potential impacts—induced seismicity—concluding that the potential is "low".  *Id*. at ES-11.

150.   BSEE and BOEM  provide slight qualifications for their no impact determinations with respect to three categories of impacts:  air quality ("negligible emissions of greenhouse gasses"); water quality ("slight localized reduction in water quality at surface water discharge location"); and wildlife (marine and coastal fish, sea turtles, marine and coastal birds, marine mammals) ("potential for some toxic effects in some species from some WST chemicals occurring within the NPDES mixing zone from discharges of WST waste fluids to surface water").  Draft PEA, at ES-11.

151.   BSEE and BOEM in fact predict in the Draft PEA that *prohibiting* the use of offshore well stimulation [Alternative 4] will have greater environmental impact than allowing it without restraint.  Draft PEA, at 4-67 ("Implementation of Alternative 4 may necessitate the drilling and production of new wells offshore and/or onshore, increase WST use at onshore wells, and/or increase the need to import more gas and oil.  These would all increase environmental and societal cumulative impacts.").

152.   The Draft PEA states that offshore fracking and acidizing have only been used infrequently in the southern California OCS.  Draft PEA, at ES-8

(stating that there have been twenty-one fracking operations conducted from four platforms, and three acidizing operations conducted from two platforms, during the time period 1985-2011).  Despite the fact that BSEE had previously acknowledged in the *EDC v. BSEE* litigation that the permits challenged in that case qualified as well stimulation, these treatments were not listed in the PEA.

153.   BSEE and BOEM also predicted that offshore fracking and acidizing will have "limited applicability" and their use "is expected to be incidental rather than fundamental to the development" of the OCS basins.  Draft PEA, at 3-8; *id.* at 3-12 (fracking has "been attempted . . . and was not deemed economically successful.").

154.   BSEE and BOEM rely upon the predicted infrequency of WST use as one of the primary justifications for their overall conclusions that the practices will have no environmental impacts. Draft PEA, at 4-67 ("Given the type and the expected frequency of use of WST activities that are reasonably foreseeable for the Federal OCS, none of the three action alternatives are expected to result in adverse impacts on the environment."); *see, e.g.*, Draft PEA, at ES-9 (accidental release of WST chemicals "under the expected infrequent use of WSTs . . .is considered to be very unlikely"); *id.* at 4-43 (benthic resources); *id.* at 4-45 (fish and essential fish habitat); *id.* at 4-48 (marine mammals); *id.* at 4-54 (recreational and commercial fisheries).

155.   BSEE and BOEM also rely upon the prediction of infrequent use of WSTs to conclude that the proposed authorization of WSTs will not have any cumulative impact. Draft PEA, at ES-10 ("Given the consistently small estimate impacts of future WST activities on resources in the Pacific OCS off southern California, incremental contributions to impacts from the proposed action are not expected to result in any noticeable or material cumulative effects on resources potentially impacted by the proposed action when added to past, current, and foreseeable future impacts on these resources from other sources.").

156.   The Draft PEA excludes "[r]outine well cleaning operations includ[ing] the use of acid or solvent treatments, water blasting, and casing scrape/surge" from the scope of its environmental analysis. Draft PEA, at 4-64.  Of these, "acid washes" are utilized most frequently, on average once every other year for *all* wells located on offshore oil platforms in the Southern California OCS. *Id*. These treatments use "similar type and concentration" of acids as the "acidizing" treatments that, unlike acid washes, are included within the scope of environmental analysis. *Id.* The main difference between acid washes and acidizing is that acid washes use less volume of acid solution than WST acidizing, typically ranging from 5,000 to 10,000 gallons as opposed to as many as 240,000 gallons. *Id.*

157.   BSEE's and BOEM's acknowledgment of the close similarity of these treatments and their environmental impacts to the acid treatments formally considered as well stimulation, and their frequent use at every well on every offshore platform in the Southern California OCS, undermines the Draft PEA's conclusion that offshore well stimulation will not have significant environmental effects due to its presumed infrequent use.

158.   The Draft PEA also appears to contradict itself, stating that "[t]he use of WSTs may support the continued recovery of oil as primary oil recovery declines with the 43 active lease areas."  Draft PEA, at 1-4. Implementation of Alternative 4 [barring offshore well stimulation] may necessitate the drilling and production of new wells offshore and/or onshore, increase [well stimulation technology] use at onshore wells, and/or increase the need to import more gas and oil.  These would all increase environmental and societal cumulative impacts."

E.   **Elected Officials and Agency Comments on the Draft Programmatic Environmental Assessment**

159.   During the thirty-day public comment period, BSEE and BOEM received numerous comments opposing the use of offshore WST, and/or critiquing

1  the environmental analysis contained within the Draft PEA, from elected officials

2  and state and federal agencies.

3      160.   For example, U.S. Representative Lois Capps, whose District

4  encompasses offshore drilling in the Santa Barbara Channel, wrote a letter with

5  Representative Sam Farr and Representative Jared Huffman that the Draft PEA "is

6  in no way a complete analysis" and "provides insufficient evidence to support the

7  finding that well stimulation poses negligible risks in offshore waters or the

8  proposal to resume permitting wells using these techniques."  Letter from Lois

9  Capps, Sam Farr & Jared Huffman, Letter Regarding Draft PEA, 1 (March 31,

10  2016).  The three Congressional representatives thus requested that BSEE and

11  BOEM prepare an EIS. *Id.* at 1–2.

12      161.   Eleven members of the California State Legislature, including local

13  Senator Hannah-Beth Jackson and Assemblymember Das Williams, wrote a letter

14  "regarding [their] concern over troubling shortcomings" in the Draft PEA, and

15  stating that "[w]e believe the assessment inadequately analyzes impacts to

16  California's ocean and coastline . . . ." Letter From Hannah-Beth Jackson, et al.,

17  Comment Letter Regarding the PEA of the Use of WSTs on the Southern

18  California OCS, 1 (March 17, 2016).  The letter further noted that, unlike

19  California state law, "federal standards do not require fracking and acidizing fluid

20  composition disclosure, and we are left only to assume that the same types of

21  chemicals are being used and produced," including "known carcinogens, toxic

22  chemicals with known impacts, and chemicals of unknown toxicity, all of which

23  pose serious risks to marine and human life."  *Id.* at 2.

24      162.   The U.S. Environmental Protection Agency ("EPA") submitted

25  comments recommending that the analysis needed to be improved to "provide

26  additional analyses, include supporting documentation, and identify specific

27  minimization or mitigation measures, as necessary, to support the finding of no

28  significant impacts for this project." Letter From EPA, US EPA Detailed

Comments on the February 2016 PEA of the Use of WSTs on the OCS, Southern California Planning Area, 1 (March 23, 2016).  In addition, EPA critiqued the Draft PEA's purpose and need statement, finding that "[s]uch a narrow and prescriptive statement identifies a solution, rather than the underlying need, and may unduly constrain the range of alternatives that would be responsive to the underlying need." *Id*. at 4.

