JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
JOSEPH H. KIM (IL 6243249)
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Tel:    (202) 305-0207
E-mail: joseph.kim@usdoj.gov
TRENT S.W. CRABLE (WA 38227)
Wildlife & Marine Resources Section
Tel:    (202) 305-0339
Fax:    (202) 305-0506
Email: trent.crable@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al., | No. 2:16-cv-08418-PSG-FFMx |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| BUREAU OF OCEAN ENERGY MANAGEMENT, et al., | Hearing Date:  June 12, 2017 |
| Defendants, | Hearing Time:  1:30 p.m. |
| and | Courtroom:      6A |
| AMERICAN PETROLEUM INSTITUTE and EXXON MOBIL CORP., | Hon.       Philip S. Gutierrez |
| Intervenor-Defendants. | |

### NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that, on June 12, 2017, at 1:30pm, or as soon thereafter as it may be heard, Defendants Bureau of Ocean Energy Management (BOEM); Richard Yarde, Regional Supervisor, Office of Environment, Bureau of Ocean Energy Management; David Fish, Acting Chief, Environmental Compliance Division, Bureau of Safety and Environmental Enforcement; Walter Cruickshank, Acting Director, Bureau of Ocean Energy Management; Margaret N. Schneider, Acting Director, Bureau of Safety and Environmental Enforcement; Bureau of Safety and Environmental Enforcement (BSEE); Joan Barminski, Pacific Region Director, Bureau of Ocean Energy Management; Mark Fesmire, Acting Pacific Region Director, Bureau of Safety and Environmental Enforcement; United States Department of the Interior; and Ryan Zinke, Secretary of the Interior (collectively, Defendants[1]), by and through their undersigned counsel, will, and hereby do, move to dismiss Plaintiffs' Complaints pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. This motion will be made before the Honorable Philip S. Gutierrez, United States District Judge, located at the First Street Courthouse, 350 West First Street, Courtroom 6A, Los Angeles, California 90012.

Defendants bring this motion under Federal Rule of Civil Procedure 12(b)(1) on the ground that the Court lacks subject matter jurisdiction over each of Plaintiffs' claims because their claims challenge a programmatic environmental assessment on which no final agency action has been based and in circumstances where future final agency action is contingent upon further agency reviews and environmental analysis. Further, Plaintiffs' claims brought under the Endangered

---

[1] Sally Jewell no longer serves as Secretary of the Interior. Ryan Zinke is automatically substituted pursuant to Fed. R. Civ. P. 25(d). As noted in ECF No. 33, Walter Cruickshank and Margaret N. Schneider have already been similarly automatically substituted.

Species Act are moot.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 24, 2017.

Respectfully submitted this 3rd day of April, 2017.

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ *Joseph H. Kim*
JOSEPH H. KIM
Natural Resources Section

/s/ *Trent S.W. Crable*
TRENT S.W. CRABLE
Wildlife & Marine Resources Section
Environment & Natural Resources Division
United States Department of Justice

*Attorneys for Federal Defendants*

# TABLE OF CONTENTS

PAGE

LEGAL BACKGROUND ................................................................... 1

I.   The Outer Continental Shelf Lands Act (OCSLA) .......................... 1

II.  The National Environmental Policy Act (NEPA) ........................... 2

III. The Coastal Zone Management Act (CZMA) ................................. 3

IV.  The Endangered Species Act (ESA) ........................................... 5

V.   The Administrative Procedure Act (APA) ..................................... 6

RELEVANT FACTUAL BACKGROUND .......................................... 7

STANDARD OF REVIEW ............................................................... 9

I.   Federal Rule of Civil Procedure 12(b)(1)...................................... 9

ARGUMENT ................................................................................ 11

I.   The Court Lacks Subject Matter Jurisdiction Over the
     NEPA and CZMA Claims Because Plaintiffs Have Not
     Challenged Any Final Agency Action Under the APA ..................... 11

     A.   The PEA and FONSI are not "Agency Action" under
          the APA .................................................................... 13

     B.   The PEA and FONSI are not "Final" Agency Actions.............. 17

          i.   NEPA: ................................................................. 18

          ii.  CZMA: ................................................................ 19

II.  The Court Lacks Jurisdiction Over Plaintiffs' ESA claims ............... 20

     A.   Plaintiffs' ESA Claims are Not Ripe. ............................... 22

     B.   Plaintiffs' Failure to Consult and "No Effect" Claims are moot. .............. 24

i

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                    **PAGE**

3

*Abbott Labs. v. Gardner*,

4

   387 U.S. 136 (1967) ............................................................22

5

*Alliance for the Wild Rockies v. U.S. Dep't of Agric.*,

6

   772 F.3d 592 (9th Cir. 2014) ...............................................25

7

*Alto v. Black*,

8

   738 F.3d 1111 (9th Cir. 2013).................................................8

9

*Am. Littoral Soc'y v. EPA*,

10

   199 F. Supp. 2d 217 (D.N.J. 2002) .....................................25

11

*Ashcroft v. Iqbal*,

12

   556 U.S. 662 (2009) ............................................................12

13

*AT&T Corp. v. Coeur d'Alene Tribe*,

14

   295 F.3d 899 (9th Cir. 2002) ...............................................14

15

*Babbitt v. United Farm Workers Nat'l Union*,

16

   442 U.S. 289 (1979) ............................................................22

17

*Bassiri v. Xerox Corp.*,

18

   292 F. Supp. 2d 1212 (C.D. Cal. 2003).........................10, 16

19

*Bell Atl. Corp. v. Twombly*,

20

   550 U.S. 544 (2007) ............................................................12

21

*Bennett v. Spear*,

22

   520 U.S. 154 (1997) .....................................................passim

23

*Bob Moore, LLC v. United States*,

24

   2016 U.S. Dist. LEXIS 38696 (D. Nev. Mar. 23, 2016) ....12

25

*Branch v. Tunnell*,

26

   14 F.3d 449 (9th Cir.1994)..................................................12

27

28

*Cal. Sportfishing Prot. Alliance v. FERC*,
  472 F.3d 593 (9th Cir. 2006)..................................................................24, 25

*Church of Scientology of Cal. v. United States*,
  506 U.S. 9 (1992) .............................................................................................23

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004)..................................................................4, 7, 21

*Ctr. for Marine Conservation v. Brown*,
  917 F. Supp. 1128 (S.D. Tex. 1996) ................................................................25

*Defenders of Wildlife v. Martin*,
  454 F. Supp. 2d 1085 (E.D. Wash. 2006) ........................................................25

*Defs. of Wildlife v. Jackson*,
  791 F. Supp. 2d 96 (D.D.C. 2011) ...................................................................25

*Doe v. Madison Sch. Dist. No. 321*,
  177 F.3d 789 (9th Cir. 1999)......................................................................22, 23

