XAVIER BECERRA
Attorney General of California
JAMEE JORDAN PATTERSON
DAVID A. ZONANA, SBN 196029
DAVID ALDERSON, SBN 231597
Supervising Deputy Attorneys General
GEORGE TORGUN, SBN 222085
Deputy Attorney General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-1002
 Fax:  (510) 622-2270
 E-mail:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiffs People of the State of*
*California, ex rel. Xavier Becerra, Attorney*
*General, and California Coastal Commission*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA, ex rel. XAVIER BECERRA, ATTORNEY GENERAL, and CALIFORNIA COASTAL COMMISSION,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,**<br><br>Defendants.<br><br>**AMERICAN PETROLEUM INSTITUTE, et al.,**<br><br>Intervenor-Defendants. | 2:16-cv-08418-PSG-FFM<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  August 13, 2018<br>Time: 1:30 p.m.<br>Courtroom: 6A<br>Judge:  Hon. Philip S. Gutierrez |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND COUNSEL OF RECORD**:

PLEASE TAKE NOTICE that, on August 13, 2018, at 1:30 p.m., or as soon thereafter as it may be heard, Plaintiffs People of the State of California, *ex rel.* Xavier Becerra, Attorney General, and the California Coastal Commission (collectively, "Plaintiffs"), by and through their undersigned counsel, will, and hereby do, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Civil Local Rules 7 and 56, and this Court's November 21, 2017 Order, Dkt. No. 91.  This motion will be made before the Honorable Philip S. Gutierrez, United States District Judge, First Street Courthouse, 350 West First Street, Courtroom 6A, Los Angeles, California 90012

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment on the ground that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  In support of this motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities and a Proposed Order.

Dated:  February 12, 2018

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA
DAVID ALDERSON
Supervising Deputy Attorneys General

/s/ George Torgun
GEORGE TORGUN
Deputy Attorney General

*Attorneys for Plaintiffs People of the State of California, ex rel. Xavier Becerra, Attorney General, and California Coastal Commission*

i

1

# TABLE OF CONTENTS

2

**Page**

3

4

Memorandum of Points and Authorities ................................................................. 1

Factual and Procedural Background ....................................................................... 2

5

Statutory Background ............................................................................................. 4

6

      I.     National Environmental Policy Act. ...................................................... 4

7

      II.    Coastal Zone Management Act. ............................................................ 5

8

Standard of Review ................................................................................................ 6

9

Argument ............................................................................................................... 7

10

      I.     Defendants Violated NEPA by Failing to Take a "Hard Look" at
the Environmental Impacts of Allowing WSTs on the Pacific

11

            OCS. ...................................................................................................... 7

12

            A.     Defendants Improperly Assumed that WSTs Would Only
Occur Infrequently in the Foreseeable Future. ........................... 8

13

14

            B.     Defendants Improperly Assumed that Permit Compliance
Would Render Impacts Insignificant. ....................................... 14

15

16

            C.     Defendants Improperly Assumed that Dilution of Toxic
Chemicals Would Render Impacts Insignificant. ..................... 17

17

            D.     Defendants Improperly Relied on the Lack of Information
to Support Their Conclusions. ................................................... 18

18

19

      II.    Defendants Violated NEPA by Defining the Statement of
Purpose and Need in Unreasonably Narrow Terms. ......................... 20

20

      III.   Defendants Violated NEPA by Failing to Consider a Reasonable
Range of Alternatives. ...................................................................... 22

21

22

      IV.   Defendants Violated the CZMA by Failing to Submit a
Consistency Determination to the Coastal Commission. .................. 24

23

Conclusion ........................................................................................................... 25

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

5

*Alaska Survival v. Surface Transp. Bd.*,
   705 F.3d 1073 (9th Cir. 2013) ................................................................ 20

6

7

*Am. Petroleum Inst. v. Knecht*,
   456 F. Supp. 889 (C.D. Cal. 1978) ......................................................... 6

8

9

*Barnes v. Federal Aviation Admin.*,
   865 F.3d 1266 (9th Cir. 2017) ................................................................ 7

10

11

*Blue Mountains Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ................................................................ 19

12

*California ex rel. Lockyer v. U.S. Dept. of Agric.*,
   459 F. Supp. 2d 874 (N.D. Cal. 2006) ................................................... 22

13

14

*Churchill County v. Norton*,
   276 F.3d 1060 (9th Cir. 2001) ................................................................ 6

15

16

*City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*,
   123 F.3d 1142 (9th Cir. 1997) ................................................................ 20

17

18

*Ctr. for Biological Diversity v. Bureau of Land Management*,
   937 F. Supp. 2d 1140 (N.D. Cal. 2013) ................................. 8, 13, 14, 19

19

20

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ................................................................ 5

21

22

*Defs. of Wildlife v. Zinke*,
   856 F.3d 1248 (9th Cir. 2017) ................................................................ 7

23

24

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ............................................................ 7, 16

25

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ............................................................ 5, 18

26

27

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ............................................................ 7, 18

28

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ................................................................. 19

*NRDC v. SEC*,
  606 F.2d 1031 (D.C. Cir. 1979) ................................................................. 7

*Sierra Club v. U.S. Forest Serv.*,
  843 F.2d 1190 (9th Cir. 1988) ................................................................. 19

*South Fork Band Council of Western Shoshone v. U.S. Dept. of Interior*,
  588 F.3d 718 (9th Cir. 2009) ................................................................. 16

*State of California v. Norton*,
  311 F.3d 1162 (9th Cir. 2002) ......................................................... 6, 25

*Western Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) ................................................................. 22

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ................................................................. 20


**Federal Statutes**

5 U.S.C. § 706 ....................................................................................... *passim*

16 U.S.C. § 1451 ......................................................................................... 1

16 U.S.C. § 1452(1) .................................................................................... 5

16 U.S.C. § 1454 ......................................................................................... 5

16 U.S.C. § 1455 ......................................................................................... 5

16 U.S.C. § 1456(c)(1)(A) ....................................................................... 5, 24

33 U.S.C. § 1251 ....................................................................................... 14

42 U.S.C. § 4321 ......................................................................................... 1

42 U.S.C. § 4332 ......................................................................................... 7

iv

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3    42 U.S.C. § 4332(2)(C)................................................................................ 5, 22

4
5    43 U.S.C. § 1331.......................................................................................... 21

6    43 U.S.C. § 1332(3)..................................................................................... 21

7    43 U.S.C. § 1802(2)(B)................................................................................ 21

8

9    **State Statutes**

10   Cal. Pub. Res. Code § 30008 ........................................................................ 6

11   Cal. Pub. Res. Code § 30230 ...................................................................... 24

12
13   Cal. Pub. Res. Code § 30231 ...................................................................... 24

