Margaret Morgan Hall (Bar No. 293699)
Email: mhall@environmentaldefensecenter.org
Linda Krop (Bar No. 118773)
Email: lkrop@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, California 93101
Telephone:  (805) 963-1622
Facsimile:  (805) 962-3152

*Attorneys for Plaintiffs Environmental Defense Center
and Santa Barbara Channelkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al., | Case No. 2:16-CV-08418-PSG |
| Plaintiffs, | **PLAINTIFFS ENVIRONMENTAL DEFENSE CENTER'S AND SANTA BARBARA CHANNELKEEPER'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| BUREAU OF OCEAN ENERGY MANAGEMENT, et al., | |
| Defendants, | |
| and | Date: August 13, 2018 |
| AMERICAN PETROLEUM INSTITUTE, et al., | Time: 1:30 p.m. |
| Intervenor-Defendants. | Courtroom: 6A |
| | Hon. Philip S. Gutierrez |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, on August 13, 2018, at 1:30 p.m., or as soon thereafter as it may be heard, Plaintiffs Environmental Defense Center and Santa Barbara Channelkeeper (collectively, "Plaintiffs"), by and through their undersigned counsel, will, and hereby do, move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Civil Local Rule 56-1, the Joint Federal Rule of Civil Procedure Rule 26(f) Report filed in this case, Dkt. No. 90 at 6–7, and this Court's resulting Order, dated November 21, 2017, Dkt. No. 91. This Motion will be made before the Honorable Philip S. Gutierrez, United States District Judge, First Street Courthouse, 350 West 1st Street, Courtroom 6A, 6th Floor, Los Angeles, California 90012.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for summary judgment on the grounds that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In support of this Motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities, Declaration of Owen P. Bailey, Declaration of Kira Redmond, Declaration of Rachel Gabrielle Horn, Declaration of Laura Morgan Coffey, Declaration of Gregory Bennett Helms, Declaration of Michael Thomas Cohen, Declaration of John Calambokidis, and a proposed judgment.

Respectfully submitted this 12th day of February, 2018

/s/ *Margaret Morgan Hall*

Margaret Morgan Hall (Bar No. 293699)

/s/ *Linda Krop*

*Attorneys for Plaintiffs*
ENVIRONMENTAL DEFENSE CENTER AND
SANTA BARBARA CHANELKEEPER

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

i

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

FACTUAL BACKGROUND ...................................................................................2

I.   The Santa Barbara Channel and History of Oil Development ......................2

II.  The Use of WSTs and Related Infrastructure ..............................................3

III. Previous Litigation and *EDC v. BSEE* Settlement Agreement .....................4

IV.  The PEA, Comments, and Current Case .......................................................4

LEGAL BACKGROUND .......................................................................................5

I.   The National Environmental Policy Act .......................................................5

II.  The Endangered Species Act .........................................................................6

STANDARD OF REVIEW ......................................................................................7

ARGUMENT ...........................................................................................................8

I.   Defendants' Issuance of the EA and FONSI Violates NEPA. ......................8

A.   WSTs May Significantly Affect the Quality of the Human Environment ...9

1.   The Southern California OCS is a Geographic Area with Unique
     Characteristics. .......................................................................................9

2.   The Environmental Effects of WSTs are Highly Controversial. ..........10

3.   The Potential Effects of WSTs are Highly Uncertain and Involve
     Unique or Unknown Risks. ...................................................................11

4.   WSTs May Cause Significant Cumulative Impacts. .............................13

5.   WSTs May Adversely Affect Listed Species. .......................................13

B.   Defendants' PEA is Unlawful under NEPA. .............................................13

1.   Defendants Failed to Adequately Analyze the Environmental Impacts
     of their Action. ......................................................................................13

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

ii

a.   The PEA is Driven by Fundamental Flaws Throughout the Analysis.
…………………………………………………………………………..14

b.   Defendants Failed to Adequately Analyze Direct Effects.................16

c.   Defendants Failed to Adequately Analyze Indirect Effects. ............17

d.   Defendants Failed to Adequately Analyze Cumulative Effects. .......18

2.   The PEA's Purpose and Need Statement is Unlawful........................19

3.   The PEA's Range of Alternatives is Unlawful. ...................................20

II.   Defendants' Issuance of the EA and FONSI Approving the Use of WSTs
Violates the ESA...........................................................................................21

A.   Defendants' Failure to Initiate Consultation Violates the ESA. ...............22

B.   Defendants' "No Effect" Determinations Violate the ESA. ......................24

CONCLUSION ........................................................................................................25

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

iii

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124 (9th Cir. 2011) ..............................17

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................................................................................................ 6, 7, 13, 16

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002) ............................... 2, 9, 11, 23

*Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) ...................................8

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ................................................................................................19

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013) ..................................................................................2

*Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009)............8

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ................................................................... 16, 21

*Defenders of Wildlife v. Flowers*, 414 F.3d 1066 (9th Cir. 2005) ..........................21

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000)........8

*EDC v. BSEE, et al.*, No. 2:14-cv-09281-PSG (C.D. Cal.) .......................... 4, 15, 20

*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174 (N.D. Cal. 2004)..........10

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.,* 528 U.S. 167 (2000) ........8

*Get Oil Out, Inc. v. Andrus*, 477 F. Supp. 40 (C.D. Cal. 1979)................................2

*Greater Yellowstone Coalition vs. U.S. Forest Service*, 12 F. Supp. 3d 1268 (D. Idaho 2014)..................................................................................10

*Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012). .....7, 21, 22, 23

*Kern v. U.S. Bureau of Land Mgmt*, 284 F.3d 1062 (9th Cir. 2002) ......................18

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

iv

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004) ..................................................15

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069 (E.D. Cal. 2004) ....................................................21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).. ....................................................................7, 16

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008) ..............................................................20

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ...............21

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)..passim

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010)........................................................ 19, 20

*Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060 (D. Mont. 2013) ...................................................... ...23, 25

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).. ......................................................................8, 9

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) ........................ 13, 14

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) .............. 10, 12, 13

*South Fork Band Council v. Dept. of Interior*, 588 F.3d 718 (9th Cir. 2009).........15

*Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998) ............................................................7

*Te-Moak Tribe of Western Shoshone v. Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010).......................................................... 13, 18

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ................................................6

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)...........................21

