1   Kristen Monsell (CA Bar No. 304793)
    Email: kmonsell@biologicaldiversity.org
2   Emily Jeffers (CA Bar No. 274222)
    Email: ejeffers@biologicaldiversity.org
3   Center for Biological Diversity
    1212 Broadway, Suite 800
4   Oakland, CA 94612
    Phone: (510) 844-7137
5   Facsimile: (510) 844-7150
6
7
8   *Attorneys for Plaintiffs Center for*
    *Biological Diversity and Wishtoyo*
9   *Foundation*

10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, *et al.*, | Case No. 2:16-cv-08418-PSG-FFM |
| Plaintiffs, | **PLAINTIFFS CENTER FOR BIOLOGICAL DIVERSITY'S AND WISHTOYO FOUNDATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BUREAU OF OCEAN ENERGY MANAGEMENT, *et al*. | Hearing Date: Aug. 13, 2018 Hearing Time: 1:30pm Courtroom: 6A Hon. Philip S. Gutierrez |
| Defendants. | |

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Notice of Mot. And Mot. for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFMx

1

*Additional Counsel for Plaintiff Wishtoyo Foundation*:

2

3

Jason A. Weiner (Ca. Bar No. 259264)
Email: jweiner.venturacoastkeeper@wishtoyo.org
9452 Telephone Rd. #432
Ventura, CA 93004
Telephone: (805) 823-3301
Facsimile: (805) 258-5107

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Notice of Mot. And Mot. for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

27

28

## **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on August 13, 2018, or as soon thereafter as it may be heard, Plaintiffs Center for Biological Diversity and Wishtoyo Foundation (collectively, "Plaintiffs"), will bring for hearing their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's November 21, 2017 Case Management Order, Dkt. No. 91. The hearing will take place before the Hon. Philip S. Gutierrez in Courtroom 6A at the U.S. District Court for the Central District of California, located at 350 West First Street in Los Angeles, California, 90012.

Plaintiffs move for summary judgment on the ground that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. For the reasons set forth below, Defendants the Secretary of the Interior, the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, and the Bureaus' Regional Directors (collectively, "Defendants") violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq*., and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq*., in issuing a decision authorizing the use of offshore hydraulic fracturing ("fracking") and acidizing at all active oil and gas leases on the Pacific Outer Continental Shelf ("OCS").

Plaintiffs respectfully request this Court to find and declare that Defendants' decision to authorize offshore fracking and acidizing on the Pacific OCS violated NEPA and the ESA. Plaintiffs also ask this Court to set aside that unlawful decision and enjoin Defendants from issuing drilling permits allowing offshore fracking and acidizing on the Pacific OCS unless and until Defendants comply with NEPA and the ESA.

Plaintiffs' Motion is based on the points and authorities set forth below, the attached declarations, and the administrative record lodged with the Court by Defendants on January 25, 2018, Dkt. No. 93. A Proposed Order accompanies this Motion.

1

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Notice of Mot. and Mot. for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1

Dated: February 12, 2018    Respectfully Submitted,

2

3             /s/ Kristen Monsell

4             Kristen Monsell (CA Bar No. 304793)
              Email: kmonsell@biologicaldiversity.org

5             Emily Jeffers (CA Bar No. 274222)
              Email: ejeffers@biologicaldiversity.org

6             Center for Biological Diversity

7             1212 Broadway, Suite 800
              Oakland, CA 94612

8             Phone: (510) 844-7137

9             Facsimile: (510) 844-7150

10

11            *Attorneys for Plaintiffs*

12            *Center for Biological Diversity*
             *and Wishtoyo Foundation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Notice of Mot. and Mot. for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ................................................................................................. 1

LEGAL BACKGROUND ..................................................................................... 1

    I.   The National Environmental Policy Act ................................................... 1

    II.  The Endangered Species Act ................................................................... 2

FACTUAL BACKGROUND ................................................................................. 3

    I.     Offshore Drilling in the Pacific Ocean ................................................... 3

    II.    The Risks of Offshore Fracking and Acidizing  ..................................... 4

    III.   Defendants' Programmatic Decision To Authorize Offshore Fracking and Acidizing on the Pacific OCS ......................................................... 6

ARGUMENT .......................................................................................................... 7

    I.   Standard of Review ............................................................................... 7

    II.  Defendants Violated NEPA by Authorizing Offshore Fracking and Acidizing Based on an Inadequate Environmental Assessment ............. 8

          A. Defendants Did Not Take a "Hard Look" at the Impacts of Well Stimulation ..................................................................................... 8

              1. Defendants Failed to Take a Hard Look at the Impacts of Waste Fluids.. 9

              2. Defendants Failed to Examine the Cumulative Impacts of Well Stimulation ........................................................................... 11

          B. The Purpose and Need Statement of the EA Is Impermissibly Narrow ....... 13

          C. Defendants Failed to Analyze a Reasonable Range of Alternatives ............ 15

    III.  Defendants Violated NEPA by Authorizing Offshore Fracking and Acidizing Without Completing an Environmental Impact Statement ................................... 16

i

Pls. Center for Biological Diversity's and Wistoyo Foundation's
Mem. in Supp. of Mot. for Summ. Judgment
Case No. 2:16-cv-08418-PSG-FFM

A.  The Impacts of Offshore Fracking and Acidizing Are Highly
    Controversial .................................................................................. 17

B.  Offshore Fracking and Acidizing Present Highly Uncertain or Unknown
    Risks ............................................................................................... 19

C.  Well Stimulation Impacts Geographic Areas With Unique
    Characteristics ................................................................................ 20

D.  Well Stimulation on the Pacific OCS Implicates Other Significance
    Factors ............................................................................................ 22

IV.  Defendants' Failure to Engage in Formal Consultation Before Authorizing
     Offshore Fracking and Acidizing Violates the ESA ........................... 23

CONCLUSION .................................................................................................... 25

ii

Pls. Center for Biological Diversity's and Wistoyo Foundation's
Mem. in Supp. of Mot. for Summ. Judgment
Case No. 2:16-cv-08418-PSG-FFM

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)………………………………………………20

*Blue Mtns. Biodiv. Proj. v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)……………2,16,17

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999 (9th Cir. 2009)……………..……1

*Cal. Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102 (C.D. Cal. 2015)……………………………………………………………………….………………24

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002)……………………………………….13

*City of Davis v. Coleman*, 521 F.3d 661(9th Cir. 1975) ……………………………………11

*Ctr. for Biological Div. v. BLM*, 937 F.Supp.2d 1140 (N.D. Cal. 2013)……………..18,19

*Ctr. for Biological Div. v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008)……………………….2

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, No. 2:16-cv-08418-PSG-FFM (C.D. Cal., filed Nov. 11, 2016)……………………………………………………...…………4

*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F.Supp.2d 1174 (N.D. Cal. 2004) ....................21

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 Fed. Appx. 440 (9th Cir. 2007) ……14,15

*Found. for N. Am. Wild Sheep v. USDA*, 681 F.2d 1172 (9th Cir. 1982)………………..18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000)…………..…….8

