JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
JOSEPH H. KIM (IL 6243249)
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
Tel:    (202) 305-0207
E-mail: joseph.kim@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, et al., | No. 2:16-cv-08418-PSG-FFMx |
| Plaintiffs, | Hon. Philip S. Gutierrez |
| v. | **DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| BUREAU OF OCEAN ENERGY MANAGEMENT, et al., | |
| Defendants, | **Hearing Date:  Aug. 13, 2018** |
| and | **Hearing Time:  1:30 p.m.** |
| AMERICAN PETROLEUM INSTITUTE and EXXON MOBIL CORP., | |
| Intervenor-Defendants. | |

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................1

    I.      PLAINTIFFS' NEPA CLAIMS FAIL BECAUSE NO "MAJOR FEDERAL ACTION" HAS OCCURRED ...........................................1

    II.     PLAINTIFFS' NEPA CLAIMS OTHERWISE FAIL ........................7

    III.    DEFENDANTS SATISFIED ANY DUTY THEY HAD .................10

         A.    The PEA and FONSI Are Not "Agency Action" for Section 7....................................................................................10

         B.     Even if the PEA and FONSI Were "Agency Action" for Section 7 Purposes, Defendants Have Satisfied the Requirements of the ESA ........................................................12

    IV.    CALIFORNIA'S CZMA CLAIM FAILS BECAUSE NO "FEDERAL AGENCY ACTIVITY" HAS OCCURRED.................15

# TABLE OF AUTHORITIES

**Cases**

*Acura of Bellevue v. Reich*,
90 F.3d 1403 (9th Cir. 1996)....................................................................14

*Alaska Envtl. Ctr. v. Lujan*,
961 F.2d 886 (9th Cir. 1992)......................................................................8

*Alaska Wilderness League v. Jewell*,
788 F.3d 1212 (9th Cir. 2015)....................................................................6

*Cal. Trout, Inc. v. U.S. Bureau of Reclamation*,
115 F. Supp. 3d 1102 (C.D. Cal. 2015)...................................................15

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002)..................................................................16

*Conner v. Burford*,
836 F.2d 1521 (9th Cir. 1988)..................................................................12

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013).............................................................4, 5

*Ctr. for Biological Diversity v. Salazar*,
791 F. Supp. 2d 687 (D. Ariz. 2011).........................................................4

*Gonzales v. Thomas*,
547 U.S. 183 (2006) ..................................................................................14

*Grand Canyon Trust v. Williams*,
98 F. Supp. 3d 1044 (D. Ariz. 2015).........................................................4

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012)............................................................11, 12

*Nat. Res. Def. Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998)..................................................................12

*Nat. Res. Def. Council v. Jewell*,
749 F.3d 776 (9th Cir. 2014)....................................................................15

*Native Vill. of Point Hope v. Minerals Mgmt. Serv.*,
564 F. Supp. 2d 1077 (D. Alaska 2008).....................................................7

*Or. Nat. Desert Ass'n v. Tidwell*,
716 F. Supp. 2d 982 (D. Or. 2010)..........................................................14

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...........................................................................1

*Sierra Club v. United States Army Corps of Eng'rs*,
  64 F. Supp. 3d, 128 (D.D.C. 2014) ....................................................3

*Wildwest Inst. v. Bull*,
  547 F.3d 1162 (9th Cir. 2008)............................................................8

**Statutes**

5 U.S.C. § 551(13) ...................................................................................3

16 U.S.C. § 1456(c)(1).............................................................................17

16 U.S.C. § 1456(c)(3).............................................................................17

16 U.S.C. § 1536(d) .................................................................................13

CAL. PUB. RES. CODE § 3157(b) ..............................................................9

**Regulations**

15 C.F.R. § 930.31(a) ..............................................................................16

30 C.F.R. § 550.269 ...................................................................................2

30 C.F.R § 550.266-550.273 .....................................................................3

30 C.F.R. § 550.285(c) ..............................................................................2

40 C.F.R. § 1508.18..............................................................................1, 3

50 C.F.R. § 404.14(b) ..............................................................................13

# ARGUMENT[1]

Plaintiffs continue to base their arguments on a fundamentally incorrect premise.  Contrary to their repeated assertions, the challenged PEA and associated FONSI did not and cannot, in fact, authorize any WSTs on the Pacific OCS.  Consequently, while this Court may have deemed the PEA and FONSI to be "final agency actions" for purposes of APA jurisdiction, the creation of these documents is not "major federal action" for NEPA purposes.  The lack of any action to approve an application to conduct WSTs similarly dooms Plaintiffs' ESA and CZMA claims.  Accordingly, Plaintiffs' motions for summary judgment should be denied, and Defendants' cross-motions for summary judgment should be granted.

