## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

Present: The Honorable    Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):      Order GRANTING in part and DENYING in part the cross-motions for summary judgment**

Before the Court are seven motions for summary judgment relating to a federal proposal to allow the use of fracking and acidizing in oil production off the coast of California. Plaintiffs the State of California and the California Coastal Commission ("California Plaintiffs"), Environmental Defense Center and Santa Barbara Channelkeeper ("EDC Plaintiffs"), and Center for Biological Diversity and Wishtoyo Foundation ("CBD Plaintiffs") (collectively "Plaintiffs") ask the Court to find that the Federal Defendants violated their statutory obligations under the National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA"), and Coastal Zone Management Act ("CZMA").[1] Federal Defendants Bureau of Ocean Energy Management ("BOEM"), Richard Yarde, David Fish, Walter Cruickshank, Scott Angelle, Bureau of Safety and Environmental Enforcement ("BSEE"), Joan Barminski, Mark Fesmire, United States Department of the Interior, and Ryan Zinke, Secretary of the Interior (collectively "the Federal Defendants"), as well as Intervenor Defendants American Petroleum Institute ("API"), DCOR, LLC ("DCOR"), and Exxon Mobil Corporation ("Exxon") (collectively "Defendants") ask the Court to uphold the federal actions.[2] The parties have filed oppositions and replies.[3] The Court held a hearing on this matter on November 5, 2018.

After considering the moving papers and the arguments made at the hearing, the Court **GRANTS** in part and **DENIES** in part all seven motions. Specifically, the Court concludes that the Federal Defendants satisfied their obligations under the National Environmental Policy Act ("NEPA") in preparing the environmental assessment that is the subject of this suit. But the

---

[1] *See* Dkts. # 95 ("*California Mot.*"), 96 ("*EDC Mot.*"), 97 ("*CBD Mot.*").

[2] *See* Dkts. # 102 ("*Gov't Cross-Mot.*"), 106 ("*API Cross-Mot.*"), 107 ("*DCOR Cross-Mot.*"), 108 ("*Exxon Cross-Mot.*").

[3] Dkts. # 109 ("*CBD Opp.*"), 111 ("*EDC Opp.*"), 113 ("*California Opp.*"), 118 ("*Gov't Reply*"), 119 ("*API Reply*"), 120 ("*DCOR Reply*"), 121 ("*Exxon Reply*").

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

Court also concludes that the Federal Defendants violated the Endangered Species Act ("ESA") by failing to consult with the relevant federal services and violated the Coastal Zone Management Act ("CZMA") by failing to prepare a consistency determination and submit it to California for review as required by that statute.

I.    Background

    A.    Underlying Facts

This is a consolidated case that is a successor to two cases previously brought in this Court: *Environmental Defense Center v. BSEE*, CV 14-9281 PSG (FFMx), and *Center for Biological Diversity v. BOEM*, CV 15-1189 PSG (FFMx). In those cases, the plaintiffs alleged that the Federal Defendants violated NEPA by approving fifty-one permits for offshore well-stimulation treatments ("WSTs")—more commonly known as "fracking" or "acidizing"—on the Pacific Outer Continental Shelf ("POCS") without conducting an adequate environmental review. *See July 14, 2017 Order,* Dkt. # 74, at 2. Both prior cases culminated in substantively similar settlement agreements entered by the Court on March 24, 2016. *See Settlement Agreement*, CV 14-9281, Dkt. # 79-1; *Settlement Agreement*, CV 15-1189, Dkt. # 41-1. In the settlement agreements, the Federal Defendants agreed to conduct an Environmental Assessment ("EA") of the potential environmental impacts of WSTs off the coast of California in the vicinity of Los Angeles, Santa Barbara, and Ventura counties. *See Settlement Agreement* (CV 15-1189), ¶ I.A; *Settlement Agreement* (CV 14-9281), ¶ I.A.

Specifically, in the Settlement Agreements, the Federal Defendants agreed:

BOEM and BSEE will undertake a programmatic Environmental Assessment ("EA") pursuant to the National Environmental Policy Act ("NEPA") to analyze the potential environmental impacts of well-stimulation practices on the Pacific OCS, including hydraulic fracturing and acid well stimulation. The focus of the EA will be on foreseeable future well-stimulation activities requiring federal approval, not past completed or expired activities for which no further federal actions remain, except to the degree that analysis of such past actions may be relevant to assessing the environmental baseline and/or an analysis of cumulative or other effects. This assessment will result in a determination that either an Environmental Impact Statement ("EIS") and Record of Decision ("ROD") is required or a Finding of No Significant Impact ("FONSI") is appropriate. BOEM and BSEE shall complete and issue the final programmatic EA by May 28, 2016, and will also issue a FONSI by that date if BOEM and BSEE determine that a FONSI is the appropriate outcome of the EA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

*See id.*  The Federal Defendants agreed to withhold approvals of future applications for permits for WSTs on the POCS until the Final EA was completed.  *See Settlement Agreement* (CV 15-1189), ¶ I.C; *Settlement Agreement* (CV 14-9281), ¶ I.C.

The Federal Defendants issued a Draft EA on February 22, 2016.  *See Administrative Record*, Dkt. # 93 ("*AR*"), 16024 et seq.  After a thirty-day public comment period, they issued a Final EA in May 2016.  *See id.* 106599 et seq.  The Final EA examined the Proposed Action of allowing the use of WSTs on the POCS ("Alternative 1").  Under this proposal,

> BSEE technical staff and subject matter experts [would] continue to review applications for permit to drill (APDs) and applications for permit to modify (APMs), and, if deemed compliant with performance standards identified in BSEE regulations at Title 30, *Code of Federal Regulations*, Part 250, subpart D (30 CFR Part 250, subpart D), will approve the use of fracturing and non-fracturing WSTs at the 22 production platforms located on the 43 active leases on the POCs.

*Id.* 16288–89.  The Final EA also examined three more limited proposals: applying subsurface seafloor depth stipulations to future permit approvals ("Alternative 2"), prohibiting open water discharge of WST waste fluids ("Alternative 3"), and not allowing any use of WSTs in the future ("Alternative 4").  *Id.* 16289–90.  After hundreds of pages of analysis, the Final EA concluded that none of the four proposals were "expected to result in adverse impacts on the environment."  *See id.* 16504.  Based on the analysis in the Final EA, BOEM and BSEE issued a Finding of No Significant Impact ("FONSI") on May 27, 2016.  *See id.* 16568–75.

B.  Procedural History

In late 2016, the three groups of Plaintiffs in this case filed separate suits in this Court, challenging the EA and FONSI.  *See Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, CV 16-8418 PSG (FFMx) (filed Nov. 11, 2016); *Ctr. for Biological Diversity v. Bureau of Ocean Energy Mgmt.*, CV 16-8473 PSG (FFMx) (filed Nov. 15, 2016); *California v. U.S. Dep't of Interior*, CV 16-9352 PSG (FFMx) (filed Dec. 19, 2016).  Plaintiffs alleged that the Federal Defendants violated NEPA by, among other things, failing to take a "hard look" at the potential environmental effects of WSTs and failing to prepare an environmental impact statement ("EIS") instead of an EA.  *See EDC Compl.*, Dkt. # 1, ¶¶ 222–41; *CBD Compl.*, CV 16-8473, Dkt. # 1, ¶¶ 103–112; *California Compl.*, CV 16-9352, Dkt. # 1 ¶¶ 49–65.  The California Plaintiffs additionally alleged that Defendants violated the CZMA by failing to prepare a consistency determination for the proposed action of allowing WSTs.  *California Compl.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

¶¶ 66–69.  And the EDC and CBD Plaintiffs alleged that the Federal Defendants violated the ESA by failing "to engage in consultation to ensure their action does not jeopardize listed species or result in the destruction or adverse modification of their critical habitat."  *EDC Compl.* ¶¶ 242–51; *CBD Compl.* ¶¶ 113–18.  All three cases were transferred to this Court, and the Court consolidated the cases for all purposes on February 17, 2017, administratively closing the two later-filed cases.

The Federal Defendants and Intervenor Defendant API moved to dismiss the cases, arguing that the Court lacked jurisdiction to hear the NEPA and CZMA claims under the Administrative Procedure Act ("APA") because the issuance of the EA and FONSI was not a "final agency action."  *See July 14, 2017 Order* at 5.  Defendants also argued that the ESA claim was not ripe, or alternatively, that it was moot.  *Id.*  The Court denied the motion.  *See id.*  It found that the FONSI was a final agency action because it was "the final step in BOEM and BSEE's NEPA process and effectively lift[ed] the moratorium on WSTs in the POCS."  *Id.* at 10.  In reaching this conclusion, the Court put significant emphasis on the fact that the agencies would not have to engage in another programmatic environmental analysis before processing requests for WST permits.  *See id.*  As for the ESA claims, the Court found that they were ripe because the issuance of the EA and FONSI triggered the ESA's consultation requirements.  *Id.* at 11–13.  And it further found that the claims were not moot because while the agencies had begun the required consultations, they had not yet been completed.  *Id.* at 13–15.

The parties now cross-move for summary judgment on all claims.

II.   Legal Standard

A.   Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Here, there are no material facts in dispute—all relevant facts are contained in the administrative record.  The parties dispute only whether the Federal Defendants complied with NEPA, the ESA, and the CZMA in issuing the EA and the FONSI.  It is appropriate for the Court to make these legal determinations on a motion for summary judgment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

B.    APA Review

Judicial review of the agencies' compliance with NEPA and the CZMA is governed by § 706 of the APA.  *See* 5 U.S.C. § 706.  The Court reviews the agency actions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  "An agency action is arbitrary and capricious 'only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) (quoting *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2012)).  "Agency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."  *Conservation Congress*, 720 F.3d at 1054.  Further, courts are at their "most deferential" when "reviewing scientific judgments and technical analyses within the agency's expertise."  *Id.*

III.    Discussion

A.    National Environmental Policy Act ("NEPA") Claims

Plaintiffs argue that the Federal Defendants failed to comply with the requirements of NEPA.  NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  The purpose of the statute is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(c).

NEPA requires agencies to prepare an "environmental impact statement" ("EIS") whenever they propose taking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  To determine whether an EIS is required—i.e. to determine whether a proposed action will significantly affect the quality of the human environment—an agency can choose to prepare an "environmental assessment" ("EA"). 40 C.F.R. § 1501.4(b).  An EA is a "concise public document" that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [FONSI]."  *Id.* § 1508.9(a).  In summary, agencies can choose to prepare an EA to determine whether they must undertake the burden of preparing a more extensive EIS.  If an agency determines through the EA process that its action will have no significant impact, it does not need to prepare an EIS and can instead issue a FONSI.  *See id.* § 1501.4(e).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | | Date | November 9, 2018 |
|---|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | | |

Here, BOEM and BSEE prepared an EA examining four proposed plans relating to the approval of WSTs. After finding that none of the plans would have a significant impact on the human environment, they issued a FONSI. Plaintiffs challenge this determination. But before addressing these arguments about the substance of the Final EA, the Court first must confront the Federal Defendants' argument that the agencies have not yet taken any "major federal action" and therefore were not required by NEPA to undertake *any* kind of environmental analysis. *See Gov't Cross-Mot.* 15:12–19:13; 42 U.S.C. § 4332(2)(C) (requiring agencies to prepare an EIS when they take "major Federal actions significantly affecting the quality of the human environment"). If the Federal Defendants are correct, then NEPA's requirements have not yet be triggered, and the statute could not have been violated no matter how unconvincing the substance of the EA might be.

        i.        *"Major Federal Action"*

That there is even a question about whether the agencies prepared the EA as part of a "major federal action" is a product of the somewhat unusual procedural background of this case. As the Court understands things, agencies generally do not prepare an EA or EIS until they themselves have determined that they are proposing to take a "major federal action." But in this case, BOEM and BSEE prepared an EA because they were required to do so by the settlement agreements in the previous cases. *See Settlement Agreement*, (CV 14-9281); *Settlement Agreement*, (CV 15-1189). However, Plaintiffs are not suing to enforce the settlement agreements. They are suing under NEPA. Therefore, the Court must determine whether the EA that was prepared pursuant to the settlement agreements was also *required* to have been prepared under NEPA (because the agencies proposed major federal action).