163.   The California Coastal Commission submitted comments that noted past correspondence with the agency and the Commission's focus "on the need for additional analysis and transparency, additional inter-agency coordination, and the need for improved disclosure of applications employed and analysis of the effects of chemicals used in the various well stimulation treatments."  Letter From Coastal Commission Staff Comments on the Draft PEA for WSTs, 1 (March 23, 2016). The Commission expressed that it was "disappointed that the Draft PEA does not reflect a greater level of responsiveness to either the procedural or substantive concerns" raised in the agency's prior correspondence. *Id.*

164.   The Commission letter goes on to assert that the Draft PEA "does not appreciably increase the knowledge base concerning the many unknowns and uncertainties surrounding WST use on the OCS." *Id.* at 2.  The letter states that "[i]n conclusion, at least until much more is known concerning potential impacts on the marine environment, we reiterate our concern regarding the need for BSEE/BOEM to assume, at this time, that use of these chemicals and treatments would affect coastal uses and resources . . .." *Id.*

165.   The California Division of Oil, Gas, and Geothermal Resources ("DOGGR") wrote and disagreed with the conclusion in the Draft PEA regarding waste fluids, noting that "even though discharge of WST waste fluid is an activity permitted by the U.S. EPA, it does not mean impacts are absent." Letter From DOGGR, Comments on the Draft PEA for the use of WSTs on the Southern California OCS 2 (March 23, 2016).  In addition, DOGGR requested closer

consideration of Alternative 3 (no dumping of WST fluids) and stated that BSEE and BOEM should conduct toxicity testing of permitted discharge containing WST fluids. *Id.*

### F. Industry Comments on the Draft Programmatic Environmental Assessment

166.   Major oil drilling organizations American Petroleum Institute, Offshore Operators Committee, California Independent Petroleum Association, and National Oceanic Industries Association, representing "member companies who are significant stakeholders in offshore oil and natural gas production, and who are experts in well stimulation treatments," wrote in support of the conclusions of the Draft PEA.  Letter from API, et al., Joint Trade Association Comments on the PEA of the Use of WSTs on the Southern California OCS (March 23, 2016) ("industry letter").

167.   The industry letter states that "well stimulation treatments, and associated discharge of WST-related fluids, is a long-standing practice within the oil and natural gas production industry in the Southern California Outer Continental Shelf, as well as other producing regions around the world." *Id.* at 1.

168.   Contradicting the Draft PEA's claim that offshore WST has and will continue to be used infrequently, the industry letter clams "the risks from WST-related operations are well understood and manageable," and thus "[a]llowing the use of WSTs is the only feasible and logical recommendation." *Id.* at 1.  Finally, the industry letter notes confusion and conflicting definitions regarding what type of acid use qualifies as a well stimulation treatment, but notes that "nearly all relevant wells require acid treatments (HCl and/or HCl-HF) to get appreciable production rates."  *Id.* at 3.

### G. Plaintiffs' Comments on the Draft Programmatic Environmental Assessment

169.   Plaintiffs EDC and Channelkeeper each submitted detailed comments on the Draft PEA.  In its comment letter, Plaintiff EDC disagreed with the Draft PEA conclusion that offshore WST from the twenty-three southern California offshore oil platforms will have no significant impact and asserted that the document is legally insufficient under NEPA in numerous requests.  Letter from EDC on the Draft PEA for WSTs on the Pacific OCS (March 23, 2016).  EDC urged BSEE and BOEM to initiate preparation of an EIS that acknowledges the significant environmental impacts and risks associated with offshore fracking and acidizing, and that provides a more detailed and thorough analysis of those impacts and risks.

170.   Among its specific comments, EDC critiqued the Draft PEA's purpose and need statement as "driven entirely by the desire of oil company lessees to conduct offshore fracking and acidizing" because "BOEM and BSEE incorrectly define the purpose and need statement as 'to allow the use of certain WSTs (e.g. hydraulic fracturing) in support of oil production at platforms on the Pacific OCS.'" *Id.* at 5.

171.   In its comment letter on the Draft PEA, EDC also asserted that by impermissibly narrowing the scope of the purpose and need statement, BSEE and BOEM in turn "unlawfully constrained their consideration of alternatives and rendered the Draft PEA an empty formality." *Id.* at 7.

172.   EDC's letter further critiqued the alternatives analysis, noting that although the agencies developed two alternatives that would place some restrictions on the use of offshore fracking and acidizing, (by prohibiting the use of fracturing WSTs at depths less than 2,000 feet and prohibiting open water discharge of WST waste fluids, respectively) the agencies inexplicably failed to consider the restrictions together in one alternative, or to otherwise craft a comprehensive alternative that would best preserve the environment in the event that future WSTs are allowed by the agencies.   EDC's letter asserted that such

approach is unlawful and that "[a]dditional alternatives would be reasonably related to the project's proper purpose, which should be whether offshore WST can safely occur, in light of OCSLA's requirement to balance resource extraction with environmental protection." *Id.*

173.   NEPA's implementing regulations place specific obligations on agencies considering a proposed action with incomplete or unavailable information.  EDC's letter noted that the Draft PEA suffers from missing information and numerous data gaps, many pertaining to the most concerning and contentious aspects of offshore well stimulation, including the toxicity of chemicals utilized in the process, as well as the impact of those chemicals on the natural environment, including water quality, threatened and endangered species, and human health.  *Id.* at 8–10.  However, as detailed in the EDC letter, BSEE and BOEM failed to adequately acknowledge these numerous and fundamental data gaps and missing information, and consequent uncertainty regarding environmental impacts, and that in any event, these gaps are so significant as to compel preparation of an EIS.

174.   EDC's letter detailed numerous areas in which BSEE and BOEM failed to adequately address direct environmental impacts.  *Id.* at 10–17.  Almost without exception, BSEE and BOEM concluded that the proposed action, Alternative 1, to allow use of offshore fracking and acidizing, will result in "no WST-related impacts expected."  Draft PEA at ES-11 and ES-12 (Table ES-1). Only with respect to water quality ("slight localized reduction in water quality at surface water discharge location"),  induced seismicity ("low potential"), and marine fish and wildlife ("potential for subtle toxic effects in some species from some WST chemicals occurring within the NPDES discharge mixing zone from discharges of WST waste fluids to surface water") do BSEE and BOEM acknowledge *any* potential environmental impacts from offshore fracking and acidizing.

175.   EDC's letter identified several issues to illustrate how the Draft PEA analyses are inadequate under NEPA, and lack scientific and analytical integrity, and concluded that because the direct, indirect, and cumulative impacts of offshore well stimulation within the Southern California OCS plainly may result in significant environmental impacts, BSEE and BOEM were required to prepare an EIS.  For example, EDC's letter explained that the Draft PEA improperly relies on unsupported and inconsistent assumptions of infrequent use of WSTs.  It also asserted that the analysis unlawfully relies on the EPA National Pollution Discharge Elimination System ("NPDES") Permit revision for no impact conclusions, which does not excuse the agencies from NEPA requirements. Moreover, EDC's letter noted potential significant impacts and risks to the environment, including to water quality, the Santa Barbara Channel, protected lands and waters, and endangered species. Finally, EDC's letter demonstrated that WSTs have inspired public controversy among the environmental community as well as elected officials.

176.   EDC's letter also critiqued the analysis of indirect effects, connected effects and cumulative and similar effects analysis as inadequate under NEPA. EDC Comment Letter, at 17–20.  Examples of such insufficient analysis highlighted in this section of EDC's letter include the failure to consider the impact of "routine" or "acid washes", as well as the environmental impacts from related infrastructure, as illustrated by the Plains Line 901 oil spill, or impacts from the continued operation of oil infrastructure due to extending the life of offshore oil platforms.  *Id.*

177.   Finally, EDC's letter concluded that BSEE and BOEM had failed to meet the overarching NEPA requirement to provide a "hard look" at the environmental impacts of WST in the Pacific OCS, and that the agencies were required to instead prepare an EIS.