*Dunn & Black, P.S. v. United States*,
  492 F.3d 1084 (9th Cir. 2007)..........................................................................13

*eCash Techs. v. Guagliardo*,
  210 F. Supp. 2d 1138 (C.D. Cal. 2001) ...........................................................12

*Epstein v. Wash. Energy Co.*,
  83 F.3d 1136 (9th Cir. 1996).............................................................................12

*Fed. Trade Comm'n v. Standard Oil of Calif.*,
  449 U.S. 232 (1980) ...................................................................................14, 20

*Forest Guardians v. Johanns*,
  450 F.3d 455 (9th Cir. 2006).............................................................................23

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................................14, 19

iii

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ...............................................................................11, 16

*Galbraith v. Cnty. of Santa Clara*,
   14 F.3d 449 (9th Cir. 1994) ...................................................................12

*Greenpeace Found. v. Mineta*,
   122 F. Supp. 2d 1123 (D. Haw. 2000) ..................................................25

*Headwaters, Inc. v. BLM*,
   893 F.2d 1012 (9th Cir. 1990)................................................................23

*Indus. Customers of NW Utils. v. Bonneville Power Admin.*,
   408 F.3d 638 (9th Cir. 2005)...........................................................14, 19

*Karuk Tribe of California v. U.S. Forest Service*,
   681 F.3d 1006 (9th Cir. 2012) ..........................................................7, 24

*Laub v. U.S. Department of Interior*,
   342 F.3d 1080 (9th Cir. 2003).................................................16, 17, 19

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) .................................................................12

*Lujan v. National Wildlife Fed'n*,
   497 U.S. 871 (1990) ..........................................................................7, 8, 16

*McCarthy v. United States*,
   850 F.2d 558 (9th Cir. 1998).................................................................11

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*,
   858 F.2d 1376 (9th Cir. 1988)..............................................................11

*Mueller v. U.S-Corp.*,
   2009 WL 273283 (C.D. Cal. Feb. 2, 2009).......................................12

*Native Fish Soc. v. NMFS*,
   992 F. Supp. 2d 1095 (D. Or. 2014)....................................................25

*Native Vill. of Point Hope v. Jewell*,
   740 F.3d 489 (9th Cir. 2014)............................................................................1

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) .......................................................................................14

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ..............................................................................22, 24

*ONRC Action v. Bureau of Land Mgmt.*,
   150 F.3d 1132 (9th Cir. 1998)......................................................................7

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
   898 F.2d 1410 (9th Cir. 1990)......................................................................6

*Rattlesnake Coalition v. EPA*,
   509 F.3d 1095 (9th Cir. 2007)......................................................................7

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .....................................................................................2

*S. Cal. Edison Co. v. FERC*,
   770 F.2d 779 (9th Cir. 1985).....................................................................22

*Scott v. Breeland*,
   792 F.2d 925 (9th Cir. 1986)...............................................................11, 16

*Sec'y of Interior v. California*,
   464 U.S. 312 (1984) .....................................................................................1

*Sierra Club v. U.S. Nuclear Regulatory Comm'n*,
   825 F.2d 1356 (9th Cir. 1987)..........................................................14, 15, 19

*St. Clair v. City of Chico*,
   880 F.2d 199 (9th Cir. 1989)...............................................................11, 12

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .............................................................................10, 16

*Stock West, Inc. v. Confederated Tribes*,
   873 F.2d 1221 (9th Cir. 1989)......................................................10, 16

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   82 F. Supp. 2d 1070 (D. Ariz. 2000)....................................................25

*Texas v. United States*,
   523 U.S. 296 (1998) ............................................................................24

*Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*,
   594 F.2d 730 (9th Cir. 1979)...............................................................11

*Tobar v. United States*,
   639 F.3d 1191 (9th Cir. 2011).............................................................13

*United States v. Los Angeles & Salt Lake R.R. Co.*,
   273 U.S. 299 (1927) ............................................................................22

*United States v. Mitchell*,
   445 U.S. 535 (1980) ............................................................................13

*Warren v. Fox Family Worldwide*,
   328 F.3d 1136 (9th Cir. 2003).............................................................11

*Water Keeper Alliance v. U.S. Dep't of Def.*,
   271 F.3d 21 (1st Cir. 2001)....................................................................5

*Western Oil & Gas Ass'n v. Sonoma Cnty.*,
   905 F.2d 1287 (9th Cir. 1990).............................................................21

*Western Oil & Gas v. U.S. EPA*,
   633 F.2d 803 (9th Cir. 1980)........................................................14, 19

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000).............................................................11