14   Cal. Pub. Res. Code § 30232 ...................................................................... 25

15   Cal. Pub. Res. Code § 30251 ...................................................................... 25

16   Cal. Pub. Res. Code § 30330 ........................................................................ 6

17

18   **Federal Regulations**

19
20   15 C.F.R. § 930.4(a) ...................................................................................... 6

21   15 C.F.R. § 930.30 ........................................................................................ 6

22   15 C.F.R. § 930.32(a)(1) ............................................................................... 6

23   15 C.F.R. § 930.34 ........................................................................................ 6

24   15 C.F.R. § 930.36 .................................................................................... 6, 24

25   15 C.F.R. § 930.41(a) .................................................................................... 6

26
27   40 C.F.R. § 1500.1 ........................................................................................ 4

28   40 C.F.R. § 1500.1(b) ....................................................................... 5, 7, 8, 17

**TABLE OF AUTHORITIES**
(continued)

**Page**

40 C.F.R. § 1500.1(c) ................................................................................ 5

40 C.F.R. § 1502.13 ................................................................................ 20

40 C.F.R. § 1502.14(a) ............................................................................ 22

40 C.F.R. § 1502.14(d) ............................................................................ 22

40 C.F.R. § 1508.9 .............................................................................. 5, 22


**Federal Register Notices**

81 Fed. Reg. 16,128, 16,131 (Mar. 26, 2015) ........................................... 9


**Federal Rules**

Fed. R. Civ. P. 56(a) ................................................................................. 6

## MEMORANDUM OF POINTS AND AUTHORITIES

In these consolidated cases, Plaintiffs People of the State of California, *ex rel*. Xavier Becerra, Attorney General, and the California Coastal Commission ("Plaintiffs") challenge a Final Programmatic Environmental Assessment ("Final PEA") and Finding of No Significant Impact ("FONSI") issued by Defendants United States Department of the Interior, *et al*. (collectively, "Defendants").  The Final PEA and FONSI allow the use of well stimulation treatments ("WSTs"), including hydraulic fracturing and acidizing, for oil and gas development at 22 production platforms on 43 lease areas that lie between 3.7 miles and 10.5 miles off the shores of Southern California (the "Proposed Action").  Despite the substantial record evidence showing the potential for significant environmental effects from offshore WSTs, including the discharge of waste fluids containing many known carcinogens, mutagens, reproductive toxins, endocrine disruptors, and other toxic chemicals, Defendants improperly concluded that such activities would result in no such effects by relying on unfounded assumptions and uncertainty rather than taking a "hard look" at such impacts, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.  Defendants also violated NEPA by defining the Final PEA's statement of purpose and need in unreasonably narrow terms, and failing to consider reasonable alternatives to the Proposed Action.

In addition, Defendants violated the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq*., by failing to prepare a determination as to whether approving the use of these WSTs is consistent to the maximum extent practicable with the enforceable policies of California's coastal management program.  As the record demonstrates, the use of hydraulic fracturing and acidizing is likely to affect resources protected by California's policies safeguarding marine resources, biological productivity and quality of coastal waters, and the prevention of oil and hazardous substance spills.  Accordingly, Defendants' issuance of the

1

Final PEA and FONSI was arbitrary, capricious, an abuse of discretion, and contrary to the requirements of NEPA and the CZMA.  This Court should vacate and set aside Defendants' approvals and prohibit any offshore WSTs unless and until Defendants comply with applicable law.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation is the second chapter in a longer story that began when Defendants were sued for authorizing WSTs in federal waters off of California's coast without any evaluation of environmental impacts under NEPA or any consistency determination under the CZMA.  In late 2014 and early 2015, the Environmental Defense Center ("EDC") and the Center for Biological Diversity ("CBD") filed separate lawsuits against the federal government in this Court.  On January 29, 2016, the parties entered into a settlement agreement in both cases which required Defendants to develop a Programmatic Environmental Assessment ("PEA") under NEPA.  *See EDC v. Bureau of Safety and Environmental Enforcement, et al.*, Case No. 2:14-cv-09281-PSG, Dkt. No 79-1; *CBD v. Bureau of Ocean Energy Management, et al.*, Case No. 2:15-cv-01189-PSG, Dkt. No. 41-1 (the "Settlement Agreement").

The purpose of the PEA was to determine whether an environmental impact statement ("EIS") or a FONSI would be appropriate.  Settlement Agreement, Section I.A.  Defendants were required to complete this first step by May 28, 2016.  *Id.*  Prior to completion of the Final PEA, Defendants agreed to withhold all approvals of WSTs on the Southern California Outer Continental Shelf ("Pacific OCS").  *Id.*, Section I.C.

The Draft PEA issued by Defendants on February 22, 2016 purported to evaluate the impacts of WSTs, including hydraulic fracturing and acid treatments, at 22 production platforms located on 43 active leases off the coast of Southern

2

California.  AR 16058-16060[1] (Draft PEA at 1-1 – 1-3).[2]  According to the Draft
PEA, "[t]he purpose of the proposed action is to allow the use of certain WSTs
(e.g., hydraulic fracturing) in support of oil production at platforms on the Pacific
OCS."  AR 16160 (Draft PEA at 1-3).  Having defined the purpose with a single
outcome in mind—"allowing the use of certain WSTs"— Defendants then set forth
four alternatives, the first three of which would allow the use of WSTs at all 22
production platforms, without any limit on the number of fracking or acidization
operations.  The fourth option, the "no project" alternative, would not allow any use
of WSTs.  AR 16066-16072 (Draft PEA at 2-3 – 2-9).  The Draft PEA found that
the Proposed Action would not result in any significant impacts.  AR 16256 (Draft
PEA at 4-71).

During the 30-day comment period, Defendants received comments from 22
governmental agencies, 102 non-governmental organizations, and thousands of
individuals.  AR 16519 (Final PEA at A-2).  Two California state agencies – the
California Coastal Commission ("Coastal Commission") and the Division of Oil,
Gas, and Geothermal Resources ("DOGGR") – submitted comments that
questioned the unfounded assumptions and lack of analysis in the Draft PEA,
suggested additional alternatives for consideration, and recommended consultation
with the State under the CZMA.  AR 2677-2690 (Coastal Commission); AR 3367-

---

[1] The administrative record in this matter is cited as "AR [page number],"
excluding leading zeros.

[2] Hydraulic fracturing, or "fracking," involves the "pressurized injection of
hydraulic fracturing fluid or fluids into an underground geologic formation in order
to fracture or with the intent to fracture the formation, thereby causing or enhancing
[... ] the production of oil or gas from a well."  AR 16306-16308 (Final PEA at 2-1
– 2-3).  Acid fracturing "is similar to [ ] hydraulic fracturing except that instead of
using a proppant to keep fractures open, it uses an acid solution to etch channels in
the rock walls of the fractures, thereby creating pathways for oil and gas to more
easily reach the well."  AR 16310 (Final PEA at 2-5).  In matrix acidizing, "an acid
solution is injected into a formation (at pressures below the formation fracture
pressure) where it penetrates pores in the rock to dissolve sediments and muds."  *Id*.