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) .................25

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

v

**Statutes**

16 U.S.C. § 1531(b) ................................................................................6

16 U.S.C. § 1536(a)(2) ................................................................... 6, 7, 21

16 U.S.C. § 1536(b)(3)(A) .......................................................................7

16 U.S.C. § 1540(g) .................................................................................5

42 U.S.C. 4332(2)(E) .............................................................................20

42 U.S.C. § 4332(C) ..............................................................................6, 9

43 U.S.C. § 1802(2)(B) ...........................................................................19

5 U.S.C. § 701 ..........................................................................................7

5 U.S.C. § 702 ..........................................................................................7

5 U.S.C. § 703 ..........................................................................................7

5 U.S.C. § 704 ..........................................................................................7

5 U.S.C. § 705 ..........................................................................................7

5 U.S.C. § 706 ..........................................................................................7

5 U.S.C. § 706(2)(A) ................................................................................7

**Other Authorities**

48 Fed. Reg. 18,026 (March 16, 1981) ....................................................20

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................7

**Regulations**

40 C.F.R. § 1500.1(c) ...............................................................................6

40 C.F.R. § 1500.1(a) ...............................................................................5

40 C.F.R. § 1500.1(b) ...............................................................................6

40 C.F.R. § 1508.27 ..................................................................................9

40 C.F.R. § 1508.27(b)(3) .........................................................................9

40 C.F.R. § 1508.27(b)(4) ........................................................................10

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

vi

40 C.F.R. § 1508.27(b)(5).........................................................................11

40 C.F.R. § 1508.27(b)(7).........................................................................13

40 C.F.R. § 1508.27(b)(9).........................................................................13

40 C.F.R. § 1508.7 ...................................................................................18

40 C.F.R. § 1508.9(a)(1) ...........................................................................6

40 C.F.R. §1508.27 (b) .............................................................................9

40 C.F.R. §1508.27(a)...............................................................................9

40 CFR § 1508.8 ......................................................................................17

40 CFR § 1508.8(b) ..................................................................................17

40 C.F.R. § 1508.9(b) ...............................................................................20

50 C.F.R. §  402.12(k) ..............................................................................7

50 C.F.R. § 402.14(a).................................................................. 7, 22, 23

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

vii

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Environmental Defense Center ("EDC") and Santa Barbara Channelkeeper ("Channelkeeper") ("Plaintiffs") challenge Defendants Bureau of Ocean Energy Management's ("BOEM") and the Bureau of Safety and Environmental Enforcement's ("BSEE"), *et al.*'s ("Defendants") approval of unconventional oil and gas development practices in the fragile marine environment off the California coast. These practices—the use of well stimulation treatments ("WSTs") including hydraulic fracturing ("fracking"), acid well stimulation ("acidizing"), and related "routine" acid treatments—rely heavily on the use of toxic chemicals and, until now, had never been subject to environmental review. In response to previous litigation, Defendants agreed to prepare a Programmatic Environmental Assessment ("PEA") under the National Environmental Policy Act ("NEPA") to determine whether WSTs may have significant impacts, and if so, prepare an Environmental Impact Statement ("EIS"). Instead, on May 27, 2016, Defendants issued a Final PEA with a Finding of No Significant Impact ("FONSI") approving the use of WSTs on the Southern California Outer Continental Shelf ("OCS") without any conditions, limitations, or mitigation (the "action").

In doing so, Defendants glossed over many potential significant impacts of these risky practices, relying on conclusory analysis and unfounded assumptions, and thus their conclusion is unlawful under NEPA. In addition, Defendants failed to comply with their duty under the Endangered Species Act ("ESA") to ensure their action does not jeopardize listed species through consultation with the expert wildlife agencies Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS"). Accordingly, this Court should grant Plaintiffs' motion for summary judgment; set aside Defendants' approval of WSTs; order Defendants to prepare an EIS and comply with ESA Section 7 consultation

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

1

1   requirements; and order Defendants to prohibit the use of WSTs until they comply

2   with NEPA and the ESA.

3                                    **FACTUAL BACKGROUND**

4   **I.    The Santa Barbara Channel and History of Oil Development**

5           Offshore oil drilling in California, especially in the Santa Barbara Channel,

6   has been controversial ever since the 1969 Santa Barbara Oil Spill. *California v.*

7   *Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). The Santa Barbara Channel region is

8   known as an international ecological treasure and contains the Channel Islands

9   National Marine Sanctuary, Channel Islands National Park, and many Marine

10  Protected Areas ("MPAs"). AR 16399[1] (Final PEA); AR 3438–40 (EDC

11  Comments). Numerous threatened and endangered species reside in the Channel on

12  a seasonal or residence basis, including blue, fin, and humpback whales, and the

13  southern sea otter. AR 16370–78 (Final PEA).

14          Today, oil drilling and production in the Southern California OCS is

15  conducted from twenty-three platforms. AR 16286 (Final PEA). These activities

16  were authorized by Development and Production Plans ("DPPs") based on EISs

17  that are sorely outdated. *See, e.g.*, *Get Oil Out, Inc. v. Andrus*, 477 F. Supp. 40, 44–

18  45 (C.D. Cal. 1979) (listing early EISs including the 1974 EIS for the Santa Ynez

19  Unit and a 1976 EIS for the Santa Barbara Channel). Additionally, the

20  technologies utilized in drilling and production are significantly different today.

21  *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937 F. Supp. 2d 1140,

22  1157 (N.D. Cal. 2013) (concluding that recent fracking practices present new and

23  significant impacts, requiring further environmental analysis). The use of WSTs

24  and similar "routine" acid treatments creates new risks and impacts and extends the

25  operating life of aging platforms. AR 3441 (EDC Comments).

26  _____

27  [1] Citations to the administrative record are in the format "AR" followed by the
    page number, excluding preceding zeros.

28  Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
    Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

                                              2

## II.     The Use of WSTs and Related Infrastructure

Fracking involves pumping a mixture of water, sand, and chemicals down a well at extremely high pressures to break apart a hydrocarbon-bearing geologic formation and increase oil or gas production. AR 16309–10 (Final PEA). Acidizing uses the application of one or more acids, typically hydrofluoric acid and hydrochloric acid, to the well or underground geologic formation, and may also be done at high pressures. AR 16310 (Final PEA). In addition, offshore oil operators commonly use a similar technology that they characterize as "routine acidizing" or "acid washes." AR 16314 (Final PEA). These treatments rely upon similar types and concentration of acids that acidizing does, and pose similar impacts, but rely upon less volume of acid solution. AR 16501 (Final PEA).