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)……………………………17

*Great Basin Mine Watch v. Hankins*, 456 F.3d 955 (9th Cir. 2006)……………………12

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001)……………………………………………..8

*Helena Hunters & Anglers v. Tidwell*, 841 F. Supp. 2d 1129 (D. Mont. 2009)…………18

*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002)……………………..8

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004)……………….12

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)…………………………………………..2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)………7

iii

Pls. Center for Biological Diversity's and Wistoyo Foundation's
Mem. in Supp. of Mot. for Summ. Judgment
Case No. 2:16-cv-08418-PSG-FFM

*Nat. Res. Def. Council v. Duvall*, 777 F. Supp. 1533 (E.D. Cal. 1991)……………………16

*Nat. Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998)………..…………..25

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005)…………..7

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005)………..19

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)…....2,17,18,20

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)………….14,15

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997)………17

*Ocean Mammal Institute v. Gates*, 546 F.Supp.2d 960 (D. Haw. 2008)………………...21

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)……………………..2

*S. Fork Band of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) ......9

*Siskiyou Reg'l Educ. Proj. v. Forest Serv.*, 565 F.3d 545 (9th Cir. 2009)………………..7

*Strahan v. Roughead*, 910 F. Supp. 2d 358 (D. Mass. 2012)……………………………25

*W. Watersheds Proj. v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)………………………….15

*W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011)……………………23

**Statutes**

5 U.S.C. § 706 .........................................................................................................................7

16 U.S.C. § 410ff ..................................................................................................................21

16 U.S.C. § 1531(a)(2) ...........................................................................................................2

16 U.S.C. § 1531(b) ...............................................................................................................3

16 U.S.C. § 1536(a)(2) ..................................................................................................3,23,25

16 U.S.C. § 1536(b)(3) .........................................................................................................23

16 U.S.C. § 1536(b)(3)(A) ......................................................................................................3

42 U.S.C. § 4332(2)(C) ..........................................................................................................2

43 U.S.C. § 1332(3) ..........................................................................................................14,16

43 U.S.C. § 1802(2)(B) .....................................................................................................14,16

iv

Pls. Center for Biological Diversity's and Wistoyo Foundation's
Mem. in Supp. of Mot. for Summ. Judgment
Case No. 2:16-cv-08418-PSG-FFM

**Regulations**

40 C.F.R. § 1501.4 ................................................................................................ 2

40 C.F.R. § 1502.9(c) ......................................................................................... 11

40 C.F.R. § 1502.13 ............................................................................................ 13

40 C.F.R. § 1502.14 ............................................................................................ 15

40 C.F.R. § 1502.14(a) ....................................................................................... 16

40 C.F.R. § 1508.7 ........................................................................................... 8,11

40 C.F.R. § 1508.8(a) ........................................................................................... 8

40 C.F.R. § 1508.8(b) ........................................................................................... 8

40 C.F.R. § 1508.9 ........................................................................................... 2,13

40 C.F.R. § 1508.27(b)(1)-(10) ............................................................................ 2

40 C.F.R. § 1508.27(b)(3) ............................................................................. 20,22

40 C.F.R. § 1508.27(b)(4) ............................................................................. 17,19

40 C.F.R. § 1508.27(b)(5) ............................................................................. 19,20

40 C.F.R. § 1508.27(b)(7) ................................................................................. 22

40 C.F.R. § 1508.27(b)(9) ................................................................................. 22

50 C.F.R. § 402.12 ............................................................................................. 23

50 C.F.R. § 402.13 ............................................................................................. 23

50 C.F.R. § 402.14 ............................................................................................. 23

50 C.F.R. § 402.14(a) ......................................................................................... 23

50 C.F.R. § 402.14(b) ........................................................................................... 3

50 C.F.R. § 402.15 ............................................................................................. 23

Pls. Center for Biological Diversity's and Wistoyo Foundation's
Mem. in Supp. of Mot. for Summ. Judgment
Case No. 2:16-cv-08418-PSG-FFM

## **INTRODUCTION**

Offshore hydraulic fracturing ("fracking") and acidizing are highly controversial, unconventional oil extraction techniques that heighten the inherently dangerous effects of offshore oil and gas drilling. While there are critical data gaps regarding the impacts of these techniques on the marine environment, what is known raises several significant concerns. Offshore fracking and acidizing increase the risk of oil spills, use toxic chemicals that threaten water quality and marine life, and prolong the lifespan of offshore drilling operations.

Nevertheless, the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement ("Defendants") issued a decision authorizing fracking and acidizing at all active leases on the Pacific Outer Continental Shelf ("OCS") without first preparing an environmental impact statement ("EIS") as required by the National Environmental Policy Act ("NEPA"). Nor did Defendants formally consult with the expert federal wildlife agencies about the impacts of these oil extraction techniques on threatened and endangered species as required by the Endangered Species Act ("ESA"). Instead, Defendants issued a cursory environmental assessment ("EA") that wholly fails to take the "hard look" at the impacts of offshore fracking and acidizing mandated by NEPA, and post hoc biological assessments that do not satisfy Defendants' ESA duties.

Accordingly, the Court should grant Plaintiffs' motion for summary judgment and prohibit Defendants from authorizing offshore fracking and acidizing on the Pacific OCS unless and until they comply with NEPA and the ESA.

## **LEGAL BACKGROUND**

### I.    The National Environmental Policy Act

NEPA is "our basic national charter for protection of the environment." *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). The statute establishes "a set of 'action-forcing' procedures that require agencies to take a 'hard

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

look' at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Chief among these procedures is the requirement that all federal agencies, including Defendants, prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Regulations implementing NEPA require agencies to consider ten factors in determining whether a federal action may have a significant impact and require an EIS. 40 C.F.R. § 1508.27(b)(1)-(10). If an agency's action *may* be environmentally significant because of *any one* of the significance criteria, the agency *must* prepare an EIS. *Ctr. for Biological Div. v. NHTSA*, 538 F.3d 1172, 1219-20 (9th Cir. 2008).

To determine whether a project's impacts may be "significant" and thus warrant preparation of an EIS, an agency may first prepare an EA. 40 C.F.R. §§ 1501.4, 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). An EA "[s]hall include brief discussions of the need for the proposal [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9. If the EA reveals that "the agency's action *may* have a significant effect upon the . . . environment, an EIS must be prepared." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (emphasis in original, internal quotations omitted).

Conversely, if the agency's EA concludes that no significant impacts are possible, it may issue a Finding of No Significant Impact ("FONSI") and forego an EIS. 40 C.F.R. §§ 1501.4, 1508.9. In such case, the agency must supply a "convincing statement of reasons" why the effects are insignificant. *Blue Mtns. Biodiv. Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). Together, the FONSI and EA must be sufficient to establish the reasonableness of the agency's decision not to prepare an EIS. *Id.*

## II.     The Endangered Species Act

In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. §

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1531(a)(2). Accordingly, the ESA seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b).