## I.    PLAINTIFFS' NEPA CLAIMS FAIL BECAUSE NO "MAJOR FEDERAL ACTION" HAS OCCURRED

Plaintiffs continue to insist that Defendants have authorized new WSTs on the Pacific OCS.  *See, e.g.*, Pls.' Reply in Support of Mot. for Summ. J. 1, 2, 5, 6, 15, 17, 20-22, ECF Nos. 109 & 110 ["CBD Response"]; Pls.' Reply in Support of Mot. for Summ. J. 1, 6, ECF Nos. 111 & 112 ["EDC Response"]; Pls.' Mem. in Opp'n to Cross Mot. for Summ. J. 1, 2, 17, 19, ECF No. 113 ["Calif. Response"].  This is fundamentally, factually wrong.  The PEA and FONSI do not, and cannot, independently authorize anything.[2]  And this mistake dooms Plaintiffs' NEPA

---

[1] Defined terms from Defendants' Cross-Motions for Summary Judgment, [ECF No. 102] ["Defendants' Br."], are continued here.

[2] In every valid NEPA case, some form of underlying "major federal action" has occurred that triggered the requirement to comply with NEPA.  This action is never the creation of the NEPA documents themselves, such as the PEA and FONSI here, but instead is a separate agency action such as an adoption of a plan or approval of a specific permit.  *See* 40 C.F.R. § 1508.18 (defining "major federal action" as "adoption" of official policies, plans, or programs, and "approval" of specific projects)*; see also, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490

1    claims, because NEPA imposes no obligations absent a major federal action that

2    significantly affects the quality of the human environment.

3            Plaintiffs appear to get caught up in semantics when they note that the PEA

4    and FONSI discuss "allowing" or "authorizing" WSTs.  CBD Response 6, 22;

5    EDC Response 3-4.  The documents do discuss the potential for such actions,

6    naturally, because the PEA was prepared to help assess the potential impacts of

7    any such future authorizations.  But the fact remains that Defendants have not yet

8    authorized—or even proposed to authorize—any future WSTs, and the PEA and

9    FONSI do not do so.  *See, e.g.*, DOI 106886 ("The PEA does not constitute an

10   authorization or approval of any immediate WST activity.  Any future proposals

11   that require federal approval will undergo contemporaneous environmental review

12   . . . .").  Plaintiffs' assertions to the contrary are belied by the record here, which

13   shows that Intervenor DCOR is the lone entity to submit an application for WST

14   use since the PEA was prepared, and that application has not been processed

15   because Defendants still await submission of a supplemental DPP.  *See* DOI

16   52221-95; Decl. of Michael Mitchell 5-6, 27-28, 43-44, ECF No. 43-1 ("Mitchell

17   Decl.").  As explained previously, supplemental DPPs also require environmental

18   review under NEPA.  Defs.' Mot. to Dismiss 17, ECF No. 43 ("Further NEPA

19   analysis will be performed at the time DCOR submits its supplemental DPP."

20

21   _____

22   U.S. 332, 336 (1989) (decision whether to issue a special use permit is a "major
     federal action" within meaning of NEPA).  Typically, an agency will issue a

23   Record of Decision ("ROD") to conclude its EIS process, or a Finding of No
     Significant Impact ("FONSI"), if one is warranted, to conclude its EA process.

24   But these documents, despite being frequently characterized as decision
     documents, are not necessarily themselves major federal actions.  Rather, they

25   conclude the analytical process under NEPA and then provide the basis for an

26   agency to undertake its separate major federal action – the adoption of plan or

27   approval of a permit – in compliance with NEPA.

1   (citing 30 C.F.R. §§ 550.285(c), 550.269); *see also* Mitchell Decl. Ex. D at 1

2   ("Your supplemental DPP will be subject to all of the procedures under 30 CFR

3   550.266 through 550.273.").