The Federal Defendants argue that no major federal action has taken place because the EA and FONSI, on their own, do not authorize the use of WSTs on the POCS. *See Federal Cross-Motion* 14:1–6. Instead, operators wishing to perform WSTs must get additional approvals from BOEM and BSEE—namely approvals of a Development and Production Plan ("DPP") and an Application for Permit to Drill ("APD"). Further, if an operator later wishes to alter some aspect of its existing well operations, it must submit and get approval of an Application for Permit to Modify ("APM"). *See id.* 2:9–24, 14:7–15:2. Because no WSTs can be used until the agencies have approved these plans and permits, the Federal Defendants contend that there can be no "major federal action" under NEPA until permits have been issued.[4]

---

[4] Since the entry of the settlement agreements in the previous cases in 2016, the agencies have received only one application for a permit, filed by Intervenor Defendant DCOR. *See* AR 52268–70. While the parties appear to disagree about the current status of the application, all agree that it has not yet been approved.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

As they see it, the EA was prepared merely "in anticipation of, and to provide possible support for, any future authorizations for WST[s]" and therefore cannot be challenged until it is relied upon as the basis for WST authorizations. *Id.* 14:10–13.

Plaintiffs disagree. They argue that the Court's previous ruling that the EA and FONSI are reviewable final agency actions under the APA settled this issue, and therefore the Federal Defendants' argument is barred by the law of the case doctrine. *See CBD Opp.* 3:3–15; *California Opp.* 2:13–4:22. And they further argue that the agencies took major federal action by engaging in active consideration of whether to allow WSTs in the future and by lifting the moratorium on accepting permit applications for WSTs. *CBD Opp.* 5:4–6:24.

    *a.*    *Law of the Case*

Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that it has already decided. *United States v. Almazan-Becerra*, 537 F.3d 1094, 1096 (9th Cir. 2017). Plaintiffs contend that the Federal Defendants' argument that no major federal action has occurred is a veiled attempt to get the Court to revisit its previous order on Defendants' motion to dismiss, where it found that it had jurisdiction to review the EA and FONSI because they were "final agency actions" within the meaning of the APA. *See California Opp.* 2:13–4:22.

It is true that Defendants make essentially the same argument here that they made in support of their motion to dismiss. In support of that motion, Defendants argued that the EA and FONSI were not "final agency actions" because entities could not use WSTs on the POCS without getting additional permits from BOEM and BSEE. *See July 14, 2017 Order* at 6–7. The Court rejected that argument, finding that the FONSI was a final agency action because it was "the final step in BOEM and BSEE's NEPA process" and "effectively lift[ed] the moratorium on WSTs in the POCS." *Id.* at 10. It also emphasized the fact that the FONSI was not equivocal and that the agencies would not have to conduct additional environmental analysis on a programmatic level before allowing WSTs. *Id.*

At the motion to dismiss stage, the Court was deciding whether it had jurisdiction under the APA. Doing so required determining whether the EA and FONSI were "final agency actions." However, the current motions present a different question: whether the agencies have taken a "major federal action" within the meaning of NEPA. While the arguments and analysis for this second question might be similar to those that applied to the earlier jurisdictional question, they are not necessarily identical. After all, whether agencies have taken "major federal action" under NEPA involves different language in a different statute than the Court analyzed when conducting its analysis under the APA. Therefore, the Court concludes that its

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

earlier decision that the EA and FONSI were final agency actions does not inexorably lead to the conclusion that the agencies have also proposed a major federal action under NEPA. Because the two questions are distinct, the law of the case doctrine does not apply. Accordingly, the Court will proceed to address the merits of the Federal Defendants' argument.

> *b.    Whether the Agencies Proposed a Major Federal Action*

As explained above, NEPA's requirements are triggered when an agency proposes a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In deciding whether the agencies in this case have proposed a "major federal action," the Court is guided by the Supreme Court's analysis in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976). In *Kleppe*, the Supreme Court confronted the question of whether NEPA required the Department of the Interior to prepare an EIS relating to coal-related operations in the "Northern Great Plains region." *Id.* at 394–95. The Court found that there was no major federal action requiring the preparation of an EIS because "there was no existing or proposed plan or program on the part of the Federal Government for the regional development of the area." *Id.* at 400. Without such a plan, the Court noted that it "would be impossible to predict the level of coal-related activity that [would] occur, and thus to analyze the environmental consequences and the resource commitments involved, and alternatives to, such activity." *Id.* at 402. *Kleppe* made clear that "mere contemplation" of action is not sufficient to trigger NEPA's requirements. *Id.* at 404 (cleaned up).

However, the facts of this case are quite different from the facts of *Kleppe*. Unlike in *Kleppe* where there was "no existing or proposed plan or program on the part of the Federal Government," the EA here makes clear that it was produced to evaluate a proposal for allowing WSTs. The very first sentence of the EA reads: "[BSEE] and [BOEM] propose to allow the use of selected well stimulation treatments (WSTs) on the 43 current active leases and 23 operating platforms on the [POCS]." *AR* 16286. It later elaborates that the "purpose of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (i.e. without the use of WSTs)." *Id.* 16302. This language describes a definite proposal for allowing the use of WSTs on the POCS. This is especially evident in light of the fact that the agencies had previously allowed fracking and acidizing on the POCS, *see id.* 16428–30, until they agreed to a temporary moratorium on permit approvals pending completion of an EA as part of the settlement agreements in the previous cases. *See Settlement Agreement* (CV 15-1189) ¶ I.C; *Settlement Agreement* (CV 14-9281) ¶ I.C. Given this background, the Court finds that the EA is fairly read to reflect a proposal for returning to something approximating the pre-moratorium status quo whereby BOEM and BSEE allowed fracking and acidizing on the POCS. This crosses the line from "mere contemplation" to a

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

proposal for a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Kleppe*, 427 U.S. at 404.

The Ninth Circuit has made clear that NEPA plaintiffs "need not wait to challenge a specific project when their grievance is with an overall plan." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994). That is because "if the agency action could only be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992). While both *Salmon River* and *Idaho Conservation League* addressed whether the plaintiffs had suffered an injury for standing purposes before an agency issued final site-specific approvals, adopting the Federal Defendants' argument here would essentially render those holdings a nullity by forcing Plaintiffs to wait to challenge WST permit approvals on a site-specific basis. In both *Salmon River* and *Idaho Conservation League*, the Ninth Circuit addressed the merits of the plaintiffs' NEPA claims even though further agency approvals were required before any action directly affecting the environment took place. *See Salmon River*, 32 F.3d at 1355–60; *Idaho Conservation League*, 956 F.2d at 1519–1523. The Court follows the Ninth Circuit's lead in doing so here.

The Federal Defendants argue the issuance of the EA and FONSI cannot itself be major federal action because otherwise, under NEPA, it would require its *own* supporting EA or EIS. *See Federal Reply* 5:1–14. But the Court does not find that the EA and FONSI themselves are major federal action. Rather, it finds that the EA and FONSI analyze a proposal for allowing WSTs on the POCS, and that *proposal* is for major federal action.

The Federal Defendants further argue that no major federal action will occur until the agencies rule on a future WST permit application. They point to two cases that found a lack of major federal action because additional agency approvals would be required before any actual activity would be allowed to take place. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 140–141 (D.D.C. 2014); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 900 F. Supp. 2d 1151, 1154–59 (D. Nev. 2012). But the Court finds the cases distinguishable. In *Sierra Club*, the court found a lack of major federal action because the agency had not yet received an application for approval of an oil spill response plan and therefore was "certainly not engaged in the process of considering any such plan or request." *Sierra Club*, 64 F. Supp. 3d at 141. But here, even though the agencies have not yet granted any permits, they clearly have engaged in the process of considering how they will handle permit requests. In addition to the EA's proposed action of allowing WST use, the agencies examined alternative proposals for allowing WSTs with subsurface seafloor depth limitations and allowing WSTs but not allowing open water discharge of WST waste fluids. *See AR* 16311–12. This evaluation of proposed limitations on WST permits shows that the agencies have already made

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

some decisions about how permit requests will be handled and whether certain limitations will generally be required. This is a far cry from the situation in *Sierra Club* where the agencies had yet to engage in any planning. *See Sierra Club*, 64 F. Supp. 3d at 141. *Center for Biological Diversity* also does not support the Federal Defendants' position. The court there found that the Fish and Wildlife Service did not engage in a major federal action when it entered into a memorandum of agreement with various state, tribal, and private entities, because the agreement primarily concerned conservation measures designed to *assist* an endangered species of fish and because merely entering into the agreement had no impact on a state engineer's decision to order a pump test that allegedly could have harmed the fish's environment. *Ctr. for Biological Diversity*, 900 F. Supp. 2d at 1159. In contrast, the actions the agencies have taken toward allowing WSTs on the POCS are entirely within their control and *could* impact the environment.

Because BOEM and BSEE proposed a programmatic action of allowing the use of WSTs on the POCS—an "overall plan" in the words of *Salmon River*—leaving only permitting for individual sites to be decided, the Court finds that the agencies have engaged in major federal action and therefore were required to determine whether that action would have a significant impact on the environment. Accordingly, the Court turns to the merits of Plaintiffs' NEPA claims.

### ii.     Merits

Plaintiffs make four arguments for why the Federal Defendants violated NEPA. First, they take issue with certain assumptions and findings of the Final EA. *See California Mot.* 7:19–20:3; *EDC Mot.* 13:23–18:25; *CBD Mot.* 8:4–13:23. Second, they argue that under the relevant regulations, the agencies should have prepared an EIS instead of an EA. *See EDC Mot.* 8:10–13:17; *CBD Mot.* 16:11–25:22. Third, they argue that the Final EA's purpose and need statement was unduly narrow. *California Mot.* 20:5–21:24; *EDC Mot.* 19:1–20:6; *CBD Mot.* 13:24–15:11. And finally, they claim that the agencies failed to consider a reasonable range of alternatives. *See California Mot.* 22:1–24:3; *EDC Mot.* 20:7–21:11; *CBD Mot.* 15:13–16:10. The Court addresses each set of arguments in turn.

### a.     Adequacy of the EA

As explained above, review of the final EA under NEPA is governed by the APA, which provides that "agency action may be overturned only when it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Barnes v. FAA*, 865 F.3d 1266, 1269 (9th Cir. 2017) (cleaned up). In reviewing whether the Final EA adequately supports the issuance of a FONSI, the Court looks to whether the agencies have "taken a 'hard look' at the consequences of [their] actions, based [their] decision on a consideration of the relevant factors, and provided a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* (cleaned up). The Court does not necessarily have to agree with the agencies' conclusion. It must uphold the agencies' NEPA actions if it is satisfied that they "fostered informed decision-making and public participation." *Nat'l Parks & Conserv. Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 667, 680 (9th Cir. 2000).

Plaintiffs make several arguments for why the EA failed to take a "hard look" at the potential environmental consequences of allowing the use of WSTs. The Court addresses each in turn.