178.   EDC's letter was prepared with the assistance of Blue Tomorrow, LLC ("Blue Tomorrow"), an environmental consulting company that specializes in assessing environmental impacts from oil and gas operations.  This expert consultant prepared written comments that EDC attached to its comment letter.

179.   In its letter, Blue Tomorrow identified specific data gaps in the Draft PEA that render a realistic assessment of impacts impossible without more data and analysis.  Specifically, Blue Tomorrow concluded that the Draft PEA's discharge toxicity analysis is inadequate because it contains a significant data gap regarding the composition of flowback fluids.  Blue Tomorrow Expert Letter 1 (March 22, 2016) ("During WSTs additional constituents are being mobilized from the formation and their chemistry and toxicity are unknown. Quantifying the risk from discharging these fluids is not possible without this information.").  In addition, the Draft PEA completely lacks direct evidence on the impacts of discharges of WST flowback fluids on the marine environment.  *Id.* at 2 ("As a result of the absence of scientific studies of impacts to the marine environment from WST waste discharges, the EA evaluation is insufficient to support the conclusion that no WST-related impacts to ecological resources are expected to occur.").  Moreover, as noted by Blue Tomorrow, "only a fraction of chemicals had toxicity data for marine organisms (twenty-six of the thirty-three chemicals screened in the hydraulic fracturing fluid; and five of the seventeen chemicals screened in the acidizing case study)." *Id.* at 3.

180.   The Blue Tomorrow expert letter also asserted that the Draft PEA failed to adequately assess the impacts of WST discharges on water quality because it failed to acknowledge that the composition of flowback fluid is distinct from injection fluid.  Blue Tomorrow Expert Letter at 1–2 ("WST fluids prior to injection likely have substantially different chemistry and constituent concentrations than flowback fluids after a WST.  During these treatments heavy metals, organics, and radioactive material can be mobilized from the formation, by

chemicals in the injection fluid or by the fracturing of the target formation, and mixed with the flowback fluids."). Specifically, flowback fluids are likely to contain additional pollutants and pose additional impacts, especially in the acidizing context, whether considered WST or "routine." *Id.* at 2 ("[A]cid treatments (matrix acidizing, acid fracturing, and acid maintenance) use high concentrations of very strong acids such as HCL and HF acids to dissolve scaling and clogging of the well bore, and to dissolve the formation rock itself to increase connectivity and permeability within the formation to increase production. After the acid treatment fluids return to the surface, they can contain very high levels of dissolved solids and heavy metals and have been reported to have pH in the range of 0 to 3."). The Blue Tomorrow letter concludes that since these pollutants are "not present in injection fluids," the agencies' analysis of impacts of WST discharges based on injection fluids is inadequate.

181. The Blue Tomorrow letter also notes that BSEE and BOEM provide no direct evidence to conclude that WST discharges have no impacts on ecological resources, and that the agencies' reliance on the CCST study is insufficient, as that study itself acknowledges a lack of data.

182. Finally, the Blue Tomorrow letter critiques the Draft PEA's failure to sufficiently address whole effluent toxicity ("WET"). As Blue Tomorrow explains, while some analysis was conducted as to "individual toxic effects" of WST fluids, "[t]here are both cumulative and interaction (or synergistic) effects that should be considered in assessing the toxic effects of a fluid with multiple toxic constituents." *Id*. The Draft PEA simply fails to conduct this analysis.

183. Finally, EDC's letter concluded by addressing violations of other environmental laws, including the ESA and Coastal Zone Management Act. In particular, EDC critiqued the Draft PEA's apparent conclusion that the agencies would not abide by legal requirements under the ESA, including section 7 consultation requirements, instead deferring such action to future authorizations.

184.   Plaintiff Channelkeeper also submitted comments on the Draft PEA. In its letter, Channelkeeper emphasized the fact that "due to lack of monitoring requirements for specific WST constituents, the unknown toxicity of WST fluid constituents, and the lack of coordination between existing monitoring and WST activities," BSEE's and BOEM's proposed reliance on the EPA NPDES permit "fails to adequately monitor impacts from WST fluids."

185.   Like the Blue Tomorrow letter, the Channelkeeper letter also further critiqued the Draft PEA reliance on the WET test under the NPDES permit, concluding that "due to limited sampling frequency, the required WET testing is inadequate to verify that WST fluids are not contributing to chronic toxicity."

186.   Given these gaps, the Channelkeeper letter concludes that BSEE and BOEM cannot rely on the NPDES permit to justify a no significant impact determination, and thus more thorough environmental review (*i.e.* an EIS) should be prepared.

## H.   The Final Programmatic Environmental Assessment and Finding of No Significant Impact

187.   BSEE and BOEM did not prepare an EIS but instead issued a Final Programmatic Environmental Analysis ("Final PEA" or "PEA") and FONSI.  As proposed in the Draft PEA, BSEE and BOEM approved the proposed action, Alternative 1 ("Allow use of WSTs").  Under this final agency action, BSEE and BOEM have approved the use of WSTs at the twenty-three production platforms located on the forty-three active leases on the Southern California OCS without conditions, mitigations, or other specific limitations.

188.   The FONSI states that BSEE and BOEM received more than 10,000 public comments on the Draft PEA, including an estimated seventy-five unique comments (not submitted via standardized email from outreach campaign). Despite this extensive public input, including the detailed comments described in detail in this complaint, the Final PEA differs in only minor respects from the Draft

PEA.  As stated by BSEE and BOEM in the Final PEA's "summary of the changes made to the Draft PEA," these revisions include "factual or editorial errors," clarification of text to "address areas of confusion," and clarification or expansion to provide additional information in "a number of areas, including the purpose and need, the proposed action and alternatives, and the discharge of WST-chemicals." Final PEA, at A-3.

189.   Among the changes, the Final PEA slightly modifies its conclusions regarding potential environmental effects.  For example, several categories of impacts (air quality; water quality; benthic resources; marine and coastal fish and essential fish habitat, sea turtles, marine and coastal birds, marine mammals; and commercial and recreational fisheries) are described as having "no discernible WST-related impacts" rather than simply "no WST-related impacts."  Final PEA, at Table ES-1, ES-12-ES-13.  The Final PEA continues to conclude that there will be "no WST-related impacts" to areas of resource concern (*e.g.* Channel Islands National Marine Sanctuary and Channel Islands National Park), recreation and tourism, archaeological resources, and environmental justice.

190.   With respect to the purpose and need, the Final PEA modifies the statement to make it even more aligned with the interests of the oil company lessees operating on the OCS, now describing the purpose of the proposed action as "to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (*i.e.* without the use of WSTs)." Final PEA, at 1-3.

191.   The Final PEA provides more detailed descriptions regarding alternatives than the Draft PEA.  For example, the Final PEA includes additional language clarifying that "for purposes of this programmatic analysis, the Bureaus are analyzing up to five WST approvals per year, and their potential impacts, in this PEA."  Final PEA, at 2-6.  However, the alternatives themselves remain unchanged.  Both the Draft PEA and Final PEA include analysis of four

1   alternatives: allow use of WSTs (the approved agency final action); allow use of

2   WSTs with subsurface seafloor depth stipulations; allow use of WSTs but no open

3   water discharge of WST waste fluids; and no action (allow no use of WSTs).