**STATUTES**

5 U.S.C. § 551(13) ................................................................8, 14, 15

vi

5 U.S.C. § 702 ..................................................................................................8

5 U.S.C. § 704 ......................................................................................8, 14, 20

16 U.S.C. § 1371 ...............................................................................................7

16 U.S.C. § 1452(1) ..........................................................................................4

16 U.S.C. § 1456(c)(1)(A) ...........................................................................4, 21

16 U.S.C. § 1456(c)(1)(C) ...........................................................................4, 21

16 U.S.C. § 1456(c)(3)(B) .................................................................................4

16 U.S.C. §§ 1532(15) ......................................................................................6

16 U.S.C. § 1532(19) ........................................................................................7

16 U.S.C. § 1536(a)(2) ......................................................................................5

16 U.S.C. § 1536(b)(1)(A) ................................................................................7

16 U.S.C. § 1536(b)(4)(iv) ................................................................................7

16 U.S.C. § 1536(c) ...........................................................................................6

16 U.S.C. § 1536(o)(2) ......................................................................................7

16 U.S.C. § 1538(a)(1)(B) .................................................................................6

16 U.S.C. § 1540(g)(1)(A) .................................................................................7

42 U.S.C. § 4332(2)(C) .....................................................................................2

43 U.S.C. § 1337(b)(4) ......................................................................................1


**FEDERAL REGULATIONS**

15 C.F.R. part 930, subpart E ...........................................................................4

15 C.F.R. § 930.36 .......................................................................................4, 21

15 C.F.R. § 930.41 .............................................................................................4

15 C.F.R. § 930.76 ...................................................................................4, 18, 21

30 C.F.R. § 250.410 ........................................................................................1, 2

30 C.F.R. § 250.465 ...........................................................................................2

30 C.F.R. § 550.201(a)(2) ..................................................................................2

30 CFR 550.266 through 550.273 ........................................................................18

30 C.F.R. § 550.267 ...............................................................................4, 18, 21

30 C.F.R. § 550.269 ........................................................................................18

30 C.F.R. § 550.272 ..........................................................................................4

30 C.F.R. § 550.281 ......................................................................................1, 2

30 C.F.R. § 550.285(c) ..........................................................................passim

40 C.F.R. §§ 1501.4 ...........................................................................................2

40 C.F.R. § 1501.4(e) ...................................................................................2, 9

40 C.F.R. § 1508.9 .............................................................................................2

40 C.F.R. § 1508.28 ...........................................................................................2

50 C.F.R. § 402.01(b) ........................................................................................6

50 C.F.R. §§ 402.02 ....................................................................................5, 24

50 C.F.R. §§ 402.03 ...........................................................................................5

50 C.F.R. § 402.12(j) .......................................................................................25

50 C.F.R. § 402.13(a) .....................................................................................5, 6

50 C.F.R. § 402.14(a)-(b) ..................................................................................6

50 C.F.R. § 402.14(b)(1) ...................................................................................5

50 C.F.R. §§ 402.14(c) ....................................................................................25

50 C.F.R. § 402.15(a) ........................................................................................6

50 C.F.R. § 402.16 ............................................................................................6

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Plaintiffs challenge a programmatic environmental assessment (PEA) on which no final agency action has yet been based and in circumstances where future final agency action is contingent upon further agency reviews and environmental analysis. Under these circumstances, there is no subject matter jurisdiction for Plaintiffs' National Environmental Policy Act, Coastal Zone Management Act, and Endangered Species Act claims, making dismissal proper pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. The claims under the Endangered Species Act are also now moot, providing an additional basis for dismissal of those claims for lack of jurisdiction.

## LEGAL BACKGROUND

### I.      The Outer Continental Shelf Lands Act (OCSLA)

OCSLA is the federal statutory scheme that governs exploration, development and production of natural resources located in the seabed of the Outer Continental Shelf. 43 U.S.C. § 1337(b)(4); *Sec'y of Interior v. California*, 464 U.S. 312 (1984). OCSLA prescribes a four stage process for that purpose: 1) formulation of a five-year leasing plan by the Department of the Interior; 2) lease sales; 3) exploration by the lessees; and 4) development and production. *Sec'y of Interior*, 464 U.S. at 337; *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 493 (9th Cir. 2014). The stage relevant to the consolidated complaints and this motion is the fourth stage governing development and production.

At the outset of the fourth stage, after discovering oil or gas in commercially producible quantities during the exploration phase, an operator must submit a Development and Production Plan (DPP) to BOEM and obtain its approval for the plan. 30 C.F.R. § 550.201(a)(2). But even after receiving approval for the DPP, an operator cannot proceed directly to drilling wells. Instead, an operator must first

submit an Application for Permit to Drill (APD) to BSEE and obtain approval for the permit. *Id.* §§ 550.281, 250.410. And if the operator later wishes to alter some aspect of its well operations—such as to perform certain types of well completion activities, including any well stimulation treatments—the operator must submit an Application for Permit to Modify (APM) to BSEE and obtain approval for that permit. *Id.* § 250.465. Finally, if an operator proposes to change certain aspects of its planned operations, or asks to conduct activities that require a permit but are not described in the approved DPP, the operator must revise or supplement its DPP, submit the changed plan to BOEM, and obtain its approval before BSEE will complete its own review or approve the relevant APD or APM. *Id.* § 550.285(c).

## II.    The National Environmental Policy Act (NEPA)

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions, and of ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA's requirements are entirely procedural and do not require any particular substantive result for any proposed action. *Id.* at 350–51.

The procedure required by NEPA includes preparation of an Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether an action might have a significant impact such that an EIS would be required, federal agencies may choose first to prepare an Environmental Assessment (EA). 40 C.F.R. §§ 1501.4, 1508.9. If the analysis in the EA demonstrates that the action will not have a significant impact, then an agency may issue a Finding of No Significant Impact (FONSI) and an EIS is not required. *Id.* §

1501.4(e). Agencies may also choose to prepare programmatic environmental analyses to which later site-specific analyses may tier. *Id.* § 1508.28.

Programmatic and tiered NEPA analyses are particularly appropriate in the context of offshore oil and gas development, due to the staged process established by OCSLA. At the first OCSLA stage, the five-year leasing program, BOEM has prepared a programmatic EIS to analyze the five-year plan. At the second stage, before the lease sales occur, BOEM prepares an EIS (analyzing the impacts of potential lease activities including exploration, development, and decommissioning) and issues a Record of Decision (ROD). At the third stage, for exploration plans (EPs), BOEM typically prepares a site-specific EA. Similarly, at the fourth stage, for development and production plans, BOEM also prepares a site-specific EA. Finally, for APDs or APMs submitted either at the exploration stage or at the development and production stage, BSEE will tailor its NEPA review based on the nature of the requested activity and may tier to prior analyses as appropriate. If the requested activity is already described in the underlying plan and existing NEPA analyses, BSEE may prepare what is known as a Determination of NEPA Adequacy (DNA) or, if there is an applicable DOI or Bureau categorical exclusion, perform a Categorical Exclusion Review (CER) to determine if extraordinary circumstances do not permit its use.[2] If the requested activity is not described in the underlying plan and a revised or supplemental plan is required, then BOEM may prepare further NEPA analyses for the supplemental plan if the existing NEPA analysis is not adequate. 30 C.F.R. § 550.285(c).

## III.    The Coastal Zone Management Act (CZMA)

The purpose of the CZMA is to "preserve, protect, develop, and where

---

[2] The Bureau has categorical exclusions for, among other agency actions, approval of APDs and APMs for wells described in approved EPs and DPPs.

possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations." 16 U.S.C. § 1452(1); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1201 (9th Cir. 2004). The CZMA encourages states to develop management plans for their coastal zones and requires federal agency activities occurring within the coastal zone, or affecting the water or resources of the coastal zone, to be "carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *Id.* § 1456(c)(1)(A); *City of Sausalito*, 386 F.3d at 1201. In order to ensure this consistency, the relevant federal and state agencies undertake a consistency review process for proposed federal agency activities. This process begins with the federal agency submitting a "consistency determination" to the relevant state agency for review. 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.36. The state agency then informs the federal agency of its concurrence with or objection to the consistency determination. 15 C.F.R. § 930.41.

Consistency review pursuant to the CZMA occurs at the plan approval stages of OCSLA, for both the EP at the third stage and the DPP at the fourth stage. 16 U.S.C. § 1456(c)(3)(B). Once an operator has an approved plan that has completed the consistency review process, the CZMA does not require any further actions at the permitting stage. *Id.* But when an operator must submit a supplemental DPP to BOEM for approval, the CZMA requires a consistency review by the affected states for that supplemental plan. 15 C.F.R. § 930.76; 30 C.F.R. §§ 550.285(c), 550.267. If an affected state objects to the supplemental plan, the regulations call for the operator either to submit a modified supplemental plan, to appeal the state's decision to the Secretary of Commerce, or to withdraw the supplemental plan. 30 C.F.R. § 550.272; *see also* 15 C.F.R. pt. 930, subpt. E.