3

1  3369 (DOGGR).  In addition, the U.S. Environmental Protection Agency ("EPA"),
2  as well as members of the California Legislature and U.S. Congress, submitted
3  comments that were critical of the Draft PEA, citing in particular the lack of
4  information or analysis to support its findings.  AR 14135-14140 (EPA); AR 2544-
5  2546 (California Legislature); AR 4418-4420 (U.S. Congress).

6      Defendants issued the Final PEA on May 27, 2016.  AR 16266.  The Final
7  PEA tweaked the punctuation and a few words of the statement of purpose without
8  substantively altering its narrow objective.  AR 16302 (Final PEA at 1-3) ("[t]he
9  purpose of the proposed action (use of certain WSTs, such as hydraulic fracturing)
10  is to enhance the recovery of petroleum and gas from new and existing wells on the
11  P[acific] OCS, beyond that which could be recovered with conventional methods
12  (i.e., without the use of WSTs).").  After examining the same four alternatives as
13  the Draft PEA (AR 16308-16315 (Final PEA at 2-3 – 2-10)), Defendants concluded
14  that the Proposed Action would not result in any significant impacts.  AR 16297-
15  16299, 16504 (Final PEA at ES-12 – ES-14, 4-77).

16      Also on May 27, 2016, Defendants issued a FONSI stating their
17  "determination that the Proposed Action would not cause any significant impacts,"
18  and that "implementing the Proposed Action does not constitute a major federal
19  action significantly affecting the quality of the human environment within the
20  meaning of Section 102(2)(c)" of NEPA.  AR 16568, 16575 (FONSI at 1, 8).  In
21  choosing to implement the Proposed Action, Defendants decided not to move
22  forward with any of the three alternatives.  AR 16572 (FONSI at 5).

23              **STATUTORY BACKGROUND**
24  **I.   NATIONAL ENVIRONMENTAL POLICY ACT.**
25      NEPA is our "basic national charter for the protection of the environment."  40
26  C.F.R. § 1500.1.  The fundamental purposes of the statute are to ensure that
27  "environmental information is available to public officials and citizens before
28  decisions are made and before actions are taken," and that "public officials make

4

1    decisions that are based on understanding of environmental consequences, and take

2    actions that protect, restore, and enhance the environment." *Id*. § 1500.1(b)-(c).

3        To achieve these purposes, NEPA requires the preparation of a detailed EIS

4    for any "major federal action significantly affecting the quality of the human

5    environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may first

6    prepare an environmental assessment ("EA") to determine whether the effects of an

7    action may be significant. 40 C.F.R. § 1508.9. An EA must discuss the

8    "environmental impacts of the proposed action" and "provide sufficient evidence

9    and analysis for determining whether to prepare an environmental impact statement

10   or a finding of no significant impact." *Id*. § 1508.9(a)–(b); *see id*. § 1500.1(b). If

11   an agency decides not to prepare an EIS, it must supply a "convincing statement of

12   reasons to explain why a project's impacts are insignificant." *Nat'l Parks &*

13   *Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). "The statement

14   of reasons is crucial to determining whether the agency took a 'hard look' at the

15   potential environmental impact of a project." *Ctr. for Biological Diversity v. Nat'l*

16   *Highway Traffic Safety Admin*., 538 F.3d 1172, 1215 (9th Cir. 2008) (internal

17   quotations omitted).

18   **II.    COASTAL ZONE MANAGEMENT ACT.**

19       Congress enacted the Coastal Zone Management Act to "preserve, protect,

20   develop, and where possible, to restore or enhance, the resources of the Nation's

21   coastal zone." 16 U.S.C. § 1452(1). To accomplish these goals, the CZMA

22   authorizes the Secretary of Commerce to review and approve coastal management

23   programs submitted by the states. *Id*. §§ 1454, 1455. The CZMA then requires that

24   "[e]ach Federal agency activity within or outside the coastal zone that affects any

25   land or water use or natural resource of the coastal zone shall be carried out in a

26   manner which is consistent to the maximum extent practicable with the enforceable

27   policies of approved State management programs." *Id*. § 1456(c)(1)(A).

28

1    The National Oceanic and Atmospheric Administration promulgated
2    regulations designed "to assure" that federal agency activities are consistent with
3    state management programs to the maximum extent practicable.  15 C.F.R. §§
4    930.30, 930.32(a)(1).  Under the regulations, if a federal agency plans to commence
5    an activity with foreseeable coastal effects, the agency must determine whether the
6    activity "will be undertaken in a manner" fully consistent "with the enforceable
7    policies of approved management programs" unless prohibited by law applicable to
8    the agency.  *Id*. §§ 930.36(a), 930.32(a)(1).  The federal agency must submit its
9    "consistency determination" to the applicable state agency for review.  *Id*. § 930.34.
10   The state agency may concur, conditionally concur, or object to a consistency
11   determination.  *Id*. §§ 930.4(a), 930.41(a).

12   In California, the California Coastal Act of 1976, California Public Resources
13   Code section 30000 *et seq*., is the approved coastal management program under the
14   CZMA.  Cal. Pub. Res. Code § 30008; *Am. Petroleum Inst. v. Knecht*, 456 F. Supp.
15   889, 893-94 (C.D. Cal. 1978).  Plaintiff California Coastal Commission is the
16   State's designated coastal zone planning and management agency and may exercise
17   all powers authorized in the CZMA.  Cal. Pub. Res. Code § 30330.  "California's
18   coastal zone includes coastal waters and adjacent shorelands, and extends three
19   miles seaward from the State's coast line."  *State of California v. Norton*, 311 F.3d
20   1162, 1167 (9th Cir. 2002).

21                          **STANDARD OF REVIEW**

22   Summary judgment is appropriate when the record shows that "there is no
23   genuine dispute as to any material fact and the movant is entitled to judgment as a
24   matter of law."  Fed. R. Civ. P. 56(a).  Judicial review of agency compliance with
25   NEPA and the CZMA is governed by Section 706 of the Administrative Procedure
26   Act ("APA"), 5 U.S.C. § 706.  *See, e.g., Churchill County v. Norton*, 276 F.3d
27   1060, 1071 (9th Cir. 2001).  Agency actions are subject to judicial reversal where
28   they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

6

accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). An agency action is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) (internal quotations and citation omitted).