These practices have never been thoroughly studied. A study by the California Council on Science and Technology ("CCST") addressing the impacts of WSTs concluded that "only incomplete information and data exist," and that "[f]ew scientific studies of the health and environmental impacts of well stimulation have been conducted to date, and the ones that have been done focus on other parts of the country." AR 25701 (CCST Volume II Study).

Platforms in the Southern California OCS do not operate in isolation, but rely upon extensive infrastructure to transport, process, store, and refine the oil and gas and bring it to market. AR 16430–31 (Final PEA). This supporting infrastructure, like operations at the platforms themselves, is subject to accidents caused by human error, weather events, mechanical and other equipment failures, and other incidents that can result in spills of oil and other hazardous substances to the surrounding marine and terrestrial environment. AR 16436–46 (Final PEA). For example, Plains All American pipeline 901, which released approximately 140,000 gallons of crude oil along the California coast, was transporting oil from

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

3

1   platforms in the Southern California OCS—including some with a history of
2   WSTs. AR 3443 (EDC Comments).

3   **III.   Previous Litigation and *EDC v. BSEE* Settlement Agreement**

4         Beginning in 2012, Plaintiff EDC began investigating the use of WSTs from
5   the platforms offshore California. Through a series of Freedom of Information Act
6   ("FOIA") requests to Defendants, EDC discovered permits that approved WSTs
7   without any environmental review. AR 7055–56 (EDC Dirty Water Report). Due
8   to Defendants' refusal to provide public or environmental review, EDC filed a
9   lawsuit under NEPA in this Court on December 3, 2014, challenging Defendants'
10  routine approval of permits authorizing the use of WSTs pursuant to categorical
11  exclusions or no analysis whatsoever. *EDC v. BSEE*, *et al.*, No. 2:14-cv-09281-
12  PSG (C.D. Cal.). The parties reached a settlement agreement requiring Defendants
13  to withhold approval of drilling permits authorizing WSTs and prepare a PEA
14  addressing potential environmental impacts of WSTs and "other acid use" in
15  federal waters offshore California. *EDC v. BSEE, et al.*, No. 2:14-cv-09281-PSG,
16  Dkt. No. 79-1, 2, 4 (January 29, 2016) ("*EDC v. BSEE* Settlement Agreement"). If
17  the agencies determined during the PEA process that the activities may have
18  significant environmental impacts, they were required to prepare an EIS. *Id.* at 2.

19  **IV.   The PEA, Comments, and Current Case**

20        On February 22, 2016, Defendants issued a Draft PEA, concluding that
21  WSTs would not result in any significant environmental impacts. AR 16256.
22  Plaintiffs and others submitted comments focused on the potentially significant
23  impacts of WSTs, including impacts to water quality, the Santa Barbara Channel,
24  and threatened and endangered species. AR 3423–54 (EDC); AR 14132-14133
25  (Channelkeeper); AR 2677–90 (California Coastal Commission ("CCC")); AR
26  3367–69 (DOGGR); AR 14135–40 Environmental Protection Agencay ("EPA"));
27  AR 2544–46 (California Legislature); AR 4418–20 (U.S. Congress).

28  Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
    Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

Plaintiffs highlighted critical information gaps that precluded informed decision-making and noted the public controversy regarding the effects of WSTs. AR 3431–33 (EDC Comments). Plaintiffs also criticized the narrow purpose and need statement and range of alternatives considered. Finally, Plaintiffs asserted that Defendants failed to meet the NEPA requirement to provide a "hard look" at the impacts of WSTs, including failing to evaluate the impacts from extending the life of existing infrastructure. Therefore, Plaintiffs commented that the agencies were required to prepare an EIS. AR 3444–45 (EDC Comments).

Rather than prepare an EIS, Defendants issued a Final PEA and FONSI, approving the proposed action, Alternative 1 ("Allow use of WSTs"). AR 16297–99, 16504 (Final PEA); AR 16568–75 (FONSI). On August 10, 2016, Plaintiffs provided notice to Defendants, pursuant to 16 U.S.C. § 1540(g), that their approval of WSTs violates the ESA. AR 106342–54. Specifically, Plaintiffs alleged that WSTs may affect endangered and threatened species by, for example, exposure to toxic chemicals and behavioral disruption.

Plaintiffs filed this case on November 11, 2016, alleging violations of NEPA and the ESA. ExxonMobil, the American Petroleum Institute ("API"), and DCOR intervened. Dkt. Nos. 35, 71. On April 3, 2017, Defendants filed a motion to dismiss, Dkt. No. 43, which this Court subsequently denied, holding that Plaintiffs have properly challenged a final agency action, and that their ESA claims are both ripe and not moot. Dkt. No. 74. Plaintiffs now move for summary judgment.

## LEGAL BACKGROUND

## I.    The National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA establishes two overarching purposes: (1) to create an open, informed and public decision-making process; and (2) to require that federal

---

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

5

officials consider environmental consequences and take actions that "protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c).

NEPA requires each federal agency to prepare, and circulate for public comment, a detailed EIS prior to undertaking any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). When a federal agency is not certain whether an EIS is required, it may prepare an environmental assessment, which must provide sufficient "evidence and analysis" for determining whether an action has significant impacts. 40 C.F.R. § 1508.9(a)(1). If the agency concludes there are no significant impacts and issues a FONSI, the agency must provide a convincing statement of reasons why potential impacts are insignificant. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). If there are substantial questions regarding whether an action has significant impacts, the agency must prepare an EIS. *Id.* at 1212.

## II.    The Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to "provide a program for the conservation of such [species]." 16 U.S.C. § 1531(b). The ESA provides a variety of protections for species listed as threatened or endangered, to ensure not only the species' continued survival, but their ultimate recovery.

One central protection, Section 7(a)(2), mandates that all federal agencies avoid actions that are likely to jeopardize the continued existence of listed species or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2).

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

6

The ESA achieves this mandate through the consultation process with expert wildlife agencies FWS and NMFS. *Id*. If the agency, or FWS or NMFS, determines the action "may affect" or is likely to adversely affect a listed species, formal consultation is required. 50 C.F.R. §§ 402.14(a), 402.12(k). Through formal consultation, FWS or NMFS prepares a biological opinion as to whether the action will cause jeopardy and, if so, suggests "reasonable and prudent alternatives" to the action. 16 U.S.C. § 1536(b)(3)(A).

## STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In record review cases like this case, the Court "may direct that summary judgment be granted to either party based upon [its] review of the administrative record." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012).