To meet these goals, Section 7(a)(2) of the ESA requires all federal agencies, including Defendants, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species," or adversely modify its critical habitat. *Id.* § 1536(a)(2).

In complying with this mandate, federal agencies must consult with the National Marine Fisheries Service and the Fish and Wildlife Service ("Services") whenever their actions "may affect" a listed species or designated critical habitat. *Id.* Formal consultation results in a biological opinion from the Services that determines if the action is likely to jeopardize the species; if so, the opinion may specify mitigation measures that will avoid jeopardy and allow the agency to proceed with the action. *Id.* § 1536(b)(3)(A). Formal consultation is not required, however, if through a biological assessment or informal consultation, the action agency determines its action is "not likely to adversely affect" any listed species *and* the Services concurs with that determination in writing. 50 C.F.R. § 402.14(b).

## FACTUAL BACKGROUND

### I.  Offshore Drilling in the Pacific Ocean

The Pacific OCS region has 43 active oil and gas leases. Administrative Record ("AR"), Dkt. No. 93 at 16300. Drilling activities occur under these leases from 23 platforms off the coast of Southern California. *Id.* Fifteen of the platforms are in the Santa Barbara Channel, four are located off Long Beach, and four are located in the Santa Maria Basin. AR 15794. Oil companies installed the platforms between 1967 and 1989, *id.*, and have been drilling for roughly 30 to 50 years. AR 16303.

The leases and platforms are located in one of the most significant and diverse

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

seascapes in the world, with a vast array of habitats, coastal and marine species, and important cultural resources. For example, the Santa Barbara Channel is habitat for several species listed under the Endangered Species Act, including blue whales, humpback whales, sea turtles, southern sea otters, and black abalone, as well as critical habitat for western snowy plovers and black abalone. AR 15883, 15889, 15894-95, 15867. Since time immemorial, the Chumash Peoples have depended upon the cultural resources within the Santa Barbara Channel, from Point Conception to Malibu and out to and around the Channel Islands, to maintain their ways of life, cultural practices, and ancestral connections. AR 106939.

In 2013, a series of requests under the Freedom of Information Act revealed that Defendants had been authorizing offshore fracking and acidizing on the Pacific OCS without conducting any analysis of the environmental impacts of these dangerous oil extraction practices. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, No. 2:16-cv-08418-PSG-FFM (C.D. Cal., filed Nov. 11, 2016), Dkt. No. 74, at 2.

## II.    The Risks of Offshore Fracking and Acidizing

Offshore fracking and acidizing are dangerous, unconventional well stimulation techniques that allow for continued production from declining reservoirs and allow oil companies to recover oil and gas that would otherwise be unrecoverable. *E.g.*, AR 16286. Offshore fracking involves injecting a mixture of water, a proppant (typically sand or ceramic materials), and chemicals into a well at extremely high pressure to fracture rock below the seafloor and create passages through which oil and gas can flow. AR 16287. Acid fracturing is similar to hydraulic fracturing except that instead of using a proppant to keep fractures open, an acid solution is used to etch channels in the rock walls, creating pathways for oil and gas to flow. AR 16288. Matrix acidizing is a process in which a mixture of hydrochloric acid and other acids are mixed with other chemicals and injected underground to dissolve oil bearing rock to enhance production of oil and gas. *Id*.

4

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1       Offshore fracking and acidizing raise several significant environmental concerns

2  beyond those of conventional oil and gas drilling. One of the most significant impacts is

3  harm to the marine environment because of the toxic chemicals used. The water pollution

4  permit for the platforms in federal waters off California allows more than nine billion

5  gallons of produced water,[1] including chemicals used in well stimulation, to be dumped

6  into the Pacific Ocean each year. AR 35090-91. The permit has no limit on the amount of

7  well stimulation chemicals that can be discharged when combined with produced water.

8  *See* AR 35091-92 (discharge limit for oil and grease only).

9       A study that examined fracking fluid determined that more than 75% of the

10  chemicals in such fluids could affect the skin, eyes, and other sensory organs; 75% could

11  affect the respiratory and gastrointestinal systems; approximately 40 to 50% could affect

12  the nervous, immune, and cardiovascular systems; 37% could affect the endocrine

13  system; and 25% could cause cancer and mutations. AR 107692, 107702-06, 107893-96.

14  Another recent study found that oil companies use dozens of extremely hazardous

15  chemicals to acidize wells in California, including known carcinogens, mutagens,

16  reproductive and developmental toxins, and endocrine disruptors. AR 107183-85.

17       Dumping these chemicals into the ocean may have numerous negative, significant

18  impacts. Scientific research has indicated that the chemicals used in fracking can harm

19  aquatic animals and other wildlife. AR 3694-95. For example, some of the chemicals

20  used in fracking can break down into nonylphenol, a very toxic substance with a wide

21  range of harmful effects that include the development of intersex fish and altered sex

22  ratios at the population level. AR 107780-86. Nonylphenol can also inhibit the

23  development, growth, and survival of marine invertebrates, and has been shown to

24  bioaccumulate in sea otters. AR 107783.

---

[1] Produced water is the waste fluid that returns to the surface along with produced oil and gas, and contains the chemicals originally injected into the wells. AR 16294.

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1    Offshore fracking and acidizing also emit dangerous air pollutants, including

2    carcinogens and endocrine disruptors. AR 107695, 107711, 108384, 108395. For

3    example, benzene, a known carcinogen, has been documented at elevated levels in people

4    living within a 10-mile radius of fracked wells. AR 108393-95, 108496. These well

5    stimulation practices also increase vessel traffic given the need to supply the platforms

6    with the chemicals and other materials used in such operations. AR 15936. Offshore

7    fracking and acidizing also prolong the life of offshore oil and gas activities, and increase

8    the risk of failures of pipelines, well control, and other equipment. AR 108650-51,

9    107769, 107250, 24391.

10   **III.   Defendants' Programmatic Decision to Authorize Offshore Fracking**

11   **       and Acidizing on the Pacific OCS**

12       In January 2016, Defendants settled litigation alleging that they violated NEPA by

13   authorizing offshore fracking and acidizing on the Pacific OCS without ever having

14   conducted an EA or EIS analyzing the environmental impacts of the use of these

15   dangerous well stimulation techniques. *See, e.g.*, Dkt. No. 74, at 2. The settlement

16   agreements required Defendants to prepare a programmatic EA and issue a determination

17   that an EIS was required, or that an EA and FONSI were appropriate. *Id*. Defendants

18   issued a draft EA in February 2016. AR 15770-16011. The draft EA proposed to

19   authorize offshore fracking and acidizing from new and existing wells at all 43 active

20   leases on the Pacific OCS so that oil companies can recover more oil from reservoirs they

21   have been drilling for decades. AR 15806-07.