4         Instead, as Plaintiffs at least sometimes acknowledge, the purpose of the

5   PEA (and associated FONSI) was to "prepare[] in anticipation of, and to [possibly]

6   provide . . . support for, any *future authorizations* for WST that may subsequently

7   arise." Defendants' Br. 14 (emphasis added); CBD Response 4 (quoting same);

8   Calif. Response 3 (quoting same); *see also* EDC Response 20. To that end, the

9   PEA and FONSI do discuss the environmental impacts that may occur *if*

10  Defendants were to authorize any future WSTs. *See, e.g.*, DOI 106886 ("This PEA

11  has been prepared to elucidate potential environmental impacts from a suite of

12  WSTs, *as a decision support tool for future proposals*." (emphasis added)); DOI

13  106907. That does not, however, equate to the PEA and FONSI themselves

14  authorizing WSTs, which they did not and cannot do. Put in this proper context,

15  Plaintiffs fail to state any valid NEPA claim.

16        In response, Plaintiffs contend that this Court already rejected Defendants'

17  argument in denying the motion to dismiss, but their contention is based on a

18  misunderstanding of the issues presented in that motion and a misinterpretation of

19  this Court's ruling. Federal Defendants recognize that this Court, in its Order

20  Denying Defendants' Motion to Dismiss [ECF No. 74], ruled that the PEA and

21  FONSI themselves are "final agency action" for purposes of establishing federal

22  court jurisdiction under the APA. *See* Defendants' Br. 7-10, 16. But as already

23  noted, this finding of "action" for jurisdictional purposes is distinct from the

24  concept of a "major federal action[] significantly affecting the quality of the human

25  environment" for NEPA purposes. Defendants' Br. 16. *Compare* 5 U.S.C. §

26  551(13) *with* 40 C.F.R. § 1508.18; *see also Sierra Club v. U.S. Army Corps of

27  Eng'rs*, 64 F. Supp. 3d 128, 140-41 (D.D.C. 2014) ("Although the fact that an

3

1  agency has not yet affirmatively acted may not preclude a finding that the agency

2  has taken 'final agency action' for purposes of the APA . . . it is readily apparent to

3  this Court that a 'major federal action' for NEPA purposes must be defined with

4  reference to an agency's *active* consideration of whether or not to act.") (citations

5  omitted), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015); *Grand Canyon Tr. v. Williams*, 98 F.

6  Supp. 3d 1044, 1060-64 (D. Ariz. 2015) (finding agency's completion of a "valid

7  existing rights determination" was "final agency action" under APA for

8  jurisdictional purposes, but did not constitute "major federal action" under NEPA

9  because the determination "was not an approval of a new project" (relying on *Ctr.*

10  *for Biological Diversity v. Salazar*, 791 F. Supp. 2d 687 (D. Ariz. 2011), *aff'd*, 706

11  F.3d 1085 (9th Cir. 2013) and *Ctr. for Biological Diversity v. Salazar*, 706 F.3d

12  1085 (9th Cir. 2013)), *aff'd sub nom. Havasupai Tribe v. Provencio*, 876 F.3d 1242

13  (9th Cir. 2017).

14  As to this separate and distinct legal argument, the record clearly shows that

15  no "major federal action" exists here.  California, in fact, concedes that this case

16  involves only an environmental analysis in the abstract (without any accompanying

17  federal action) when, in the CZMA portion of its brief, it acknowledges that this

18  case does not involve "an application for a federal license or permit" or "a

19  submission by a person for a plan under OCSLA (or even a federal license or

20  permit for an activity purportedly described in such a plan)."  Calif. Response 19;

21  *see also id.* at 21.  Because there was no trigger giving rise to a legal duty under

22  NEPA, there can be no basis for Plaintiffs' NEPA claims.[3]

23  _____

24  [3] CBD weakly argues that the issuance of the PEA and FONSI constituted a
triggering action because it "lifted a moratorium" on WST approvals.  CBD

25  Response 6, 21, 22.  In settling prior litigation with CBD and EDC, Defendants
voluntarily agreed to "withhold approvals of future Applications for Permits to

26  Drill ("APDs") and Applications for Permits to Modify ("APMs") involving

27

4

Perhaps for this reason, Plaintiffs next contend that the PEA and FONSI *themselves* constitute the "major federal action" that triggers NEPA, because those documents supposedly constitute "active consideration" of whether to allow offshore fracking. *See, e.g.*, CBD Response 5. CBD even explicitly states that its contention is that "the PEA and FONSI qualify as major federal action." *Id.* It simply cannot be the case that a NEPA document alone is a "major federal action," which would mean that the NEPA document requires its own supporting NEPA document. Indeed, Plaintiffs cannot identify a single case where a court has reached such a nonsensical outcome under NEPA.[4] As already noted, such an interpretation of NEPA's requirements would create a hopelessly circular quagmire where the mere act of preparing a NEPA analysis would be a "major federal action," that then would require its own supporting NEPA analysis, *ad infinitum.* Defendants' Br. 16. This Court should not accept Plaintiffs' invitation to create such ill-advised legal precedent on this issue.