### 1.     *Frequency of WSTs*

In the Final EA, BOEM and BSEE analyzed the potential environmental impact of WSTs based on a forecast that up to five WST permits would be approved each year. *See AR* 106644. This projection was grounded in part on historical data. *See id.* Since 1982, there have been no more than four WSTs approved in a single year. *See id.* And since 2000, there have been only six WSTs approved in total—and no more than three in any given year. *See id.* The analysis in the Final EA is therefore based on a projected yearly rate of WST approvals that is *higher* than any year on record and *significantly higher* than the trend in recent years. The agencies noted that this estimate is "conservative in its approach" and "potentially overestimates the potential for impacts." *Id.*

Nevertheless, Plaintiffs argue that the estimate of five WST approvals per year is unreasonably low. *See California Mot.* 8:15–16; *EDC Mot.* 14:7–15:10; *CBD Mot.* 10:19–11.23. Specifically, they argue that the agencies' decision to adopt this projection was arbitrary and capricious because it relied on unreliable historical data about the use of WSTs, ignored the fact that the nature of the POCS makes it a prime candidate for increased use of WSTs, and disregarded the Intervenor Defendants' own statements indicating that they intend to increase their use of WSTs. *See California Mot.* 8:15–16; *EDC Mot.* 14:7–15:10; *CBD Mot.* 10:19–11:23.

Plaintiffs, especially the California Plaintiffs, attack the historical data used by the agencies to determine that no more than four WSTs permits have ever been approved in a single year. *See California Mot.* 8:12–12:11. They point to a 2016 email from a BSEE official stating that while the agency was "sued on 13" acidizing jobs, "a lot more routine acid jobs have taken place, we do not have number between 1984–2011." *AR* 1099. They also direct the Court to an email from a government scientist stating that "[i]t appears that there is not enough information on [discharge monitoring reports] to identify WSTs." *Id.* 1034. And finally, they focus on a July 2016 academic article reporting that no formal data collection system has been set up to track the use of WSTs. *See id.* 24424. Based on these potential shortcomings in the data, Plaintiffs argue

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|--------------------------------------------------------------------------------|

that the agencies decision to adopt a projection of five WSTs per year is "simply arbitrary." *California Mot.* 10:2.

But while the historical data before the agency may not have been perfect, the Court is not convinced that it was so unreliable that it was arbitrary and capricious for the agencies to base their projections on it. The information before the agencies indicated that the actual number of WSTs was quite low. Based on that data, since 2000, only six WSTs *in total* have been approved and implemented on the POCS—an average of less than one every two years. *See AR* 106644. Even assuming for the sake of argument that some WSTs may not have been counted, the agencies adopted a forecast of five WSTs per year that is more than *ten times higher* than the rate in recent years. There is no evidence that the historical data miscounted WSTs by such a large magnitude that it would be unable to support a projection that no more than five WSTs per year would be approved in the future. Accordingly, it was not unreasonable for the agencies to rely on this data. If anything, given the historical numbers, it appears that the agencies were extraordinarily conservative in their estimate.

Plaintiffs argue that Defendants acted arbitrarily in undervaluing the possibility that WST use would increase in the future because, Plaintiffs argue, the POCS oil reservoirs are "prime candidates" for WSTs. *See California Mot.* 10:4–11:2. The Final EA noted that the reservoirs on the POCS have been in production for between 26 and 48 years and that the oil and natural gas pressures in the reservoirs have been gradually declining with this production. *See AR* 106636. It further noted that the use of WSTs might "support the continued recovery of oil and natural gas" because they allow for the recovery of oil and natural gas that cannot easily be recovered by traditional means. *See id.* Plaintiffs argue that because the POCS reservoirs are now aging, it is highly likely that well operators will increasingly need to employ WSTs. *See California Mot.* 10:27–11:2. In support, they point to statements that the Intervenor Defendants have made during this litigation. For example, in its motion to intervene, Intervenor Defendant Exxon stated that it anticipated that it would need to use WSTs to re-start production at its existing platforms and to drill and complete new wells. *See Exxon Mot. to Intervene*, Dkt. # 20, 7:25–8:5. And in conjunction with its motion to intervene, the manager of Intervenor Defendant DCOR said in a declaration that the company has "near-term plans to use hydraulic fracturing as a well stimulation technique." *Declaration of Alan C. Templeton*, Dkt. # 19, ¶ 19.

But other information before the agencies suggested that a significant increase in the use of WSTs on the POCS is unlikely. The Final EA reports that the offshore Monterey Formation is naturally highly fractured, and therefore there has been little need for fracturing by WSTs in order to extract oil and natural gas. *See AR* 106761. The Final EA also found that most of the "undiscovered, technically recoverable resources in the area" are "expected to be found in highly permeable sandstone reservoirs" that will "not require the application of WST[s]." *Id.* 106671.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

Plaintiffs have not disputed these scientific findings. And while the Intervenor Defendants had an incentive to play-up their plans for future use of WSTs in their motions to intervene in this case, in 2013, operators were informally polled about their future plans to use fracking in the Monterrey Formation, and all said that they had no future plans to do so. *See id.* 106668.

Plaintiffs rely on *Center for Biological Diversity vs. Bureau of Land Management*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013), in support of their argument that the agencies' estimate of future WST frequency was unreasonably low. But the facts of that case are distinguishable. In *Center for Biological Diversity*, the Bureau of Land Management issued a FONSI after analyzing the potential for fracking on leased parcels of federal land. *Id.* at 1144. The agency projected that only one well would be drilled on the leased area based on the fact that in the previous 20 years, none of the lease sales in the area had had any wells drilled on them. *See id.* at 1155. The court found the one-well projection unreasonable because the lands were considered "high potential" for oil, and oil prices were "significantly higher" than in the past. *Id.* Given these facts, the court found that the agency should have considered the possibility that more than one well would be drilled. *See id.* at 1155–58.

But the facts of this case could not be more different. Unlike the "high potential" land in *Center for Biological Diversity*, the agencies have determined that the POCS has a *low* potential for additional WSTs, in large part because its geological composition renders WSTs unnecessary for extracting oil. *See AR* 106761. Further, unlike in *Center for Biological Diversity*, where the agency relied on the fact that no wells had been drilled in the past to project that only one would be drilled in the future, here the agencies adopted a projection for WST approvals that is higher than any year on record and significantly higher than in recent years which have seen only six approvals in total since 2000. This was a conservative estimate. Plaintiffs' arguments that the agencies should have been even *more* conservative rests on speculation about future WST use that is not supported by the information that was in front of the agencies.

The agencies took a hard look at the information about the likelihood of future WSTs and made a reasonable projection that no more than five WST permits would be approved each year. The Court concludes that this projection was not arbitrary and capricious.

### 2.    *Fluid Pollutant Discharges*

One possible way the use of WSTs could affect the environment is through the discharge of WST fluids into the ocean. WSTs involve the use of various chemicals. *See AR* 106627. During a WST, some of the chemicals become commingled with water from the geological formation. *Id.* This commingled fluid, referred to as "produced water" is recovered by the WST

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|------|

operator, treated, and either discharged into the ocean or "reinjected" into a reservoir beneath the seafloor. *Id.*

In 2014, EPA, pursuant to its authority under the Clean Water Act, issued National Pollution Discharge Elimination System General Permit CAG 280000 (the "NPDES Permit") to regulate "[d]ischarges from offshore [oil and gas] exploration, development and production facilities in the Federal waters off the southern California coast." *Id.* 106683. The NPDES Permit regulates twenty-two types of discharges from oil and gas facilities, including pollutants that are discharged in produced water waste fluid from WSTs. *Id.* The limits on effluent concentrations imposed by the NPDES Permit apply at the boundary of a 100-meter mixing zone around the point where the effluents are discharged into the water. *See id.* 106651. In the Final EA, the agencies assumed that WST site operators would comply with the limits of the NPDES Permit and concluded on that basis that "no effects on water quality are expected beyond the mixing zone." *Id.*

Plaintiffs raise several issues with this conclusion. They first argue that the agencies cannot abdicate their hard look obligations under NEPA by simply relying on permitting done by the EPA. *See California Mot.* 14:17–16:12; *EDC Mot.* 15:11–22; *CBD Mot.* 9:10–10:2. They cite to two Ninth Circuit cases in support. *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004). But both of those cases involved situations where an agency did not perform its own environmental analysis and instead attempted to rely on non-NEPA documents from other agencies. Here, the agencies *did* perform their own analysis of whether the use of WSTs was likely to significantly impact water quality. *See AR* 106683–93. They used the NPDES Permit only to establish facts about the likely concentrations of fluid discharges by assuming that well operators would discharge fluids in compliance with the permit. *See id.* 106834. And they concluded that discharges complying with the NPDES Permit were not likely to have a significant impact on the environment. *Id.* This was a permissible use of the NPDES Permit.

Plaintiffs also argue that the testing performed under the NPDES Permit is not sufficient to determine the impact of fluid discharges on wildlife. *See California Mot.* 16:13–17:7; *CBD Mot.* 9:21–10:2. They point out that the tests take place only quarterly and are not timed to coincide with the use of WSTs. However, the Final EA specifically acknowledged this issue and explained that the NPDES Permit requires oil and grease sampling, as well as visual monitoring of free oil, in conjunction with *every* use of a WST. *See AR* 106796. The agencies found that quarterly tests, combined with visual monitoring, would work together to help detect a potential loss of control over discharges. *Id.* While Plaintiffs undoubtedly wish that EPA would test more frequently, the Court concludes that BOEM and BSEE took the requisite hard look at the testing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

issue and reasonably concluded that testing under the NPDES Permit is sufficient to ensure that there will be no significant impact on the environment.

Plaintiffs also take issue with the Final EA's conclusion that dilution of WST chemicals discharged in the ocean would render any impacts insignificant. *See California Mot.* 17:10–18:10. But the Final EA explains how it estimated dilution. *See e.g., AR* 106797. And, in response to comments, the agencies analyzed data collected from actual well treatment fluids used on the POCS in 2014 and 2016 to estimate the concentrations of chemicals in discharges. *See id.* 106798. Relying on this data, they found that the estimated concentrations were "generally very low." *Id.* 106799. This demonstrates that the agencies seriously evaluated potential chemical concentrations and reached a reasoned decision that they were not likely to be high enough to impact the environment.

Finally, Plaintiffs take issue with the fact that the agencies reached the conclusion that discharges would not have a significant impact on the environment even though there is no toxicity data available for many WST fluids. *See California Mot.* 16:20–26; 17:20–18:10. The Final EA specifically acknowledges that toxicity information is not available for some chemicals but notes that the NPDES Permit program and the Whole Effluent Toxicity ("WET") limits that must be adhered to prior to discharge help ensure that the unknown toxicity of these chemicals is accounted for in the analysis. *AR* 106781. The California Plaintiffs argue that the agencies should have sought out further toxicity data. *See California Mot.* 18:12–19:26. But the Final EA describes the "exhaustive search" that the agencies conducted to discover any and all relevant scientifically credible information. *AR* 106781. The Court concludes that the agencies considered all reasonably available information. This is all that NEPA requires.

### 3.    *Routine Acid Use*

The EDC Plaintiffs briefly argue that the Final EA improperly failed to examine the effects of the use of acid for wellbore cleanups. *See EDC Mot.* 15:23–16:3. However, the Court agrees with the Federal Defendants that the agencies sufficiently addressed this routine use of acid—which differs significantly from acidizing in that it is not intended to penetrate into the formation and uses much smaller volumes and concentrations of acid—in the fourth proposal, which proposed prohibiting WSTs but allowing routine acid use. *See Gov't Cross-Mot.* 30:2–13; *AR* 106834. As part of this discussion, the Final EA found that "the use of acid washes for routine well cleanup is not expected to result in any adverse environmental impacts on the POCS." *AR* 106834. This determination was not arbitrary or capricious.

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

4.      *Other Issues*

The EDC Plaintiffs make conclusory arguments that the Final EA failed to adequately analyze potential effects on air quality, seismicity from the use of WSTs, and the potential indirect effects of increased oil production.  However, all of these issues were addressed in the Final EA.  The Court concludes that the agencies took the requisite hard look at these issues and therefore determines that their analysis satisfies NEPA.