4          192.    Based on the analysis in the Draft PEA and minor changes in the Final

5   PEA, BSEE and BOEM issued their May 27, 2016, FONSI.  That FONSI includes

6   brief descriptions of the agencies' conclusions that its approval of WST without

7   conditions, mitigations, or other restrictions on the Southern California OCS will

8   not have significant impacts on Physical Resources including air quality, water

9   quality, and geologic resources/seismicity; Biological Resources including benthic

10  resources, marine and coastal fish, birds, mammals, and reptiles; and

11  Socioeconomic Considerations.  Despite the numerous gaps in information

12  addressing numerous potential impacts from the use of WST in the Southern

13  California OCS, BSEE and BOEM confidently declare in the FONSI that

14  "[a]lthough some questions were raised during the public comment period as to the

15  availability of adequate information, there is no question as to the overall

16  consequences." FONSI at 6.

17         **I.    Subsequent Drilling Authorizations Issued Since the Final PEA**

18         193.    Programmatic decisions such as BSEE's and BOEM's May 27, 2016,

19  FONSI authorizing the use of WST without conditions, mitigations, or other

20  restrictions from twenty-three producing platforms within the Southern California

21  OCS have immediate and important consequences.  Authorizing practices such as

22  offshore WST, even at a broad or programmatic level, has great significance

23  because such a decision "will influence subsequent site-specific actions."  *Laub v.*

24  *U.S. Dep't of Interior*, 342 F.3d 1080, 1088 (9th Cir. 2003).   Stated slightly

25  differently, a preferred alternative set out and chosen in a programmatic NEPA

26  decision "will determine the scope of future site-specific proposals."  *Id*. at 1089.

27  CEQ regulations define this practice as "tiering."  40 C.F.R. § 1502.20 (1978)

28  ("Whenever a broad environmental impact statement has been prepared . . . and  a

subsequent statement or environmental assessment is then prepared on an action
included within the . . . program or policy (such as a site specific action) the
subsequent statement or environmental assessment need only summarize the issues
discussed in the broader statement . . ..”); FONSI at 4 (deciding that BSEE "will
approve the use of fracturing and non-fracturing WSTs at the 22 production
platforms located on the 43 active leases" if deemed compliant with regulatory
performance standards).

194.   The settlement agreement in *EDC v. BSEE* established May 28, 2016,
as the date in which BSEE's moratorium on consideration or approval of WST
permits ended.

195.   BSEE has yet to fulfill its duty under the *EDC v. BSEE* settlement
agreement to permanently increase the public transparency of permit issuance
within the Pacific Region by expanding its existing "eWell system" currently used
in the Gulf of Mexico to the Pacific Region, or by establishing an equivalent
system for the Pacific Region.

196.   Pending completion of that system becoming operational, the
settlement agreement provides that BSEE shall provide interim notice of such
permit applications directly to plaintiff EDC.  BSEE is currently providing that
interim notice through a website.[2]

197.   According to BSEE's interim website, two applications for WST have
been submitted and approved since the May 27, 2016, issuance of the FONSI
programmatically authorizing the use of WST offshore in the Southern California
OCS.

198.   The first permit was issued to the company DCOR, and approved as
an Application for Permit to Modify at Well S-55.  The permit was issued under
Lease No. 216.  Lease No. 216 was one of twenty-six leases totaling 129,708 acres

---

[2] *See* http://www.bsee.gov/About-BSEE/BSEE-Regions/Pacific-Region/BSEE-
Pacific-Region-Completed-Applications-for-Permit-to-Modify-APM/.

1  sold by the government on December 15, 1966, and February 2, 1968. Lease 216

2  is within the Santa Clara Unit and is accessed from Platform Gilda.

3       199.   DCOR's APM for Well S-55 was submitted on BSEE Form-0124.

4  For Item 16 ("Proposed or Completed Work") DCOR selected "enhance

5  production," and in particular "acidize" and "artificial lift."  BSEE appears to have

6  redacted key information provided by DCOR on Form-0124, including Item 17

7  ("Briefly Describe Proposed Operations") and the attachments submitted with Item

8  18 ("Attach complete well prognosis" as required by BSEE regulations).  Although

9  the attachments are not included, DCOR's response indicates that it submitted five

10  attachments, including a workover procedure and acid schedule.  DCOR states on

11  the Form the estimated duration of the operation to be eleven days, with a proposed

12  start date of August 15, 2016.

13       200.   Prior to approving the APM for Well S-55, BSEE was required to

14  conduct NEPA analysis.  However, to the best of Plaintiffs' knowledge, no NEPA

15  documents accompanying this APM are publicly available.  Accordingly, on July

16  19, 2016, Plaintiff EDC submitted a FOIA request to the BSEE Pacific Region

17  office for all APMs and APDs submitted and deemed complete from January 1,

18  2016, to the present.  The request includes all accompanying NEPA

19  documentation, such as categorical exclusions reviews, decision memos or other

20  analyses or decision documents.  Plaintiffs are awaiting BSEE's response to this

21  FOIA request.

22       201.   The second permit was issued to the company DCOR, and approved

23  as an Application for Permit to Modify at Well B-35.  The permit was issued under

24  Lease No. 241.  Lease No. 241 was one of twenty-six leases totaling 129,708 acres

25  sold by the government on December 15, 1966, and February 2, 1968.  Lease No.

26  241 is accessed from Platforms A, B, and C.

27       202.   DCOR's APM for Well B-35 was submitted on BSEE Form-0124.

28  Under "Permit Primary Type" DCOR selected "Enhance Production" and under

"Permit Subtype(s)" DCOR selected "Acidize."  Under "Operation Description" DCOR selected "perform acid cleanout."  BSEE appears to have redacted key information provided by DCOR on Form-0124, including the attached Procedure and Well Information referenced under "Operation Description."  DCOR states on the Form the estimated duration of the operation to be seven days, with a proposed start date of September 1, 2016.

203.   Plaintiffs have likewise been unable to identify any NEPA documentation associated with the APM for Well B-35.

## J.    Violations of the Endangered Species Act

204.   BSEE and BOEM have also failed to engage in consultation to ensure their action does not jeopardize listed species or result in the destruction or adverse modification of their critical habitat, as required by Section 7(a)(2) of the ESA, *id.* 16 U.S.C. § 1536 (a)(2).

205.   On August 10, 2016, Plaintiffs provided notice to BSEE, BOEM, and DOI Secretary Jewell, pursuant to Section 11(g) of the ESA, 16 U.S.C. § 1540(g), that BSEE and BOEM are in violation of Sections 7 and 9 of the ESA, due to their programmatic approval of offshore well stimulation treatments.