4

## IV.   The Endangered Species Act (ESA)

Section 7(a)(2) of the ESA requires federal agencies (action agencies) to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02 (definition of "action"), 402.03 (Section 7 applies to actions "in which there is discretionary Federal involvement or control"). To ensure compliance with those mandates, the ESA's implementing regulations outline a detailed process whereby action agencies consult with the appropriate expert "consulting agency" (either the National Marine Fisheries Service (NMFS) or the Fish and Wildlife Service (FWS), or both (the Services), depending on the species involved) to, among other things, analyze the potential impacts of a proposed action on ESA-listed species and their critical habitat.

The action agency must engage in consultation—either "informal" or "formal," as appropriate—if its proposed action "may affect" a listed species or critical habitat. Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the [action] agency . . . designed to assist the [action] agency in determining whether formal consultation . . . is required." 50 C.F.R. § 402.13(a). If during informal consultation the action agency determines, and the consulting agency concurs, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated and no further action is necessary. *See id.* § 402.13(a), 402.14(b)(1). If, however, the action agency or the consulting agency determines that the action is "likely to adversely affect" listed species or designated critical habitat, the agencies will then engage in formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). To facilitate the consultation, the action agency may, and in some cases must, submit a

"biological assessment" to the consulting agencies. *Id.* § 402.14(c); 16 U.S.C. § 1536(c). Formal consultation leads to the issuance of a written biological opinion (BiOp) by the consulting agency that assesses the likelihood of "jeopardy" to the species and "destruction or adverse modification" of its critical habitat. *Id.* § 402.14(g)–(h).

Following formal consultation, the action agency must determine "whether and in what manner to proceed with the action in light of its Section 7 obligations and the Service's biological opinion." *Id.* § 402.15(a). Where a BiOp concludes that the proposed action is not likely to jeopardize a listed species or destroy or adversely modify critical habitat, the action agency may reasonably rely on the BiOp and proceed with the action in compliance with the ESA. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415–16 (9th Cir. 1990) (affirming agency's reasonable reliance on a BiOp). Reinitiation of consultation may be required under certain enumerated circumstances. *See* 50 C.F.R. § 402.16. There is no statutory deadline for completing reinitiated consultation. *See* 16 U.S.C. § 1536(b)(1)(A) (consultation in the first instance "shall be concluded within the 90-day period . . . or . . . within such other period of time as is mutually agreeable to the Secretary and the Federal agency").

## V.   The Administrative Procedure Act (APA)

Neither NEPA nor the CZMA provide for judicial review. *See, e.g.*, *City of Sausalito*, 386 F.3d at 1205–06 (citing cases regarding NEPA and CZMA). Therefore, Plaintiffs must rely on the Administrative Procedure Act (APA) for a waiver of sovereign immunity in order to establish this Court's subject matter jurisdiction over their NEPA and CZMA claims. *See, e.g.*, *Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*, 509 F.3d 1095, 1104–05 (9th Cir. 2007). The ESA citizen-suit provision provides for judicial review of claims such as those brought

here alleging that an action agency has failed to consult or reinitiate consultation. *Bennett v. Spear*, 520 U.S. 154, 173–74 (1997). Nevertheless, the ESA does not contain a standard or scope of review and so the APA standard and scope of review apply to ESA citizen-suit claims. *See Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*).

Section 702 of the APA provides a limited waiver of sovereign immunity for claimants who are suffering legal wrong or are adversely affected or aggrieved by "agency action." 5 U.S.C. § 702; *Lujan*, 497 U.S. at 882. Sections 702 and 704 provide a right to judicial review of "final agency action for which there is no other adequate remedy in court." *Id.* § 704; *Alto v. Black*, 738 F.3d 1111, 1117 (9th Cir. 2013). Therefore, in order to invoke the APA's waiver of sovereign immunity and establish federal court jurisdiction for judicial review under the APA, a plaintiff must challenge a final agency action.

"Agency action" is defined in the APA as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act." *Id.* § 551(13). For an agency action to be "final," two conditions must exist: "First, the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78 (citation omitted).

## RELEVANT FACTUAL BACKGROUND

These three consolidated cases are related to two prior cases brought in this Court—*Environmental Defense Center v. BSEE*, No. 2:14-cv-09281-PSG-FFMx (C.D. Cal.), and *Center for Biological Diversity v. BOEM*, No. 2:15-cv-01189-PSG-FFMx (C.D. Cal.). In the first round of litigation, Plaintiff EDC asserted

claims under NEPA and the APA challenging 51 permits (APDs and APMs) issued by BSEE or its predecessor agencies that they asserted had authorized well stimulation treatments on the Outer Continental Shelf (OCS) offshore of California. Plaintiff CBD asserted similar claims under NEPA and the APA, as well as a claim under the CZMA, that challenged 21 permits (APDs and APMs) issued by BSEE for alleged well stimulation treatments in the same area. Those two cases were resolved through substantively similar settlement agreements entered by the Court on March 24, 2016.

Among the terms agreed to by the parties to those settlement agreements was the commitment by the Federal Defendants to prepare a programmatic environmental assessment (PEA) that would analyze the potential environmental impacts of future foreseeable well stimulation treatments on the Pacific OCS. That PEA has now been completed and BOEM and BSEE have issued a Finding of No Significant Impact (FONSI) based on the analysis contained in the PEA. The FONSI provides the agencies' conclusions regarding the analysis conducted and determined that an EIS was not required, but the FONSI was not accompanied by any decision document and does not independently authorize any specific activity. *See* 40 C.F.R. § 1501.4(e). Since issuance of the FONSI, BSEE has not issued any permits approving well stimulation treatment activities on the Pacific OCS. Decl. of Michael Mitchell ¶ 11, Defs.' Ex. 1. Moreover, BSEE must perform further required analyses of the site-specific circumstances presented by any future application for a permit to conduct any such activities. These further analyses would include determining whether the activity is adequately covered by an approved plan or requires a revised or supplemental plan under OCSLA, and whether the activity has been appropriately analyzed in compliance with NEPA or requires further review (e.g., an existing NEPA analysis, a new EA, or a CER). *See*

Ex. 1 ¶¶ 4–6.