In contrast to the deferential standard applied to substantive agency decision-making, "review of an agency's procedural compliance with statutory norms is an exacting one." *NRDC v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979). In reviewing an agency's decision not to prepare an EIS under NEPA, courts consider "whether the agency has taken a 'hard look' at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Barnes v. Federal Aviation Admin.*, 865 F.3d 1266, 1269 (9th Cir. 2017) (internal quotations and citations omitted).

## ARGUMENT

### I. DEFENDANTS VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE ENVIRONMENTAL IMPACTS OF ALLOWING WSTS ON THE PACIFIC OCS.

NEPA requires agencies to take a "hard look" at the environmental consequences of proposed agency actions before those actions are undertaken. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004); *see* 42 U.S.C. § 4332. "To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data … ." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. § 1500.1(b)). Moreover, "[t]he information must be of high

7

1  quality.  Accurate scientific analysis, expert agency comments, and public scrutiny

2  are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

3      Here, the Final PEA and FONSI conclude that there will be no significant

4  environmental impacts from allowing the use of WSTs, including hydraulic

5  fracturing and acidizing, on the Pacific OCS.  AR 16504-16506 (Final PEA at 4-77

6  – 4-79); AR 16571-16575 (FONSI at 4-8).  However, rather than providing the

7  sufficient analysis or evidence required by NEPA to take a "hard look" at the

8  environmental impacts of the Proposed Action, Defendants' conclusions are based

9  on unfounded assumptions and a lack of information regarding the use of WSTs.

10    **A.    Defendants Improperly Assumed that WSTs Would Only Occur**
           **Infrequently in the Foreseeable Future.**

11

12    Discounting all evidence in the record to the contrary, Defendants improperly

13  assumed that WSTs will occur only infrequently in the Pacific OCS in the future.

14  (Final PEA at 2-6; FONSI at 4, 6).  Yet this assumption is built on data that

     Defendants admit is unreliable.  By contrast, the evidence discussed below strongly

15  indicates that an increased use of WSTs is reasonably foreseeable.  Defendants

16  compound their error by then relying on their assumption of infrequent use as a

17  basis for concluding, with minimal analysis, that the Proposed Action will not have

18  any significant effects on the environment.  *See infra*, Part I.A.5.

19

20    A similar reliance on unfounded assumptions about the use of fracking on

21  public lands in California resulted in invalidation of a U.S. Bureau of Land

22  Management ("BLM") EA and FONSI.  *See Ctr. for Biological Diversity v. Bureau*

23  *of Land Management*, 937 F. Supp. 2d 1140, 1148, 1155 (N.D. Cal. 2013) ("*CBD v.*

24  *BLM*") (finding that BLM's projection of a single exploratory well "fails to take

25  into account all 'reasonably foreseeable' possibilities as required by NEPA," as

26  evidenced by the record and the defendants' own acknowledgment "that fracking

27  activity in the United States has increased dramatically in recent years.").  So too

28

8

here, Defendants' heavy reliance on this assumption plainly illustrates their failure to take a "hard look" at the environmental impacts of the Proposed Action.

### 1. Defendants' Assumption of Infrequent Use of WSTs Rests on Data They Admit is Unreliable.

The use of WSTs has become commonplace in the development of oil and gas resources in recent years due to significant technological advances in hydraulic fracturing and horizontal drilling.  *See* AR 16306 (Final PEA at 2-1) ("WSTs are commonly used at onshore wells in California and throughout the United States"). For example, in the onshore context, BLM has estimated that 90 percent of all new wells on federal and Indian lands in 2013 were stimulated using hydraulic fracturing techniques.  81 Fed. Reg. 16,128, 16,131 (Mar. 26, 2015).

For federal waters, Defendants admit that they don't actually know the true number of WSTs that have occurred on the Pacific OCS in recent years.  *See, e.g.*, AR 1099; 7063.  In fact, regarding acidizing and matrix acid jobs, Defendants state that they "do not have [a] number between 1984-2011."  AR 1099.  Elsewhere, Defendants conclude that there is "not enough information" on discharge monitoring reports to determine the number of WSTs that occurred.  AR 1034-39. This stems in part from the fact that "[n]o formal data collection system has been set up to track use of well stimulation conducted in federal waters."  AR 24424.

Nonetheless, the Final PEA asserts that, since 1982, "the highest number of WSTs in a single year is four hydraulic fracturing treatments (in 1997).  Since 2000, no more than three WSTs have been approved and implemented in any single year, and only six WSTs in total have been approved and implemented on the [Pacific] OCS since 2000."  AR 16311 (Final PEA at 2-6).  Defendants then conclude that "[g]iven the historic record of WST use on the [Pacific] OCS and the indicated industry plans known at this time, the Bureaus have determined that a reasonable forecast of WST use on the [Pacific] OCS in the future is up to five

9

WST applications per year." *Id.* However, given the unreliability of the data and the evidence discussed below, Defendants' conclusion is simply arbitrary.

### 2. The Aging Oil Reservoirs on the Pacific OCS are Prime Candidates for WSTs.

As Defendants themselves admit, "[t]he reservoirs associated with the 43 active leases on the [Pacific] OCS have been in production from 26 to 48 years, and reservoir pressures have been gradually declining with this production.  The use of WSTs may support the continued recovery of oil and natural gas as primary recovery declines within the active lease area."  AR 16303 (Final PEA at 1-4).  Defendants further acknowledge that "[a]dvances in WSTs … have allowed for continued production from onshore and offshore reservoirs where primary recovery has begun to decline as a result of declining reservoir pressures."  *Id.*  They point out that the use of WSTs will "allow lessees to recover hydrocarbon resources (i.e., oil) that would otherwise not be recovered from the reservoirs in the 43 lease areas that have been and continue to be accessed by existing wells and any new wells in the foreseeable future."  AR 16302 (Final PEA at 1-3).  And, they note that "[s]ome operators have had some success increasing hydrocarbon production by performing frac-pacs (a type of hydraulic fracturing) in the sandstone reservoirs of the eastern Santa Barbara Channel."  AR 16428 (Final PEA at 4-1 n.3).

Moreover, Defendants admit that not allowing WSTs could result in "the potential closure of wells that become unproductive and could benefit from the implementation of a WST (i.e., WST use may prolong oil production)."  AR 16502 (Final PEA at 4-75); AR 16504 (Final PEA at 4-77) ("Alternative 4 may have economic effects associated with the decommissioning of wells that become unproductive in the absence of WST use"); AR 16313 (Final PEA at 2-8) ("Under Alternative 4, without the use of WSTs, production at some wells may be expected to decline sooner than under the proposed action, as reservoir pressures continue to decline with primary production").  In other words, given the advanced age of

10

offshore wells on the Pacific OCS, operators will increasingly need to employ WSTs in the face of declining production.