The issues before this Court are whether Defendants complied with NEPA and the ESA. Such issues are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). *Blue Mountains Biodiversity Project*, 161 F.3d at 1211; *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998). Accordingly, Defendants' actions shall be set aside if found to be "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious when it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

7

**ARGUMENT**

Defendants' approval of the use of WSTs pursuant to its FONSI and PEA violates both NEPA and the ESA. Defendants' action is unreasonable in light of the many substantial questions regarding potential significant impacts of the use of WSTs, and the PEA fails to constitute a hard look at environmental impacts. In addition, Defendants have failed to satisfy their obligation under ESA Section 7 to ensure against jeopardy of protected species through the process of consultation with expert wildlife agencies. Therefore, this Court should set aside Defendants' PEA and FONSI approving WSTs.[2]

**I.     Defendants' Issuance of the EA and FONSI Violates NEPA.**

Defendants are in violation of NEPA both because their conclusion that no EIS is required is unreasonable and because their PEA failed to adequately consider the impacts of WSTs. An EIS must be prepared if there are "substantial questions" regarding whether the action may have significant impacts; Plaintiffs need not show that significant effects will in fact occur. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 864–65 (9th Cir. 2005). The unique setting of the Santa Barbara Channel, the controversy surrounding WSTs, the

---

[2]Plaintiffs have standing in this case, as demonstrated by declarations of their members and Executive Directors filed with this motion. Plaintiffs suffer injury based on Defendants' PEA and FONSI approving the use of WSTs. *See Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.,*528 U.S. 167, 180–81 (2000); *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) ("The interest that individuals have in observing a species or its habitat . . . is sufficient to confer standing."); *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir. 2000) ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient" to establish injury.) Plaintiffs have recreational, aesthetic, academic, and other interests in the Santa Barbara Channel that are adversely affected by Defendants' action. *See e.g.*, Horn Decl. (declaring, for example, she regularly swims in the Channel and near platforms, and fears contact with WST chemicals will directly impact her health); Coffey Decl. (stating that, as a naturalist, she worries WSTs will harm or kill the wildlife that she loves to see in the Channel); Helms Decl.; Cohen Decl.; Calambokidis Decl.; Bailey Decl.; Redmond Decl. These injuries are caused by Defendants' approval of WSTs and would be redressed by a favorable ruling from this Court. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

---

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

evidence of potential effects, and the many data gaps concerning impacts all demonstrate that, at the very least, there is a substantial question that significant impacts will occur. Moreover, Defendants' PEA suffers fatal flaws by relying on unfounded assumptions, glossing over potential impacts, and narrowly defining the purpose and need of the action and alternatives to it.

## A. WSTs May Significantly Affect the Quality of the Human Environment.

The use of WSTs is a major federal action significantly affecting the quality of the human environment, thus requiring Defendants to prepare an EIS. *See* 42 U.S.C. § 4332(C). Whether an action significantly affects the environment is determined through consideration of both the context and intensity of the action. 40 C.F.R. § 1508.27. When considering context, "significance varies with the setting of the proposed action," whereas intensity "refers to the severity of the impact" and includes analysis of ten specific factors. *Id.* § 1508.27(a), (b). The presence of any single factor may be enough to demonstrate that the action is significant. *Ocean Advocates*, 402 F.3d at 865. Here, several factors are met.

### 1. The Southern California OCS is a Geographic Area with Unique Characteristics.

The unique setting of the Santa Barbara Channel warrants special consideration under both the context and intensity factors. The significance of WSTs must be analyzed in the context of this sensitive ecological region. *See* 40 C.F.R. § 1508.27(a); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001) ("*Nat'l Parks*") (acknowledging the setting, wildlife, and ecological significance of Glacier Bay National Park and that its unique characteristics are "undisputed and of overwhelming importance").

Similarly, the Santa Barbara Channel is an area replete with "[u]nique characteristics . . . such as proximity to . . . park lands . . . or ecologically critical areas." 40 C.F.R. § 1508.27 (b)(3); *see California v. Norton*, 311 F.3d at 1176–77

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

9

(noting potential effects of oil and gas production in this region, including on the Channel Islands National Marine Sanctuary). Many of its waters and islands are specially designated, including the Channel Islands National Park. Specific platforms within the OCS are in direct proximity to these protected zones. AR 16397–99 (Final PEA); AR 3438–40 (EDC Comments). The PEA mentions the presence of these areas, but fails to adequately acknowledge their environmental, economic, and social importance, or the risks that WSTs pose to this unique area. AR 3440 (EDC Comments). The FONSI simply states there is "no consequence of the Proposed Action that has bearing on any of these noted characteristics." AR 16573. Defendants' conclusory statements dismissing the intensity of impacts on this unique region are inadequate under NEPA. *See Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1196 (N.D. Cal. 2004) (holding the agency violated NEPA even though it recognized a unique area, when it failed to show how impacts were insignificant); *Greater Yellowstone Coalition vs. U.S. Forest Service*, 12 F. Supp. 3d 1268, 1275–79 (D. Idaho 2014) (EA failed to adequately analyze potential effects on wilderness area).

### 2. The Environmental Effects of WSTs are Highly Controversial.

The use of WSTs also meets the significance standard because its effects are "highly controversial." 40 C.F.R. § 1508.27(b)(4). This standard is met when there is a substantial dispute as to the "size, nature, or *effect*" of the action. *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988) (emphasis in original) (internal quotations omitted). A substantial dispute exists when evidence raised prior to the issuance of a FONSI "casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks*, 241 F.3d at 736. The burden is on Defendants to provide a "well reasoned" or "convincing" explanation as to why responses disputing an EA do not create a public controversy. *Id.*

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

10

Here, a substantial dispute exists regarding the effects of WSTs.[3] Drilling in the Channel has been highly controversial for decades. *See California v. Norton*, 311 F.3d at 1177 (highlighting the "continuous and significant public controversy over the environmental effects of offshore oil activities in California for the past thirty years"). WSTs have only intensified this controversy. In response to the Draft PEA, Defendants received an "outpouring of public protest"—of the 11,246 comments received, 5,964 criticized the approval of WSTs. *Nat'l Parks*, 241 F.3d at 736 (internal quotations omitted); AR 16519 (Final PEA). Also, twenty-two governments and agencies, 102 non-governmental organizations, and sixty-six individuals submitted comments. *Id.* Many of these comments alleged that WSTs may have significant impacts. *See e.g.*, AR 3434 (EDC Comments raising potential for direct, indirect, and cumulative impacts); AR 14132–33 (Channelkeeper Comments regarding water quality impacts); AR 12372–73 (State Senator Jackson, *et al.*'s letter regarding potential impacts to human and marine life from the use of chemicals in WSTs, and the "troubling" conclusion of no impacts); AR 16577–78 (Congresswoman Capps, *et al.*'s letter raising concerns regarding drilling from platforms with a history of spills). On the other hand, the PEA concluded that impacts are nonexistent or negligible; and "[t]herein lay the controversy." *Nat'l Parks*, 241 F.3d at 737; *see* AR 16297–99, 16504 (Final PEA). Defendants failed to provide a convincing statement to resolve that controversy.