22       Defendants accepted public comments on the draft EA for thirty-days. AR 16518.

23   Defendants received thousands of comments from concerned individuals urging them to

24   prohibit the use of offshore well stimulation given the risks to the environment. AR

25   16547. Defendants also received numerous comments from scientists, government

26   agencies, and elected officials documenting known harms from fracking and acidizing;

27

28

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

disagreeing with Defendants' conclusion that there would not be significant impacts from the use of these well stimulation treatments on the Pacific OCS; and highlighting critical data gaps regarding their impacts on the marine environment. *See, e.g.*, AR 2544-2546, 3836-3837, 4418-442, 4332-4334, 6890-92, 12372-75.

Nevertheless, Defendants decided not to prepare on EIS on the use of these inherently dangerous oil extraction techniques. Instead, Defendants issued an EA and FONSI on May 27, 2016. AR 16266, 16575. Defendants' EA and FONSI adopt the proposed action, authorizing the unrestricted use of offshore fracking and acidizing at all active oil and gas leases on the Pacific OCS. AR 16286, 16568. And despite a multitude of comments highlighting the substantial deficiencies in the agencies' analysis and conclusions, Defendants made only superficial changes in the final EA. *See, e.g.*, 16522 (Defendants' statement that they "stand by the conclusions" in the draft EA).

## ARGUMENT

### I.    Standard of Review

Judicial review of agency action under NEPA and the ESA are governed by Section 706 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Pursuant to the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," or adopted "without observance of procedure required by law." *Id.*; *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005).

The APA's standard of review "requires the court to engage in a substantial inquiry, a thorough, probing, in-depth review." *Siskiyou Reg'l Educ. Proj. v. Forest Serv.*, 565 F.3d 545, 554 (9th Cir. 2009). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor*

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[2]

## II.   Defendants Violated NEPA by Authorizing Offshore Fracking and Acidizing Based on an Inadequate Environmental Assessment

Defendants' EA wholly fails to satisfy the agencies' duties under NEPA. Specifically, Defendants' EA fails to take the requisite "hard look" at the myriad dangers of offshore fracking and acidizing, fails to adequately define the purpose and need of the proposed action, and fails to consider a reasonable range of alternatives. Defendants relied on this faulty EA to improperly conclude that they need not prepare an EIS on their decision to authorize offshore fracking and acidizing and to issue a FONSI. Defendants' decisions were arbitrary, capricious, and should be set aside.

A. Defendants Did Not Take a "Hard Look" at the Impacts of Well Stimulation

Defendants did not take the required "hard look" at the environmental impacts of offshore fracking and acidizing on the Pacific OCS. In taking a "hard look," NEPA requires Defendants to consider "all foreseeable direct and indirect impacts" and "the cumulative impacts of th[e] project." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 40 C.F.R. §§ 1508.7, 1508.8(a), (b).

Here, Defendants wholly failed to take a "hard look" at the direct and indirect effects of the discharge of the chemicals used in well stimulation on the Pacific OCS. Defendants also failed to take a "hard look" at the cumulative impacts of well stimulation, including the effects of prolonged offshore drilling activities on the Pacific

---

[2] Plaintiffs have standing to bring this case. As described in the attached declarations, Plaintiffs' members have suffered concrete and particularized injuries that are fairly traceable to Defendants' actions, and those injuries will likely be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000); *see also Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) ("[i]t suffices that, as NEPA contemplates, [the agencies'] decision could be influenced by the environmental considerations that NEPA requires an agency to study."); Declarations of Kopcho, Sakashita, Waiya, Ayala, Attach. 1-5 of Pls.' Motion for Summ. Judgment.

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1   OCS. Such failures render their EA and FONSI unlawful.

2       *1.   Defendants Failed to Take a Hard Look at the Impacts of Waste Fluids*

3       Defendants admit that offshore fracking and acidizing will cause water pollution,

4   but failed to take a hard look at the impacts of these activities on water quality and

5   marine life. Specifically, Defendants improperly concluded that the Clean Water Act

6   ("CWA") permit for offshore oil and gas platforms on the Pacific OCS will mitigate

7   against the impacts of the discharge of well stimulation wastes into the ocean, relied on

8   entirely conclusory statements, and improperly concluded there would be no significant

9   impacts because well stimulation would occur infrequently.

10       First, Defendants improperly concluded that there will be no significant impacts on

11   water quality or marine life from the discharge of fracking and acidizing chemicals into

12   the ocean because the discharges are regulated by a CWA permit. *E.g.*, AR 16318, 16455,

13   16471. In particular, Defendants assume that the discharge of well stimulation chemicals

14   will not have significant impacts because the CWA permit requires whole effluent

15   toxicity ("WET") testing, AR 15821, 16318, which will help address any potential

16   toxicity of well stimulation chemicals. AR 16461. But Defendants cannot avoid their duty

17   to take a hard look at impacts because a "facility operates pursuant to a … permit." *S.*

18   *Fork Band of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).

19   That is especially true here where the CWA permit has *no limit* on the amount of fracking

20   and acidizing chemicals that can be discharged when combined with produced water. *See*

21   AR 35091-92. Moreover, as Defendants themselves recognized, the permit requires WET

22   testing only once per quarter (which can be reduced to once per year) and does not

23   require testing concurrently with well stimulation events. AR 35083, 16463 (EA stating

24   that water sampling "is not specifically coordinated with the conduct of [well stimulation]

25   activities" so well stimulation chemicals "may not be present in the sampled discharges

26   when quarterly WET tests are performed"). The WET testing requirement thus does not

27

28

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

mitigate against the potentially toxic impacts of well stimulation chemicals. Defendants' attempt to use WET testing to evade their duty to evaluate those impacts is improper.

Second, Defendants continually rely on conclusory and inaccurate statements in their purported evaluation of the impacts of the discharges on water quality and marine life. For example, Defendants claim that "[a]cids used in treatments would be largely neutralized by formation minerals during use and thus would produce no effects on water quality or marine life." AR 16473. But Defendants have no scientific evidence to support this conclusion. And in fact, this conclusion contradicts numerous studies in the record, including a report from California scientists finding chemical concentrations in waste fluids from acidizing that would exceed acute or chronic toxicity values even after the typical dilution factor. AR 24459. It also contradicts record evidence demonstrating that the waste fluid from acidizing is highly acidic, with a pH of 0 to 3, AR 107174, 107181, 107183, 107183-87, and ignores a scientific study noting that hydrofluoric acid—a commonly used chemical in acidizing, AR 107176—"is of great concern because of its very high acute mammalian toxicity and neurotoxicity." AR 107183; *see also* AR 1218-19 (letter from the Environmental Protection Agency ("EPA") expressing concern over acidic nature of some well stimulation chemicals, including the effect on California's Ocean Plan pH standards and potentially toxic effects on marine life).