Finally, Plaintiffs offer a handful of arguments that dispense entirely with the "major federal action" requirement, and instead invite this Court to assess the adequacy of the PEA simply because the Defendant agencies prepared it, and without regard to whether any analysis was yet required under NEPA. For

---

hydraulic-fracturing operations or acid well stimulation on the Pacific OCS" pending completion of the PEA. *See* Agreements § I(C). The expiration of this commitment in no way constitutes or creates a federal action. Instead, the commitment itself confirms Defendants' points and illustrates the fundamental flaw of Plaintiffs' position: the relevant federal action is the approval of a permit, not the issuance of the PEA and FONSI.

[4] Plaintiff CBD does offer up an analogy between "major federal action" under NEPA and "agency action" under the ESA, CBD Response 3, but no Plaintiff directly argues that there is no distinction between "major federal action" under NEPA and "agency action" under the APA. Plaintiffs' ESA claims are discussed in more detail below.

example, despite conceding that this case does not involve "an application for a federal license or permit"—meaning that no NEPA duty has been triggered—California nonetheless urges this Court to determine whether a NEPA violation has occurred. Calif. Response 4, 19, 21. California insists that "[i]t is of no consequence that the EA and FONSI 'were undertaken voluntarily as part of the settlement agreement,' or that 'Defendants have not yet approved an application to conduct WSTs in reliance on the analysis in these documents." *Id.* at 4. Contrary to California's assertion, the fact that NEPA does not yet require any analysis is not only relevant—it is dispositive. EDC similarly ignores the major federal action requirement in arguing that Defendants are "attempt[ing] to create a new 'exempt' category of NEPA review that applies to 'voluntary' actions." EDC Response 4. Defendants are doing no such thing. Major federal actions that could significantly affect the environment, voluntarily undertaken or otherwise, must comply with NEPA at the time the action *is taken*.[5]  But a NEPA analysis developed in the abstract and not relied upon to support any actual approval or activity is simply not itself a major federal action requiring NEPA compliance. Simply put, it would make little sense for Defendants to invoke an exemption to NEPA requirements when no NEPA requirements exist in the first place.

At bottom, the question for these cases cannot be whether the PEA alone provides adequate and comprehensive NEPA analysis for potential future WST approvals, because that was never the purpose of the PEA. Although Defendants intend for the programmatic analysis to serve as a foundation for the overall analysis of any future WST applications, the nature and context of any such future

---

[5] Indeed, it is mandatory or non-discretionary actions that generally do not trigger NEPA. *See, e.g.*, *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1225 (9th Cir. 2015).

6

applications and associated decisions, as well as the manner in which the PEA

aligns with them, are at present entirely speculative.  Any challenge will need to

await an actual future WST application and decision, and its more complete record

of the applicable supporting environmental analysis, including whatever site-

specific NEPA documentation Defendants may ultimately prepare.  Until that time,

there is no legal duty to prepare a NEPA analysis, and thus no basis for Plaintiffs'

challenges to the adequacy of the existing NEPA analysis.[6]

---

[6] Because Defendants have taken no action requiring compliance with NEPA,
Plaintiffs cannot obtain an order compelling Defendants to prepare an EIS.  As
illustrated in *Native Village of Point Hope v. Minerals Management Service*, an
agency cannot be compelled to complete—or as plaintiffs request here, to
enhance—a NEPA analysis that merely addresses "hypothetical events that may
occur in the future," because NEPA is not triggered at that stage and thus does not
require the preparation of an EA or EIS in the first instance.  564 F. Supp. 2d 1077,
1081 (D. Alaska 2008); *see also* Defendants' Br. 18.  And while Plaintiffs attempt
to distinguish *Point Hope*, their arguments are unavailing.  Plaintiffs contend that
the EA at issue here was not "voluntarily prepared," as in *Point Hope*, because this
EA was compelled by a settlement agreement.  The argument fails, however,
because this Court is not being called upon to enforce specific performance of a
settlement agreement (nor would this Court have jurisdiction to hear a claim for
specific enforcement of such an agreement in any event); rather, it is being called
upon to enforce asserted statutory obligations under NEPA.  The relevance of
*Point Hope* is the basic issue of whether *NEPA* required the preparation of an EA
or EIS.  And, as already explained, it does not in the absence of a major federal
action, as here.  Plaintiffs also attempt to distinguish *Point Hope* by arguing that
the permits discussed therein were upheld because they were "addressed in prior
EISs and fell 'well below' the number of permits already evaluated in an earlier
PEA."  EDC Response 4-5.  This argument undermines rather than supports their
position, however, as it emphasizes that the relevant question for evaluating the
necessity and adequacy of a NEPA analysis is how it relates to the actual
underlying federal action.  Both there and here, that action is the approval of
permits: there, the supporting NEPA was found adequate because it covered the
number of permits granted; here, the conclusion is even more self-evident as *no
permits* have been granted.