5.      *Summary*

For the reasons set forth above, the Court finds that the agencies took a hard look at the potential environmental effects of allowing WSTs on the POCS and reasonably concluded that they would have no significant impact.  Accordingly, the Court concludes that they did not act arbitrarily or capriciously in preparing and issuing the EA and FONSI.

b.      *Whether the Agencies Should Have Prepared an EIS*

The Court now turns to Plaintiffs' argument that the relevant regulations required BOEM and BSEE to prepare an EIS instead of an EA.  "An EIS *must* be prepared if substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (cleaned up).  In making this determination, agencies are guided by regulations adopted by the Council on Environmental Quality ("CEQ").  *See id.* at 865.  Under these regulations, the agency must consider whether a proposed action will significantly affect the environment.  *See id.*  "Significantly" has two components: context and intensity.  *See* 40 C.F.R. § 1508.27.  Context refers to the affected interests and affected locality.  *See id.* § 1508.27(a).  Intensity refers to "the severity of the impact."  *Id.* § 1508.27(b).  The regulation lists ten factors that agencies should consider in evaluating intensity.  *See id.*  One factor "may demonstrate intensity . . . on its own," mandating the preparation of an EIS instead of an EA, "although the presence of one factor does not necessarily do so."  *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017).

To prevail on a claim that an agency should have prepared an EIS, "a plaintiff need not show that significant effects *will in fact occur*."  *Ocean Advocates*, 402 F.3d at 864 (cleaned up).  Instead, it is sufficient for plaintiffs to raise "substantial questions whether a project may have a significant effect."  *See id.* at 864–65.  The Ninth Circuit has described this as "a low standard."  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

Plaintiffs argue that BOEM and BSEE should have prepared an EIS instead of an EA because several of the intensity factors are present here. *See EDC Mot.* 9:7–13:17; *CBD Mot.* 16:13–22:26. The Court addresses each relevant factor in turn.

*1.     Controversy*

The regulation provides that "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial" should be considered in evaluating intensity. 40 C.F.R. § 1508.27(b)(4). "'Controversial' refers to disputes over the size or effect of the action itself, not whether or how passionately people oppose it." *Wild Wilderness*, 871 F.3d at 728. When evidence "raised prior to the preparation of . . . [a] FONSI . . . casts serious doubt upon the reasonableness of an agency's conclusions," the burden is placed on the agency "to come forward with a 'well-reasoned explanation' demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences." *Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (cleaned up).

Plaintiffs argue that there has been an "outpouring of public protest" about the use of WSTs on the POCS, pointing to the 5,964 negative comments submitted about the Draft EA. *See EDC Mot.* 11:5–8. The Court agrees with the Federal Defendants that the mere presence of negative comments alone does not create a public controversy. But the comments could still give rise to a public controversy if they "cast serious doubt" on the agencies' conclusions. *See Nat'l Parks*, 241 F.3d at 736. However, the Court has reviewed the comments that Plaintiffs rely on and does not believe that they give rise to a public controversy. These comments primarily raised questions about whether the agencies' conclusions were grounded in sufficient data. *See, e.g.*, *AR 2678* (comments from the California Coastal Commission focusing on the "many unknowns and uncertainties surrounding WST use on the OCS"); *id.* 4332 (letter from thirty-two scientists highlighting "significant data gaps on basic questions regarding offshore fracking and acidizing"). Plaintiffs have not identified any comments that provided information affirmatively undercutting the agencies' conclusions.

The agencies addressed the negative comments in the Final EA, explaining that they used the best data available and did not believe that any of the data gaps were material given their projection that the use of WSTs on the POCS would be limited. *See id.* 106855. They further noted that while the effects of *onshore* fracking might be controversial, this controversy did not translate to WSTs on the POCS given their limited projected scope. *See id.* 106860. As discussed above, the Court believes that these projections about the scope of WST use were reasonable. Accordingly, the Court is convinced that the agencies "made a reasoned decision based on [their] evaluation of the significance—or lack of significance—of the" information

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
| --- | --- | --- | --- |
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

provided in the public comments.  *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378
(1989).

Given the agencies' reasoned decisionmaking and the lack of affirmative evidence
contradicting the agencies' findings, the Court finds that Plaintiffs have failed to "cast serious
doubt on the reasonableness of [the agencies'] conclusions."  *See Nat'l Parks*, 241 F.3d at 736.
Accordingly, no public controversy exists that would require the preparation of an EIS.

2.      *Unique Characteristics*

The CEQ regulations provide that "[u]nique characteristics of the geographic area such as
proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and
scenic rivers, or ecologically critical areas" should be considered in evaluating intensity.  40
C.F.R. § 1508.27(b)(3).

Plaintiffs argue that the Santa Barbara Channel, where most of the drilling on the POCS
takes place, is a unique area.  *See EDC Mot.* 9:18–10:16; *CBD Mot.* 20:19–22:12.  As the Final
EA recognizes, the area is home to the Channel Islands Marine Sanctuary and Channel Islands
National Park.  It is also home to several endangered species, such as the blue whale.  *See AR*
107267–70.  The CBD Plaintiffs also point out that the area contains cultural resources, such as
submerged remains of the Chumash people.  *CBD Mot.* 21:12–20.

The agencies do not dispute that the area is unique.  But in the Final EA, they found that
discharges from platforms using WSTs would not affect the water quality or use of these
sensitive areas because of the distance between the areas and the platforms.  The closest
platform to the Channel Islands Marine Sanctuary is 1,100 meters from the sanctuary's outer
boundary, which itself extends six nautical miles from the Channel Islands National Park.  *See*
*AR* 106824.  The agencies found that the "dilution and natural breakdown of WST constituents"
over those distances "should preclude any impacts on water quality at the sanctuary or the
natural park."  *Id.*

Plaintiffs argue that several district courts have required the preparation of an EIS "when
a proposed activity will affect an environmentally sensitive area."  *See EDC Opp.* 7 n.6 (citing
*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1196 (N.D. Cal. 2004); *Greater*
*Yellowstone Coalition v. U.S. Forest Serv.*, 12 F. Supp. 3d 1268, 1275–79 (D. Idaho 2014);
*Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1136–37 (D. Mont. 2009)).
However, these cases involved situations where there was either serious uncertainty or a lack of
analysis about why an activity would not affect a sensitive area, *see Greater Yellowstone*, 12 F.
Supp. 3d at 1276; *Helena Hunters*, 841 F. Supp. 2d at 1138, or a situation where the agency

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

conceded that the activity would adversely affect a sensitive area but concluded that the benefits outweighed the adverse effects, *see Blackwell*, 389 F. Supp. 2d at 1197. In contrast, the agencies here have explained why the limited use of WSTs will not adversely affect the Channel Islands Marine Sanctuary and the Channel Islands National Park. BOEM and BSEE concluded that there is not expected to be any adverse effect on water quality outside of the 100-meter mixing zone around the discharge point. *See AR* 106651. The Marine Sanctuary is 1,110 meters away from the closest discharge point—eleven times the distance at which the agencies concluded that dilution will render the WST chemicals harmless—and the National Park is much further still. *See id.* 106824. The Court concludes that this analysis reasonably explains why WST use will not impact these environmentally sensitive areas, and therefore this factor does not counsel in favor of preparing an EIS.

3. *Uncertainty*

The CEQ regulations provide that "the degree to which possible effects on the human environment are highly uncertain or involve unique or unknown risks" should be considered in evaluating intensity. 40 C.F.R. § 1508.27(b)(5).

The Final EA notes that "[d]ue, in part to the lack of toxicity data for many constituents of WST fluids, potential effects on marine life within the [100-meter] mixing zone are not fully understood." *AR* 106792. Several commenters also identified this issue. *See id.* 2677–90 (California Coastal Commission comments); *id.* 3434–54 (EDC comments); *id.* 14132–33 (Channelkeeper comments); *id.* 14135–40 (EPA comments). However, BOEM and BSEE referenced studies that examined the potential effects within the mixing zone of discharges that may or may not have contained WST fluids. *Id.* 106792. These studies found little effect on water quality or on various animal species. *Id.* The agencies ultimately concluded that "[b]ecause (1) WSTs are infrequent activities, (2) WST fluids contain <1% chemical additives, and (3) recovered WST fluids are mixed and highly diluted with much greater volumes of produced water, it is unlikely that the presence of WST chemical constituents at expected levels . . . would alter conditions observed near platforms, as reported in these studies." *Id.* 106793.

Plaintiffs argue that this conclusion is highly uncertain given the lack of information about the toxicity of several WST chemicals and their impact on the environment. *See EDC Mot.* 12:6–7; *CBD Mot.* 19:15–20:3. However, the agencies specifically addressed this concern in the Final EA, stating that any uncertainty is limited by:

- The known toxicity of many of the chemicals

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

- The lack of effects of most of the toxic compounds for which toxicity values *are* available

- The low likelihood that chemicals without known toxicity values would have toxicities that are substantially higher than most of the chemicals for which the toxicity *is* known

- The fact that studies have not detected significant effects from historical discharges of greater quantities of produced water than are expected to be discharged on the POCS, and the fact that it is a practical impossibility to test the toxicity of every discharged chemical against every potentially exposed marine species.

*AR* 106876–77.

The regulation does not automatically require than an EIS be prepared just because data gaps exist. Instead, it states that an EIS should be prepared when those gaps render the effects of the action "highly uncertain." 40 C.F.R. § 1508.27(b)(5); *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006) ("[T]he regulations do not anticipate the need for an EIS anytime there is *some* uncertainty, but only if the effects of the project are 'highly uncertain.'"). Here, the agencies analyzed this precise issue and made a reasoned decision that the lack of toxicity data for some chemicals did not render the effects of WSTs highly uncertain. This is sufficient to satisfy NEPA.

Further, the gaps in the data were not caused by a failure on the part of the agencies to seek out all available toxicity data, but rather by the fact that data simply is not available, in part because some of the chemicals are proprietary. *See AR* 106790. Plaintiffs have not explained how additional toxicity data could be obtained if the agencies prepared an EIS. *But see Gov't Reply* 9:5–7 ("An EIS at this point in time would not contain any more specific information regarding the proposed fluid amounts or components than what is contained in the [Final EA]."). While they suggest that the agencies may have been able to obtain additional information by conducting their own studies of WST use in the Gulf of Mexico, *see CBD Mot.* 20:11–17, the Court concludes that the agencies satisfied their NEPA obligations by evaluating the information that was reasonably available to them. *See Methow Forest Watch v. U.S. Forest Serv.*, 383 F. Supp. 2d 1263, 1273 (D. Or. 2005) (finding that an agency satisfied NEPA when it explicitly acknowledged that there were no available studies analyzing the issue in question and explained the limitations of relying on the studies that were available).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|------------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|-------------------------------------------------------------------------------|

4.    *Other Factors*

Plaintiffs briefly argue that the potential cumulative effects of WST use and the potential for WSTs to adversely affect endangered or threatened species counsel in favor of preparing an EIS.  *See EDC Mot.* 13:7–17; *CBD Mot.* 22:14–27.  However, BOEM and BSEE expressly addressed these issues in the Final EA.  They found that "[g]iven the estimated negligible to small potential impacts of future WST activities on various resources in the POCS . . . incremental impacts from the proposed action are not expected to result in any cumulative effects on the resources of the POCS and adjacent coastal and mainland areas."  *AR* 106629.  And they examined the potential impacts to listed species, concluding that WSTs were not likely to cause adverse effects for most species.  *Id.* 106810–22.  Given these reasoned findings, the Court finds that the agencies reasonably concluded that neither factor counseled in favor of preparing an EIS.