206.   There are at least twenty-five species listed as endangered or threatened pursuant to the ESA that may be present in the Southern California OCS and that may be affected by the action.  These species include the endangered black abalone, with critical habitat designated on portions of the shoreline of the Channel Islands, 74 Fed. Reg. 1937 (January 14, 2009); the endangered white abalone in its pacific coast range, 66 Fed. Reg. 29054 (May 29, 2001); the endangered southern California steelhead, with designated critical habitat on multiple waterways between the Santa Maria River and San Mateo Creek, 71 Fed. Reg. 834 (Jan 5, 2006), 50 C.F.R. §§ 224.101, 266 (2016); the endangered scalloped hammerhead shark, Eastern Pacific DPS, 79 Fed. Reg. 38214 (July 3, 2014); the threatened green sturgeon (southern DPS), 71 Fed. Reg. 17757 (April 6,

2005); the endangered tidewater goby, proposed to be reclassified as threatened, 59 Fed. Reg. 5494 (Feb. 4, 1994), with critical habitat in waterways along Santa Barbara, Ventura, and Los Angeles Counties, 78 Fed. Reg. 8746 (Feb. 6, 2013); the endangered sei whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered blue whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered fin whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered North Pacific right whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); 73 Fed. Reg. 12024 (March 6, 2008); the endangered humpback whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the endangered sperm whale, 35 Fed. Reg. 18319 (Dec. 2, 1970); the threatened Guadalupe fur seal, 50 Fed. Reg. 51252 (December 16, 1985); the threatened southern sea otter, 42 Fed. Reg. 2965 (January 14, 1977); the endangered Hawaiian petrel, 32 Fed. Reg. 4001 (March 11, 1967); the endangered California Ridgway's rail, 35 Fed. Reg. 16047 (Oct. 13, 1970); the endangered short-tailed albatross, 65 Fed. Reg. 46643 (July 25, 2000); the endangered California least tern, 35 Fed. Reg. 16047 (October 13, 1970); the endangered light-footed Ridgway's rail, 35 Fed. Reg. 16047 (October 13, 1970); the threatened western snowy plover (Pacific DPS), 58 Fed. Reg. 12864 (March 5, 1993); the threatened marbled murrelet, 57 Fed. Reg., 45328 (Sep 28, 1992); the endangered loggerhead turtle North Pacific DPS, 76 Fed. Reg. 58868 (Sep. 22, 2011); the endangered leatherback turtle, 35 Fed. Reg. 8491 (June 2, 1970); the threatened green turtle East Pacific DPS, 81 Fed. Reg. 20057 (April 6, 2016); and the threatened olive ridley turtle. 43 Fed. Reg. 32800 (July 28, 1978). All of these species may be affected by WSTs.

207. Plaintiffs' notice letter alleged that BOEM and BSEE are in violation of the ESA for failing to lawfully consult with the FWS and NMFS regarding impacts on the listed species identified in paragraph 206 above; failing to "use the best scientific and commercial data available," and failing to insure that the project will not jeopardize the continued existence of listed species or result in the destruction or adverse modification of their designated critical habitat. Plaintiffs

1   also provided notice that to the extent BSEE and BOEM concluded that the

2   programmatic approval would have "no effect" on listed species, such conclusions

3   were unlawful and in violation of Sections 7 and 9 of the ESA.

4        208.   The best available scientific information demonstrates that offshore

5   well stimulation, including fracking and acid well stimulation, as well as similar

6   practices including "routine" acid treatments or "acid washes," may impact

7   threatened and endangered marine and coastal species in numerous respects: toxic

8   chemicals used in the process risk being spilled during transportation and delivery,

9   and WST-related wastes risk being spilled during handling, processing, and

10  disposal. Impacts of these toxic discharges on the marine environment have never

11  been meaningfully analyzed.  In addition, the action threatens many of these

12  species with noise disturbance or being struck by platform supply vessels

13  delivering WST equipment and supplies, and by the risk of accidental seafloor

14  surface expressions or produced water pipeline leaks.  Well stimulation also

15  extends the life of existing oil platforms thereby prolonging the occurrence and

16  impacts of offshore drilling.  Such impacts include the risk of oil spills on a

17  sensitive marine environment suffering from a history of devastating spills,

18  including the May 19, 2015, rupture of the Plains All-American Pipeline, which

19  delivered crude that originates from offshore platforms where WSTs have

20  occurred.  The spill harmed hundreds of coastal birds and other marine wildlife.

21  The Ninth Circuit Court of Appeals has already specifically recognized the

22  potential for adverse impacts on listed species in relation to OCS oil and gas

23  production offshore California. *Norton*, 311 F.3d at 1176–77  (finding potential

24  adverse impacts on threatened and endangered species including the southern sea

25  otter; the potential adverse effects on ecologically significant or critical areas

26  including the Channel Islands National Marine Sanctuary).

27       209.   During the programmatic WST NEPA process, BSEE and BOEM

28  specifically acknowledged the potential for impacts to listed species.  The Final

PEA identifies potential impacts to benthic organisms, which includes black abalone and white abalone.  For example, it states there are "minimal effects on benthic organisms" regarding the discharge of flowback fluids. Final PEA, at 4-52.

210.   The Final PEA identifies potential impacts to marine and coastal fish, which includes the southern California steelhead, the scalloped hammerhead shark, and the tidewater goby.  For example, it recognizes the potential for fish to be "temporarily exposed to highly diluted concentrations of WST-related chemicals" in platform discharges.  Final PEA, at 4-54.

211.   The Final PEA identifies potential impacts to marine mammals, which includes the sei whale, the blue whale, the fin whale, the humpback whale, the sperm whale, the Guadalupe fur seal, and the southern sea otter.  For example, it acknowledges potential impacts "associated with the discharge from platforms of WST-related fluids and chemicals," Final PEA, at 4-54, from "noise" and being "struck by PSVs," Final PEA, at 4-55, from a surface spill of WST chemicals, *id.* at 4-56, and from "disturbance in behavior and/or distribution of some individuals." *Id.*

212.   The Final PEA identifies potential impacts to birds, which includes the western snowy plover, the marbled murrelet, the light-footed Ridgway's rail, and the California least tern.  For example, the Final PEA states that marine and coastal birds may be affected by "noise or the presence of PSVs" and the "accidental release of WST chemicals." *Id.* at 4-59–60.

213.   The Final PEA identifies potential impacts to sea turtles, which includes the loggerhead turtle, the leatherback turtle, the green turtle, and the olive ridley turtle.  For example, sea turtles could be impacted by the "accidental release of WST fluids and crude oil," resulting in "decreased health, reproductive fitness, and longevity," Final PEA, at 4-61, "affected during spill containment and cleanup activities.," *id.* at 4-62, "struck by PSVs," disturbed by noise associated with PSVs, and "expos[ed] [to WST chemicals] through direct contact and through ingestion

of contaminated food," *id.* at. 4-60.

214.   These potential impacts, even if characterized as minimal, trigger Federal Defendants' duty to initiate consultation, because the action "may affect" these listed species.  50 C.F.R. § 402.14(a) (1986); 51 Fed. Reg. 19926 (June 3, 1986) (this standard includes "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character"); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013) ("While the 'disturbance effects' may be discountable or insignificant . . . 'any possible effect' requires the [agency] to obtain the concurrence of the Wildlife Service in order to avoid consultation.").  Federal Defendants' own analysis identifies such potential effects, triggering the consultation requirement.

215.   In addition to the potential impacts identified above, Federal Defendants have also failed to address indirect and cumulative impacts, for example, the impacts to threatened and endangered species and their critical habitat from extending the life of oil platforms and infrastructure, such as oil pipelines that may rupture and harm wildlife.