The present consolidated cases all involve challenges similar to those brought in the first round of litigation, including claims brought under the APA alleging violations of NEPA and the CZMA, and adding a claim under the ESA. *See, e.g.*, Compl. Decl'y & Inj. Relief ¶¶ 3, 8 (EEC Compl.), ECF No. 1; Compl. Decl'y and Other Relief, No. 2:16-cv-08473, ¶¶ 8, 10 (CBD Compl.), ECF No. 1; Compl. Decl'y & Inj. Relief, No. 2:16-cv-09352 ¶ 4 (State Compl.), ECF No. 1. But unlike the prior litigation, none of the complaints in these consolidated cases challenges a discrete and final agency action approving a plan or permit for well stimulation activities as analyzed in the PEA. Instead, Plaintiffs here have challenged the PEA, which does not itself constitute final agency action. EDC Compl. ¶ 193 (describing challenge to PEA as "at a broad or programmatic level").

Plaintiffs' ESA claims are rooted in Defendants' obligation to consult with the Services under Section 7. Since 1978, Defendants have consulted with the Services dozens of times on the potential effects of various oil and gas activities offshore of California. *See, e.g.*, Biological Assessment to NMFS 1–3, Defs.' Ex. 2. Most relevant to this motion, on March 27, 2017, Defendants submitted biological assessments to the Services to further the consultations reinitiated on September 1, 2011. *See* Letter to NMFS 1, Defs.' Ex. 3; Letter to FWS 1, Defs.' Ex. 4. *See also* Defs.' Ex. 2; Biological Assessment to FWS, Defs.' Ex. 5. These biological assessments serve as "a comprehensive review of present and future offshore oil and gas activities in the Southern California Planning Area and the potential effects of [those] activities on [ESA-listed species]." *Id.*

## STANDARD OF REVIEW

### I.   Federal Rule of Civil Procedure 12(b)(1)

"A federal court is presumed to lack jurisdiction in a particular case unless

the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted). Plaintiffs bear the burden of demonstrating the Court's jurisdiction to hear their claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998) ("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."); *Bassiri v. Xerox Corp.*, 292 F. Supp. 2d 1212, 1219 (C.D. Cal. 2003) ("[W]hen a defendant brings a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of establishing jurisdiction") (citation omitted), *rev'd & remanded on other grounds*, 463 F.3d 927 (9th Cir. 2006). To meet this burden, "the 'party who seeks the exercise of jurisdiction in his favor [must] clearly [] allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted), *holding modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004). Where, as here, a plaintiff fails to do so, the court has "no power to do anything with the case except dismiss." *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988) (citation omitted).

Rule 12(b)(1) allows a party to raise by motion the defense of the Court's "lack of jurisdiction over the subject matter." If the Court, at any time, determines it lacks subject-matter jurisdiction, the case must be dismissed. Fed. R. Civ. P. 12(h)(3). In considering a motion to dismiss for lack of subject-matter jurisdiction, the court "may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (citation omitted); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (in ruling on a 12(b)(1) jurisdictional motion, court may look beyond

complaint and consider extrinsic evidence). If it is necessary to resolve factual disputes, the court does not presume that the allegations of the complaint are true; the plaintiff bears the burden of establishing subject-matter jurisdiction through affidavits or other appropriate evidence. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). Further, "[t]he district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading." § 1363 Relevance and Construction of the Pleading on a Rule 12(b) Motion, 5C Fed. Prac. & Proc. Civ. § 1363 (3d ed.); *eCash Techs., Inc. v. Guagliardo*, 210 F. Supp. 2d 1138, 1144 n.7 (C.D. Cal. 2001).

Sovereign immunity, mootness, and ripeness are defenses properly raised under Federal Rule of Civil Procedure 12(b)(1) to address the lack of subject matter jurisdiction. *See, e.g.*, *Bob Moore, LLC v. United States*, No. 2:15-CV-660-GMN-PAL, 2016 WL 1171001, at *1 (D. Nev. Mar. 23, 2016) (sovereign immunity); *Mueller v. U.S-Corp.*, No. EDCV08-00918-DSFMAN, 2009 WL 273283, at *2 (C.D. Cal. Feb. 2, 2009) (sovereign immunity); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (mootness); *St. Clair*, 880 F.2d at 201 (ripeness).

## ARGUMENT

Plaintiffs' Complaints fail to challenge any relevant final agency action, as required by the APA. Accordingly, this Court lacks jurisdiction over the NEPA, CZMA, and ESA claims in these cases and must dismiss those claims for lack of subject matter jurisdiction. Further, the claims brought under the ESA are now moot and therefore must also be dismissed for lack of subject matter jurisdiction.

### I.   The Court Lacks Subject Matter Jurisdiction Over the NEPA and CZMA Claims Because Plaintiffs Have Not Challenged Any Final Agency Action Under the APA

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). The party asserting a claim against the United States bears "the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).

Neither NEPA nor CZMA provides a waiver of sovereign immunity allowing a plaintiff to sue the federal government. Therefore, Plaintiffs in these consolidated cases must rely on the waiver of sovereign immunity found in the APA. In order to invoke the APA's waiver and establish this Court's subject matter jurisdiction, Plaintiffs must challenge a final agency action. Plaintiffs have failed to satisfy this fundamental requirement with respect to their NEPA and CZMA claims and, therefore, those claims must be dismissed.

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."[3] 5 U.S.C. § 704; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004). An "agency action" is defined as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). An agency action will be considered "final" if it (1) "mark[s] the consummation of the agency's decision-making process," and (2) is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal citations and quotations omitted);

---

[3] Plaintiffs do not bring claims under a separate statutory right-of-review provision; therefore, section 704 of the APA applies here.

*accord AT & T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 911–12 (9th Cir. 2002) (Gould, J., concurring in part and dissenting in part). "[T]he core question is whether the agency has completed its decisionmaking, and whether the result of that process is one that will directly affect the parties." *Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

In assessing the finality of an agency action, a court considers whether the agency action represents the final administrative word to ensure that judicial review will not interfere with agency decision-making and will avoid piecemeal review. *Fed. Trade Comm'n v. Standard Oil of Co.*, 449 U.S. 232, 242–43 (1980). "An order is final when the administrative agency has given its 'last word on the matter.'" *Sierra Club v. U.S. Nuclear Regulatory Comm'n*, 825 F.2d 1356, 1362 (9th Cir. 1987) (quoting *W. Oil & Gas Ass'n v. U.S. Envtl. Prot. Agency*, 633 F.2d 803, 807 (9th Cir. 1980)). Moreover, a court should "not entertain [review] where pending administrative proceedings or further agency action might render the case moot and [make] judicial review completely unnecessary." *Id.*

**A. The PEA and FONSI are not "Agency Action" under the APA**

Fundamentally, the Plaintiffs have not challenged "agency action" as that term is defined in the APA. Neither the PEA, nor its associated FONSI, are "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Under the structure of OCSLA at the relevant stage, such an "agency action" occurs, for example, when an agency approves a DPP, APD, or APM. *See* supra Legal Background I; *cf., e.g.*, EDC Compl. ¶ 43 (recognizing OCSLA's four stages), ¶ 44 (discussing, in the relevant fourth stage, the "two separate and distinct discretionary agency actions"—action on the DPP and APD/APM). Here, the PEA is merely a programmatic analysis to support

potential *future* approvals of not-yet submitted DPPs, APDs, or APMs. As such, the associated FONSI does not actually approve anything—it merely serves as the procedural end point to close out this preliminary analysis.