### 3. Intervenors' Statements Contradict Defendants' Assumption.

Intervenors' statements further undermine Defendants' assumption regarding the frequency of WSTs.  For example, the American Petroleum Institute states that its members "rely upon well stimulation technologies, including hydraulic fracturing and acidizing, in conducting offshore exploration and development operations in order to improve well life and reliability, productivity, and oil recovery."  Dkt No. 13 at 8.  Exxon Mobil Corporation "anticipates that it will require the use of certain well stimulation treatments at one or more wells," and "will require acid well stimulation treatments to drill and complete new wells and recomplete existing wells."  Dkt. No. 23 at 8.  DCOR, LLC states that it "has current and future exploration and development plans for its substantial investments in offshore leases in the Pacific OCS, which rely on application of WSTs to new and existing wells, including the continued use of both hydraulic fracturing and acidizing WSTs."  Dkt. No. 45 at 1; *see id.* at 7-8.  These statements contradict the central assumption in the Final PEA that WSTs will only occur infrequently on the Pacific OCS in the foreseeable future.

### 4. Commenters Also Highlighted the Problems with Defendants' Assumption.

As stated by the Coastal Commission in its comments, Defendants "apparent dismissal of effects due to assumed low levels of use ... does little to reassure concerned parties that the conclusions expressed in the PEA are warranted, or that there would be some threshold level of use which would trigger a finding of significant effects."  AR 2678.  Moreover, "the PEA does not acknowledge or evaluate the uncertainties underlying this central assumption, such as the possibility that future developments (e.g., increases in oil prices, new technologies, new

11

geologic information) could make the use of WST in the Pacific OCS more economical or desirable." AR 2680. The Coastal Commission recognized that "as production from existing wells and reservoirs continues to decline, there may be an incentive for operators to increase their use of WST in order to maximize recovery," and "use of hydraulic fracturing in State waters in the Long Beach Unit has become a routine well completion practice for certain reservoirs." *Id*. Thus, the Coastal Commission recommended that "the analysis in the PEA should be revised to examine several scenarios of future WST activity in the OCS, including scenarios in which the use of WSTs is substantially greater than present, and should address the potential environmental effects of increased WST use." *Id*. Defendants made no changes to the Final PEA in response to these comments.

### 5. Defendants' Unfounded "Infrequency" Assumption Undermines Their Conclusions That Multiple Environmental Impacts are Not Significant

Defendants cite the "infrequent use of WSTs" to support their conclusions that several impacts of the Proposed Action, including accidents, induced seismicity, air quality, water quality, ecological resources, and recreational and commercial fisheries, would be insignificant. AR 16442, 16444, 16449, 16450, 16452-16454, 16461, 16477, 16479, 16481, 16484, 16486, 16489-16491 (Final PEA at 4-15, 4-17, 4-22, 4-23, 4-25 – 4-27, 4-34, 4-50, 4-52, 4-54, 4-57, 4-59, 4-62 – 4-64). For example, Defendants claim that "given the past limited WST use on the [Pacific] OCS … , and the likely limited future application of fracturing WSTs, few if any wells may be expected to undergo sufficient repeated pressurization and depressurization events to affect well cement casing integrity." AR 16442 (Final PEA at 4-15). With regard to induced seismicity, Defendants conclude that the use of WSTs is "not expected to result in any increase in seismicity of the [Pacific] OCS and adjacent coastal counties" due to "the expected very low frequency of WST use anticipated for the reasonably foreseeable future … ." AR 16450 (Final

12

PEA at 4-23); *see also* AR 16454 (Final PEA at 4-27) (finding no noticeable impacts on air quality or climate change "[b]ased on the expected very low frequency of WST use anticipated for the reasonably foreseeable future"); AR 16484 (finding potential for fish and marine mammals to be exposed to WST-related chemicals in produced water, but concluding that such exposure "would occur infrequently and would be localized and of short duration").

Courts have rejected similar attempts by federal agencies to discount the use of WSTs in their NEPA analyses.  In *CBD v. BLM*,  plaintiffs challenged an EA regarding four oil and gas leases on approximately 2,700 acres in Monterey and Fresno counties.  937 F. Supp. 2d at 1144.  Despite the growing use of fracking nationwide, the defendants had assumed for purposes of the EA, based on data from 2006, that "no more than one exploratory well would be drilled in total on the land within the leases."  *Id*. at 1148.  The court found that "this projection fails to take into account all 'reasonably foreseeable' possibilities as required by NEPA," as evidenced by the record and the defendants' own acknowledgment "that fracking activity in the United States has increased dramatically in recent years."  *Id*. at 1155.  Thus, the court concluded that "it was not reasonable for BLM to consider only a single exploratory well scenario based on past data."  *Id*. at 1156.

The court then determined that "[t]his unreasonable lack of consideration of how fracking could impact the development of the disputed parcels went on to unreasonably distort BLM's assessment of at least three of the 'intensity' factors in its FONSI."  *Id*. at 1157.  First, "BLM erroneously held that the leases were not highly controversial," even though "[t]here was clearly a controversy here regarding the nature of the drilling to occur on the leases and the potential impacts drilling would impose on the nearby communities."  *Id*. at 1157-58.  "Second, BLM erroneously analyzed the potential effect of the leases on public health and safety" by ignoring the risks posed by fracking.  *Id.* at 1158.  "Third, BLM erroneously

13

1    discounted the uncertainty from fracking that may be resolved by further data

2    collection" by "instead opting to summarize general data about fracking (much of it

3    raising substantial concerns about the impact of fracking) before dismissing the

4    issues as outside of its jurisdiction." *Id*. at 1159.

5    　　Similarly here, Defendants' assumption regarding the "infrequent use of

6    WSTs" on the Pacific OCS distorted its consideration of several environmental

7    impacts and significant factors.  As discussed above, Defendants cited the

8    infrequent use of WSTs as a basis for the Final PEA's conclusions regarding

9    insignificant impacts from accidents, induced seismicity, air quality, water quality,

10   ecological resources, and recreational and commercial fisheries.  In the FONSI,

11   Defendants rely on the conclusions in the Final PEA and similarly cite the alleged

12   infrequency of WSTs in evaluating NEPA's significance factors.  AR 16571, 16573

13   (FONSI at 4, 6).  Because of this unfounded assumption, Defendants failed to take

14   a "hard look" at the impacts of the Proposed Action, in violation of NEPA.