### 3. The Potential Effects of WSTs are Highly Uncertain and Involve Unique or Unknown Risks.

Defendants' action is likewise significant because "the possible effects" of WSTs "are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). The PEA suffers from missing information and numerous data gaps

---

[3]In addition, there is dispute over the size of the action. As explained below, while the PEA assumes infrequent use of WSTs (up to five annually), the Intervenors-Defendants' pleadings in this case reveal their extensive reliance on these practices and  confirm that the size might be much more widespread.

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

11

1    concerning critical potential impacts. Defendants must prepare an EIS to resolve

2    that uncertainty, rather than relying on it to support a conclusion of no impacts.

3    *Nat'l Parks*, 241 F.3d at 733 ("The [agency's] lack of knowledge does not excuse

4    the preparation of an EIS; rather it requires the [agency] to do the necessary work

5    to obtain it."); *see also Sierra Club,* 843 F.2d at 1195.

6          The effects of WSTs are highly uncertain because there are significant data

7    gaps concerning the toxicity of chemicals used and their impact on the

8    environment, species, and human health. Even the CCST study cited throughout

9    the PEA recognizes the unknown nature of impacts, and the fact that as many as

10   100 chemicals used in WSTs have "completely unknown materials." AR 25776.

11   Moreover, what *is* known about the chemicals only shows the potential for

12   significant impacts. For example, with respect to acidizing, at least twenty-eight of

13   the 200 chemicals used are "F-graded" (known carcinogens, mutagens,

14   reproductive and developmental toxins, endocrine disrupters, or high acute toxicity

15   chemicals). AR 107174–90 (Abdullah, Khadeeja, *et al.*, "Toxicity of acidization

16   fluids used in California oil exploration"). The use of these chemicals in a fragile

17   marine environment poses unique and unknown risks.

18         In addition, the PEA's discharge toxicity analysis contains a significant data

19   gap regarding the composition of flowback fluids, and the impacts of discharges of

20   such fluids on the marine environment. AR 3423–54 (EDC Comments); AR

21   14132–33 (Channelkeeper Comments); AR 2677–90 (CCC Comments); AR

22   14135–40 (EPA Comments). The PEA relied on data for only a fraction of the

23   chemicals used: including five of the seventeen chemicals screened for acidizing,

24   and twenty-six of the thirty-three screened for fracking. AR 3453 (Blue Tomorrow

25   Comments).

26         Given these significant data gaps, an EIS is required so that studies are

27   conducted *before* "significant environmental damage may occur to a treasured

28   Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

12

natural resource." *Nat'l Parks*, 241 F.3d at 736; *Sierra Club*, 843 F.2d at 1195; *Ocean Advocates*, 402 F.3d at 870–71 (requiring agency to quantify potential effects rather than ignore the unknown); *Blue Mountains Biodiversity Project*, 161 F.3d at 1213 (internal quotations omitted) ("[G]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.").

### 4. WSTs May Cause Significant Cumulative Impacts.

The proposed use of WSTs "is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). As explained below, the PEA glossed over the potential significant cumulative impacts of WSTs. *See Te-Moak Tribe of Western Shoshone v. Dep't of the Interior*, 608 F.3d 592, 602 (9th Cir. 2010).

### 5. WSTs May Adversely Affect Listed Species.

Due to the many potential impacts to listed species that the PEA itself identifies, as explained below, "the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)(9).

Therefore, for the above reasons, Defendants are required to prepare an EIS.

### B. Defendants' PEA is Unlawful under NEPA.

In addition, Defendants' PEA is inadequate because it fails to provide a hard look at the impacts of the action, fails to provide a valid purpose and need of its action, and, in turn, unreasonably defines the scope of alternatives considered.

### 1. Defendants Failed to Adequately Analyze the Environmental Impacts of their Action.

If an agency decides not to prepare an EIS, it must provide a "convincing statement of reasons why potential effects are insignificant." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (internal quotations omitted). The court can only defer to the agency's decision that impacts are insignificant when its

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

13

decision is "fully-informed and well considered." *Id.* Throughout the PEA, Defendants repeatedly relied on unwarranted assumptions and conclusory analysis to determine that there are no significant impacts. For these reasons and more, Defendants failed to provide a convincing statement of reasons and thus failed to take a hard look at the direct, indirect, and cumulative impacts of the use of WSTs.

### a.   The PEA is Driven by Fundamental Flaws Throughout the Analysis.

Defendants make critical analytical flaws that permeate their entire analysis. First, Defendants rely on the unsupported assumption that WSTs will occur "infrequently" and arbitrarily base their analysis on only five instances of WSTs per year. AR 16311, 16450, 16454 (Final PEA). This assumption drives Defendants' conclusions that impacts will be insignificant.[4] However, Defendants fail to provide any evidence for their assertion that WSTs will only be used infrequently. In fact, the record supports the opposite conclusion, that the practices are critical to the oil industry and likely to be used extensively. The PEA itself acknowledges a "downward trend in production . . . without the future use of WSTs." AR 16303.

Defendants' assumption has been directly contradicted by oil industry statements made in comments on the Draft PEA and in pleadings in this case that highlight their specific plans, and general intentions, to use WSTs offshore California, and reveal that such treatments are *necessary* to their operations. AR 3675 (API, *et al.* Comments) ("[WSTs], and associated discharge of WST-related fluids, is a long-standing practice within the oil and natural gas production industry in the Southern California [OCS], as well as other producing regions around the

---

[4]For example, the PEA concludes that "[b]ased on the expected very low frequency of WST use anticipated…[the use of WSTs] is not expected to result in any increase in seismicity." AR 16450; *see also* AR 16454 (same regarding air impacts); AR 16479–91(same regarding benthic resources, marine and coastal fish and birds, and sea turtles).