Finally, Defendants repeatedly dismissed the significance of any impacts of the discharge of fracking and acidizing chemicals by assuming that these oil extraction techniques would occur infrequently in the future. AR 16296, 16459, 16479, 16481, 16484, 16489, 16491. But Defendants' assumption that well stimulation will occur infrequently (i.e., five times per year) is inconsistent with the premise that it is needed. In particular, Defendants' proposal is premised on the fact that oil companies have already been drilling Pacific OCS reservoirs for 26 to 48 years, and reservoir pressures have been continually declining as a result. AR 16302-03. According to Defendants, the use of well

10
Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

stimulation treatments will support the continued recovery of oil and allow companies to recover oil from these reservoirs that would otherwise be unrecoverable. AR 15806-07, 16302-03. In other words, Defendants' entire proposal is based on the fact that oil companies will need to use offshore fracking and acidizing in the future, and at an increased rate. Indeed, ExxonMobil, DCOR, and the American Petroleum Institute all intervened in this case to preserve the industry's ability to use well stimulation on the Pacific OCS, and ExxonMobil and DCOR have indicated their intent to use such practices in the future. *See* Dkt. No. 23-3 at 3-4 (Exxon declaration that "ExxonMobil will require acid well stimulation treatments to drill and complete new wells, and recomplete existing wells" and that any restriction on its ability to use these practices will "severely restrict ExxonMobil's plans to further develop its existing Pacific OCS leases"); Dkt. No. 45-4 at 4 (DCOR declaration that "[t]he ability to pursue permits to utilize Well Stimulation Techniques to improve potential productivity of the wells at these platforms is vital to DCOR's efforts to fully develop [its leases]").

Defendants dismissed their duty to address these inconsistencies by stating that any use of well stimulation beyond the five times per year assumed in the EA would trigger the agencies' duty to supplement their NEPA analysis. AR 16525; *see also* 40 C.F.R. § 1502.9(c). But the possibility that Defendants may have to supplement their analysis at some future point does not excuse them from conducting a comprehensive environmental review now. *See City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) ("the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken") (citations omitted).

### 2. Defendants Failed to Examine the Cumulative Impacts of Well Stimulation

Defendants also failed to analyze the cumulative impacts of offshore fracking and acidizing, 40 C.F.R. § 1508.7, including the impacts of extending offshore drilling activities and the lifespan of aging infrastructure. In analyzing the cumulative impacts of

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

an action, an agency must consider "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The regulations instruct that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

Here, Defendants' "analysis" of cumulative impacts is nothing more than general statements and a list of activities on the Pacific OCS that affect the environment. In fact, their cumulative impacts "analysis" comprises less than one page of the EA and includes only broad categories of activities such as "oil and gas development and production in federal and state waters as well as onshore" and "commercial . . . vessel traffic," and nothing more than a list of potential impacts such as "climate change." AR 16496-97.

But a cumulative impacts analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004). Defendants' meager list of broad categories wholly fails to conduct a "quantified assessment of their combined environmental impacts" as required by NEPA. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 972 (9th Cir. 2006) (citations omitted).

For example, Defendants claim that they need to authorize unconventional well stimulation treatment so that oil companies can recover oil that would be unrecoverable using conventional methods. AR 16302-03. Defendants repeatedly admit that allowing such techniques will enhance oil production and prolong offshore drilling activities. *See, e.g.*, AR 16453 (noting use of well stimulation will lead to an "incremental increase in production"); AR 16303 ("use of [well stimulation] may support the continued recovery of oil as primary recovery declines with the 43 active lease areas"); AR 16428 ("some operators have had some success increasing hydrocarbon production by performing frac-pacs (a type of hydraulic fracturing) in the sandstone reservoirs of the eastern Santa

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

Barbara Channel"); AR 16313 (production may decline without use of of well stimulation). But Defendants failed to consider the cumulative impacts of prolonged offshore drilling. *See* AR 16542 (EA stating that it does not consider impacts of non-well stimulation-related oil and gas production).

The impacts of prolonged offshore oil and gas drilling activities are widespread and well documented. *E.g.*, AR 20821-26, 108680, 108182, 108425-26. For example, longer lifetimes for old reservoirs and wells increase the risk of failures of pipelines, well control, or other equipment. The risk of failure is of particular concern for federal waters off California, where oil companies have already been drilling for roughly 30 to 50 years. AR 16303. Studies show that 30% of offshore oil wells in the Gulf of Mexico experienced well casing damage in the first five years after drilling, and damage increased over time to 50% after 20 years. AR 108650-51, 107769. Another study by California scientists found that older wells can become pathways for fluid migration, and that the high injection pressures used in fracking can "increase this risk significantly." AR 24391. And a study on offshore pipelines found that after 20 years the annual probability of pipeline failure increases rapidly, with values in the range of 0.1 to 1.0, which equates to a probability of failure of 10 to 100% per year. AR 107250.

As in *California v. Norton*, Defendants' decision to authorize the use of offshore fracking and acidizing on the Pacific OCS "extend[s] the life of oil . . . production off of California's coast, with all of the far reaching effects and perils that go along with offshore oil production," 311 F.3d 1162, 1173 (9th Cir. 2002), and Defendants' NEPA evaluation must address these effects and perils. The EA failed to do so, rendering Defendants' EA and FONSI improper.

B. The Purpose and Need Statement of the EA Is Impermissibly Narrow

Defendants' purpose and need statement fails to comply with NEPA. NEPA requires that agencies specify the purpose and need for a proposed action. 40 C.F.R.

13
Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

§§ 1502.13, 1508.9; *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 234 Fed. Appx. 440, 443 (9th Cir. 2007) (applying purpose and need requirement to an EA). A court reviews an agency's purpose and need for reasonableness. *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). Under this standard, an agency cannot define the purpose and need based on private interests alone; it must also consider the statutory context of the proposed action and other congressional directives. *Id.* Further, an agency cannot "craft a purpose and need statement so narrowly drawn as to foreordain approval of the [proposed action]." *Id.* at 1072. Yet that is precisely what Defendants did here.

In their final EA, Defendants defined the purpose and need as:

> The purpose of the proposed action (use of certain WSTs [well stimulation treatments] . . .) is to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (i.e., without use of WSTs). The use of WSTs may improve resource extraction from some existing wells, and in some future new wells, on the POCS. The need for the proposed action is the efficient recovery of oil and gas reserves from the POCS.

AR 16302. This purpose and need statement is unreasonable in light of the statutory context of the proposed action. The Outer Continental Shelf Lands Act ("OCSLA")—the statute governing Defendants' management of offshore drilling—requires Defendants to ensure that "environmental safeguards" are in place for offshore oil development, 43 U.S.C. § 1332(3), and "balance orderly energy resource development with protection of the human, marine, and coastal environments." *Id.* § 1802(2)(B). By framing the purpose and need as to allow well stimulations so that oil companies can recover more oil than could be recovered with conventional methods, Defendants are considering only the desires of the petroleum industry, rather than whether these dangerous extraction techniques can occur in light of risks to the human, marine, and coastal environment, as required by OCSCLA.