## II.   PLAINTIFFS' NEPA CLAIMS OTHERWISE FAIL

Even assuming NEPA's procedural requirements were somehow triggered—despite the lack of any major federal action—Plaintiffs' criticisms of the PEA would still lack merit. *See also* Defendants' Br. 19-39.  In assessing the adequacy of any programmatic NEPA document, courts typically account for the preliminary nature of the analysis, as is appropriate when the defendant agency has yet to propose any irreversible and irretrievable commitment of natural resources. *See Wildwest Inst. v. Bull*, 547 F.3d 1162, 1168 (9th Cir. 2008); *see also N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890-91 (9th Cir. 1992).

The PEA is more than adequate given its programmatic nature, and the fact that Defendants will have further opportunities to prepare additional environmental analyses as necessary prior to authorizing WSTs.  Plaintiffs largely take issue with some of the assumptions underlying the PEA, which Plaintiffs contend are speculative.  But it is always necessary for federal agencies to make reasonable assumptions when conducting a forward-looking programmatic analysis under NEPA that is not tied to an actual concrete proposal or action.  Defendants' assumptions in this case, moreover, were wholly reasonable and are entitled to this Court's deference. *See* Defendants' Br. 27-29 (explaining reasonableness of assuming up to five WST approvals per year); *id.* at 30-33 (same for permitting for discharged fluids); *id.* at 33 (same regarding alleged data gaps).  Plaintiffs' arguments otherwise are entirely speculative and fail to identify any specific information Defendants failed to consider in the PEA.

For example, Plaintiffs worry that perhaps more than five applications for WSTs may be approved in some future year.  Aside from engaging in blatant speculation divorced from the facts in the record (which demonstrate that no WSTs have been approved over the past two years), even if more than five were ever approved in one year, Defendants could then assess (and perhaps Plaintiffs could

8

question) whether additional environmental analysis were needed.  But this matter plainly is not before the Court at this time.

Similarly, Plaintiffs postulate that an EIS will cure the deficiencies they perceive in the PEA's analysis of impacts from discharged fluid, but do not explain how or why this would be the case.  An EIS at this point in time would not contain any more specific information regarding the proposed fluid amounts or components than what is contained in the PEA.  Information regarding proposed fluid amounts for specific WST operations would not be available until the WST permit application stage, and as Defendants have previously explained, WST applications are subject to further environmental review at that time.  Moreover, the terms and conditions of the general NPDES permit, and laws protecting proprietary information on fluid components, would remain the same and cannot be changed as a result of this (or any) NEPA analysis.  So it is unclear what additional information or analysis on this issue would appear in an EIS, and Plaintiffs have not demonstrated otherwise.

Finally, CBD alleges that Defendants only considered routine acidizing in the No Action alternative.  CBD Response 9-10.  This is inaccurate.  While the No Action alternative explicitly considered the routine use of acid within its scope, these activities are also encompassed and analyzed in the other action alternatives and the cumulative impacts analyses.  The No Action alternative provides an analytical baseline, and the ongoing routine activities considered in that alternative are explicitly anticipated to continue occurring under the other alternatives, and were analyzed accordingly.  *See* DOI 106646 (Final PEA page 2-8) ("Under Alternative 4 [No Action], routine well maintenance activities (*e.g.*, wellbore cleanup) and enhanced oil recovery techniques (*e.g.*, water flooding) that fall outside of the S.B. 4 definition of a WST [*see* CAL. PUB. RES. CODE § 3157(b) (West 2018)] would still continue (*as they would under any of the other three*

9

*alternatives*" (emphasis added)); *see also id.* at 106829 (describing potential future activities that could contribute to cumulative impacts of Alternative 1 [proposed action alternative] as including other "oil and gas development and production activities in Federal and State waters as well as onshore").

In sum, to the extent that the PEA can be reviewed now, it must be in its proper context as a foundational, programmatic analysis in support of possible future WST approvals.  As a programmatic analysis, the PEA more than satisfies NEPA's "hard look" requirement, and there is no basis for concluding that it is arbitrary or capricious.