5.    *Summary*

For the foregoing reasons, the Court finds that the agencies reasonably concluded that none of the intensity factors of 40 C.F.R. § 1508.27 are present here.  Accordingly, they did not act arbitrarily or capriciously in failing to prepare an EIS.

c.    *Purpose and Need Statement*

An agency preparing an EA must supply a statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."  40 C.F.R.§ 1502.13.  Such statements are reviewed for "reasonableness."  *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013).  Agencies are afforded "considerable discretion" in how they choose to define a project's purpose and need.  *Id.*  However, "[a] purpose and need statement will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained."  *Id.*

BOEM and BSEE defined the purpose and need of the EA as follows:

The purpose of the proposed action (use of certain WSTs, such as hydraulic fracturing) is to enhance the recovery of petroleum and gas from new and existing wells on the POCS, beyond that which could be recovered with conventional methods (i.e. without the use of WSTs).  The use of WSTs may improve resource extraction from some existing wells, and in some future new wells, on the POCS. The need for the proposed action is the efficient recovery of oil and gas reserves from the POCS.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

*AR* 106619.  Plaintiffs argue that this statement is improperly narrow because it is effectively the same as the proposed action that was adopted and therefore did not allow for consideration of other alternatives.  *See California Mot.* 20:24–21:12; *EDC Mot.* 19:11–16; 14:4–15.  They primarily complain that the agencies failed to incorporate environmental considerations into the purpose and need statement given the Outer Continental Shelf Lands Act's ("OCSLA") requirement that the agencies ensure "environmental safeguards" are in place and in light of Congress's purpose to "balance orderly energy resource development with protection of human, marine, and coastal environments."  *See* 43 U.S.C. §§ 1332(3), 1802(2)(B).  The Federal Defendants contend that the purpose and need statement was largely a product of the settlement agreements in the earlier cases, which required the agencies to "analyze the potential environmental impacts of well-stimulation practices on the Pacific OCS, including hydraulic fracturing and acid well stimulation."  *Settlement Agreement* (CV 15-1189), ¶ I.A; *Settlement Agreement* (CV 14-9281), ¶ I.A.  They argue that it was only natural for the agencies to define their purpose and need in terms of allowing WSTs, since the agreements specifically required analysis of the impact of WSTs.

The Court agrees with the Federal Defendants.  Agencies are given considerable discretion in deciding how to formulate purpose and need statements, and it was reasonable for BOEM and BSEE to frame the EA in terms of allowing WSTs given the settlement agreements in the previous litigation.  Further, the EA expressly considered three alternatives to allowing WSTs without conditions—including an alternative proposal for prohibiting the use of WSTs altogether.  The Court does not believe that the purpose and need statement unduly constrained the agencies from considering these alternative options.  Therefore, the statement did not violate NEPA.

### d.      Reasonable Range of Alternatives

NEPA requires agencies to "study, develop, and describe appropriate alternatives."  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013).  While an agency preparing an EA instead of an EIS must still "give full and meaningful consideration to all reasonable alternatives," the "obligation to discuss alternatives is less than in an EIS."  *Id.* (cleaned up).  That said, an EA will be ruled inadequate if a viable, but unexamined, alternative exists.  *Id.*

Here, the EA evaluated four proposals: (1) allowing the use of WSTs, (2) allowing the use of WSTs with subsurface seafloor depth stipulations, (3) allowing WSTs but not allowing open water discharge of WST waste fluids, and (4) not allowing the use of WSTs.  *AR* 106641–44.  Plaintiffs argue that the agencies should have considered additional alternatives, specifically: limiting the number of WSTs authorized each year, limiting the use of WSTs to

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

only certain locations or certain times of year to protect migrating endangered species, only allowing specific types of WSTs (for example, only allowing acidizing), requiring the disclosure of WST fluid constituents and additives, and requiring notice to state agencies and the public prior to conducting WSTs or waste discharges. *See California Mot.* 22:1–23:17; *CBD Mot.* 15:13–16:10.

Some of the alternatives Plaintiffs proffer *were* covered by the Final EA. The EA examined a proposal for allowing up to five WST approvals per year and a proposal for not allowing any WST approvals—finding that both proposals would have no significant impact on the environment. Given this finding, there was no need for the agencies to consider imposing different limits on the number of WSTs per year. As for the site-specific and timing proposals, the Court agrees with the Federal Defendants that these would be better addressed during a site-specific permitting inquiry rather than in a programmatic EA like the one at issue here. With regard to proposals for only allowing certain kinds of WSTs, Plaintiffs can hardly complain that the agencies did not examine a proposal for only allowing acidizing when they themselves entered into a settlement agreement that required the agencies to examine both acidizing *and* fracking. *Settlement Agreement* (CV 15-1189), ¶ I.A; *Settlement Agreement* (CV 14-9281), ¶ I.A. The Court finds that the decision to consider both forms of WSTs was appropriate given the history leading up to the preparation of the EA. As for proposals for disclosure requirements, Plaintiffs do not explain how imposing such requirements would affect the impact of WSTs on the environment. *See Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("[A]n agency is not required to consider remote and speculative alternatives." (cleaned up)).

The Court concludes that BOEM and BSEE considered a reasonable range of alternatives in preparing the EA.

> ### iii.   Summary

For the foregoing reasons, the Court concludes that BOEM and BSEE did not act arbitrarily and capriciously in preparing the EA and issuing a FONSI. Accordingly, the Court **GRANTS** Defendants' motions for summary judgment on the NEPA claims and **DENIES** Plaintiffs' motions for summary judgment on those claims.

### B.   Endangered Species Act ("ESA") Claims

The EDC and CBD Plaintiffs bring claims for violation of the ESA. Before turning to the merits of these ESA claims, the Court first must determine which specific claims remain in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

dispute. In their complaint, the EDC Plaintiffs alleged that the Federal Defendants violated Section 7 of the ESA by failing to initiate consultation with the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service "("NMFS") (collectively "the Services"), violated Section 9 of the ESA by permitting a "taking" of an endangered species, and unlawfully determined that allowing WSTs would have "no effect" on listed species. *EDC Compl.*, Dkt. # 1, ¶¶ 242–51. The CBD Plaintiffs alleged that the Federal Defendants violated the ESA by failing to initiate consultations with the Services under Section 7 and by failing to request from the Services a list of ESA-listed species or habitats that might be affected by WSTs. *CBD Compl.*, CV 16-8473, Dkt. # 1, ¶ 117.

However, the Federal Defendants correctly point out that in their current motions, the EDC Plaintiffs have not addressed their claims based on Section 9 and the CBD Plaintiffs have not addressed their claims based on the failure to request a list of species and habitats. *See Gov't Cross-Mot.* 40:5–17. The Court finds that Plaintiffs have abandoned those claims and therefore **GRANTS** summary judgment in favor of Defendants on those theories of liability. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009). The Court will now address the remaining ESA claims, which concern the agencies' failure to initiate consultations and their allegedly unlawful determination that WSTs will have "no effect" on listed species.

*i.    Consultation Under Section 7(a)(2)*

Section (7)(a)(2) of the ESA requires federal agencies to ensure that any action that they "authorize, fund, or carry out is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of designated critical habitat." *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02 (definition of an "action"), 402.03. The ESA uses the term "action agency" to refer to the agency that is taking the action that requires consultation. Here, BOEM and BSEE are the "action agencies."

Although the ESA does not require action agencies to reach a certain substantive outcome, the ESA mandates procedures that an action agency must follow before authorizing, funding, or carrying out "actions." If a proposed action "may affect" a listed species or critical habitat, the action agency must, at the least, informally consult with the Services. *See* 50 C.F.R. § 402.13(a). An informal consultation includes discussions and correspondence between the action agency and the Services, and may include a Biological Assessment ("BA") prepared by the action agency for the Services' review. *Id.* §§ 402.13, 402.14(c); 16 U.S.C. § 1536(c). If during informal consultation, the action agency and the Services concur that the action is not likely to adversely affect a listed species or critical habitat, no further consultation is necessary. 50 C.F.R. §§ 402.13(a), 402.14(b)(1). However, if the action agency or the Services determine

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

that the action is "likely to adversely affect" listed species or critical habitat, the agencies then engage in "formal consultation." *Id.* §§ 402.13(a), 402.14(a)–(b). Formal consultation leads to the issuance of a "Biological Opinion" or "BiOp" by the Services that assesses the likelihood of "jeopardy" to the species or "destruction or adverse modification" of critical habitat. *Id.* § 402.14(g)–(h).

The EDC and CBD Plaintiffs allege that Defendants violated Section 7(a)(2) by failing to consult with the Services about the effects of WSTs on wildlife before issuing the EA.[5] There is no dispute that BOEM and BSEE did not initiate informal consultations with the Services before issuing the Final EA in May 2016. However, in March 2017, a week before they filed their motion to dismiss in this case, the agencies sent BAs to the Services. *See AR* 106023–111 (BA sent to FWS), 106112–71 (BA sent to NMFS). The BAs determined that for the species within the jurisdiction of NMFS, all would either not be affected or may be affected, but would be unlikely to be adversely affected, by the use of WSTs. *See id.* 106112–71. For the species within the ambit of FWS, the BAs found that most would either not be affected, or may be affected, but were unlikely to be adversely affected, by the use of WSTs. *See id.* 106023–111. However, it found that three of the species—the Western snowy plover, California least tern, and Southern sea otter—were likely to be adversely affected by any oil spills. *See id.* 106081.

In December 2017, NMFS issued a letter concurring in BOEM and BSEE's effects determinations with regard to the species within its domain. *See id.* 106301–26. In July 2017, FWS sent BOEM and BSEE a letter requesting more information before beginning the formal consultation process, which was required because the agencies determined that WST use was likely to adversely affect some species. *See id.* 106294–98.

With this factual background established, the Court turns to the question of whether the Federal Defendants violated the ESA. Making this determination requires the Court to analyze four questions: (1) whether the agencies have taken an "action" that triggered the consultation requirements, (2) whether the agencies initiated informal consultations by sending the BAs to the agencies in March 2017, (3) whether consultations that began after the Final EA was issued can

---

[5] The EDC Plaintiffs specifically allege that BOEM and BSEE failed to consult with FWS about the southern sea otter, Guadalupe Fur Seal, light-footed Ridgway's rail, western snowy plover, marbled murrelet, California least tern, short-tailed albatross, Hawaiian petrel, and California Ridgway's rail. *EDC Compl.* ¶ 251. They allege that the agencies failed to consult with NMFS about the black abalone, white abalone, sei whale, blue whale, fin whale, North Pacific right whale, humpback whale, sperm whale, southern California steelhead, scalloped hammerhead shark, southern green sturgeon, tidewater goby, loggerhead turtle, leatherback turtle, green turtle, and olive ridley turtle. *Id.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|-------------------------------------------------------------------------------|

cure a failure to initiate consultations before the issuance of the Final EA, and (4) whether Plaintiffs have demonstrated that they are entitled to any further relief.

          a.     Existence of an "Action"

The Federal Defendants first argue that the ESA's consultation requirements have not been triggered because the agencies have not yet taken an "action" within the meaning of the statute. *See Gov't Cross-Mot.* 40:19–43:15.

The ESA requires consultation with the Services for any "agency action" that "may affect" a listed species or critical habitat. 16 U.S.C. § 1536(a)(2). An "action" for ESA purposes is "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," and includes the "granting of licenses" and "actions directly or indirectly causing modifications to the land, water or air." 50 C.F.R. § 402.02. The Ninth Circuit assesses the "action" inquiry under the ESA in two steps: "First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency has some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020–21 (9th Cir. 2012) (en banc). "There is 'agency action' whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id.* at 1011.