216.   If Federal Defendants are implicitly making a "no effect" or "not likely to adversely affect" determination with respect to any of the species, such a determination is invalid because it is arbitrary and capricious.  BSEE and BOEM rely on cursory analysis and unfounded assumptions about the frequency of WSTs to reach the conclusion that impacts are "minimal" or "negligible."  There is no rational connection between recognizing these potential impacts and any conclusion of "no effect," and the agencies overlook many important aspects of the problem such as extending the life of existing platforms.  *See Native Ecosystems Council*, 946 F. Supp. 2d at 1079 ("To recognize that the Project will result in 'disturbance effects' and then conclude that the Project will have 'no effect' on grizzly bears is arbitrary and capricious.").

217.   Federal Defendants have also concluded the action will have "no effect" on certain listed species:  the North Pacific right whale, short-tailed albatross, Hawaiian petrel, southern green sturgeon, and California Ridgway's rail. However, in the analysis for all such species, BSEE and BOEM summarily reach conclusions that the species will not occur in the area with any regularity as a basis for concluding that the action will have "no effect" on the species.  Their own analysis, however, fails to use the best scientific information available, and recognizes that species may be present, yet fails to explain how despite their presence, the species will not be impacted.

218.   For example, with respect to the North Pacific right whale, the Final PEA states that there are "very few sightings of individuals off southern California and any individuals that may enter the project area would likely spend a very limited amount of time in the vicinity of any of the offshore platforms."  Final PEA, at 4-55.  However, because this species has a migration range that includes the action area, individuals are subject to all of the same threats to which the other whales assessed in the Final PEA are subject, including collisions with vessels.

219.   With regard to the short-tailed albatross, the Final PEA reaches a "no effect" conclusion because of irregular occurrence and "lack of recorded sightings in the vicinity of the project area."  Final PEA, at 3-60.  However, it also notes that nine of the records of sightings have occurred in the action area, including around the Channel Islands.  *Id.* at 3-59.  Therefore, the short-tailed albatross is likewise subject to the same potential impacts to which the other marine and coastal birds are subject.  BSEE's and BOEM's analysis of the Hawaiian petrel and the California Ridgway's rail follow similar unsupported conclusions.

220.   With respect to the southern green sturgeon, Federal Defendants overlook that the species may be present, as it occurs up and down the west coast, including near Point Conception. *See* NMFS, Green Sturgeon Range Map (December 2007).

221.   Federal Defendants had sixty days (or until October 9, 2016) to remedy these alleged violations before Plaintiffs could bring suit in Federal District Court.  Based on available information, Defendants have failed to remedy any of their violations of the ESA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of NEPA
### Approval of Unlawful EA and FONSI

222.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

223.   Pursuant to NEPA, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9 (1978).  Defendants have failed to abide by this overarching requirement in numerous respects.

224.   NEPA requires federal agencies proposing actions to "briefly specify the underlying purpose and need to which the agency is responding to in proposing the alternatives including the proposed action." 40 C.F.R. §§ 1502.13, 1508(9)(b) (1978); 43 Fed. Reg. 45,983 (1979).   A purpose and need statement that states a purpose to enact or adopt a private party applicant's proposal is unlawfully narrow. *National Parks Conservation Ass'n*, 606 F.3d at 1069–72.  The PEA fails to meet these legal requirements by including a purpose and need statement that is driven entirely by the desire of oil company lessees to conduct offshore well stimulation.

225.   The legal settlement in *EDC v. BSEE* further undermines the notion that the underlying purpose of the PEA was simply to facilitate offshore well stimulation.  As stated in the settlement, the PEA is a central obligation agreed to by the agencies in order to resolve Plaintiffs' numerous alleged claims that the agencies have routinely violated NEPA in their issuances of categorical exclusions for offshore fracking and acidizing.  Under the settlement, the purpose of the PEA is for the agencies, *for the first time*, to consider the potential environmental

1    impacts of offshore well stimulation, and then based on that analysis, determine

2    *whether* further offshore well stimulation should be permitted or otherwise

3    authorized.  Indeed, BSEE and BOEM agreed that they "will not pre-determine the

4    outcome of this assessment."  The purpose and need statement runs directly afoul

5    of this binding settlement commitment, as well as NEPA's underlying

6    requirements, by not only presuming that offshore fracking and acidizing can be

7    done safely and in conformance with governing laws, but that BSEE and BOEM

8    have an obligation to promote their use.

9        226.   Using the purpose and need statement as a foundation, federal

10   agencies must rigorously explore and objectively evaluate a reasonable range of

11   alternatives and their associated impact on the environment.  42 U.S.C. §4332(C);

12   40 C.F.R. 1502.14 (1978).  As purpose and need statements are one of the main

13   engines driving the alternatives analysis within a NEPA document, failure to

14   properly define a project's purpose and need will, in turn, preclude proper

15   consideration of a reasonable range of alternatives.  *National Parks Conservation*

16   *Ass'n*, 606 F. 3d at 1072 ("As a result of this unreasonably narrow purpose and

17   need statement, the BLM necessarily considered an unreasonably narrow range of

18   alternatives.").

19       227.   BSEE and BOEM unlawfully narrowed the scope of the purpose and

20   need statement, and in turn unlawfully constrained their consideration of

21   alternatives and rendered the PEA an empty formality.  Although the agencies

22   developed two alternatives that would place some restrictions on the use of

23   offshore fracking and acidizing, by prohibiting the use of fracturing WSTs at

24   depths less than 2,000 feet and prohibiting open water discharge of WST waste

25   fluids, respectively, the agencies inexplicably failed to consider the restrictions

26   together in one alternative, or to otherwise craft a comprehensive alternative that

27   would best preserve the environment in the event that future WST treatments are

28   allowed by the agencies.

228.   BSEE and BOEM also failed to adequately consider a reasonable range of alternatives due to their unsupported conclusions that offshore fracking and acidizing will essentially cause no environmental impacts.

229.   Specifically, in the PEA BSEE and BOEM analyze the following categories of potential environmental impacts:  air quality (including greenhouse gas emissions); water quality; geologic resources/seismicity; benthic resources; marine and coastal fish and essential fish habitat; marine and coastal birds; marine mammals; sea turtles; commercial and recreational fisheries; areas of special concern; recreation and tourism; environmental justice; and archeological resources.  Final PEA at ES-5, ES-7.  Almost without exception, BSEE and BOEM conclude that the proposed action Alternative 1 to allow use of offshore fracking and acidizing will result in "no" or "negligible" impacts.  Final PEA at ES-11–ES-13 (Table ES-1).  Only with respect to air quality ("negligible emissions of greenhouse gases"); water quality ("slight localized reduction in water quality at surface water discharge location");  benthic resources ("potential for some individuals to be temporarily exposed to highly diluted concentrations of WST-related chemicals within the NPDES discharge mixing zone"); and marine and coastal fish and essential fish habitat, sea turtles, marine and coastal birds, and marine mammals ("potential for some individuals to be temporarily exposed to highly diluted concentrations of WST-related chemicals within the NPDES discharge mixing zone. Short-term and localized disturbance in behavior and/or distribution of individuals during WST implementation possible but effects negligible") do BSEE and BOEM acknowledge *any* potential environmental impacts from offshore fracking and acidizing.  These conclusions are unlawful under NEPA, and lack scientific and analytic integrity.