The contrast from the previous related cases is instructive, in that those cases unquestionably challenged agency action. *See, e.g.*, EDC Compl. ¶ 4 (describing previous case as challenging "decisions to approve fifty-one Applications for Permits to Drill ('APDs') and Applications for Permits to Modify ('APMs') authorizing" specific well stimulation treatments); CBD Compl. ¶ 64 (listing 21 "issued permits authorizing fracking of various wells" for prior litigation). In the present case, however, no approved APMs or APDs involving well stimulation treatments as analyzed in the PEA are at issue.

Lacking either of these "two separate and distinct discretionary agency actions," EDC Compl. ¶ 44, the Complaints can do no more than speculate as to what approvals BOEM and BSEE may issue in the future. *See, e.g.*, EDC Compl. ¶ 187 (alleging that "BSEE and BOEM have approved the use of WSTs [well stimulation treatments] at the twenty-three production platforms located on the forty-three active leases on the Southern California OCS," but failing to challenge or even identify a single permit actually approving such actions); CBD Compl. ¶ 6 (alleging that Defendants "issued a decision authorizing the use of offshore fracking and other forms of well stimulation on the Pacific OCS," again, without identifying any such permit). Ignoring that subsequent permits are required before WSTs can be employed, Plaintiffs contend that the PEA and associated "Finding of No Significant Impact . . . are final agency actions and are therefore judicially reviewable within the meaning of the [APA]." State Compl. ¶ 2. But this conclusory assertion is legally incorrect, and factually unsupported, and therefore does not meet Plaintiffs' burden to establish jurisdiction here. *See, e.g.*, *Steel Co.*,

14

523 U.S. at 104; *FW/PBS*, 493 U.S. at 231; *Stock W.*, 873 F.2d at 1225; *Scott*, 792 F.2d at 927; *Bassiri*, 292 F. Supp. 2d at 1219. Rather, as Plaintiff EDC correctly concedes, the Complaints do no more than attempt to challenge the PEA "at a broad or programmatic level." EDC Compl. ¶ 193. But without any "agency action," no such broad or programmatic challenge is proper.

Plaintiff EDC cites *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1088–89 (9th Cir. 2003) in its Complaint in an attempt to avoid this result. EDC Compl. ¶ 193. However, although *Laub* may support the ability to challenge certain programmatic *actions*, it does not support jurisdiction here. In *Laub*, the court allowed a NEPA challenge to a programmatic environmental impact statement/environmental impact report (EIS/EIR) and associated Record of Decision (ROD). *See id.* at 1082–83. Although *Laub* discussed whether the "NEPA claims were . . . ripe for review," it did so by addressing the question of whether "the challenged action [is] a final agency action." *Id.* at 1087–88 (citing *Lujan*, 497 U.S. at 882–83). Notably, while the NEPA analysis was called "programmatic," the Record of Decision contained final agency action. The *Laub* court allowed the challenge to proceed based on its conclusion that "[t]he ROD reflects a final selection of a long-term plan" and led to the execution of large-scale plans and agreements that would substantively dictate the scope of site-specific activities to carry out those plans and agreements. Thus, the court found the challenge ripe because the "program" set forth a "long-term plan" to be implemented, *id.* at 1088, holding that "because the ROD pre-determines the future through the selection of a long-term plan (to the exclusion of others which will not be among the available options at the implementation phase), it is ripe for review." *Id.* at 1091. In other words, what made the NEPA analysis ripe for challenge in *Laub* was not that the analysis was programmatic in nature, but rather that it dictated future *decisions* and

15

*actions*. No analogous situation is present here.

Perhaps recognizing this "agency action" limitation, Plaintiff EDC alleges that there have been two "subsequent drilling authorizations issued since the Final PEA," though EDC does not directly challenge those authorizations in its suit. EDC Compl. ¶ 52; *see also id.* at ¶¶ 197–202. As narrowly stated in the argument heading, Plaintiff EDC is correct—those two cited applications have been approved since the PEA. However, Plaintiff EDC is incorrect to the extent it asserts or implies that these two applications approved any of the well stimulation treatments addressed in the PEA. They did not. Those approvals authorized routine well clean-up operations involving the use of acid at volumes that fell below the threshold for being considered "well stimulation treatments." Defs.' Ex. 1 ¶ 10.

Since completion of the PEA, BSEE has received only one application for a permit to conduct a well stimulation treatment as that term is defined and analyzed in the PEA.[4] However, the Bureaus' procedural review of that APM further demonstrates why jurisdiction over Plaintiffs' claims here is lacking. On December 6, 2016, DCOR, LLC submitted to BSEE an APM to conduct well stimulation. *See* Defs.' Ex. 1 ¶ 9, Ex. B (DCOR, LLC, Application for Permit to Modify S-62, dated 12-06-2016 (publicly available at https://www.bsee.gov/stats-facts/ocs-regions/pacific-region-completed-applications-for-permit-to-modify-apm) (seeking approval for hydraulic fracturing)). BSEE subsequently requested BOEM to review the APM and determine if the activities proposed were described in DCOR's existing DPP for the relevant well. Defs.' Ex. 1 ¶ 12, Ex. D. On January 19, 2017, BOEM determined that DCOR's existing DPP did not describe the proposed activities submitted in the APM and therefore required DCOR to submit

---

[4] The PEA analyzed potential impacts of "well stimulation treatments" as that term is defined in California Senate Bill 4 (2013).

and obtain approval of a supplemental DPP before BSEE can complete its review and issue a decision on the APM. *Id.* Further NEPA analysis will be performed at the time DCOR submits its supplemental DPP. *See* 30 C.F.R. §§ 550.285(c), 550.269; Defs.' Ex. 1 ¶¶ 12–13, Ex. D at 1 ("Your supplemental DPP will be subject to all of the procedures under 30 CFR 550.266 through 550.273."). Further review by the state of California for the supplemental DPP will likewise take place pursuant to the CZMA. 30 C.F.R. §§ 550.285(c), 550.267; 15 C.F.R. § 930.76. DCOR has not yet submitted a supplemental DPP. Defs.' Ex. 1 ¶ 13. Despite this lack of any final action with respect to any plan approvals or permit applications, Plaintiffs have proceeded prematurely to challenge the PEA and FONSI now.