15   **B.    Defendants Improperly Assumed that Permit Compliance**

16   **       Would Render Impacts Insignificant.**

17   　　The second faulty assumption relied upon by Defendants is that compliance

18   with a general permit issued under the federal Clean Water Act, 33 U.S.C. § 1251 *et*

19   *seq*., would render impacts related to the use of toxic chemicals insignificant.  This

20   permit, known as the National Pollution Discharge Elimination System General

21   Permit CAG 280000" (the "NPDES General Permit"), was issued by EPA in 2014

22   to regulate discharges from offshore oil and gas exploration, development, and

23   production facilities in federal waters off the Southern California coast.  AR 16350

24   (Final PEA at 3-27); AR 35074 (NPDES General Permit).  Defendants' reliance on

25   the NPDES General Permit to support its conclusions is both arbitrary and

26   unlawful.  As a matter of law, an agency cannot excuse itself from taking a hard

27   look under NEPA because an activity is conducted pursuant to another permit.

28   Further, the NPDES General Permit does not set any limit on the quantity of WST

14

1   chemicals discharged, does not require monitoring for many WST chemicals, and

2   does not link testing to the frequency of WST activity.  In sum, the NPDES General

3   Permit serves different purposes that are wholly inadequate to address the potential

4   environmental impacts of WSTs.

5         It is undisputed that WSTs on the Pacific OCS will involve the use of dozens

6   of extremely toxic chemicals, including many known carcinogens, mutagens,

7   reproductive toxins, developmental toxins, endocrine disruptors, or acute toxicity

8   chemicals.  AR 16457-16460 (Final PEA at 4-30 – 4-33); AR 16477 (Final PEA at

9   4-50); *see* AR 107174-107190 (Abdullah, Khadeeja, *et al*., "Toxicity of acidization

10  fluids used in California oil exploration," Toxicology & Environmental Chemistry

11  (2016) (finding at least 28 F-graded hazardous chemicals used in acidization); AR

12  25772-25775 (finding at least 33 WST chemicals that are "hazardous to aquatic

13  species").  Following completion of a WST, waste fluids that return to the surface

14  in "produced water" are disposed of either by reinjection into the well or by

15  discharge into the ocean.  AR 16433-36 (Final PEA at 4-6 – 4-9).  Half of this

16  produced water may be discharged into the ocean.  AR 16449 (Final PEA at 4-22).

17        Defendants assume that "the existence of the NPDES Permit program" and the

18  whole effluent toxicity ("WET") testing required by that permit will "help[] to

19  ensure that the toxicity of those WST fluids … are adequately accounted for in the

20  impacts analysis."  AR 16448 (Final PEA at 4-21).  Defendants state, without any

21  evidence or analysis, that "[b]ecause permit limits are requirements, no effects on

22  water quality from such discharges are expected beyond the 100-m[eter] mixing

23  zone."  AR 16455 (Final PEA at 4-28); *see* AR 16461-64 (Final PEA at 4-34 – 4-

24  37); AR 16473 (Final PEA at 4-46); AR 16473 (Final PEA at 4-46).  Defendants

25  then conclude in the Final PEA that "[d]ue to the permit limits and monitoring, it is

26  expected that marine life protected under such measures would be effectively

27  protected from any adverse effects of WST constituents in permitted discharges."

28

AR 16477 (Final PEA at 4-50); *see also* AR 16481-84 (Final PEA at 4-54 – 4-57) (same for impacts on marine coastal fish and marine mammals); AR 16487 (Final PEA at 4-60) (same for impacts on sea turtles); AR 16491 (Final PEA at 4-64) (same for impacts on recreational and commercial fisheries).

Defendants are mistaken.  As an initial matter, an agency cannot excuse itself from conducting the required "hard look" under NEPA because an activity is conducted pursuant to another permit or because impacts have been discussed in a "non-NEPA document."  *See South Fork Band Council of Western Shoshone v. U.S. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004) (rejecting as "without merit" arguments that an agency is excused from NEPA compliance where a "facility operates pursuant to a state permit").

Moreover, as comments by the Coastal Commission and others demonstrate, the NPDES General Permit is not adequate to support Defendants' conclusions in the Final PEA, for several reasons.  AR 2681-2682; AR 14132-33.  First, the NPDES General Permit has no limits on the amount of WST chemicals that can be discharged when combined with produced water.  AR 2681.  Second, the monitoring required by the NPDES General Permit only requires documentation of the volume of discharge, free oil, and the concentrations of oil and grease for each WST.  AR 35092-35093.  Monitoring for even the most common WST fluid constituents is not required.  *Cf.* AR 16457 (Final PEA, Table 4-12), 16458 (Final PEA, Table 4-13), 16460 (Final PEA, Table 4-14) *with* AR 35091-92, 35119-35124, 35127-35128.  Even if such monitoring were required, toxicity data on many WST fluids is lacking.  *See* AR 16465 (Final PEA at 4-38) (noting lack of toxicity data on 31 chemicals); AR 16478 (Final PEA at 4-51) (noting lack of toxicological bioassay data); AR 16480 (Final PEA at 4-53) (same).

16

Furthermore, WET testing is only required by the NPDES General Permit on a quarterly basis and is not connected to the use of WSTs.  AR 35086-35087; AR 16463 (Final PEA at 4-36).  That frequency diminishes to an annual test after four consecutive WET tests indicate no observable effects.  AR 35086; AR 16462 (Final PEA at 4-35).  Consequently, the existence of the NPDES General Permit provides no support for Defendants' conclusions in the Final PEA and does not exclude them from the "hard look" required by NEPA.

**C.    Defendants Improperly Assumed that Dilution of Toxic Chemicals Would Render Impacts Insignificant.**

Defendants also improperly assumed that the dilution of WST chemicals and other waste fluids discharged in ocean waters would render any impacts insignificant, without any evidence or analysis to support such an assertion.  As stated in the Final PEA, "[b]ecause WST flowback fluids are mixed and diluted with much greater volumes of produced water, concentrations of WST fluids at platform discharge points would be low and would appear infrequently."  AR 16459 (Final PEA at 4-32).  Defendants then rely on the dilution of WST chemicals to conclude that any impacts from the discharge of such chemicals would have no significant impacts related to water quality or the marine environment.  AR 16461, 16470-16471, 16478-16479, 16481-16482, 16487, 16490 (Final PEA at 4-34, 4-43 – 4-44, 4-51, 4-52, 4-54 – 4-55, 4-60, 4-63).

However, the Final PEA lacks any direct evidence or analysis regarding the impacts of WST flowback fluids on the marine environment or how dilution would lessen any toxicity in such fluids.  *See* 40 C.F.R. §§ 1500.1(b) ("information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."); 1502.24 ("Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses" in NEPA documents).  This assumption is particularly arbitrary given the lack of toxicity data for many WST chemicals.  *See* AR 16465 (Final PEA at 4-

17

38).  Commenters on the PEA specifically recommended that Defendants back up their assertions with evidence.  For example, EPA recommended that Defendants provide "a quantitative assessment, including the expected dilution factors prior to discharge, to further evaluate impacts and to support the conclusion that water quality would not be adversely affected."  AR 14136.  The Coastal Commission found that "the document relies on assumed low levels of uses and dilution" to support its findings, but failed to provide evidence to reach objective conclusions.  AR 2678.  In sum, Defendants' unsupported reliance on dilution to reach conclusions regarding insignificant impacts violated NEPA.  *See Native Ecosystems Council*, 418 F.3d at 964.