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

14

world."); Declaration of Ken Dowd at ¶¶14, 16, Dkt. No. 20-3 ("ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells, at SYU…. [the requested relief] would also severely restrict ExxonMobil's plans to further develop its existing Pacific OCS leases."); Declaration of Alan C. Templeton at ¶¶19, 23, Dkt. No. 45-4 (referring to DCOR's "near-term plans to use hydraulic fracturing as a well stimulation technique" and noting "an injunction would severely restrict DCOR's plans to develop its existing Pacific OCS leases."). Defendants' assumption of infrequent use of WSTs is without reason given industry statements demonstrating the importance of these practices to offshore oil operations.

Second, the PEA improperly relies on the Environmental Protection Agency's California OCS National Pollution Discharge Elimination System ("NPDES") General Permit as a basis for its conclusions that WSTs will have no or insignificant impacts. *See, e.g.*, AR 16477 (Final PEA). However, "a non-NEPA document" cannot satisfy an agency's obligations under NEPA. *South Fork Band Council v. Dept. of Interior*, 588 F.3d 718, 726 (9th Cir. 2009); *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 998 (9th Cir. 2004). In fact, both the EPA and CCC, which approved the NPDES Permit, asserted that Defendants' reliance on the Permit is inadequate, and noted the need to conduct further analysis of the impacts of WST discharges on the marine environment, including water quality and ocean wildlife. AR 14135–40 (EPA Comments); AR 2677–90 (CCC Comments).

Finally, the agencies inappropriately excluded other forms of acid use from the scope of their analysis of impacts. The *EDC v. BSEE* Settlement Agreement required Defendants to not just study WSTs that rise to the level of the state law definition, but to also include impacts of "other acid use." *EDC v. BSEE* Settlement Agreement at 4. Acid washes and treatments rely on similar types and

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

15

1   concentrations of acids as WSTs, AR 16501 (Final PEA), and likewise may result

2   in significant impacts. Such other forms of acid use should have been part of the

3   proposed action, with impacts examined accordingly.

**b.    Defendants Failed to Adequately Analyze Direct Effects.**

5   Defendants failed to adequately address impacts to air quality (including

6   greenhouse gas emissions); water quality; geologic resources/seismicity; benthic

7   resources; marine and coastal fish and essential fish habitat; marine and coastal

8   birds; marine mammals; sea turtles; commercial and recreational fisheries; areas of

9   special concern; recreation and tourism; environmental justice; and archeological

10  resources. AR 16290, 16293 (Final PEA). With respect to all these categories,

11  Defendants summarily concluded that the proposed action will result in "no" or

12  "negligible" impacts. AR 16296–98 (Final PEA (Table ES-1)). These conclusions

13  are based on the faulty assumptions explained above and are too cursory to

14  constitute a hard look under NEPA.

15  With respect to all of these categories, Defendants "shunted aside significant

16  questions with merely conclusory statements" and failed to provide an adequate

17  foundation for their conclusions that impacts will be insignificant. *Ctr. for*

18  *Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1223

19  (9th Cir. 2008) ("*CBD v. NHTSA*") (internal quotations omitted). Defendants'

20  "vague and conclusory statements" without "supporting data" are inadequate under

21  NEPA. *Id.* at 1223–24 (internal quotations omitted); *see also Blue Mountains*

22  *Biodiversity Project*, 161 F.3d at 1213–14. Defendants thus failed to "articulate a

23  satisfactory explanation for [their] action," rendering it arbitrary and capricious.

24  *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

25  In particular, the PEA fails to adequately assess the impacts of WST

26  discharges on water quality. The PEA acknowledges there is a "lack of toxicity

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

16

data for many constituents of WST fluids." AR 16459 (Final PEA). However, as explained above, it fails to sufficiently address this data gap. In order to evaluate impacts, Defendants should identify "[a]cute and chronic toxicity data for [WST] chemicals, as well as chemicals identified in flowback fluids." AR 24468 (CCST Volume III Study). The PEA also fails to adequately evaluate impacts from the discharge of flowback fluids, instead relying on information pertaining to discharges of injection fluids. Flowback fluids, however, are likely to contain additional pollutants and pose additional impacts, especially in the acidizing context. AR 14135–40 (EPA Comments); AR 3451–54 (Blue Tomorrow Comments). Finally, the PEA fails to sufficiently address whole effluent toxicity ("WET"). While some analysis was conducted as to "individual toxic effects" of WST fluids, the PEA failed to analyze the cumulative and interactive or synergistic effects of fluids with multiple toxic constituents. AR 16454–59. Defendants cannot rely on the WET testing under the NDPES Permit because it is not timed with WST discharges and is performed infrequently. AR 24436 (CCST Volume III Study); AR 2682 (CCC Comments); AR 14132-33 (Channelkeeper Comments). Therefore, the PEA's analysis of water quality is a far cry from a hard look.

### c.   Defendants Failed to Adequately Analyze Indirect Effects.

Defendants must consider not only direct effects in their PEA, but also indirect effects. 40 CFR § 1508.8; *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). The PEA failed to consider the indirect impacts that will result from the increased oil production facilitated by WSTs, including the increased need to transport, process, and refine the crude oil. These activities may cause significant impacts to the environment and public health and safety. WSTs also allow

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

17

production to continue beyond that which would occur under conventional methods, thus extending the life of the platforms and related facilities. AR 16302–12 (Final PEA). The PEA, however, failed to consider the indirect effects caused by these activities and by prolonging the life of the platforms.

### d.   Defendants Failed to Adequately Analyze Cumulative Effects.

Cumulative impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" and can result from "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. §§ 1508.7, 1508.27(b)(7); *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002). The discussion of cumulative impacts must include "quantified or detailed information" so that the courts and the public "can be assured that the [agency] provided the hard look that it is required to provide." *Te-Moak Tribe of Western Shoshone*, 608 F.3d at 603. Although the PEA acknowledged other oil and gas development activities in the region, it failed to offer any analysis whatsoever regarding the cumulative impacts of such activities in combination with the action. Instead, the PEA summarily concluded that because WSTs will result in "limited or negligible impacts," the cumulative impacts would also be inconsequential. AR 16487 (Final PEA). This conclusory statement misses the whole point of analyzing cumulative impacts, which is to address the fact that individually minor actions may nevertheless result in significant impacts when considered together with other (possibly minor) actions.[5]

By failing to adequately consider the direct, indirect, and cumulative effects that will result from WSTs, the PEA failed to provide a hard look at impacts or disclose the environmental consequences of the action.

---

[5] The PEA also ignored cumulative impacts caused by acid washes and "routine" acidizing.