Moreover, this purpose and need is unreasonably narrow because it makes

14
Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

approval of the proposed action—authorizing well stimulation on the Pacific OCS—a foregone conclusion. Multiple entities raised this issue with Defendants during the comment period on the draft EA, including EPA which described the purpose and need as "narrow and prescriptive." AR 1221; *see also* AR 3367 (comments from the Division of Oil, Gas and Geothermal Resources ("DOGGR")—an agency that regulates oil and gas activities on state and private lands in California—disagreeing with Defendants' purpose and need). Defendants made only superficial changes to their purpose and need in the final EA, and ultimately inappropriately "defin[ed] the goals of its projects so narrowly that only its preferred alternative will meet those goals." *Envtl. Prot. Info. Ctr.*, 234 Fed. Appx. at 443; *see also BLM*, 606 F.3d at 1072 (holding purpose and need unreasonably narrow as it predetermined outcome of analysis). The EA and FONSI are thus unlawful.

C. Defendants Failed to Analyze a Reasonable Range of Alternatives

NEPA requires an agency to "give full and meaningful consideration to all reasonable alternatives" in an EA. *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). "[T]he existence of a viable but unexamined alternative renders an EA inadequate." *Id.*; *see also* 40 C.F.R. § 1502.14 (alternatives analysis is "the heart" of the NEPA process). Here, Defendants examined only four alternatives in detail: (1) authorizing well stimulation; (2) authorizing well stimulation at depths of more than 2,000 feet below the seafloor only; (3) authorizing well stimulation, but prohibiting the dumping of wastes from well stimulation into the ocean; and (4) prohibiting the use of well stimulation. *E.g.*, AR 16571-73. In considering only these alternatives, Defendants failed to fully and meaningfully consider all reasonable alternatives to allowing the unrestricted use of offshore fracking and acidizing.

For example, Defendants failed to examine reasonable alternatives suggested during the public comment period, including an alternative that would limit the number of well stimulation treatments authorized each year, an alternative that would limit the

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

use of well stimulation to certain times of year to protect migrating endangered species, or an alternative under which only certain types of well stimulation could be used (e.g., matrix acidizing only). *See* AR 107127 (raising these as possible alternatives). Each of these alternatives are well within the agencies' authority under OCSLA, *see* 43 U.S.C. §§ 1332(3), 1802(2)(B), and would reduce the risks and harms of offshore well stimulation.

Moreover, NEPA requires Defendants to "briefly discuss the reasons for [alternatives] having been eliminated." 40 C.F.R. § 1502.14(a). Defendants did not explain why they failed to consider these alternatives, instead simply stating that "no commenters suggested an additional alternative for review that would lend itself to meaningful analysis." AR 16530. Defendants' EA and FONSI are thus improper.

### III. Defendants Violated NEPA by Authorizing Offshore Fracking and Acidizing Without Completing an Environmental Impact Statement

Defendants' decision to authorize offshore fracking and acidizing without first preparing an EIS also violates NEPA and renders their decision unlawful. The Ninth Circuit has established a "relatively low threshold for preparation of an EIS." *Nat. Res. Def. Council v. Duvall*, 777 F. Supp. 1533, 1537 (E.D. Cal. 1991). "To prevail on a claim that the [agency] violated its statutory duty to prepare an EIS, a 'plaintiff need not show that significant effects will in fact occur.' It is enough for the plaintiff to raise 'substantial questions whether a project may have a significant effect' on the environment." *Blue Mtns.*, 161 F.3d at 1212 (citations omitted). If a plaintiff raises "substantial questions" regarding whether a project may have a significant effect on the environment, a decision not to prepare an EIS is unreasonable. *Id*.

Defendants' authorization of offshore fracking and acidizing implicates several NEPA significance factors: the environmental impacts are highly controversial; the environmental impacts are highly uncertain; and the use of offshore fracking and acidizing may impact ecologically and culturally significant areas, may adversely affect

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

threatened and endangered species, and may have cumulatively significant impacts. NEPA thus requires Defendants to prepare an EIS before authorizing these inherently dangerous oil extraction techniques on the Pacific OCS.[3]

A. The Impacts of Offshore Fracking and Acidizing Are Highly Controversial

NEPA requires the preparation of an EIS when the effects of a federal action "are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). This criterion is met here.

In the Ninth Circuit, a proposal is highly controversial when "substantial questions are raised as to whether a project . . . may cause significant degradation" of a resource, *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997), or when there is a "substantial dispute [about] the size, nature, or effect of" the action. *Blue Mtns.*, 161 F.3d at 1212. A "substantial dispute exists when evidence, raised prior to the preparation of [a] . . . FONSI . . . casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks*, 241 F.3d at 736. When such doubt is raised, "NEPA then places the burden on the agency to come forward with a 'well-reasoned explanation' demonstrating why those responses disputing the EA's conclusions 'do not . . . create a public controversy.'" *Id.* (citations omitted). Defendants failed to satisfy this burden.

Indeed, the record in this case presents a classic example of a highly controversial project. Numerous scientists, agencies, and elected officials repeatedly questioned Defendants' conclusions and the severity of the environmental impacts of offshore fracking and acidizing. For example, a letter from more than thirty scientists urged Defendants to complete a comprehensive EIS because of known harms from fracking, including water contamination and air pollution. AR 4332-4334. The California Coastal

---

[3] Defendants are not entitled to any deference in their interpretation of the NEPA significance factors. As the D.C. Circuit has explained, "because NEPA is addressed to all federal agencies and Congress did not entrust administration of NEPA to [Defendants] alone," "the court owes no deference to [Defendants'] interpretation of NEPA or the CEQ regulations" in determining whether an action warrants preparation of an EIS. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002).

17

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

Commission also expressed concerns over the potential impacts of fracking on coastal resources, including the chronic effects of fracking pollutants on marine life. AR 2678, 2680-2682; *see also* AR 3368 (letter from DOGGR questioning Defendants' conclusion that discharges of well stimulation fluids would not have significant impacts).

Additionally, Defendants received multiple comments from local, state, and federal officials voicing their opposition to the use of well stimulation in the Pacific Ocean and Defendants' conclusion that these practices would not have significant environmental impacts. *See, e.g*., AR 2544-2546, 3836-3837, 4418-442. One letter from eleven California state legislators expressed concern over the "troubling shortcomings" of Defendants' analysis and noted Defendants' proposal "undermines California's . . . ability to protect its coastal resources and public health." AR 12372-73. Defendants also received over 5,300 comments from individuals opposed to the proposal to allow offshore fracking and acidizing in the Pacific. AR 16547.

These are exactly the type of criticisms that courts have held demonstrate a controversy. *See Found. for N. Am. Wild Sheep v. USDA*, 681 F.2d 1172, 1182 (9th Cir. 1982) (state agencies' comments expressing disagreement with EA's conclusions create "precisely the type of 'controversial' action for which an EIS must be prepared"); *Nat'l Parks*, 241 F.3d at 736 (the submission of 450 public comments largely opposing the project required an EIS); *Helena Hunters & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1137 (D. Mont. 2009) (state agency's comments "that there will be greater impacts than disclosed in the EA" "is a controversy that warrants preparation of an EIS").