## III.   DEFENDANTS SATISFIED ANY DUTY THEY HAD UNDER THE ESA

The Court should dismiss Plaintiffs' ESA claims either as waived or without merit. Plaintiffs abandoned, and therefore waived, a number of their ESA claims from the outset, including EDC's allegations of a violation of ESA Section 9 for failure to request a list of species from the consulting agencies (Pls.' EDC Compl. ¶ 249, ECF No. 1), and CBD's allegations of a violation of ESA Section 7 for failure to ensure that the "decision" does not jeopardize the continued existence of any listed species or critical habitat.  Compl. ¶ 117, *Ctr. for Biological Diversity v. Bureau of Ocean Energy Mgmt.*, No. 16-cv-8473 (C.D. Cal. filed Nov. 15, 2016), ECF No. 1 ("CBD Compl."); *see* Defendants' Br. 29 n.14.  EDC also appears to have abandoned its claim that Defendants' determination in the PEA that the "action will have 'no effect' on the North Pacific right whale, short-tailed albatross, and Hawaiian petrel" violates the ESA.  EDC Response 23-24 n.17. Defendants definitively rebutted that claim in their opening brief, Defendants' Br. 47-48, and EDC has provided no reply. As for the ESA claims Plaintiffs do advance, they are all meritless. Defendants were under no obligation to consult on their NEPA document, but even if they were, consultation is in process.

## A.     The PEA and FONSI Are Not "Agency Action" for Section 7 Purposes

Defendants had no duty to engage in ESA consultation on the PEA and FONSI because the issuance of these non-mandatory documents did not authorize, fund, or carry out any underlying activity by the action agencies – BOEM and BSEE – nor are any well stimulation activities approved by industry that could affect listed species.  As the Ninth Circuit has held, an ESA "agency action" occurs only when "a federal agency affirmatively authorize[s], fund[s], or carrie[s] out [an] underlying activity."  *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020-21 (9th Cir. 2012) (en banc).  Here, just as the PEA and FONSI are not major federal action under NEPA because they do not authorize any activity significantly affecting the quality of the human environment, these documents standing alone similarly are not "agency action" under the ESA because they do not affirmatively authorize, fund, or carry out any underlying activity that could affect listed species. *See supra* Argument I.

The Court's ruling on the motion to dismiss is not dispositive on this question for several reasons.  *Contra* CBD Response 21; EDC Response 20.  First, as already noted, the standard of review on a motion to dismiss is different than on a motion for summary judgment.  Defendants' Br. 40 n.21.  Second, as explained above, in ruling on the motion to dismiss the Court did not evaluate whether, much less find, that the PEA and FONSI are major federal actions or identify any major federal action taken by BOEM or BSEE.  If there is no major federal action, as Defendants have demonstrated, the action agencies have not authorized anything and thus it follows that the agencies have not authorized, funded, or carried out any underlying activity that triggered a duty to consult under the ESA.

Similarly, the Ninth Circuit cases finding ESA agency action based on a programmatic action by an agency are likewise inapplicable because Plaintiffs'

misguided analogy is premised on the mistaken notion that the PEA and FONSI authorize well stimulation activities.  CBD Response 22 ("in each of those cases, the NEPA documents did not authorize an action, as they do in the present case."); EDC Response 22 ("Like the LRMPs, the PEA has long-lasting, future effects."). As Defendants demonstrated already, in contrast to the cases where the Ninth Circuit held a programmatic approval required ESA consultation, here there is only a bare NEPA analysis unassociated with any approval or other action mandating NEPA review or ESA consultation.  Defendants' Br. 42.

> **B.     Even if the PEA and FONSI Were "Agency Action" for Section 7 Purposes, Defendants Have Satisfied the Requirements of the ESA**

Even were the Court to find that ESA consultation was required here, the Court should reject Plaintiffs' ESA claims alleging that Defendants failed to initiate or reinitiate consultation because Defendants have reinitiated their programmatic consultations with both the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), and have completed consultation with NMFS.  Defendants' Br. 43.  Plaintiffs' arguments regarding the Court's continued ability to provide relief for these claims are misplaced.