The Federal Defendants argue that no "action" has taken place because the agencies have not yet authorized any permits for WSTs on the POCS. *See Gov't Cross-Mot.* 40:19–41:14. But this is a rehash of an argument that the Court rejected at the motion to dismiss stage. *See July 14, 2017 Order* at 11–13. In its order denying Defendants' motion to dismiss, the Court applied the two-step inquiry from *Karuk Tribe* and found both steps satisfied. *See id.* at 12. The Court found that BOEM and BSEE had "affirmatively authorized" private entities to proceed with WSTs because the EA and FONSI had "set an affirmative future direction for these activities and set the course for how these activities are conducted."[6] *Id.* (citing *Karuk Tribe*, 681 F.3d at 1011). And it found that the agencies had "some discretion" over how to supervise WSTs, given that the EA and FONSI presented and dismissed alternative options. *Id.*

---

[6] It is not disputed that the use of WSTs "may affect" at least some listed species—another requirement for triggering the ESA's consultation requirements. *See* 16 U.S.C. § 1536(a)(2). As the Court noted in its July 17, 2017 Order, the agencies have acknowledged as much in the BAs sent to FWS and NMFS. *See July 17, 2017 Order* at 12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

The Court's decision was in accord with cases from the Ninth Circuit finding that the ESA's consultation requirement can be triggered by a programmatic analysis that plots the course for future individual approvals. *See id.* at 13; *Wash. Toxic Coal. v. EPA*, 413 F.3d 1024, 1031–33 (9th Cir. 2005); *P. Rivers Council v. Thomas*, 30 F.3d 1050, 1051 (9th Cir. 1994). The Federal Defendants concede that at least *some* programmatic approvals trigger the ESA but argue that this one does not because it "is only a bare NEPA analysis unassociated with an action mandating NEPA review or ESA consultation." *Gov't Cross-Mot.* 42:24–25. But, as explained above with regard to the NEPA claims, the Final EA is not merely a document floating in space, unassociated with any concrete plan. Instead, the EA analyzes a definite proposal for allowing WSTs on the POCS and creates the framework under which future requests for WST permits will be evaluated. Accordingly, the Court adheres to its decision at the motion to dismiss stage that the Final EA reflects an agency action that triggered the ESA's consultation requirements. Because the agencies did not consult with the Services before issuing the Final EA, they violated the ESA.

> b.    *Whether the Agencies Initiated Consultations*

In their complaints, the EDC and CBD Plaintiffs ask the Court to declare that BOEM and BSEE violated the ESA and order the agencies to "initiate or reinitiate consultation pursuant to Section 7 of the ESA." *See EDC Compl.* at 72; *CBD Compl.* at 33. Accordingly, the Court turns to the question of whether the agencies initiated (or reinitiated) consultation within the meaning of the ESA when they sent the BAs to the Services in March 2017. If they did, then Plaintiffs may already have received at least some of the relief they seek.

The Court's analysis of this question is made more difficult by Plaintiffs' tendency to confuse informal and formal consultations. For example, the CBD Plaintiffs argue that the agencies must engage in *formal* consultations with the Services whenever they conclude that an action "may affect" a listed species. *See CBD Mot.* 23:20. But this simply misstates the law. As explained above, if a proposed action "may affect" a listed species, the agency must, at a minimum, engage in *informal* consultations with the relevant Service. *See* 50 C.F.R. § 402.13(a). However, if, during these informal consultations, the agency and Service both conclude that the action is not likely to adversely affect a listed species or critical habitat, no further consultations are necessary—that is, the agency and Service do *not* have to engage in formal consultations. 50 C.F.R. §§ 402.13(a), 402.14(b)(1). Formal consultations are required only if the agency or the Service determine that the action is "likely to adversely affect" a listed species. *See id.* §§ 402.13(a), 402.14(a)–(b). With this framework in mind, the Court turns to Plaintiffs' complaints about the agencies' consultations with NMFS and FWS.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|--------------------------------------------------------------------------------|

### 1.     NMFS Consultations

BOEM and BSEE submitted a BA to NMFS analyzing the projected effects of WST use on various species of marine animals.  *See AR* 106112–106171.  For each of these species, BOEM and BSEE found that they may be affected by WSTs but were not likely to be adversely affected.[7]  *See id.* 106137.  NMFS issued a letter concurring in BOEM and BSEE's "may affect, but not likely to adversely affect" determinations for all of the species.  *Id.* 106301–26.  As explained above, when the relevant Service concurs in an agency's determination that an action is not likely to adversely affect a listed species, that is the end of the consultation process.  50 C.F.R. §§ 402.13(a), 402.14(b)(1).  No further formal consultations are needed.  *See id.* §§ 402.13(a), 402.14(a)–(b).  Because NMFS concurred in BOEM and BSEE's determinations, the Federal Defendants argue that they have satisfied their consultation obligations with regard to the species within NMFS's domain.  *See Gov't Cross-Mot.* 43:24–44:5.

However, Plaintiffs raise three issues with the NMFS consultations.  First, the CBD Plaintiffs argue that the BA submitted to NMFS failed to evaluate impacts to the scalloped hammerhead shark.  *See CBD Mot.* 25 n.4.  However, the Federal Defendants explain that this was merely an oversight.  *See Gov't Cross-Mot.* 44 n.23.  After the agencies realized that the scalloped hammerhead shark had been left out of the BA, they consulted with the National Oceanic and Atmospheric Administration ("NOAA")—the agency that oversees NMFS—and NOAA agreed that WSTs were not likely to adversely affect the sharks because they rarely visit the waters off of Southern California.  *See AR* 106277.  The Court finds that this adequately cured BOEM and BSEE's initial omission of scalloped hammerhead sharks from the BA.

Second, Plaintiffs argue that BOEM and BSEE's consultations with NMFS were not coextensive with the proposal for the use of WSTs in the Final EA because the NMFS concurrence letter purportedly conditioned the agency's concurrence on the assumption that no more than five WSTs would take place each year.  *See EDC Mot.* 24:18–22.  However, Plaintiffs misread the NMFS letter.  While the letter states that BSEE "expects to review and approve . . . up to 5 well stimulation treatments," NMFS did not explicitly condition its concurrence on no more than five WSTs occurring each year.  *See AR* 106304.  It described the five-WST-per-year number as an expectation, not a hard limit.  *See id.*  Further, it was appropriate for BOEM and BSEE to describe the proposed action as encompassing up to five WSTs per year because that is the projection adopted in the Final EA.  In the event that the agencies propose to approve more

---

[7] Specifically, the agencies made this determination for the blue whale, fin whale, humpback whale, North Pacific right whale, sei whale, sperm whale, Western gray whale, Guadalupe fur seal, leatherback sea turtle, loggerhead sea turtle, green sea turtle, olive ridley sea turtle, green sturgeon, steelhead trout, white abalone, and black abalone.  *AR* 106137.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|-------------------------------------------------------------------------------|

than five WSTs per year, they will undoubtedly have to engage in additional NEPA analysis and further ESA consultations. However, as things stand now, the Court concludes that the consultation with NMFS adequately reflected the scope of the proposed action.

Finally, Plaintiffs complain that the BAs submitted to the Services did not evaluate the potential impacts of a large-scale oil spill, excluded other types of acid use that may affect listed species, and ignored indirect effects that could be caused by extending the life of aging infrastructure. *See EDC Mot.* 14:1–10; *CBD Mot.* 25 n.4. While NMFS's concurrence letter, agreeing with BOEM and BSEE that the use of WSTs is not likely to adversely affect listed species, is subject to judicial review, Plaintiffs do not challenge that concurrence here. Instead, they allege that BOEM and BSEE failed to *initiate* consultations. *EDC Compl.*, Dkt. # 1, ¶¶ 242–51; *CBD Compl.*, CV 16-8473, Dkt. # 1, ¶ 117. While the Court previously left open the possibility that it could order the agencies to prepare more complete Biological Assessments, *see July 14, 2017 Order*, after further briefing—and after reviewing NMFS's concurrence letter, which was issued after the Court's previous order—the Court does not believe that such relief is appropriate here. This is not a situation where the agencies submitted sham BAs in an attempt to moot Plaintiffs' consultation claims. Instead, the BAs contain a thorough analysis of the effect of WSTs on listed species. While Plaintiffs may believe that the agencies failed to consider some important factors, the Court concludes that these arguments are more appropriately raised in a challenge to NMFS's concurrence letter rather than through their current claims for failure to *initiate* consultation.

Accordingly, the Court finds that BOEM and BSEE adequately initiated and completed consultation with NFMS, subject to Plaintiffs' timeliness argument which is discussed below.

### 2.    FWS Consultations

BOEM and BSEE submitted a BA to FWS that analyzes the effect of WST use on listed species within FWS's purview. *See AR* 106023–111. The agencies found that WST use would have "no effect" on the California condor, California Ridgway's rail, and California sea-blite. *See id.* 106035–38. They further found that WSTs may affect, but were unlikely to adversely affect, the short-tailed albatross, Hawaiian petrel, light-footed Ridgway's rail, marbled murrelet, California red-legged frog (and its critical habitat), tidewater goby (and its critical habitat), and the salt mark bird's beak. *See id.* 106038–39, 106081. But BOEM and BSEE found that the Western snowy plover (and its critical habitat), California least tern, and Southern sea otter *were* likely to be adversely affected in the event of an oil spill. *See id.* 106081. Because the agencies concluded that WSTs were likely to adversely affect some of the species, they asked FWS to engage in formal consultation. *See* 50 C.F.R. §§ 402.13(a).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|-------------------------------------------------------------------------------|

On July 28, 2017, FWS responded with a letter asking BOEM and BSEE to provide more information before formal consultation began. *See AR* 106294–98. Specifically, FWS asked the agencies to confirm the scope of WST use, elaborate on how artificial lighting and noise would be used, and provide further information about oil spill scenarios and the discharge of WST chemicals. *See id.* FWS informed the agencies that it would not begin formal consultation until it received either the requested information or a statement explaining why that information could not be made available. *See id.* 106298. While the Federal Defendants represent that they are "actively working with FWS to address its needs for completion of the reinitated consultation," *see Gov't Cross-Mot.* 47:12–14, they were unable to provide any additional information at the hearing as to where things currently stand.

Plaintiffs argue that this impasse means that the agencies have not adequately initiated consultation with FWS. To the extent they complain about omission of certain factors from the BA, the Court finds—as explained above with regard to the NMFS—that these arguments are better made in a challenge brought after the consultations are completed. The same goes for the EDC Plaintiffs' argument that the agencies arbitrarily concluded in the Final EA that the use of WSTs would have "no effect" on the North Pacific right whale, short-tailed albatross, and Hawaiian petrel. *See EDC Mot.* 24:24–25:13. While it is perhaps understandable that they brought this claim in their complaint given that BOEM and BSEE had not yet begun any consultation with the Services at the time, the agencies have now prepared and submitted BAs to the Services that address the "no effect" findings. The Court agrees with the Federal Defendants that complaints about the "no effect" determinations should be brought as challenges to the results of the consultation process.

The EDC Plaintiffs do make one argument that is specific to the consultations with FWS. They argue that the BA submitted to FWS by the agencies did not constitute an initiation of consultation because FWS responded by requesting additional information. *See EDC Mot.* 24:12–14. However, the regulations define informal consultation as "all discussions, correspondence, etc. between the Service and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13. It is clear under the plain language of this definition that the BA the agencies submitted to FWS commenced informal consultation because it was "correspondence" designed to assist the agencies in determining whether formal consultation was required. *See id.* In other words, contrary to Plaintiffs' contention, informal consultation has already begun.

However, unlike with NMFS, the agencies' consultation with FWS has not yet been completed because FWS is waiting for additional information before beginning the formal consultation phase. *See AR* 106298. The Court addresses below whether this merits judicial intervention.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

### c. Timeliness

As discussed above, the Court has concluded that the agencies have commenced informal consultation with FWS and have commenced and completed consultation with NMFS. However, these consultations did not begin until after BOEM and BSEE issued the Final EA. The CBD Plaintiffs argue that these after-the-fact consultations cannot cure the agencies' initial failure to consult because the ESA requires consultations to take place *before* an agency takes an action that may adversely affect a listed species. *See CBD Mot.* 25:13–22.