230.   BSEE and BOEM's conclusion of no environmental impacts is driven by several fundamental assumptions and other significant errors, including: 1) unsupported and inconsistent assumption of infrequent use of well stimulation

treatments; 2) unlawful reliance on U.S. EPA's NPDES General Permit, which authorizes wastewater discharges from offshore platforms located in the Southern California OCS; 3) failure to adequately assess the impacts of well stimulation treatments on water quality; and 4) failure to adequately consider the environmental context of the Santa Barbara Channel, protected lands and waters (including Channel Islands National Park and Channel Islands National Marine Sanctuary), and threatened and endangered species in its programmatic analysis of offshore well stimulation in the Southern California OCS.  In addition, BSEE and BOEM failed to adequately assess the increased risk of environmental impacts associated with the use of well stimulation extending the life of aging offshore oil platforms beyond their estimated life span.

231.   BSEE and BOEM were required in the PEA to consider "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.7 (1978).  A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions regardless of what agency . . . or person undertakes such actions."  *Id*.  In addition, BSEE and BOEM should have considered "similar" actions, most notably "routine" acid use or "acid washes." 40 C.F.R. § 1508.25(a)(3) (1978).

232.   BSEE and BOEM have failed to conduct a lawful cumulative effects analysis in the PEA.  For example, the PEA fails to analyze impacts associated with oil infrastructure, including pipelines and processing plants.   The Refugio Oil Spill is an example of the extent of such potential impacts.  On May 19, 2015, the Plains All-American Pipeline 901 suffered a massive leak, due to external corrosion, resulting in approximately 2,934 barrels (over 140,000 gallons) of crude oil spilling from onshore Gaviota Coast, onto the beach and into the ocean. Pipeline and Hazardous Materials Safety Administration, *Failure Investigation Report* (May 19, 2015).  The spill resulted in hundreds of dead birds and mammals

1  and many more injured, 150 miles of coastline contaminated, two State parks

2  closed, and 138 square miles of fishing grounds closed.  Pipeline 901 delivers

3  crude that originates from seven offshore oil platforms in the Channel, including

4  from Platforms Heritage, Harmony and Hondo (operated by ExxonMobil);

5  Hidalgo, Harvest and Hermosa (operated by Freeport McMoran); and Holly

6  (operated by Venoco).  Offshore WST is known to occur on at least three of these

7  platforms.  Offshore WST enhances production and extends the life of offshore oil

8  platforms, necessitating continued operation of oil infrastructure, and posing

9  additional threats.  The PEA fails to analyze the cumulative impacts of existing and

10  future oil infrastructure or assess the incremental impacts of WSTs.

11  233.   In addition, the PEA does not contain a lawful analysis regarding the

12  cumulative and similar impacts of "routine" acidizing or "acid washes", and the

13  estimated impacts on the environment this practice may have.  BSEE and BOEM

14  apparently consider essentially all treatments using acid to be "routine," as the

15  PEA states that only two matrix acidizing treatments meeting the SB 4 definition

16  were conducted on the California OCS between 1985 and 2011, and that "the rest

17  would be currently classified as routine well maintenance treatments."  Final PEA,

18  at 4-3; *see also id.* at ES-8.  This information appears to conflict with information

19  EDC has compiled through its own review of BSEE records obtained through

20  FOIA, including specific permits that were challenged in the previous *EDC v.*

21  *BSEE* lawsuit.  *See*, *e.g.,* Jan. 3, 2011, APM at Platform Harmony (authorizing

22  "acid stimulate" with  17,000 gallons 15% HCL and 26,000 gallons 12-3 mud acid

23  (12% HCL + 3% HF); March 22, 2013, APM at Platform Harmony (authorizing

24  "acid stimulate" with 75,000 gallons 15% HCL); December 2, 2013, APM at

25  Platform Gilda (authorizing "acid stimulation").  Whatever label is ascribed to the

26  practices authorized under these permits, the failure to consider their cumulative

27  impacts was unlawful.

28

234.   BSEE's and BOEM's May 27, 2016, FONSI  authorizes the use of WST without conditions, mitigations, or other restrictions from twenty-three producing platforms within the Southern California OCS.  According to Plaintiffs' information and belief, at least two applications for WST have been submitted and approved since that authorization, including an APM for Well S-55 (Platform Gilda)(operations including "enhance production," and "acidize" and "artificial lift" and an APM for Well B-35 (Platforms A, B, or C) (operations include "enhance production" and acidize).

235.   BSEE and BOEM will continue to issue implementing decisions approving APMs and/or APMs that include WST operations in reliance upon the May 27, 2016, FONSI.

236.   The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary and capricious, an abuse of discretion, not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  For each of the above reasons, and others, BSEE's and BOEM's adoption of an inadequate PEA and FONSI to authorize the use of offshore well stimulation in the Southern California OCS without qualification or restriction is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

**SECOND CLAIM FOR RELIEF**
**Violation of NEPA**
**Failure to Prepare an EIS**

237.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

238.   NEPA requires all federal agencies to prepare an EIS for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(C).  BSEE and BOEM violated NEPA in approving the PEA and FONSI authorizing the use of well stimulation techniques, including hydraulic

1   fracturing and acid well stimulation, from the twenty-three production platforms
2   located in the Southern California OCS, without conditions, mitigations, or other
3   restrictions without preparing an EIS.  BSEE's and BOEM's conclusion that
4   preparation of an EIS was not required prior to the programmatic authorization of
5   offshore well stimulation within the Southern California OCS is unlawful.

6       239.   In determining whether a proposed action may significantly affect the
7   environment, NEPA requires that both the context and intensity of that action be
8   considered.  40 C.F.R. § 1508.27 (1978).  In considering context, "[s]ignificance
9   varies with the setting of the proposed action."  *Id.* § 1508.27 (a).   Consideration
10  of intensity, on the other hand, "refers to the severity of the impact," which is
11  guided by consideration of ten specific factors.  Many of these factors requiring the
12  preparation of an EIS are triggered by BSEE's and BOEM's approving the PEA
13  and FONSI authorizing the use of well stimulation techniques, including hydraulic
14  fracturing and acid well stimulation, from the twenty-three production platforms
15  located in the Southern California OCS, without conditions, mitigations, or other
16  restrictions, including  "[u]nique characteristics of the geographic area such as
17  proximity to park lands . . . wetlands . . . or ecologically critical areas,"  "[t]he
18  degree to which the action may establish a precedent for future actions with
19  significant effects or represents a decision in principle about a future
20  consideration," and "[w]hether the action is related to other actions with
21  individually insignificant but cumulatively significant impacts."  *Id.* § 1508.27(b).
22  "The presence of one such factor may be sufficient to deem the action significant."
23  *National Parks*, 241 F. 3d at 731; *Norton*, 311 F.3d at 1162.

24      240.   In addition to NEPA's overarching significance regulations, NEPA's
25  implementing regulations place specific obligations on agencies considering a
26  proposed action with incomplete or unavailable information.  Under those
27  regulations, when there is incomplete or unavailable information regarding
28  potential environmental impacts, the agency shall always make clear that such

information is lacking.  40 C.F.R. § 1502.22 (1978).   An "agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain . . . [and] where uncertainty may be resolved by further collection of data, or where the collection of data may prevent speculation on potential effects." *National Parks*, 241 F. 3d at 731.