In sum, no application has been approved that relies on the PEA and FONSI issued by BOEM and, thus, there is no "agency action," much less "final" agency action. Plaintiffs' attempt to challenge the PEA and FONSI directly, and divorced from any permit, is beyond the scope of the APA's limited waiver of sovereign immunity and must be dismissed for lack of jurisdiction.

**B. The PEA and FONSI are not "Final" Agency Actions**

Even if the completion of the PEA and FONSI could be deemed agency action under the APA, they are not *final* agency actions subject to judicial review. As noted above, an agency action will be considered "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal citations and quotations omitted). "[T]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Indus. Customers of Nw. Utils.*, 408 F.3d at 646 (quoting *Franklin*, 505 U.S. at 797). "An order is final when the administrative agency has given its 'last

word on the matter.'" *Sierra Club*, 825 F.2d at 1362 (quoting *W. Oil & Gas*, 633 F.2d at 807). Here, neither the PEA, nor its associated FONSI, are "final" agency actions for NEPA or CZMA purposes.

       i.    *NEPA*:

Consistent with the above, the programmatic NEPA analysis at issue here is not "final" agency action. The PEA is not merely "programmatic," it is also preliminary. Here, nothing in the PEA "pre-determines the future" or excludes any of "the available options at the" DPP, APD, or APM stages for complying with NEPA. *See Laub*, 342 F.3d at 1091. Rather, the PEA provided the groundwork for any further NEPA analysis that may yet occur at the relevant "agency action" points: as relevant here, actions on DPPs, APDs, or APMs.

In these circumstances, the PEA and FONSI do not "mark the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 177–78, on any future DPP, APD, or APM. At most, the challenged PEA may be seen as merely analysis that will be used in the "fourth and final OCSLA stage," as the PEA has not yet contributed to either of the "separate and distinct discretionary agency actions that must occur prior to the commencement of drilling operations"—the "approval of a" DPP, or the "issuance of . . . APDs or APMs . . . ." *Cf.* EDC Compl. ¶ 44. Final agency action in the form of approval of a DPP, APD, or APM in reliance on the PEA must occur before the PEA can be subject to judicial review. Any such future action may yet undergo site-specific environmental analysis. While that site-specific NEPA analysis may tier to the PEA (and if so, the PEA may be challenged then), the NEPA analyses themselves can only be challenged when they are relied upon to support a final agency action that is properly subject to judicial review.

For this same reason, no "rights or obligations have been determined,"

*Bennett*, 520 U.S. at 178, nor will they be determined prior to approval of a future DPP, APD, or APM. The FONSI merely concluded the procedural analysis contained in the PEA; it did not vest (or divest) any rights or obligations, and it did not establish or alter any legal relationships. Indeed, even an environmental impact statement under NEPA is not itself a "final agency action" within the meaning of the APA. Standing alone, a final environmental analysis does not create rights or obligations or produce other legal consequences. *See id.* at 177–78. It is instead a procedural prerequisite to taking some *other* step that may, in turn, create rights or obligations and qualify as "final agency action" reviewable under section 706(2) of the APA. Such "preliminary, procedural, or intermediate agency action," as distinguished from final agency action, is "not directly reviewable" under the APA, although it "is subject to review on the review of the final agency action." 5 U.S.C. § 704; *see also Std. Oil Co.*, 449 U.S. at 244–45 (discussing APA's treatment of preliminary action). Accordingly, there has not been any "final" agency action subject to challenge under the APA at this time.

      ii.    *CZMA*:

      A CZMA challenge similarly must be predicated on final agency action, albeit using slightly different terminology and focusing on certain final agency actions to the exclusion of others. The CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *City of Sausalito*, 386 F.3d at 1221 (quoting 16 U.S.C. § 1456(c)(1)(A)). "A federal agency ensures consistency of its actions with a state management program by submitting a 'consistency determination to the relevant State agency.'" *Id.* (quoting 16 U.S.C. §

19

1456(c)(1)(C)) (citing 15 C.F.R. § 930.36).

Here, again, the PEA and FONSI certainly do not "mark the consummation of the agency's [CZMA] decisionmaking process," *Bennett*, 520 U.S. at 177–78, regarding any future DPP, APD, or APM involving well stimulation treatments. While the CZMA does not require consistency reviews for APDs and APMs, any future DPP or supplemental DPP will undergo consistency review under the CZMA. 30 C.F.R. §§ 550.285(c), 550.267; 15 C.F.R. § 930.76. Thus, once there is any new DPP, or the need for a supplemental DPP, the CZMA will then require consistency review. *Id.* But because there is not yet any such agency action, there is not yet any basis to bring a CZMA claim.

## II.   The Court Lacks Jurisdiction Over Plaintiffs' ESA claims

Plaintiffs Environmental Defense Center and Santa Barbara Channelkeeper (EDC) allege that Defendants violated the ESA by: failing to "initiate consultation with the appropriate wildlife agency" under Section 7; arbitrarily concluding that "the action" will have "no effect" on certain ESA-listed species; and causing "take" of ESA-listed species in violation of Section 9 by authorizing "offshore WST pursuant to the FONSI and PEA." EDC Compl. ¶¶ 242–51. Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (CBD) allege that Defendants violated Section 7 of the ESA by failing: "to request from the Services a list" of ESA-listed species or habitat that might be affected by the "decision to authorize offshore fracking and other well stimulation on the Pacific OCS"; to prepare a "biological assessment or informally consult" on the effects of that "decision"; to initiate and/or reinitiate formal consultation" on the effects of that "decision"; and to ensure that the "decision" "does not jeopardize the continued existence of any" listed species or adversely modify critical habitat. CBD Compl. ¶¶ 113–18. All of these claims are either unripe, moot, or both. As none of these claims present a

case or controversy at this time, they are currently not suitable for review. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999).

The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 770 F.2d 779, 785 (9th Cir. 1985) ("The doctrine of ripeness prevents courts from becoming involved in abstract questions which have not affected the parties in a concrete way."). "The ripeness inquiry asks 'whether there yet is any need for the court to act.'" *W. Oil & Gas Ass'n v. Sonoma Cty.*, 905 F.2d 1287, 1290 (9th Cir. 1990) (citation omitted). To determine whether a case is ripe, the Court considers both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. In determining whether the issues are fit for judicial decision, a court looks to whether the controversy presented is "definite and concrete" as opposed to "hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). In assessing whether delayed review will impose a hardship on plaintiffs, a court looks to the nature of the challenged action. There is no hardship where the challenged actions "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (citing *United States v. Los Angeles & Salt Lake R.R.*, 273

U.S. 299, 309–10 (1927)).

Mootness is also tied to Article III's limit on federal court jurisdiction to "cases or controversies." *Doe*, 177 F.3d at 797. A plaintiff must maintain a live case throughout litigation to preserve federal jurisdiction. *Id.* "Federal courts lack jurisdiction to consider 'moot questions . . . or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). A court cannot "take jurisdiction over a claim to which no effective relief can be granted." *Headwaters, Inc. v. U.S. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989).