> **D.    Defendants Improperly Relied on the Lack of Information to Support Their Conclusions.**

Finally, the Final PEA improperly relied on the lack of information regarding the impacts of WSTs to conclude that there would be no significant impacts from the Proposed Action, rather than doing the necessary work to obtain such knowledge.  *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) ("lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it").  According to Defendants, "there remains incomplete or unavailable information related to the activities contemplated in this programmatic analysis or gaps in science for particular resources or impacts."  AR 16447 (Final PEA at 4-20).  Yet Defendants then rely on this lack of information to support their conclusions regarding the impacts of the Proposed Action.  *See, e.g*., AR 16450, 16452 (Final PEA at 4-23, 4-25) (finding air quality and climate change impacts will be minor based on a lack of data); *see also* AR 16459, 16477 (Final PEA at 4-32, 4-50) (finding no adverse affect on water quality even with lack of data on toxicity of many WST fluids).

In their comments on the Draft PEA, state and federal agencies urged Defendants to provide additional information and analysis to address these

18

1    uncertainties.  As stated by the Coastal Commission, "[t]he PEA does not

2    appreciably increase the knowledge base concerning the many unknowns and

3    uncertainties surrounding WST use on the OCS. … It would be much more helpful

4    for the document to focus on the unknowns and uncertainties, followed by concrete

5    proposals for the development of the additional studies needed to reach objective

6    conclusions regarding safe levels (if any) of use."  AR 2678; *see also* AR 2682.

7    Similarly, DOGGR commented that Defendants' "conclu[sion] that effects of

8    discharging WST fluids on marine life are not fully understood due to the lack of

9    toxicity data for many constituents of WST fluids" is contrary to NEPA, and

10   "[t]oxicity testing of permitted discharge containing WST fluids could help address

11   this data gap."  AR 3368.  EPA also recommended that Defendants "provide

12   additional analysis, include supporting documentation, and identify specific

13   minimization or mitigation measures, as necessary, to support the finding of no

14   significant impacts for this project."  AR 14136.

15        As the Ninth Circuit has stated, "general statements about 'possible effects'

16   and 'some risk' do not constitute a 'hard look' absent a justification regarding why

17   more definitive information could not be provided."  *Blue Mountains Biodiversity*

18   *Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).  Moreover,

19   "[p]reparation [of an EIS] is mandated where uncertainty may be resolved by

20   further collection of data, or where collection of such data may prevent speculation

21   on potential effects."  *CBD v. BLM* , 937 F. Supp. 2d at 1159 (quoting *Native*

22   *Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005)); *see*

23   *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) ("The

24   purpose of an EIS is to obviate the need for speculation by insuring that available

25   data are gathered and analyzed prior to the implementation of the proposed

26   action").

27

28

Thus, Defendants' determination that the Proposed Action would result in no significant impacts was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA. *See* 5 U.S.C. § 706(2).

## II.   DEFENDANTS VIOLATED NEPA BY DEFINING THE STATEMENT OF PURPOSE AND NEED IN UNREASONABLY NARROW TERMS.

Defendants further violated NEPA by defining the Final PEA's statement of purpose and need in unduly narrow terms, improperly constraining the range of alternatives and effectively preordaining the outcome of the NEPA process. The statement of purpose and need also nowhere acknowledges Congress's direction to balance resource development and environmental protection.

An agency tasked with preparing an EA must include a statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. While an agency is granted considerable discretion, a statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013). Since "[t]he stated goal of a project necessarily dictates the range of reasonable alternatives … an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Moreover, "[w]here an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004).

Here, the Final PEA's stated purpose and need is unduly narrow and, in effect, is the same as the Proposed Action. In particular, the stated "purpose of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to enhance the recovery of petroleum and gas from new and existing wells on the [Pacific] OCS, beyond that which could be recovered with conventional methods (i.e.,

20

without the use of WSTs).”  AR 16302 (Final PEA at 1-3).  “The need for the proposed action is the efficient recovery of oil and gas reserves from the [Pacific] OCS.”  *Id.*  The Proposed Action itself, Alternative 1 in the Final PEA, is to “allow use” of offshore WSTs in the Pacific OCS.  AR 16308 (Final PEA at 2-3).  In effect, rather than providing a “purpose and need to which the agency is responding in proposing the alternatives including the proposed action,” it provided such a statement only for the Proposed Action.

This unduly narrow purpose and need statement improperly constrained the consideration of reasonable alternatives.  *See supra* Part III.  As EPA stated in its comments on the Draft PEA,[3] “[s]uch a narrow and prescriptive statement identifies a solution, rather than the underlying need, and may unduly constrain the range of alternatives that would be responsive to the underlying need.”  AR 14139. Moreover, nowhere does the purpose and need statement reflect the statutory requirements of the Outer Continental Shelf Lands Act (“OCSLA”), 43 U.S.C. § 1331 *et seq.*, which establishes a framework under which Defendants may lease areas of the OCS for oil and gas development.  OCSLA mandates that “environmental safeguards” be in place for offshore oil development and requires Defendants “to balance orderly energy resource development with protection of the human, marine, and coastal environments.”  43 U.S.C. §§ 1332(3), 1802(2)(B). Instead, the statement only considers the purpose of increasing energy production from the Pacific OCS through the use of WSTs.

Defendants’ failure to properly define its purpose and need statement in the Final PEA was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

---

[3] The statement of purpose and need did not materially change from the Draft PEA, which provided that “[t]he purpose of the proposed action is to allow the use of certain WSTs (e.g., hydraulic fracturing) in support of oil production at platforms on the Pacific OCS.”  AR 16060 (Draft PEA at 1-3).

21

**III.   DEFENDANTS VIOLATED NEPA BY FAILING TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES.**

Defendants also violated NEPA by failing to consider a reasonable range of alternatives to the Proposed Action.  To wit, each of Defendants three primary alternatives allow the use of WSTs at all Pacific OCS platforms, without any limit on the number of WST operations.  Moreover, several reasonable alternatives proposed by commenters were not analyzed in the Final PEA.

NEPA requires that Defendants provide a "detailed statement" regarding the "alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii); *see* 40 C.F.R. §§ 1502.14(a); 1508.9(b).  Agencies should "[r]igorously explore and objectively evaluate all reasonable alternatives" that relate to the purposes of the project, and briefly discuss the reasons for eliminating any alternatives from detailed study.  40 C.F.R. § 1502.14.  The requirement to consider reasonable alternatives "lies at the heart of any NEPA analysis."  *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 459 F. Supp. 2d 874, 905 (N.D. Cal. 2006).  "The existence of a viable but unexamined alternative renders an EA inadequate."  *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (internal quotations and citations omitted).