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

18

## 2.   The PEA's Purpose and Need Statement is Unlawful.

An agency's stated purpose and need of the action cannot be defined "in unreasonably narrow terms" so as to preclude consideration of a reasonable range of alternatives. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Specifically, the purpose and need statement cannot be entirely driven by private party interests. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010) ("*Nat'l Parks v. BLM*"). Instead, when stating a purpose and need, an agency "should always consider the views of Congress" articulated "in the agency's statutory authorization to act, as well as in other congressional directives." *Id.* at 1070 (internal quotations omitted).

Defendants unlawfully crafted a purpose and need statement that is driven entirely by the desire of oil company lessees. The PEA states that the purpose of the proposed action is "to enhance the recovery of petroleum and gas from new and existing wells on the POCS beyond that which could be recovered with conventional methods," and the need "is the efficient recovery of oil and gas reserves from the POCS." AR 16302. The statement improperly assumes that the government must promote unconventional oil extraction, which is squarely within the industry's interests. Defendants, however, operate under a broad congressional directive under OCSLA, that oil production must be balanced with "protection of the human, marine, and coastal environments." 43 U.S.C. § 1802(2)(B). The purpose and need statement should reflect this congressional purpose.[6]

Moreover, the purpose of the PEA, as agreed to by Defendants in the settlement in *EDC v. BSEE*, was to analyze the potential environmental impacts of

---

[6]In addition, the purpose and need statement fails to acknowledge the Congressional directives placed on BOEM and BSEE by numerous other applicable environmental laws such as NEPA itself, the ESA, Clean Water Act, and Coastal Zone Management Act.

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

19

WSTs on the Pacific OCS. *EDC v. BSEE* Settlement Agreement at 2. The PEA was prepared, not to evaluate a specific proposal that must meet certain oil production goals, but to inform the agencies and the public regarding the potential impacts of WSTs, without "pre-determin[ing] the outcome of this assessment." *Id.* at 3. However, the purpose and need statement is limited to the predetermined outcome of enhancing production, and thus unduly constrains the analysis.

### 3. The PEA's Range of Alternatives is Unlawful.

The PEA must give "full and meaningful consideration to all reasonable alternatives" to the action. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008); 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). Failure to properly define a project's purpose and need will necessarily preclude consideration of a reasonable range of alternatives. *Nat'l Parks v. BLM,* 606 F.3d at 1069–72. The alternatives considered may not be entirely driven by a private applicant's preferences. *See* Forty Most Asked Questions Concerning Council on Environmental Quality's NEPA Regulations, 48 Fed. Reg. 18,026 (March 16, 1981) ("[T]he emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out the particular alternative.").

Here, by narrowing its purpose and need statement, Defendants considered an unreasonably narrow range of alternatives. The agencies considered only two alternatives that would involve any restriction on WSTs, including restricting WSTs to depths greater than 2,000 feet and prohibiting open water discharge of waste fluids. AR 16289. These alternatives would allow the approval of WSTs and are only minimally different than the action. The PEA failed to consider any alternative that would limit the *amount* of WSTs, or that would combine restrictions. Additional alternatives further restricting WSTs should have been

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

20

considered, in accordance with the proper purpose of the PEA. *See CBD v. NHTSA*, 538 F.3d at 1218–19. Instead, the narrow range of alternatives renders it impossible for the agency to meaningfully analyze and compare impacts. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013) (noting that the court questions "how an agency can make an informed decision on a project's environmental impacts when each alternative considered would authorize the same underlying action"); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp.2d 1069, 1088–89 (E.D. Cal. 2004) (holding the agency did not take a hard look at reasonable alternatives when it "dismissed out of hand any proposal which would have reduced the amount of timber harvest.").

Therefore, Defendants' PEA is inadequate and an EIS is required.

## II. Defendants' Issuance of the EA and FONSI Approving the Use of WSTs Violates the ESA.

Defendants' approval of the FONSI and PEA authorizing the use of WSTs is an agency action that may affect species listed as endangered or threatened under the ESA. Therefore, consultation pursuant to Section 7(a)(2) of the ESA is required. 16 U.S.C. § 1536(a)(2). This section is the "heart of the ESA." *Karuk Tribe*, 681 F.3d at 1019. It places the "ultimate duty" on BOEM and BSEE to ensure their action does not jeopardize the very existence of listed species. *See Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005) (internal quotations omitted). This analysis is critical because if the wildlife agency makes a jeopardy determination at the end of the consultation process, the action simply cannot go forward as is. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007). Defendants acknowledged potential impacts to some of the species addressed, but failed to engage in consultation with FWS and NMFS to ensure the action does not jeopardize these listed species. With respect to other species, Defendants made arbitrary and capricious "no effect" determinations.

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

21

**A.      Defendants' Failure to Initiate Consultation Violates the ESA.**

If an action "may affect" a listed species or critical habitat, the agency must engage in consultation. 50 C.F.R. § 402.14(a). This requirement triggers consultation if an action has "any chance of affecting listed species or critical habitat," even if effects are "benign" or of an "undetermined character." *Karuk Tribe*, 681 F.3d at 1027 (internal quotations omitted). Defendants identified potential effects on listed species throughout the PEA, and therefore must engage in consultation to ensure the action does not jeopardize their continued existence. As this Court has already concluded, Defendants' action "may affect" listed species. Dkt. No. 74 at 12 ("Plaintiffs have also shown that WSTs 'may affect' twenty-five threatened or endangered species, and the Biological Assessments that Defendants submitted to the services confirm as much.").

The PEA and FONSI broadly admit that "operational discharges to the ocean from the platforms and support vessel traffic *may affect* ecological resources in the project area," AR 16360 (Final PEA) (emphasis added), and that the action "is expected to have negligible to minor effects on biological resources." AR 16571 (FONSI). Specifically, the PEA identifies "minimal effects" to benthic resources (which include black abalone and white abalone). AR 16479. The PEA recognizes the potential for marine and coastal fish (which include the southern California steelhead, the scalloped hammerhead shark, and the tidewater goby) to be "temporarily exposed to highly diluted concentrations of WST-related chemicals" in platform discharges. AR 16481. The PEA identifies potential impacts to marine mammals (which include the sei whale, blue whale, fin whale, humpback whale, sperm whale, Guadalupe fur seal, and southern sea otter) "associated with the discharge from platforms of WST-related fluids and chemicals," AR 16481; from "noise" and being "struck by PSVs," AR 164582; from a surface spill of WST chemicals, AR 164583; and from "disturbance in behavior and/or distribution of