For example, in *Ctr. for Biological Div. v. BLM*, the plaintiffs challenged an EA for an oil lease sale on federal land. 937 F.Supp.2d 1140, 1144 (N.D. Cal. 2013). The plaintiffs alleged, *inter alia*, that the lease sale required an EIS because the impacts of fracking that could be conducted under the lease were highly controversial. *Id.* at 1158. The court agreed, pointing to a letter from Monterey County objecting to the lease sale

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1  and the conclusions in the EA because the experts at its water agency believed that
2  fracking under the lease would put water supplies at risk; and to objections to the lease
3  sale from environmental organizations and concerned individuals. *Id.* at 1149-50, 1158.

4      Fracking is one of the most controversial energy issues of our time. The degree of
5  controversy surrounding fracking and its use in the Pacific Ocean triggers the
6  requirement to prepare an EIS. 40 C.F.R. § 1508.27(b)(4).

7      B. Offshore Fracking and Acidizing Present Highly Uncertain or Unknown Risks

8      NEPA requires an agency to prepare an EIS when an action's effects are "highly
9  uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). As the Ninth
10  Circuit has held, "[p]reparation of an EIS is mandated where uncertainty may be resolved
11  by further collection of data, or where the collection of such data may prevent speculation
12  on potential . . . effects." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233,
13  1240 (9th Cir. 2005) (citations omitted). Here, the highly uncertain effects of offshore
14  fracking and acidizing necessitate the preparation of an EIS.

15      For example, on the Pacific OCS, oil companies are allowed to dump their waste
16  fluids from drilling activities, including well stimulation chemicals, into the ocean. But
17  the effects of these discharges on water quality and marine life are highly uncertain.
18  Defendants themselves noted that "lack of toxicity data" for many chemicals known to be
19  used in fracking "was identified as a problem . . . as was the lack of available data on
20  chronic impacts of these chemicals in the marine environment." AR 16465. Many other
21  documents in the record underscore the uncertainty of the impacts of well stimulation on
22  the marine environment. S*ee, e.g.*, AR 2681 (letter from state agency noting data is
23  lacking for roughly 70% of the chemical additives used in fracking); AR 4332-34 (letter
24  from 32 scientists noting "significant data gaps on basic questions regarding offshore
25  fracking and acidizing," including inadequate reporting of well stimulation events, the
26  composition of well stimulation fluid, and toxicity data for common chemicals in
27
28

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

fracking and acidizing fluids). Indeed, a report from California scientists found that "no studies have been conducted on the toxicity and impacts of well stimulation fluids discharged in federal waters to the marine environment." AR 40385.

As the Ninth Circuit has made clear, "lack of knowledge does not excuse the preparation of an EIS; rather it requires the [agency] to do the necessary work to obtain it." *Nat'l Parks*, 241 F.3d at 733. That is especially true here where the EA represents the *first time Defendants have ever* analyzed the impacts of offshore fracking and acidizing on the Pacific OCS. *See Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (holding that the "highly uncertain" impact that a first-ever whale hunt would have on the local whale population supported the need for an EIS).

Defendants attempt to avoid their obligation to gather additional data by claiming that it would be impractical to do so. AR 16544. But this claim is entirely conclusory and ignores numerous ways Defendants could have obtained additional information, such as studying the effects of ongoing well stimulation in the Gulf of Mexico. *See* AR 4454 (acknowledging offshore fracking is occurring in the Gulf of Mexico). As with the controversy surrounding fracking, the admitted uncertainty of its impacts warrants preparation of an EIS. 40 C.F.R. § 1508.27(b)(5).

C. Well Stimulation Impacts Geographic Areas With Unique Characteristics

NEPA also requires the preparation of an EIS when an action may affect areas with "unique characteristics," including ecologically critical areas or areas containing cultural resources. 40 C.F.R. §1508.27(b)(3). Here, while there are many data gaps regarding offshore fracking and acidizing, what is known demonstrates that offshore fracking and acidizing may have a significant impact on ecologically critical areas and areas containing cultural resources, requiring the preparation of an EIS.

For example, the Santa Barbara Channel, where most offshore oil and gas drilling occurs on the Pacific OCS, AR 16326-27, is home to the Channel Islands Marine

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

Sanctuary and Channel Islands National Park. 16 U.S.C. § 410ff; *see also Ocean Mammal Institute v. Gates*, 546 F.Supp.2d 960, 978-79 (D. Haw. 2008) (federally-recognized sanctuary can be an ecologically critical area for purposes of NEPA). The Sanctuary is internationally recognized as a United Nations, Educational, Scientific and Cultural Organization Biosphere Reserve. AR 107999. The area is also incredibly biologically diverse. *E.g.*, *id.* As one example, the area is designated a biologically important feeding area for endangered blue whales in the summer and fall. AR 107188; *see also* AR 43732 (noting Channel Islands are home to only major breeding population of brown pelicans in western U.S.); *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F.Supp.2d 1174, 1195-96 (N.D. Cal. 2004) (recognizing an area that provides biological connectivity for northern spotted owls as an ecologically critical area under NEPA).

The Santa Barbara Channel is also geographically unique because of the numerous cultural resources present in the area. For example, the area is home to submerged Chumash remains and sacred Chumash natural cultural marine resources, including dolphins and abalone. AR 6929. Congress expressly designated the Channel Islands National Park to protect important cultural resources, including "archaeological evidence of substantial populations of Native Americans." 16 U.S.C. § 410ff. And the National Oceanic Atmospheric Administration—the agency charged with administering the Channel Islands Marine Sanctuary—has expressly recognized that it "hosts . . . culturally significant resources." AR 46075.

Defendants' decision to authorize the use of well stimulation on the Pacific OCS may have significant impacts on these unique areas. For example, record evidence demonstrates that offshore fracking and acidizing increase harms beyond those of conventional oil drilling through increased air and water pollution, increased vessel traffic, and increased risk of oil spills, among other harms. *See, e.g.*, AR 107692, 107702-06, 107893-9, 107183-85 (harmful chemicals used in fracking and acidizing); AR 3694-

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

95, AR 107780-86 (harmful impacts of well stimulation chemicals on marine life); AR 107695, 107711, 108384, 108395 (harmful air pollutants from fracking); AR 107267-70 (harmful impacts from increased vessel traffic).

Moreover, by Defendants' own admission, offshore fracking and acidizing allow oil companies to recover oil that would otherwise be unrecoverable, and thereby prolong the lifespan of offshore oil and gas activities in the Santa Barbara Channel and elsewhere in federal waters off California. AR 16452, 16303, 16453, 16428, 16502, 16313. As explained above, the impacts of extended offshore oil and gas drilling are widespread and well documented. *See, e.g.*, AR 20821-26 (Defendants' EIS summarizing negative impacts of offshore drilling in Gulf of Mexico); *supra*, pp. 12-13 (describing increased risk of oil spills and accidents). Defendants' decision may significantly impact unique geographic areas, and requires the preparation of an EIS. 40 C.F.R. §1508.27(b)(3).

D.   Well Stimulation on the Pacific OCS Implicates Other Significance Factors

NEPA also requires an agency to prepare an EIS where an action may have "cumulatively significant impacts" or where an action "may adversely affect an endangered or threatened species or its [critical] habitat." 40 C.F.R. § 1508.27(b)(7), (9). Offshore well stimulation implicates both these significance factors, requiring an EIS.