First, CBD's contention that the ESA required BOEM and BSEE to consult before issuing the PEA and FONSI fails for the same reason discussed above – namely that the PEA and FONSI do not authorize any activity.  The cases CBD cites as holding that action agencies have a duty to consult before engaging in "agency action" are thus distinguishable because BOEM and BSEE have not taken an "agency action."  CBD Response 23 (citing *Karuk Tribe*, 681 F.3d at 1020 and *Conner v. Burford*, 836 F.2d 1521, 1535 (9th Cir.), *opinion superseded*, 848 F.2d 1441 (9th Cir. 1988).  Moreover, neither the ESA nor its regulations contain any requirement about the timing of ESA consultation.  Defendants' Br. 44.  And in

1    this case, because no activities have been authorized and thus no well stimulation
2    activities are occurring on the ground, it is not too late for the action agencies to
3    incorporate into any future authorizations any measures that might be required as a
4    result of consultation.  The situation here thus contrasts with the one in *Natural*
5    *Resources Defense Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998), and
6    undercuts CBD's reliance on that case.  CBD Response 24.  Contrary to CBD's
7    argument, Defendants have not foreclosed the formulation or implementation of
8    any reasonable and prudent measures by issuing the PEA and FONSI.  Instead,
9    issuance of the PEA and FONSI merely provides possible analytical support for
10   future authorizations for well stimulation treatments that may subsequently arise,
11   and the action agencies can still incorporate any measures resulting from the
12   consultations into those future authorizations.  Defendants' Br. 45.

13          Second, Plaintiffs' arguments that the Court can order the action agencies to
14   engage in formal consultation are incorrect.  CBD Response 25; EDC Response
15   23.  To begin with, the arguments ignore the process outlined in the ESA
16   consultation regulations.  The regulations clearly require some sort of consultation
17   if an action agency determines that an action "may affect" listed species or critical
18   habitat.  But whether that consultation is informal or formal depends on whether
19   either the action agency or consulting agency determines that the action also is
20   likely to adversely affect any listed species or designated critical habitat.  If the
21   action agency makes a "not likely to adversely affect" determination, and the
22   consulting agency concurs, the agencies conclude informal consultation and no
23   formal consultation is required.  50 C.F.R. § 404.14(b).  This is precisely what
24   occurred here with respect to the ESA-listed species under NMFS's jurisdiction –
25   BOEM and BSEE determined that their future actions may affect, but are not likely
26   to adversely affect listed species and critical habitat, and NMFS concurred.
27   Defendants' Br. 44 (citing DOI0106301-25).  Plaintiffs do not challenge those

determinations here.  Absent such a challenge, and a finding that the

determinations were arbitrary and capricious, the Court cannot order BOEM and

BSEE to engage in formal consultation.[7]

_____

[7] For similar reasons, the Court cannot order the agencies to change the scope of the consultation under the circumstances presented here.  As an initial matter, BAs are not subject to judicial review.  *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 996 (D. Or. 2010).  Furthermore, while NMFS's concurrence is subject to judicial review, Plaintiffs have not challenged it.  Plaintiffs argue that, because the BAs do not consider all the impacts Plaintiffs believe should have been considered, the production of the BAs does not cure Defendants' alleged failure to consult.  CBD Response 25 & n.8; EDC Response 25.  But this is not how the ESA or APA works.  If Plaintiffs are unhappy with the scope of the effects considered in the consultation, the proper course is for them to challenge the end product of the consultation – either a concurrence letter or biological opinion.  It would not be appropriate for the Court to interfere with the consultation process before it is completed and where no action has been approved.  *Natural Resources Defense Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (en banc) and *California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1114 n.9 (C.D. Cal. 2015), cited in the Court's decision on the motion to dismiss [ECF No. 74 at 14], are not to the contrary.  Neither case stands for the proposition that the Court here can order Defendants to consider effects that were not included in the BAs.  In *Jewell*, the plaintiffs challenged a completed biological opinion, not a BA.  Moreover, the Ninth Circuit held that issuance of a new biological opinion did not moot a challenge to a prior opinion because the new opinion did not consider the effects of a different agency action that the plaintiffs had in that case claimed required consultation.  Here, Plaintiffs are not arguing that there is another agency action that requires consultation.  Rather, they are arguing that Defendants failed to consider certain effects of a single agency action (to the extent there is one).  In *California Trout*, the court did not order defendants to consider additional effects in an ongoing consultation.  Instead, the court said that it appeared that exceedance of the incidental take limits in a prior biological opinion was being considered in a reinitiated consultation, but if the record or other evidence later showed this was not the case, then the court "may determine that an order that defendants address the effects of the incidents of take in exceedance of the [incidental take statement] through formal consultation is appropriate."  115 F. Supp. 3d at 1114 n.9.  Likewise here, it is premature for the Court to order the

Finally, it would also be inappropriate for the Court to order formal consultation with FWS, but for a different reason. In that context, the agencies have not completed consultation,[8] so they have not yet finalized their determinations as to whether or not the action is likely to adversely affect listed species or their critical habitat.  It is for the agencies, not the Court, to make those determinations in the first instance.  *Acura of Bellevue v. Reich*, 90 F.3d 1403, 1408 (9th Cir. 1996) (holding an action unfit for judicial review because "[r]uling at this time . . . would inappropriately interfere with the Department's intra-agency decision-making process before it is completed"); *see also Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam) (agencies bring their expertise to bear in making determinations in the first instance, and the court later determines whether the decision exceeds the leeway the law allows).