The ESA does not explicitly provide that consultations must occur before an agency action takes place. *See* 16 U.S.C. § 1536(2).[8]  In support of their argument that consultations must precede the agency action, the CBD Plaintiffs rely on the Ninth Circuit's decision in *Natural Resources Defense Council v. Houston*, 146 F.3d 118 (9th Cir. 1998).  In *Houston*, an agency executed water contracts before completing consultations with the Services about whether the contracts would adversely affect the winter-run chinook salmon.  *See id.* at 1126–27. After the contracts had been executed, FWS issued a BiOp concluding that the contracts would not jeopardize the existence of the salmon.  *See id.* at 1128.  The agency argued that this subsequent BiOp mooted any claims based on their failure to consult before the contracts were executed.  *See id.*  But the Ninth Circuit disagreed.  *See id.* at 1129.  It found that the plaintiffs had still suffered a procedural injury because if the BiOp had been issued before the contracts were executed, the agency and the FWS would have had more flexibility to modify the contracts to take conservation recommendations into account.  *See id.*

However, the Court does not read *Houston* to mandate that consultations take place before an agency action in all circumstances.  In *Houston*, the Ninth Circuit focused on the fact that the agency had made a "irreversible and irretrievable commitment of resources" before consultations were completed.  *See id.* at 1128; *see also* 16 U.S.C. § 1536(d) ("After the initiation of consultation . . . the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures.").  It cited this factor in distinguishing *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724 (10th Cir. 1997), where the Tenth Circuit held that informal consultation that took place after an agency action mooted an ESA claim based on a lack of consultations.  *Houston*, 148 F.3d at 1128; *see Smith*, 110 F.3d at 728 ("An injunction ordering consultation is no longer

---

[8] The statute reads "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agemcy . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(2).

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

warranted.  There is no point in ordering an action that has already taken place.").  The Court finds it significant that the Ninth Circuit distinguished *Smith* on its facts rather than categorically foreclosing the possibility that later consultations could cure an initial failure to consult.  Accordingly, the Court interprets *Houston* to hold only that an agency cannot cure an earlier failure to engage in consultations after it has made an "irreversible and irretrievable commitment of resources," and to leave open the possibility that after-the-fact consultations can cure an ESA violation when no such commitment of resources has been made.

The Federal Defendants suggest that the agencies would have made an "irreversible and irretrievable commitment of resources" had they proceeded with issuing WST permits. *See Gov't Cross-Mot.* 45:1–5.  Had this occurred, they concede that it is possible that an initial failure to consult could not be cured by post-hoc consultations.  *See id.*  However, because no permits have been issued, Defendants argue that they can still cure any violation because there is time for the consultations with the Services to alter the final plan before resources are irreversibly committed.  *See id.* 45:6–20.  For example, BOEM and BSEE could incorporate feedback and recommendations from the Services into their permitting decisions.  *See id.*

The Court is persuaded by the Federal Defendants' argument.  While it perhaps would have been prudent for BOEM and BSEE to consult with the Services before issuing the Final EA, the agencies have not yet passed the point of no return.  Before any resources have been irreversibly or irretrievably committed, they have begun (and in the case of NMFS, completed) the required consultations.  Accordingly, the Court rejects the CBD Plaintiffs' argument that the agencies' initial failure to consult cannot be cured by the consultations that began in March 2017.

Because the NMFS consultation has been completed, the Court finds that the agencies' initial failure to consult with NMFS has been cured.  Accordingly, the claim based on a failure to consult with NMFS is now **MOOT**.  *See Smith*, 110 F.3d at 728.   However, because the agencies' consultation with FWS is ongoing, the remains a live controversy with regard to that consultation.  Therefore, the Court will proceed to analyze whether Plaintiffs are entitled to relief on this claim.

> d.     *Remedy*

In their complaint, the EDC Plaintiffs ask the Court to:

•     Declare that Defendants have violated the ESA by failing to initiate consultation with respect to all listed species that may be present;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

- Declare that Defendants have violated the ESA, and its implementing regulations, by making unlawful "no effect" determinations.

- Enjoin Defendants from issuing Permits (to Drill or Modify) for well stimulation treatments, until and unless Defendants comply with the ESA and all other applicable laws.

*EDC Compl.* at 72.  In a similar vein, the CBD Plaintiffs ask the Court to:

- Declare that the agencies violated the procedural and substantive provisions of Section 7 of the ESA, and order them to initiate or reinitiate consultation.

- Prohibit the agencies from authorizing offshore fracking and other well stimulation practices until they comply with the ESA.

*CBD Compl.* at 33.  As explained above, the Court concludes that the CBD Plaintiffs' "no effects" claim must be brought in a separate challenge at the completion of the consultation process.  And the claims based on lack of consultation with NMFS are now moot.  That leaves only Plaintiffs' claims for declaratory and injunctive relief with regard to the agencies' failure to consult with FWS before issuing the Final EA.

Declaratory relief on this claim is certainly appropriate.  As the Court has explained, the ESA required the agencies to consult with FWS before issuing the Final EA, and they did not do so.  Further, this violation has not yet been cured because the belated consultation has not been completed.  Accordingly, the Court turns to the question of whether an injunction is also appropriate.

The general rule is that a plaintiff seeking an injunction must demonstrate that (1) it has suffered an irreparable injury, (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury, (3) that a remedy in equity is warranted, taking into account the balance of the hardships, and (4) that the public interest would not be disserved by a permanent injunction.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).  In *Monsanto*, the Supreme Court held that this "traditional four-factor test" applies when a plaintiff seeks an injunction to remedy a NEPA violation, and the Court assumes that it likewise applies to injunctions sought to remedy ESA violations.  *See id.* at 157.

The Court agrees with Plaintiffs that *Houston* and the ESA itself prohibit the Federal Defendants from approving WST permits before consultation with FWS is complete because doing so would constitute an "irreversible or irretrievable commitment of resources."  16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|------------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|--------------------------------------------------------------------------------|

U.S.C. § 1536(d); *Houston*, 146 F.3d at 1128. After permits have been issued, Defendants' ESA violation can no longer be cured. *See Houston*, 146 F.3d at 1128. The possibility that the Federal Defendants will move forward with approving WST permits before consultation is complete therefore presents a risk of irreparable harm.

However, the Federal Defendants appear to recognize this in their briefs, stating that "an analogous situation [to the execution of water contracts in *Houston*] might be if Defendants had approved [WST permits] allowing the use of WSTs before ESA consultation was completed." *See Gov't Cross-Mot.* 45:1–5. Given this representation, the Court has considered whether an injunction is necessary to ensure that the agencies do not move forward with permitting before the FWS consultation is complete, as it appears that the agencies may voluntarily suspend permitting until that time. However, Defendants have made no clear commitment to this effect, and therefore the Court concludes that it is appropriate to issue an injunction to prevent the irreparable harm that Plaintiffs will suffer if the agencies issue WST permits before ESA consultation with FWS has been completed.

The other *Monsanto* factors also counsel in favor of an injunction. Money damages would be insufficient to remedy the harm caused by the ESA violation. The Federal Defendants seem unlikely to suffer harm from an injunction since it appears that even without an injunction they would await the completion of consultation before proceeding with WST permitting. And the public interest is served by an order ensuring the government complies with the law. Accordingly, the Court will order the Federal Defendants to refrain from approving APDs, APMs, or DPPs for the use of WSTs on the POCS unless and until they complete consultation with FWS under the ESA.

Plaintiffs also ask the Court to order Defendants to begin formal consultation with FWS. But even assuming that this could be appropriate under some circumstances—and there are reasons to think that it is not, *see Gov't Reply* 15:1–12—the Court concludes that it is not necessary in this case, because the injunction prohibiting the agencies from proceeding with permitting until consultation is complete should provide them with a sufficient incentive to complete the consultation. If the agencies drag their feet, they hurt only themselves by prolonging the period in which they may not approve WST permits.

> e.    *Summary*

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motions for summary judgment on their claims that the agencies violated the ESA by failing to consult with FWS before issuing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

the Final EA.  The Court **DENIES** Defendants' motions for summary judgment on these claims.  And the Court finds that the claims based on failure to consult with NMFS are **MOOT**.

The Court **GRANTS** Plaintiffs' request for a declaration that the agencies violated the ESA and further **GRANTS** their request for an injunction.  Defendants are prohibited from approving any plans or permits (APDs, APMs, or DPPs) for the use of WSTs on the POCS unless and until they complete consultation with FWS under the ESA.

C.    Coastal Zone Management Act ("CZMA") Claims

Under federal law, the seaward boundaries of coastal states extend three miles from their coastlines.  *See* 43 U.S.C. § 1312.  The CZMA gives coastal states the right to review "Federal agency activity within or outside the coastal zone that affects any land or water use or natural resources of the coastal zone" for consistency with the state's coastal management programs.  16 U.S.C. § 1456(c)(1)(A); *see California v. Norton*, 311 F.3d 1162, 1167 (9th Cir. 2002).  If a state determines that a proposed federal activity is inconsistent with its coastal management program, it may seek mediation of the dispute or relief in federal court.  *See Norton*, 311 F.3d at 1167.

The California Coastal Commission ("the Commission") is the agency responsible for the planning and management of California's coastal zone, which includes exercising the state's powers under the CZMA.  Cal. Pub. Res. Code § 30330.  The California Plaintiffs allege that BOEM and BSEE violated the CZMA and associated regulations by failing to prepare and submit to the Commission a determination as to whether the proposed use of WSTs is consistent with California's coastal management program.  *See California Compl.*, CV 16-9352, Dkt. # 1, ¶ 67; *California Mot.* 24:5–25:20.

Defendants do not dispute that the agencies failed to submit a determination to the Commission for review.  Instead, they argue that BOEM and BSEE have not yet taken any "federal agency activity" within the meaning of the CZMA and therefore have not triggered the consistency review requirements.  *See Gov't Cross-Mot.* 49:19–24; *API Cross-Mot.* 11:6–17:14; *see also* 16 U.S.C. § 1456(c)(1)(A).

    *i.*    *Applicability of § 1456(c)(1) of the CZMA*

The California Plaintiffs are suing under Section 1456(c)(1) of the CZMA.  *See California Compl.* ¶ 67.  This section provides that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A). The regulations implementing the CZMA define "Federal agency activity" as follows:

> The term "Federal agency activity" means any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities. The term "Federal agency activity" includes a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities when coastal effects are reasonably foreseeable, e.g., a Federal agency's proposal to physically alter coastal resources, a plan that is used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone. "Federal agency activity" does not include the issuance of a federal license or permit to an applicant or person (see subparts D and E of this part) or the granting of federal assistance to an applicant agency (see subpart F of this part).

15 C.F.R. § 930.31.

However, an agency action is not necessarily reviewable under § 1456(c)(1) of the CZMA—the provision Plaintiffs invoke here—just because it falls within the regulatory definition of "Federal agency activity." Section 1456(c)(3) of the CZMA provides for a separate consistency review of federal licenses or permits. *See* 16 U.S.C. § 1456(c)(3); *Norton*, 311 F.3d at 1170. Sections 1456(c)(1) and 1456(c)(3) are "mutually exclusive." *Norton*, 311 F.3d at 1170; 16 U.S.C. § 1456(c)(1)(A). If a federal agency activity can be reviewed under § (c)(3), it cannot be reviewed under § (c)(1).[9] Therefore, in order to be reviewable under § (c)(1), an agency action must both qualify as a "Federal agency activity" under the regulatory definition and fall outside the scope of the permit and license review of § (c)(3).