241.   The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that "are therefore arbitrary and capricious, an abuse of discretion, not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  For each of the above reasons, and others, BSEE's and BOEM's May 27, 2016, FONSI authorizing of the use of offshore well stimulation in the Southern California OCS without qualification or restriction and without first preparing an EIS is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

### THIRD CLAIM FOR RELIEF
### Violation of ESA
### Failure to Initiate Consultation and Unlawful No Effect Determinations in Violation of Sections 7 and 9

242.   Each and every allegation set forth in the Complaint above is incorporated herein, by reference.

243.   The ESA requires all federal agencies to initiate consultation with the appropriate wildlife agency (NMFS or FWS) before undertaking an action that "may affect" a listed species or critical habitat.  50 C.F.R. § 402.14(a) (1986); 16 U.S.C. § 1536 (a)(2).  This standard triggers consultation if an action has "any chance of affecting listed species or critical habitat," even if effects are "benign" or of an "undetermined character." *Karuk Tribe*, 681 F.3d at 1027 (internal citations omitted).  BSEE and BOEM violated the ESA in approving the PEA and FONSI authorizing the use of well stimulation techniques, including hydraulic fracturing

and acid well stimulation, from the twenty-three production platforms located in the Southern California OCS, without initiating consultation.  BSEE's and BOEM's failure to initiate consultation, despite the potential for impacts on listed species, prior to the programmatic authorization of offshore well stimulation within the Southern California OCS, and the agencies' determination that the use of WSTs on the Southern California OCS will have no effect on listed species, violated Sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538.

244.   Federal Defendants' decision to approve the FONSI and PEA authorizing the use of offshore well stimulation in the Southern California OCS is a project "authorized, funded, or carried out by such agency" and therefore within the definition of agency action subject to the ESA under 50 C.F.R. § 402.02.50 (1986).

245.   Under ESA Section 7, BSEE and BOEM were required to request from both NMFS and FWS "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (2016) (emphasis added). To the best of Plaintiffs' knowledge, BSEE and BOEM have not created a species list and received concurrence from NMFS and FWS, nor have they requested the preparation of the list, in violation of Section 7(a)(2).

246.   The action may affect at least twenty-five species listed as endangered or threatened under the ESA, and identified above in paragraph 206; however, Federal Defendants have not initiated consultation with respect to any of these species.

247.   BSEE and BOEM acknowledge the presence of, and potential impacts on at least twenty listed species, as described in paragraphs 204–221 above, and generally recognize that the action may affect listed species. FONSI, at 4 (concluding that the action "is expected to have negligible to minor effects on biological resources"); Final PEA, at 3-37 (emphasis added) ("[O]perational

1   discharges to the ocean from the platforms and support vessel traffic may affect

2   ecological resources in the project area.").  While BSEE's and BOEM's analysis

3   dismisses these impacts, even negligible or minor potential impacts trigger the

4   consultation requirement.  *See Karuk Tribe*, 681 F.3d at 1027 ("[A]ctions that have

5   *any chance* of affecting listed species or critical habitat—even if it is later

6   determined that the actions are 'not likely' to do so—require at least some

7   consultation under the ESA.").

8       248.   Federal Defendants have also concluded that the action will have "no

9   effect" on certain species.  For the reasons explained in paragraphs 204–221

10  above, BSEE's and BOEM's "no effect" conclusions with respect to the North

11  Pacific right whale, the southern green sturgeon, the short-tailed albatross, the

12  Hawaiian petrel, and the California Ridgway's rail are arbitrary and capricious and

13  fail to use the best scientific information available, in violation of Sections 7 and 9

14  of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538.

15      249.   As a result of failing to engage in consultation under Section 7, BSEE

16  and BOEM have likewise failed to establish an ITS that would account for impacts

17  from "incidental take" associated with offshore WSTs, and thus face liability under

18  Section 9.  *See* 16 U.S.C. § 1536 (o)(2) (establishing that taking that is "in

19  compliance with the terms and conditions specified" in the ITS is "not considered a

20  prohibited taking" under Section 9).  Potential impacts that could constitute take

21  are described above, and include, for example, impacts from exposure to toxic

22  chemicals or collisions with PSVs.  *See* Final PEA Section 3.5 (Ecological

23  Resources), 4.5.1.4 (Environmental Consequences- Ecological Resources).

24  However, in the absence of an ITS that sets limits on take and is designed to ensure

25  against jeopardy, impacts from offshore WSTs that cause take with respect to all

26  twenty-five listed species that may be affected, likewise violates Section 9.

27  BSEE's and BOEM's authorization of offshore WST pursuant to the FONSI and

28

---

Complaint for Declaratory and Injunctive Relief                                    Page 70

PEA violates Section 9's prohibition on "taking" of any threatened or endangered species.  *See* 16 U.S.C. §1538(a).

250.   The ESA provides that "any person" may bring suit "to enjoin any person, including the United States . . . who is alleged to be in violation" of the ESA. 16 U.S.C. § 1540(g)(1)(A).  Federal Defendants have failed to engage in consultation to ensure the action does not jeopardize these listed species or result in the destruction or adverse modification of their critical habitat, as required by Section 7(a)(2) of the ESA, 16 U.S.C. § 1536 (a)(2).

251.   For each of the reasons above, and others, BOEM's and BSEE's failure to initiate consultation with FWS (in relation to the southern sea otter, the Guadalupe Fur Seal, the light-footed Ridgway's rail, western snowy plover, marbled murrelet, California least tern, short-tailed albatross, Hawaiian petrel, and California Ridgway's rail) and NMFS (in relation to the black abalone, white abalone, sei whale, blue whale, fin whale, North Pacific right whale, humpback whale, sperm whale, southern California steelhead, scalloped hammerhead shark, southern green sturgeon, tidewater goby, loggerhead turtle, leatherback turtle, green turtle, and olive ridley turtle) with respect to the May 27, 2016, FONSI and PEA violates Sections 7 and 9 of the ESA, 16 U.S.C. §§ 1536(a)(1)–(2), 1538, and is subject to judicial review under the ESA.

## RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request that the Court:

A.   Declare that Defendants have violated NEPA, its implementing regulations, and the APA as described above by failing to take a "hard look" at the potential environmental impacts of offshore well stimulation and failing to prepare an EIS before authorizing the use of WST, without condition, mitigation, or other restriction, from twenty-three production platforms located in the Southern California OCS;

B.     Vacate the Final PEA and FONSI;

C.     Enjoin Defendants from issuing Permits (to Drill or to Modify) for well stimulation treatments, until and unless Defendants comply with NEPA and all other applicable laws;

D.     Remand the Final PEA and FONSI to Defendants for preparation of an EIS that addresses the potential environmental impacts of WST in the Southern California OCS;

E.     Declare that Defendants have violated the ESA, and its implementing regulations, by failing to initiate consultation with respect to all listed species that may be present;

F.     Declare that Defendants have violated the ESA, and its implementing regulations, by making unlawful "no effect" determinations;

G.     Enjoin Defendants from issuing Permits (to Drill or to Modify) for well stimulation treatments, until and unless Defendants comply with the ESA and all other applicable laws;

H.     Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the ESA and the Equal Access to Justice Act, 28 U.S.C. § 2412, or other authority; and

I.     Grant such additional relief as the Court deems just and proper.

Respectfully submitted this November 11th, 2016

/s/ _____

Margaret Morgan Hall (Bar No. 293699)
Email: mhall@environmentaldefensecenter.org
906 Garden Street
Santa Barbara, California 93101
Phone:  (805) 963-1622
Facsimile:  (805) 962-3152

*Attorneys for Plaintiffs*
ENVIRONMENTAL DEFENSE CENTER and
SANTA BARBARA CHANNELKEEPER