### A. Plaintiffs' ESA Claims are Not Ripe.

All of the ESA claims made by Plaintiffs are based either on the alleged authorization of the use of well stimulation treatments or the alleged harms caused by the actual use of well stimulation treatments, neither of which have occurred. Use of these well stimulation treatments has not been authorized, and will not be authorized unless and until Defendants receive an APD or APM for a well stimulation treatment, review that application, and deem it compliant with the required standards. To date, BSEE has only received one such application since entry of the settlement agreement. As explained above, that application cannot be reviewed by BSEE until after DCOR meets BOEM's requirements. Until the BOEM review is complete, the underlying application will not be reviewed or approved by BSEE and well stimulation activities cannot proceed. *See supra* Argument I. In sum, the necessary approvals have not been made, nor are any approvals imminent at this time. *See id.* Further, Defendants may undertake and complete additional ESA consultation before granting any approval, and will do so if necessary. *See id.* Plaintiffs' claims are not fit for review at this time.

The issuance of a PEA and FONSI is not an "action" that requires ESA Section 7 consultation. ESA regulations define "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. The Ninth Circuit has characterized the "'agency action' inquiry" as "two-fold": "First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020–21 (9th Cir. 2012). The PEA and FONSI fail at step one, because they do not authorize, fund, or carry out any underlying activity. Examples listed in the regulatory definition of "agency action" are instructive on this point. The examples in the definition that pertain to authorizations are: "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02. The issuance of a NEPA document that itself has no effect except as it may be relied upon to support a subsequent action does not resemble any of these. An agency must consult under Section 7 only when it makes an "affirmative" act or authorization. *See Cal. Sportfishing Prot. All. v. Fed. Energy Regulatory Comm'n*, 472 F.3d 593, 595 (9th Cir. 2006). Here, no conduct was authorized, funded, or carried out by the issuance of the PEA or FONSI. *See supra* Argument I. Plaintiffs' claims are not ripe for review unless and until the activities analyzed in the PEA and FONSI are actually fully reviewed through the required agency processes, which may themselves include additional consultation, and approved by the issuance of a permit. *See id.* Until that point, there is no hardship in delaying judicial review. The Court therefore lacks jurisdiction over Plaintiffs' unripe ESA claims and must dismiss them.[5]

---

[5] For the same reasons, Plaintiffs' ESA claims fail to state a claim upon which

Moreover, delaying review of Plaintiffs' claims will not impose a hardship on Plaintiffs because Defendants have not "command[ed] anyone to do anything or to refrain from doing anything." *Ohio Forestry Ass'n*, 523 U.S. at 733. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted), or where the effects of such events have not yet been "felt in a concrete way by the challenging parties," *Ohio Forestry Ass'n*, 523 U.S. at 733 (citation omitted).

### B.  Plaintiffs' Failure to Consult and "No Effect" Claims are Moot.

Plaintiffs' claims alleging that Defendants failed to consult as required by ESA Section 7(a) are moot because Defendants have already reinitiated their existing programmatic consultation. EDC alleges that Defendants' "failure to initiate consultation . . . with respect to the May 27, 2016, FONSI and PEA violates Sections 7 and 9 of the ESA," EDC Compl. ¶ 251, and requests relief in the form of a declaration that "Defendants have violated the ESA, and its implementing regulations, by failing to initiate consultation . . . ." *Id.* at 72. CBD alleges that Defendants' "failure to reinitiate consultation on the effects . . . violates their procedural and substantive duties under Section 7," CBD Compl. ¶ 118, and requests relief in the form of: a declaration that Defendants' "actions and inactions regarding their decision to authorize offshore fracking and other well stimulation practices on the Pacific OCS violate the procedural and substantive provisions of Section 7 of the ESA"; and an order that Defendants "initiate or reinitiate consultation pursuant to Section 7 of the ESA on the effects of continued offshore oil and gas drilling, including offshore fracking and other well stimulation

---

relief can be granted. Defendants do not move for dismissal on this basis in this motion, but reserve it for a possible future motion, if necessary.

practices . . . ." *Id.* at 33.

The relief sought by Plaintiffs is essentially an order requiring Defendants to initiate or reinitiate formal consultation. Defendants have already done so—they submitted biological assessments on March 27, 2017, to both NMFS and FWS that cover all current and anticipated future OCSLA activities on the Pacific OCS, including well stimulation treatments, and all required species and critical habitat. *See* Defs.' Exs. 1, 5; 50 C.F.R. §§ 402.14(c), 402.12(j). The Ninth Circuit Court of Appeals and numerous other courts have held that initiating or reinitiating formal consultation moots a claim that the agency has failed to engage in the Section 7 consultation process.[6] *See, e.g., All. for the Wild Rockies v. U.S. Dep't of Agric.,* 772 F.3d 592, 601 (9th Cir. 2014) ("Reinitiation of consultation is the precise relief sought by Alliance. Accordingly, Alliance's Section 7 claim is moot."); *Native Fish Soc'y v. Nat'l Marine Fisheries Servs.,* 992 F. Supp. 2d 1095, 1115 (D. Or. 2014) ("NMFS has reinitiated consultation, but plaintiffs contend that the reinitiation was untimely and request declaratory relief. The court concludes that this claim is moot as the court cannot provide plaintiffs with any meaningful relief."). Defendants already have provided the relief requested by Plaintiffs for their ESA claims, and there is no longer any effective relief the Court can grant on Plaintiffs' claims for failure to initiate or reinitiate consultation. These claims are constitutionally moot.

Respectfully submitted this 3rd day of April, 2017.

---

[6] *See also Defs. of Wildlife v. Jackson,* 791 F. Supp. 2d 96, 109 (D.D.C. 2011); *Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1103 (E.D. Wash. 2006); *Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency*, 199 F. Supp. 2d 217, 245–47 (D.N.J. 2002); *Greenpeace Found. v. Mineta,* 122 F. Supp. 2d 1123, 1127–28 (D. Haw. 2000); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 82 F. Supp. 2d 1070, 1079 (D. Ariz. 2000).

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ *Joseph H. Kim*
JOSEPH H. KIM
Natural Resources Section

/s/ *Trent S.W. Crable*
TRENT S.W. CRABLE
Wildlife & Marine Resources Section
Environment & Natural Resources Division
United States Department of Justice

*Attorneys for Federal Defendants*


CERTIFICATE OF SERVICE

I, Trent S.W. Crable, hereby certify that, on April 3, 2017, I caused the foregoing to be served upon counsel of record through the Court's electronic service. I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 3, 2017                    /s/ *Trent S.W. Crable*
                                        TRENT S.W. CRABLE