In the Final PEA, Defendants evaluated four alternatives: (1) Alternative 1: Proposed Action—Allow use of WSTs at 22 production platforms located on 43 leases on the Pacific OCS; (2) Alternative 2: Allow use of WSTs at the 22 production platforms, but only at depths greater than 2,000 feet below the seafloor surface; (3) Alternative 3: Allow use of WSTs at the 22 production platforms, but no open water discharge of WST waste fluids; and (4) Alternative 4: No Action— Allow no use of WSTs at the production platforms.[4]  AR 16308 –16315 (Final PEA at 2-3 – 2-10).  Alternatives 2 and 3 were largely the same as Alternative 1.  As Defendants admit in the Final PEA, "Alternatives 1, 2, and 3 all include the use of

_____

[4] The no action alternative is required by NEPA.  *See* 40 C.F.R. § 1502.14(d).

the same four types of WST, and thus the nature and magnitude of any potential WST-related impacts will be relatively similar among these three alternatives." AR 16447 (Final PEA at 4-20); *see* AR 16504 (Final PEA at 4-77) ("Overall, there are relatively few differences among the action alternatives (or between fracturing and non-fracturing WSTs) regarding the nature and magnitude of the environmental effects"). Consequently, the alternatives evaluated by Defendants did not allow for informed decision-making or public participation in evaluating the impacts of WSTs on the Pacific OCS.

Moreover, Defendants failed to consider other reasonable alternatives suggested by the Commission, DOGGR, and other commenters. These reasonable alternatives included:

- prohibiting the use of WSTs in specific locations or at particular times of the year (AR 2678);

- requiring the disclosure of WST fluid constituents and additives (AR 3367);

- requiring notice to state agencies and the public prior to conducting WSTs or waste discharges (AR 3367); or

- limiting the number of WSTs in a given year (AR 2655).

While the Final PEA considered but eliminated from evaluation three additional alternatives, the reasonable alternatives suggested by commenters were not included or evaluated. AR 16315—16318 (Final PEA at 2-10 – 2-13) (allowing WSTs with limits on injection pressures; allowing WSTs with limits on the volume of injected fluids; allowing WSTs but prohibiting certain chemicals). The Final PEA also failed to adequately explain why such alternatives were not reasonable. Rather, Defendants erroneously claimed that "[t]here were no commenters who proposed that the PEA include a wider range of alternatives that also suggested an additional alternative for review that would lend itself to meaningful analysis." AR 16530 (Final PEA at A-13).

23

In sum, Defendants' failure to consider reasonable alternatives to the Proposed Action in the Final PEA was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

## IV.  DEFENDANTS VIOLATED THE CZMA BY FAILING TO SUBMIT A CONSISTENCY DETERMINATION TO THE COASTAL COMMISSION.

The CZMA required Defendants to submit a determination to the Coastal Commission as to whether the Proposed Action is fully consistent with enforceable policies in the California Coastal Act.  This determination is required because it is reasonably foreseeable that the Proposed Action will affect coastal uses and resources protected by these policies.  *See* 16 U.S.C. § 1456(c)(1)(A); 15 C.F.R. § 930.36.

First, it is reasonably foreseeable that the Proposed Action will affect marine resources, as well as the biological productivity and quality of coastal waters.  *See* Cal. Pub. Res. Code §§ 30230-31 (policies protecting marine resources and coastal waters).  Under the Proposed Action, the use of WSTs at 22 production platforms in coastal waters will likely increase, and chemicals used in WSTs will be discharged into coastal waters from at least 13 of the platforms.  *See supra*, Part I.A-D; AR 16313, 16436 (Final PEA stating that open water discharge is permitted from all platforms but only 13 currently do so).  The Proposed Action does not limit the amount of WST chemicals that can be discharged from the platforms, nor does it limit the amount or type of chemicals that may be used in WSTs in general.  AR 2681, 40365.  The Final PEA itself expresses concern about water quality and toxicity to organisms from WST chemicals, especially near discharge points.  AR 16459, 16484.  In fact, it is well-established that exposure to WST chemicals (few of which have been studied) harms organisms.  AR 25772-75, 107174-90.  Even produced water that is highly-diluted can cause such harm.  *See*, *e.g.*, AR 23311 (2010 BOEM report concluding "it is clear that sublethal effects can occur ... within 100 m of any produced watered discharge"), 23309 (same report describing a study

24

1  which found that "detectable development effects [on sea urchins] can persist out to
2  100 to 500 m where produced water concentrations drop to approximately 1 ppm").

3      Second, it is also reasonably foreseeable that the Proposed Action will result
4  in additional spills of hazardous substances in coastal waters from the 22 platforms,
5  including during the transportation of chemicals to and from the platforms and
6  during operations.  *See* Cal. Pub. Res. Code § 30232.  The Final PEA admits as
7  much.  AR 16439, 16441 (Final PEA, Tables 4-4, 4-6).

8      Third, the Proposed Action will likely affect the scenic and visual quality of
9  the coast by extending the life of aging infrastructure at the 22 platforms and
10  increasing the marine transport of chemicals and equipment to that infrastructure.
11  *See supra*, Part I.A.2.; *see also* Cal. Pub. Res. Code § 30251.

12      In light of the foreseeability of discharges, spills and the prolonging of the life
13  of 22 oil platforms, it was arbitrary and capricious for Defendants not to prepare a
14  determination as to whether the Proposed Action is fully consistent with
15  enforceable policies in the California Coastal Act.  The Court should find
16  defendants in violation of the CZMA and enjoin them from proceeding with the
17  Proposed Action.  *See State of California v. Norton*, 311 F.3d at 1169-70, 1178
18  (setting aside approval of offshore lease suspensions because federal government
19  failed to undertake consistency review of the suspensions); 5 U.S.C. §§ 706(1),
20  706(2)(A) & (D).

21                        **CONCLUSION**

22      For the foregoing reasons, Plaintiffs respectfully request that the Court grant
23  their motion for summary judgment.

24
25
26
27
28

25

1    Dated:  February 12, 2018              Respectfully submitted,

2                                          XAVIER BECERRA
                                           Attorney General of California
3                                          DAVID A. ZONANA
                                           DAVID ALDERSON
4                                          Supervising Deputy Attorneys General

5                                          /s/ George Torgun
                                           GEORGE TORGUN
6                                          Deputy Attorney General

7                                          *Attorneys for Plaintiffs People of the*
                                           *State of California, ex rel. Xavier*
8                                          *Becerra, Attorney General, and*
                                           *California Coastal Commission*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26