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

22

some individuals." *Id*. The PEA identifies potential impacts to birds (which include the western snowy plover, marbled murrelet, light-footed Ridgway's rail, and California least tern), such as "noise or the presence of PSVs" and the "accidental release of WST chemicals." AR 16486–87. The PEA states that sea turtles (which includes the loggerhead turtle, the leatherback turtle, the green turtle, and the olive ridley turtle) could be impacted by the "accidental release of WST fluids and crude oil," resulting in "decreased health, reproductive fitness, and longevity," AR 16488; "affected during spill containment and cleanup activities," AR 16489; and "struck by PSVs," disturbed by noise associated with PSVs, and "expos[ed] [to WST chemicals] through direct contact and through ingestion of contaminated food." AR 16487.[7]

Defendants dismissed many of these impacts as "negligible." However, these potential impacts, even if negligible, show that the action "may affect" listed species, and thus trigger Defendants' duty to ensure against jeopardy through consultation. *See* 50 C.F.R. § 402.14(a); *Karuk Tribe*, 681 F.3d at 1027; *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079 (D. Mont. 2013) (concluding that even "discountable or insignificant" effects trigger this standard).[8]

Defendants cannot point to their subsequent Biological Assessments ("BAs") or the responsive letters from FWS and NMFS to avoid liability under

---

[7]Defendants also failed to address indirect and cumulative impacts on these species, for example, from extending the life of platforms and infrastructure, such as pipelines, that may rupture and harm wildlife.

[8]Moreover, Defendants' conclusion that these impacts are "negligible" is arbitrary and capricious because there is no rational connection between recognizing impacts and a conclusion of "no effect" or "not likely to adversely affect." *See Native Ecosystems Council*, 946 F. Supp. 2d at 1079 (holding that the agency's conclusion of "no effect" after recognizing "disturbance effects" was arbitrary). Also, as explained above, Defendants rely on cursory analysis and unfounded assumptions to dismiss impacts to species. In fact, the Ninth Circuit has already recognized the potential for adverse impacts on listed species, such as the sea otter, due to offshore oil production in California. *See California v. Norton*, 311 F.3d at 1176–77. Such impacts are only compounded by the use of WSTs.

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

23

ESA Section 7. The BAs prepared by Defendants *after* Plaintiffs filed their lawsuit do not constitute complete consultation addressing Plaintiffs claims because they do not include the full scope of activities challenged or species affected; inappropriately assume only five WSTs will be used per year; exclude other acid use which likewise "may affect" listed species; and ignore indirect effects on species such as those resulting from extending the life of aging infrastructure. *See* AR 106023–111 (FWS BA); AR 106112–171 (NMFS BA). Accordingly, as this Court determined, the Court may still grant "effective relief" on Plaintiffs' ESA claims by ordering Defendants to conduct a "more complete Biological Assessment, or to engage in formal consultation, if warranted." Dkt. No. 74 at 15.

The letters from FWS and NMFS also confirm that Defendants are far from complying with their Section 7 obligations. For example, the FWS letter states that BOEM's request was insufficient to initiate consultation because it "lacked sufficient detail" to even enable FWS "to determine the effects of the proposed action on listed species." AR 106298 (FWS Letter). Moreover, the FWS highlights the lack of data surrounding the impacts of toxic discharges on listed species and BOEM's unsupported conclusion regarding the risks of accidents. AR 106296. In addition, the NMFS letter reveals that the scope of consultation is not coextensive with Plaintiffs' claims because it assumes without basis that the amount of WSTs will be limited to five treatments per year. AR 106304 (NMFS Letter). Therefore, Defendants are in violation of ESA Section 7 and must comply with their duties to avoid jeopardy, through the consultation process.

### B. Defendants' "No Effect" Determinations Violate the ESA.

The PEA explicitly concluded the action will have "no effect" on the North Pacific right whale, short-tailed albatross, and Hawaiian petrel. AR 16482, 16382–83. An agency's "no effect" determination is arbitrary and capricious when it fails to provide a rational basis for its conclusion. *W. Watersheds Project v.*

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

24

1  *Kraayenbrink*, 632 F.3d 472, 496–98 (9th Cir. 2011). Defendants summarily

2  concluded that these species will not occur in the area with any regularity as a basis

3  for concluding that the action will have "no effect" on the species. AR 16482,

4  16382–83. However, Plaintiffs need not demonstrate that a species occupies the

5  area; the threshold for consultation requires inclusion of all such species that *may*

6  be present. *See Native Ecosystems Council*, 946 F. Supp. 2d at 1077 ("[I]t is not

7  necessary that grizzly bears occupy an area to satisfy the 'low threshold' for

8  consultation"). The PEA in fact admits the potential presence of these species by

9  pointing to recorded sightings in or near the project area. AR 16482, 16382–83.

10  Therefore, these species may be present and may be affected by WSTs because

11  they are subject to all of the same threats to which other species in the PEA are

12  subject, as explained above. Accordingly, consultation is required.

13       In sum, Defendants are in violation of their obligations to ensure against

14  jeopardy through consultation pursuant to ESA Section 7.

15                                   **CONCLUSION**

16       Well stimulation poses significant threats to the unique and sensitive

17  environment and wildlife offshore California. This Court should set aside

18  Defendants' PEA and FONSI; order them to prepare an EIS and complete

19  consultation under the ESA; and prohibit Defendants from issuing any well

20  stimulation permits until they have complied with NEPA and the ESA.

21                        Respectfully submitted this 12th day of February, 2018

22

23                        /s/ *Margaret Morgan Hall*

24                        Margaret Morgan Hall (Bar No. 293699)

25                        /s/ *Linda Krop*

26                        *Attorneys for Plaintiffs*
                         ENVIRONMENTAL DEFENSE CENTER AND
27                        SANTA BARBARA CHANELKEEPER

28  Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
    Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

1

### CERTIFICATE OF SERVICE

2    I, Margaret Morgan Hall, hereby certify that on February 12, 2018, I

3 electronically filed PLAINTIFFS ENVIRONMENTAL DEFENSE CENTER'S

4 AND SANTA BARBARA CHANNELKEEPER'S NOTICE OF MOTION AND

5 MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS

6 AND AUTHORITIES IN SUPPPORT THEREOF, and all attachments, with the

7 Clerk of the Court using the CM/ECF system, which constitutes appropriate

8 service pursuant to Local Rule 5-3.2.

9

10                                 /s/ *Margaret Morgan Hall*

11                                 Margaret Morgan Hall

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs EDC's and SBCK's Notice of Motion and Motion for Summary Judgment;
Memorandum of Points and Authorities, Case No. 2:16-cv-08418-PSG

26