For example, and as explained above, the use of offshore fracking and acidizing prolongs offshore drilling activities. *Supra*, pp. 12-13. Accordingly, the impacts of Defendants' proposal includes the cumulative impacts from offshore oil and gas drilling, such as air pollution, water pollution, harm to wildlife, and increased risk of oil spills. The cumulative impacts of offshore drilling are clearly significant. Additionally, as explained further below, *infra*, pp. 23-24, well stimulation could have negative impacts on threatened and endangered species, including lethal and sub-lethal impacts from the discharge or accidental release of toxic chemicals. *E.g.*, AR 16437, 16440. The presence of these factors also requires an EIS. Defendants' failure to prepare one violates NEPA.

22
Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

## IV.    Defendants' Failure to Engage in Formal Consultation Before Authorizing Offshore Fracking and Acidizing Violates the ESA

Defendants repeatedly acknowledged in the EA that offshore fracking and acidizing could affect ESA-listed species and designated critical habitat, yet Defendants did not consult with the wildlife agencies before authorizing these practices on the Pacific OCS. AR 16477-83. The failure to engage in consultation *prior* to issuing the approval violates Section 7 of the ESA. 16 U.S.C. § 1536(a)(2).

The ESA requires an agency, before taking an action, to determine what the effects of that action on endangered species and critical habitat might be. *Id.*; 50 C.F.R. §§ 402.12-402.15. If the action "may affect" listed species or critical habitat, formal consultation is required. 50 C.F.R. § 402.14(a). The "may affect" standard is a low one: "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citation omitted). Formal consultation results in a biological opinion from the relevant expert wildlife agency that evaluates the nature and extent of the effects of the proposed action on threatened and endangered species and their critical habitats. 16 U.S.C. § 1536(b)(3). If the biological opinion concludes that the proposed action is likely to jeopardize a listed species, the action agency must modify its proposal to avoid jeopardy. *Id.*

Here, the "may affect" standard has been met, triggering formal consultation. For example, in the final EA Defendants recognized that the discharge of toxic wastewater into the ocean may affect sea turtles, marine mammals, fish, seabirds, and benthic organisms, including through localized exposure to potentially toxic levels of well stimulation chemicals and loss of prey similarly exposed. *E.g.*, AR 16437. These animals include endangered loggerhead and leatherback sea turtles, endangered blue whales, and endangered black abalone, among others. AR 16362, 16372, 16390-91, 16487. Defendants also recognized that delivery of supplies used in well stimulation may result

---

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

in injury and mortality to ESA-listed sea turtles and whales from ship strikes. *Id*. In addition, Defendants recognized that the accidental release of chemicals during transport and delivery, and subsequent cleanup, may affect several listed marine mammals, including lethal impacts. AR 16440, 16484, 16488. And numerous studies in the record indicate that Defendants' authorization may affect listed species because of the toxic chemicals used. *See, e.g.*, AR 24459 (finding chemical concentrations in waste fluids from acid treatments that would exceed acute or chronic toxicity values even after the typical dilution factor); AR 107783 (stating fracking chemicals can bioaccumlate).

But despite acknowledging potential impacts to threatened and endangered species, Defendants failed to consult with the expert wildlife agencies prior to approving offshore fracking and acidizing on the Pacific OCS. Defendants do not dispute that no consultation occurred prior to approval, instead arguing in their motion to dismiss that their submission of Biological Assessments to the expert wildlife agencies *after* the approval moots Plaintiffs' ESA claim. Defendants' rationale fails because the flawed assessments do not cure the agencies' failure to formally consult as required by Section 7.

As this court found in its order denying Defendants' Motion to Dismiss, Defendants post-hoc submission of Biological Assessments to the wildlife agencies does not absolve them of their duty to engage in formal consultation. *See* Dkt. No. 74 at 13-14 ("Defendants offer no reason why the Court could not require BOEM and BSEE to conduct a more complete Biological Assessment, or to engage in formal consultation, if warranted."). A failure to consult claim "[is] not rendered moot by the issuance of a [biological opinion] following completed consultation [if] the [biological opinion] did 'not represent a consultation' concerning the impacts to endangered species identified by plaintiffs." *Cal. Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1112-13 (C.D. Cal. 2015) (citations omitted).

Here, the proffered Biological Assessments do "not represent a consultation

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

concerning the impacts to [listed] species," *id.*, from Defendants' decision to authorize offshore fracking and acidizing on the Pacific OCS. For example, the Biological Assessments do not consider the impacts to ESA-listed species from the discharge of toxic chemicals used in fracking and acidizing into the ocean. *E.g.*, AR 106129, 106303.[4] The failure to consider the impacts of wastewater discharges on ESA-listed species is especially galling considering Defendants acknowledged in the final EA that "potential effects are *primarily associated* with the discharge from platforms of WST-related fluids and chemicals." AR 16481 (emphasis added). Furthermore, the Fish and Wildlife Service has yet to concur with the Biological Assessment, *see* AR 106294-98 (requesting more information from Defendants), and the National Marine Fisheries Service's concurrence is conditional on no more than five well stimulation treatments occurring per year, AR 106304, a condition not found in Defendants' authorization.

Defendants failure to engage in formal consultation "cannot be corrected with post-hoc assessments of a done deal," *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998), especially when those assessments do not themselves address the potential harms to imperiled species as mandated by Section 7 of the ESA. *Strahan v. Roughead*, 910 F. Supp. 2d 358, 378-80 (D. Mass. 2012) (plaintiff's Section 7 claim was not moot, despite reinitiation of consultation, because the consultation did not address the entire range of challenged activities). Therefore, Defendants violated Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), by failing to consult with the expert wildlife agencies before issuing their decision authorizing the unmitigated use of offshore fracking and acidizing on the Pacific OCS.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion.

---

[4] Defendants' Biological Assessments also fail to evaluate any impacts to the scalloped hammerhead shark, and the potential impacts of a large-scale oil spill.

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1

2         Dated: February 12, 2018              Respectfully Submitted,

3

4                                           /s/ Kristen Monsell

5                                           Kristen Monsell (CA Bar No. 304793)
Email: kmonsell@biologicaldiversity.org

6                                           Emily Jeffers (CA Bar No. 274222)
Email: ejeffers@biologicaldiversity.org

7                                           Center for Biological Diversity

8                                           1212 Broadway, Suite 800
Oakland, CA 94612

9                                           Phone: (510) 844-7137

10                                         Facsimile: (510) 844-7150

11

12                                         *Attorneys for Plaintiffs*

13                                         *Center for Biological Diversity*
*and Wishtoyo Foundation*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 12, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will be served upon counsel of record through the Court's CM/ECF System.

<u>/s/ Kristen Monsell</u>
Kristen Monsell

Pls. Center for Biological Diversity's and Wishtoyo Foundation's
Mem. in Support of Motion for Summ. Judgment,
Case No. 2:16-cv-08418-PSG-FFM