## IV.    CALIFORNIA'S CZMA CLAIM FAILS BECAUSE NO "FEDERAL AGENCY ACTIVITY" HAS OCCURRED

California's CZMA claim is also based on a fundamentally incorrect premise.  Defendants agree that, under the CZMA, a "federal agency activity" includes "activities where *a federal agency makes a proposal for action initiating an activity* or series of activities when coastal effects are reasonably foreseeable, *e.g.*, *a federal agency's proposal* to physically alter coastal resources, a plan that is used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone."  Calif. Response 17 (quoting 15 C.F.R. § 930.31(a)) (emphasis added).  But as explained both in Defendants' opening brief and above, there is no

---

consideration of effects where consultation is ongoing (with FWS).

[8] As noted previously, BOEM and BSEE reinitiated consultation with FWS in 2017, and that consultation is ongoing.  Defendants' Br. 46.  EDC does not raise any new arguments in its reply on this issue that Defendants have not already addressed.

1   such federal "activity," "proposal," "plan," or "proposed rulemaking" here.  All

2   there is, at present, is the NEPA analysis itself.  *See id.* at 19, 21 (conceding that

3   this case does not involve "an application for a federal license or permit," nor does

4   it involve "a submission by a person for a plan under OCSLA (or even a federal

5   license or permit for an activity purportedly described in such a plan).").  Thus,

6   there is no "federal agency activity" that would require a consistency determination

7   under CZMA.

8       California fails to cite any case holding that NEPA analysis itself can trigger

9   the requirement for a consistency determination under CZMA.  California relies

10  exclusively on *California v. Norton*, 311 F.3d 1162 (9th Cir. 2002).  Defendants

11  agree that this case is instructive on this issue, but disagree with the conclusions

12  drawn by California.  That case involved the federal agency activity of directing

13  lease suspensions, and the Ninth Circuit analogized that activity with another

14  covered federal activity -- lease sales.  *Id.* at 1170.  But there is no similar analogy

15  that can be drawn to a NEPA analysis preceding possible industry applications for

16  federal approvals.  The PEA analyzes potential future operations by private entities

17  that would be subject to federal approval (the subject matter of section (c)(3)), not

18  activities proposed or conducted by the federal government (the subject matter of

19  (c)(1)).  The federal actions associated with the authorization of WSTs are the

20  approval of an operator's proposed DPP followed by approval of an operator's

21  application for a subordinate permit – plainly the stuff of (c)(3).  California's

22  theories under CZMA here would eradicate the critical statutory distinction

23  between the handling of these two distinct contexts.  Indeed, if and when there are

24  any actual applications, consistency review may then be proper under a different

25  provision of the CZMA than that relied upon by California -- 16 U.S.C. §

26

27

16

1456(c)(3).[9]

Respectfully submitted this 19th day of July, 2018.

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
/s/ *Joseph H. Kim*
JOSEPH H. KIM
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
*Attorney for Federal Defendants*

Of Counsel:

Joanna Brinkman
Melissa Hearne
Office of the Solicitor
U.S. Department of the Interior

---

[9] If WST use requested in a particular permit has already been described and included in previously approved DPPs, then the opportunity for consistency review occurred at the time the DPP was approved.  As noted above, Intervenor DCOR has submitted an application for WST use, although no use has yet been approved as Defendants wait for a supplemental DPP.  *See* DOI 52221-95; Mitchell Decl. at 5-6, 27-28, 43-44.  The supplemental DPP may be subject to consistency review under 16 U.S.C. § 1456(c)(1), but that is not before the Court at this time.

<u>CERTIFICATE OF SERVICE</u>

I, Joseph H. Kim, hereby certify that, on July 19, 2018, I caused the foregoing to be served upon counsel of record through the Court's electronic service.  I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 19, 2018                           /s/ *Joseph H. Kim*
                                                JOSEPH H. KIM