### a. *Federal Agency Activity*

The Court first addresses whether BOEM and BSEE engaged in "Federal agency activity." The definition in the regulation is broad by its own terms and has several provisions that are directly relevant to the action at issue here. *See* 15 C.F.R. § 930.31. It states that federal agency activity means "any functions performed by . . . a Federal agency in the exercise of its statutory duties." *Id.* The Final EA appears to satisfy this criterion in that it highlights BOEM and BSEE's obligations under the Outer Continental Shelf Lands Act in explaining why the agencies have prepared the report. *See AR* 106633. The definition of federal agency activity also states that it includes "a range of activities where a Federal agency makes a proposal for

---

[9] Federal agency activity that is reviewable under § 1456(c)(2) is also not reviewable under § 1456(c)(1), but that provision is not at issue in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

action initiating an activity or series of activities when coastal effects are reasonably
foreseeable," for example, "a plan that is used to direct future agency actions." 15 C.F.R. §
930.31. The Final EA appears to fall into the category of "a plan that is used to direct future
agency actions," because it charts the course that the agencies will follow in evaluating requests
for WST permits.

But the Federal Defendants disagree. Similar to their position with regard to the NEPA
claims, they argue that the Final EA is not an "activity," "proposal," "plan," or "proposed
rulemaking" but rather a bare NEPA analysis divorced from anything that could be described as
an agency activity.[10] *See Gov't Reply* 15:22–16:7; *see also API Reply* 1:16–22. However, as the
Court has explained in analyzing both the NEPA and ESA claims, the Final EA reflects a plan
for allowing WSTs on the POCS. It is not merely an abstract analytical document unmoored
from any proposed action. It therefore falls within the regulatory definition of "Federal agency
action."

Intervenor Defendant API argues that the WSTs themselves are the only things that will
have coastal effects. Because they will be performed by private companies, API argues that they
are not "functions performed by or on behalf of a Federal agency," and therefore are not Federal
agency activity within the meaning of the CZMA. *See* 15 C.F.R. § 930.31. But the Court
disagrees with the underlying premise. The regulation makes clear that the term "Federal agency
activity" encompasses a "proposal for action initiating an activity or series of activities when
coastal effects are reasonably foreseeable," including a plan that is used to direct future agency
actions. *See id.* It is "reasonably foreseeable" that the agencies' decision to move forward with
considering WST permits will have coastal effects. Accordingly, the Court concludes that
BOEM and BSEE have taken "Federal agency action" within the meaning of the CZMA.

> b.     *Whether the Agency Action Falls Under § 1456(c)(3)*

As explained above, even though the agencies took "Federal agency activity," their
actions cannot be reviewed under § (c)(1) if they are separately reviewable under § (c)(3).
Different from § (c)(1), which applies to federal agencies, § (c)(3) requires license and permit
*applicants* to certify that their proposed activity is consistent with the state's coastal management
programs. *See* 16 U.S.C. § 1456(c)(3). The state then has an opportunity to object to the

---

[10] The Federal Defendants appear to acknowledge that this argument largely rises and falls with
their argument that the agencies have not yet taken major federal action under NEPA. *See Gov't
Cross-Mot.* 48:6–9 ("Although this claim is distinct from Plaintiffs' NEPA claims, the NEPA
discussion above is helpful for understanding the CZMA claim. As discussed above, the only
action at issue in these cases is the NEPA analysis itself.")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|
| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. | | |

certification. *See id.* If a state objects, the agency cannot issue the permit unless the Secretary of Commerce overrules the objection or finds that the activity is necessary in the interest of national security. *See id.*

Defendants argue that because the companies seeking WST permits will have to certify under § (c)(3) that their use of WSTs is consistent with California's coastal management program, BOEM and BSEE's proposal for allowing WSTs cannot also be reviewed under § (c)(1), because § (c)(1) and § (c)(3) are mutually exclusive. *See Gov't Cross-Mot.* 49:19–51:1; *API Cross-Mot.* 15:4–17:9. The California Plaintiffs counter that while individual permitting requests may later be reviewed under § (c)(3) of the CZMA, the overarching federal plan to allow WSTs on the POCS is not subject to § (c)(3) review. *See California Reply* 19:15–21:11. Because review under § (c)(3) will address only site-specific activities rather than the proposed action described in the Final EA, they argue that the mutual exclusivity provision does not apply. *Id.*

Both sides rely heavily on the Ninth Circuit's decision in *Norton*, though they disagree about its implications. In *Norton*, the Department of Interior granted "suspensions" of leases for oil production off the coast of California, which had the effect of extending the life of the leases. *See Norton*, 311 F.3d at 1164–65. The state of California argued that this decision was subject to review under the § (c)(1) of the CZMA. *Id.* at 1169. The United States argued that review under § (c)(1) would be duplicative because any activities that took place under the extended leases would be reviewed for consistency under § (c)(3) when exploration plans or DPP's were approved. *See id.* at 1172. In particular, the government focused on a section of the CZMA which provides that after a DPP has undergone consistency review under § (c)(3), the subsidiary licenses and permits needed to carry out the activities provided in the plan are not subject to another round of consistency review. *See id.*; *see also* 16 U.S.C. § 1456(c)(3)(B). From there, it "extrapolate[d] that federal agency activities antecedent and prerequisite to exploration and development and production plans . . . could not logically be subject to consistency review because consistency review occurs once, and once only—at the exploration and [DPP] stage." *Norton*, 311 F.3d at 1172.

But the Ninth Circuit rejected this view and instead agreed with California. *See id.* It found that while the "subsidiary licenses and permits" needed to carry out DPPs may not be subject to consistency review, it did not follow that the lease suspensions were not subject to review under § (c)(1), because the suspensions were not subsidiary to the DPPs. *See id.* It pointed out that Congress had specifically provided that the sales of leases could be reviewable under § (c)(1) even though activities conducted under those leases would also be reviewed under § (c)(3). *See id.* at 1173. From this, the Ninth Circuit found that Congress had "made it clear that the statute does not prohibit consistency review of federal agency activities that are not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

subsidiary to exploration and [DPPs]." *Id.* In sum, it held that "[t]he exploration plan and [DPP] stages are *not* the only opportunities for review afforded to States under the statutory scheme." *Id.* The Court then went on to find that the lease suspensions were subject to review under § (c)(1), noting that "the leases at issue ha[d] *never* been reviewed by California" and that the suspensions "represent[ed] a significant decision to extend the life of oil exploration and production off of California's coast, with all of the far reaching effects and perils that go along with offshore oil production." *Id.*

The Court reads *Norton* to stand for two propositions. First, the CZMA does not prohibit multiple rounds of consistency review for related activities. *See id.* And second, federal agency activities that are "not subsidiary to exploration and [DPPs]" may be reviewed under § (c)(1) even though a DPP, APD, or APM may later be subject to review under § (c)(3). *See id.*

These holdings would appear to doom Defendants' arguments. The agencies' proposal to move forward with allowing WSTs—the activity at issue in this case—does not appear to be subsidiary to a DPP; instead, it is antecedent to review of APDs, APMs, and DPPs for the use of WSTs. But Intervenor Defendant API argues this conclusion is not so obvious after all. *See API Reply* 14:14–18:1. California has previously concurred in DPPs for oil production on the POCS, albeit likely under the assumption that production would use traditional methods rather than WSTs. *See e.g.*, *AR* 48637–47. API argues that this previous concurrence in DPPs means that any APDs or APMs for the use of WSTs will be subsidiary to the previous concurrence. *See API Reply* 15:18–17:9. It contends that California cannot argue that permit requests for WSTs fall outside the scope of the state's previous concurrence until the requests have been submitted. *See id.*

But this argument is too clever by half. Whatever California may have concurred in with regard to past plans and permits for oil production on the POCS, it seems clear that it has not concurred in the use of WSTs. Further, what is at issue in this case is action by the *agencies* to move forward with a proposal for allowing WSTs. In no sense can this agency action be said to be subsidiary to DPPs created by private oil companies. And California certainly has not concurred in this federal proposal for allowing WSTs on the POCS, as the Final EA marks the first time the issue has been comprehensively studied.

Accordingly, the Court finds that regardless of whether individual permits or development plans can later be challenged under § (c)(3) of the CZMA, BOEM and BSEE's proposal for allowing the use of WSTs on the POCS cannot. Therefore, it is reviewable under § (c)(1).

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|---|---|---|---|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|---|---|

*iii. Remedy*

In their complaint, the California Plaintiffs ask the Court to issue an injunction prohibiting the Federal Defendants from approving WST permits until they comply with the CZMA by submitting a consistency determination to the Commission and completing the CZMA review process. *See California Compl.* at 25.

The Court agrees that this injunction is appropriate. Applying the *Monsanto* factors, the Court finds that the California Plaintiffs have suffered an irreparable injury in being denied their right under the CZMA to receive and be given an opportunity to review a consistency determination under 16 U.S.C. § 1456(c)(1). Money damages are ill-suited for remedying this type of violation. And the balance of the hardships appears to tip heavily in California's favor. The Court is separately enjoining the Federal Defendants from approving permits pending the completion of consultations with FWS under the ESA. It is possible that the CZMA process could be completed before the ESA process, in which case Defendants will suffer no additional harm. Further, the Federal Defendants have repeatedly emphasized the fact that operators are only rarely expected to request permits for WSTs on the POCS. *See, e.g.*, *Gov't Cross-Mot.* 27:24–29:4. Accordingly, the Court does not anticipate that an injunction requiring the Federal Defendants to complete the CZMA process before issuing WST permits will substantially interfere with the course of action that the agencies would otherwise take.

Finally, the public interest would not be disserved by issuing an injunction because any interest in proceeding forward with WSTs is outweighed by the interest of the people of the state of California in ensuring that their representatives are afforded their statutory right to review the proposed action for consistency with California's coastal management plan. The Court's conclusion is in line with *Norton* where the Ninth Circuit affirmed the district court's decision to issue an injunction to remedy a CZMA violation. *See Norton* 311 F.3d at 1169, 1178. Accordingly, the Court concludes that an injunction should issue.

For the foregoing reasons, the Court **GRANTS** the California Plaintiffs' motion for summary judgment on their CZMA claims and **DENIES** Defendants' motions for summary judgment on these claims. The Federal Defendants are prohibited from approving any plans or permits (DPPs, APDs and APMs) for the use of WSTs on the POCS unless and until they complete the CZMA process under 16 U.S.C. § 1456(c)(1) for the proposed action described in the Final EA.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-8418 PSG (FFMx) | Date | November 9, 2018 |
|----------|----------------------|------|------------------|

| Title | Environmental Defense Center et al. v. Bureau of Ocean Energy Management et al. |
|-------|-------------------------------------------------------------------------------|

IV.   <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' and Defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part.

On the NEPA claims, the Court **GRANTS** Defendants' motions for summary judgment and **DENIES** Plaintiffs' motions for summary judgment.

On the ESA claims, the Court **GRANTS** the EDC and CBD Plaintiffs' motion for summary judgment with regard to their claims based on the agencies' failure to consult with FWS.  It **DENIES** Defendants' motions for summary judgment on these claims.  The Court finds that Plaintiffs' claims based on the agencies' failure to consult with NMFS are **MOOT** because this consultation has been completed.

On the CZMA claims, the Court **GRANTS** the California Plaintiffs' motion for summary judgment and **DENIES** Defendants' motion for summary judgment.

The Court concludes that injunctive relief is appropriate.  The Federal Defendants are **ORDERED** to refrain from approving any plans or permits (DPPs, APDs, or APMs) for the use of WSTs on the POCS unless and until they (1) complete consultation with FWS under the ESA and (2) complete the CZMA process under 16 U.S.C. § 1456(c)(1) for the proposed action described in the Final EA.

This order closes the case.

**IT IS SO ORDERED**.